UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GEORGETTE FLEISCHER,

           Plaintiff/Petitioner,

    -against-

BARNARD COLLEGE; LOCAL 2110 OF THE
UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
(UAW); and ARBITRATOR RALPH S. BERGER,

          Defendants/Respondent.

-----------------------------------------------------------X

SDNY
2019 NOV 19  PM 4: 23

**19 CV 10738**

**COMPLAINT and PETITION**

Plaintiff/Petitioner Georgette Fleischer ("Plaintiff," "Petitioner," or "Fleischer") respectfully alleges as follows:

1. Plaintiff/Petitioner brings this action to vacate an arbitration opinion and award rendered on August 19, 2019 (the "Opinion & Award") by Arbitrator Ralph S. Berger (the "Arbitrator" or "Berger"), in a matter brought before the Arbitrator by Local 2110 of the UAW ("Local 2110" or the "Union"). In the Opinion & Award, the Arbitrator denied the Grievance brought by Local 2110, and ruled that "The Employer did not violate the collective bargaining agreement when it did not offer Georgette Fleischer an appointment for the 2017-2018 academic year." A copy of the Opinion & Award is attached hereto as Exhibit A.

2. Plaintiff/Petitioner complains that Local 2110 failed in its duty of fair representation when it effected a collective bargaining agreement ("CBA") so weak on job security the bargaining unit is now, little more than two years after the signing of the first contract on April 7, 2017,

half of what it was, and half of the bargaining unit positions that remain have been filled by new faculty, cycled in as former faculty have been cycled out. Local 2110 struck a Faustian bargain in which impressive salary increases—bragging rights for both the Union and Barnard—sold off seniority, facilitating rampant age discrimination (indeed, long-term faculty who had given years of service to Barnard have been most damaged by the contract), and dismantled job security; in this regard, Local 2110 effected a contract that benefits the few and hurts the many: this is not what a union contract is supposed to do. Local 2110 failed in its duty of fair representation when it effected a contract that dismantles Academic Freedom which is available to non-unionized Barnard faculty, thereby disadvantaging bargaining unit members. Local 2110 failed in its duty of fair representation when it retaliated against Fleischer for speaking up for the interests of the Barnard Contingent Faculty ("BCF"), by marginalizing her from the bargaining process, even though she had been elected to the bargaining committee with the most votes, alternately bullying and ignoring her, and colluding with the administration to get rid of her. Local 2110 failed in its duty of fair representation when it failed to direct her, and others fired at the same time, to immediately file complaints for discrimination based on age, union activity, and gender through Barnard's internal procedures, per Article 4, §2 of the CBA; having failed to do so meant that in Fleischer's case her claim for discrimination based on union activity was foreclosed in the arbitration. Local 2110 failed in its duty of fair representation when it undermined Fleischer's fight for reinstatement by deliberately delaying her grievance to prevent her from joining forces in a "class grievance" with colleagues fired at the same time, and delayed her arbitration so it did not even begin until a year after termination and resulted in a negative decision 27 months after termination. Local 2110 failed in its duty of fair

representation when it sabotaged her arbitration by refusing to move from Berger to one of
the other arbitrators after Fleischer presented evidence of Berger's conflict of interest with
Barnard's new union-busting law firm, Jackson Lewis. Local 2110 failed in its duty of fair
representation when it treated Fleischer disparately in comparison to the way it treated fellow
bargaining committee member Richard (Todd) Rouhe, for whom it skipped over Berger to
Daniel Brent, and for whom it conducted a timely arbitration Rouhe won. Local 2110 failed
in its duty of fair representation when it refused to challenge a blatantly dishonest and biased
arbitration Opinion & Award despite Fleischer's numerous pleas to join her and offers to
work as an unpaid paralegal for the Union's lawyer in order to save costs.

3.  Plaintiff/Petition complains that Barnard College ("Barnard" or "the administration")
breached the CBA when it failed to reappoint her after 17 years of dedicated service, no
fewer than four courses per year. Barnard was unable to meet its burden of proof by "clear
and convincing evidence" that Fleischer was fired because her teaching performance was
"unsatisfactory" (CBA, Article 11, §6(f)(1)). Barnard's anti-union animus stains its conduct
from the beginning of the union drive and culminates in its vindictive treatment of Fleischer,
the faculty member who started the union and was most committed, energetic, vocal, and
visible in promoting unionization for the BCF (CBA, Article 4, §2). Barnard trampled on
Fleischer's Academic Freedom and it tramples on the Academic Freedom of all BCF who
would dare to exercise such freedom (CBA, Article 9, §1 and §3). In its drive to arrogate all
decision-making to itself, the Barnard administration brazenly abrogates the basic principles
of the American Association of University Professors (the "AAUP"), Academic Freedom and
Shared Governance.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to §8(b)(1)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §159; §10 of the Federal Arbitration Act, 9 U.S.C. §10 ("FAA"); and §301 of the Labor Management Relations Act, 29 U.S.C. §185 ("LMRA").

5. This Court has jurisdiction over this action pursuant to 29 U.S.C. §185, 9 U.S.C. §10, and 28 U.S.C. §1331.

6. Fleischer, Barnard and the Union reside in and regularly conduct business within the jurisdiction of this Court. Arbitrator Berger conducts business, and may reside, in Brooklyn, New York, but he regularly conducts business within the jurisdiction of this Court. The arbitration took place in New York, New York.

7. Venue is properly laid in this District pursuant to 28 U.S.C. §1391(b).

## THE PARTIES

8. Georgette Fleischer is a writer and adjunct college professor of English and Comparative Literature, who continues to teach intermittently at Columbia University in addition to her 17 consecutive years of service to Barnard. At all times relevant herein, Fleischer has lived and conducted business within this Court's judicial district.

9. Barnard is a not-for-profit educational corporation authorized to conduct business in the State of New York. It operates an elite private undergraduate women's college in New York City, with its principle place of business at 3009 Broadway, New York, NY 10027. Barnard is an employer within the meaning of Section 2(2) of the NLRA. 29 U.S.C. §152(2). Barnard is affiliated with Columbia University but is legally and financially independent of Columbia.

10. The Union is, upon information and belief, an association under the laws of the State of New York, having its principle place of business at 256 West 38th Street, Suite 704, New York,

4

New York 10018. The Union is the exclusive representative of the part-time and certain of
the non-tenure full-time Barnard faculty for the purposes of collective bargaining. The Union
is a labor organization within the meaning of Section 2(5) of the NLRA. 29 U.S.C. §152(5).

11. Ralph S. Berger is a member of the New York State Bar Association and the National
Academy of Arbitrators. He is the first of three arbitrators listed in alphabetical order to be
assigned on a rotating basis to hear arbitrations under the CBA (Article 22, §4, Step Three).
Arbitrator Berger's principle place of business is 60 Remsen Street, Suite 7C, Brooklyn, New
York 11201.

## FACTUAL BACKGROUND

12. Georgette Fleischer received her Master of Fine Arts degree in Writing from Columbia
University's School of the Arts in May 1994, and her Ph.D. in English and Comparative
Literature from Columbia's Graduate School of Arts and Sciences in February 2002.

13. Georgette Fleischer's scholarly interests are in Modernism, and the Comparative European
Novel more broadly. She has numerous publications, including her work on Djuna Barnes's
*Nightwood*, which was published in *Studies in the Novel*, as well as other scholarly and
general audience publications.

14. At or about September 1, 2000, Margaret Vandenburg hired Fleischer to teach in the First
Year English program at Barnard. After Fleischer received her Ph.D., in February 2002, she
was offered an appointment in the First Year Seminar Program, where she was renewed each
year for a total of 12 consecutive years; intermittently she taught another course for English
Majors called Critical Writing (at one time called Literary Theory and Criticism).

15. Fleischer has always been known as a strong academician and a committed and gifted
teacher.

5

16. In Spring 2011 Margaret Vandenburg asked Fleischer to allow outside observers from Yale University and Pomona College to review her First Year English: Women and Culture class. That observation took place on March 24, 2011; Fleischer received a "glowing report" on her teaching. Indeed, upon information and belief, when the Yale reviewer learned from Vandenburg that Fleischer received "pushback" because of her high standards and because her grading is less inflated than her colleagues', he wrote an additional letter in praise of her teaching. When the time would come for the Union to request Fleischer's personnel file, neither the report nor the letter were in it, nor were there reports in it of favorable teaching observations performed in Spring 2004 by Vandenberg and then First Year Dean—now President of Allegheny College—Hilary Link. Improbably the Barnard administration would claim that the documents could not be located. Yet, on January 13, 2015 in an email to Fleischer, soon-to-be new Director of First Year English Wendy Schor-Haim would write that she had read the Yale reviewer's "glowing report" of Fleischer's teaching. Needless to say, Barnard falls short of any industry's standards, including AAUP expectations, in failing to maintain Fleischer's personnel file.

17. During the Academic Year 2012-2013, Fleischer was asked to teach a one-time seminar, on Madame de Lafayette's *Princesse de Cleves*, in the Revisiting the Classics series, which were taught by a mixture of tenure and non-tenure faculty to raise funds from alumnae. Fleischer's seminar was a huge success, and she received commendations from participants, including an alumna who was a trustee of Barnard.

**Barnard's administration changes, and so does its culture**

18. In July 2008 Debora Spar became the seventh president of Barnard, the first change in leadership since Fleischer had started teaching in September 2000. Spar came from Harvard

6

Business School, sat on the Board of Goldman Sachs, and continues to sit on the Board of the

Howard Hughes Medical Center.[1] The culture of Barnard changed markedly. Cost of living

increases for part-time faculty like Fleischer were cut off. Expenditures for publicity and

branding went up.

19. *The New York Times* celebrated the new branding in an article entitled "Making Sure Visitors

Know They're at Barnard, with a B" (September 3, 2014).

20. In May 2011, Sheryl Sandberg of Facebook and *Lean In* fame was Barnard's commencement

speaker.

21. In July 2012, Linda A. Bell became the Provost and Dean of the Faculty at Barnard. Bell is a

labor economist trained at Harvard, whose scholarly interests in gender differentials focus on

executive compensation, or "top women wage earners."

22.  In Spring 2013, Fleischer was asked to teach Critical Writing, a four-credit course and better

remunerated than the three-credit First Year English classes she mostly taught. Unlike when

Fleischer had taught the course before, in Spring 2013 she was underpaid for Critical Writing

at her three-credit course scale. Fleischer's several attempts to rectify the underpayment were

met with increasing hostility. Indeed, then English Department Chair Peter Platt, who had

praised Fleischer's teaching on more than one occasion, threatened to cancel Fleischer's

Critical Writing course for low enrollment (4 enrollees in a 10 cap course). Later Fleischer

would be denied her teaching evaluations with the claim from Provost Linda Bell's office

that teaching evaluations for courses whose enrollment did not meet a certain threshold were

not released on CourseWorks. (CourseWorks is an Information Technology System

maintained by Columbia University which allows faculty to see the enrollment in their

---

[1] Debora Spar resigned from Barnard as of March 2017, in the middle of the Spring semester, in order to become President of Lincoln Center, a position from which she stepped down about a year later. On May 22, 2017, the very day Fleischer was terminated, Sian Leah Beilock was announced as the eighth president of Barnard College.

courses, and a week or two after the end of each semester their anonymous online student evaluations.) However, Fleischer's colleague Andy Lynn had the same enrollment for his Critical Writing course (4 enrollees in a 10 cap course), but unlike Fleischer he was told that cancellation of classes was adjudicated on a "course by course" and "semester by semester" basis, was permitted to access his evaluations through CourseWorks per usual, and was asked to teach the course again the very next semester. Fleischer was never asked to teach Critical Writing again, even though she let it be known that she would love to do so.

23. For 12 consecutive years, Fleischer was appointed and then reappointed to teach one course each year in the First Year Seminar ("FYS") Program. Like Critical Writing, FYS is better remunerated than First Year English because it came with an additional $1500 stipend (now raised to $2000) to compensate for attendance at pedagogy sessions and other additional work necessary to make FYS the memorable First Year Foundation experience Barnard intends it to be. (For instance, Fleischer incorporated theater performances, external lectures, and museum and gallery visits into the syllabus for her course).

24. In February 2014, Fleischer was informed by Vandenburg that though she had recommended Fleischer for reappointment to FYS for Academic Year 2014-2015, Fleischer had been "refused" and that "this [had] never happened before." Preliminarily, Vandenburg was unable to give a reason for the refusal; she cast about and then stated "it's just not a good fit." Fleischer contacted the then Director of First Year Seminar, Elizabeth Hutchinson, and invited her to observe Fleischer's teaching in the classroom and to accept a dossier of teaching materials, including student papers which included Fleischer's comments on them. Hutchinson refused.

25. When pressed for a reason for her nonreappointment after 12 consecutive years, Hutchinson cited complaints that had been lodged against Fleischer by students. Significantly, none of these alleged complaints had been brought to Fleischer's attention, Barnard had kept them from Fleischer so she had no opportunity to rebut them, nor were they used constructively to improve Fleischer's teaching. Equally significantly, when the Union would later receive Fleischer's personnel file, there was no evidence of student complaints other than an email from Provost Linda Bell soliciting follow-up information from an advisor who had verbally shared with Bell, apparently in passing, two First Year students' hearsay expressions of difficulty with Fleischer's course. (From the evidence it appears that the students' intent was not to complain about Fleischer but rather to unload to a sympathetic advisor about how challenging Fleischer's course was.)

26. Because the events outlined in paragraph 24 hereto did not comport with Barnard's procedures as published in its Code of Academic Freedom and Tenure, Fleischer sought to grieve the decision to nonreappoint her to FYS for Academic Year 2014-2015. In early May 2014 Fleischer was called to a meeting with Provost Bell, she thought in order to discuss the timeline for the grievance, only to be told by Bell that she would not get the Faculty Internal Grievance ("FIG") because Fleischer was not "faculty."

**Barnard is challenged by the AAUP and ruled against in State Supreme Court**

27. Fleischer reached out to the national office of the AAUP, which issued a May 16, 2014 letter to Barnard President Spar, stating "We are troubled by the above sequence of events. . . . Regulation 13 of our Association's *Recommended Institutional Regulations* provides that an adjunct faculty member with as many consecutive years of service as Ms. Fleischer had completed at Barnard College should be recognized as having certain basic rights, including

a written statement of reasons for nonreappointment and access to an appropriate grievance process for review of a claim that the adverse decision was based on inadequate or impermissible considerations." The swift but undated response from Spar could best be described as a brushoff.

28. Fleischer was forced to file an Article 78 proceeding in New York Supreme Court, *In the Matter of Georgette Fleischer v. Barnard College* (Index No. 100638/2014). At oral argument, in January 2015, Fleischer was accompanied by her *pro bono* attorney, Arnold Pedowitz, and supporters who wore in solidarity with her badges that read "Barnard Adjuncts Deserve Due Process." Among the supporters was Maida Rosenstein, Local 2110 President, who must have been recognized by Barnard's in-house attorneys, because the support staff at Barnard has been organized under Local 2110 for many years.

29. In April 2015, Justice Alexander W. Hunter, Jr. ordered Barnard to give Fleischer the Faculty Internal Grievance ("FIG"). *The Chronicle of Higher Education* published a write-up on the case, in which Provost Bell registers Barnard's disappointment with the decision.

30. The FIG took place on June 11, 2015. Fleischer was supported by witness-colleagues from the English Department, Linn Cary Mehta, Sonam Singh, and Kate Levin, the latter of whom would leave Barnard at the end of that academic year. The FIG was a complete charade, with the tenure faculty who are appointed, promoted, and salaried by Provost Bell ruling unanimously against Fleischer, recycling the same language Barnard had used in its failed Supreme Court legal filings.

31. Civil rights attorney Patrick DeLince joined Arnold Pedowitz in drafting an age discrimination complaint on behalf of Fleischer against Barnard. Attempts were made to settle the matter, but unsuccessfully. DeLince then filed a complaint on Fleischer's behalf

with the New York City Human Rights Commission. Another attempt to mediate the case took place in August 2017, to no avail. Barnard wanted Fleischer to sign a non-derogatory clause, which she would not do. The case remains in investigation. For that reason, age discrimination was bracketed out of the arbitration under the CBA.

### Fleischer's efforts on behalf of the BCF run afoul of Local 2110

32. By this time, the BCF union drive was well under way, having started quietly well over a year before when Fleischer reached out to Rosenstein at the recommendation of Carl Levine of Levy Ratner, an attorney to whom Fleischer had been referred by the AAUP. (Levine is Rosenstein's attorney on many, if not most, Local 2110 matters.)

33. Indeed, on the afternoon of June 11, 2015, the same day as the morning FIG, Fleischer, Rosenstein, three others who would become members of the BCF bargaining committee: Sonam Singh, Richard (Todd) Rouhe, and Siobhan Burke, a former student of Fleischer's who teaches writing courses through the Dance Department, along with other supporters, hand-delivered petition cards to the National Labor Relations Board (NLRB) at 26 Federal Plaza, New York, New York.

34. Representation hearings followed in June and July of 2015. Fleischer was the only BCF who attended every day of the hearings; she acted as fact-checker for the Union's attorneys, Richard Levy and Carl Levine; she also testified on behalf of the Union.

35. On the other side of the aisle, Provost Bell was the administration's main witness. Wendy Schor-Haim, newly promoted by Bell as Director of First Year English after Vandenburg had "stepped down," attended as one of the leaders of an anti-union campaign, passing up notes to the administration's attorneys, most heatedly during Fleischer's testimony.[2]

---

[2] Schor-Haim would later lie under oath during the arbitration hearing at which she testified on December 13, 2018 that it was only much later that she learned that Fleischer was a leader of the BCF union drive.

36. Starting out, the objective of the BCF campaign was to organize all non-tenure faculty into one bargaining unit. Schor-Haim was part of a group which constituted about a sixth of the originally projected bargaining unit, non-tenure faculty who serve as full-time Lecturers, Associates, and Professors of Professional Practice. The administration or its union-avoidance attorneys from Morgan, Brown & Joy coined a third category of faculty for the purpose of the representation hearings, "reviewed and renewable," in order to argue that their place and function at the college is so different from the mostly part-time other non-tenure faculty that the two groups could not possibly form a community of interest. Part of the anti-union campaign was a website created around the time of the representation hearing and since taken down, in which the "reviewed and renewable" faculty called themselves Barnard full-time non-tenure line faculty members ("BFTNTLF") and on which they attacked the union drive as "a hostile takeover of our faculty group [which] requires a lot of misinformation and even outright lies." Schor-Haim was one of only two faculty members who posted publicly to the site.

37. As the representation hearings concluded, Local 2110 President Maida Rosenstein became anxious that the "reviewed and renewable" faculty's antiunion campaign could derail the BCF project. Fleischer was convinced that the union would carry a clear majority in an election with secret ballots, as she believed that some of the "reviewed and renewable" faculty who had originally signed petition cards—one of whom had *pleaded with* Fleischer that her category be included in the unit ("I don't want to be the only person in my department who isn't protected either by tenure or a union")—would vote in favor of the union during a secret ballot election. In other words, Fleischer believed that those who had changed position—after having signed a petition card in favor of the union, they then signed

the BFTNTLF petition asking the NLRB to remove them from the unit—were 'performing' for the administration in order to stay in its favor, but that when assured of a secret ballot they would again vote in favor of the union. Initially, Singh sided with Fleischer, but then Rosenstein instrumented a conference call for which she had prepared Burke and Mehta to follow her fears and vote in favor of relinquishing the "reviewed and renewable" faculty in return for President Spar's promise that the administration would not interfere with the union election; in that conference call, Singh then folded to Rosenstein's position.[3] Fleischer anticipated that the administration would later use the 'out' of the "reviewed and renewable" faculty as a means to cut the bargaining unit down to size without having to go to the expense and commitment of creating tenure-line positions; that is exactly what has happened. Fleischer was so upset by this outcome, she declined to appear at the NLRB the day the settlement with Barnard was signed, despite a phone call from Rosenstein pleading with her to join them, and in other words, go along with the decision that had been made against her lone dissent. Fleischer was so disappointed by an outcome she was sure would be destructive to the BCF, she resigned from the union drive.

38. In Fall 2015, Singh invited Fleischer to lunch and asked her to come back to the union drive, so that he would not be the only one resisting Rosenstein's autocratic tendencies. Fleischer appreciated Singh's concerns, felt she could contribute meaningfully, and ran for bargaining committee, to which she was elected with the most votes. Fleischer's candidate statement is attached hereto as Exhibit B.

39. Meanwhile, Fleischer learned from Mehta that Rosenstein did not want Fleischer to be on the bargaining committee. Indeed, Rosenstein, who had seen that Mehta could be persuaded to

---

[3] Both Singh and Fleischer had been offered full-time organizing positions by Local 2110 on the BCF campaign, and both had accepted them. Fleischer never assumed the position, however, because she resigned in protest over Rosenstein's settlement with President Spar; Fleischer was replaced by Siobhan Burke, Fleischer's former student.

her position as Fleischer could not, had *asked* Mehta to run for bargaining committee; Mehta had said she would run only if Fleischer were also on the committee. Rosenstein reportedly said she did not want Fleischer on the bargaining committee because "she doesn't know how to compromise."

40. Fleischer reached out to Nuria Quella, a full-time Term Professor in Economics, and asked her to run for the bargaining committee, feeling it important that there be at least one full-time representative and there be at least one faculty member from the social sciences (there were none from the sciences). The other members elected were Singh (English), Burke (Dance), and Rouhe (Architecture).

41. Bargaining committee members were compensated at a rate calculated by averaging each of the five bargaining committee members' per course rate, divided by the number of weeks in a semester; the compensation came out to almost $500 per week before taxes. Over time, Fleischer came to feel increasingly frustrated with how little work the other members of the bargaining committee were doing; there were several campaign moments when Fleischer found she had done more work than all the others combined. Eventually Fleischer came to believe that the bargaining committee was being paid not so much to work as to go along with Rosenstein; as such, Fleischer felt there was an element of corruption entering into the bargaining committee's decisions, especially as over time Fleischer was being voted down three to one on every decision.[4] Fleischer also became discomforted by a sense that bargaining committee members were advocating only for their own benefit and the benefit of the segment of faculty similarly situated as themselves, rather than for the good of the whole

---

[4] Quella left Barnard as of July 2016, because she was offered a multi-year appointment at another institution of higher education and Provost Bell refused to match it, despite the recommendation of Quella's acting chair.

bargaining unit. A comment like "I don't care about the full-time faculty because their conditions are already better than ours" mortified Fleischer, but apparently her alone.

42. Frustrated by the Barnard administration's intransigence at the bargaining table, Rosenstein and the bargaining committee prepared for and took a strike authorization vote in mid-November 2016. Coincidentally or not, the ballot box opened the very day President Debora Spar announced she would resign from Barnard to assume the presidency of Lincoln Center. The strike authorization was successful by a wide margin. Around this time, Fleischer recalls, in a shared taxi ride home, Fleischer asked Rosenstein whether members could be fired for striking, and Rosenstein said no. Fleischer asked why not. Rosenstein responded, "It's illegal." Even at the time, Fleischer noted how uncomfortable Rosenstein was with this question and her reluctant answer seemed forced.

43. In late November or early December 2016, after bargaining for nine or ten months to little avail, Rosenstein had a "sidebar" conversation with Michael Bertoncini, lead attorney from Barnard's new notorious union-busting law firm Jackson Lewis, right after which she suggested to a caucus of the bargaining committee that the proceedings move to "off-the-record" conversations with the other side. Fleischer alone objected, and as had become usual, was voted down. Fleischer then wanted to pick straws to determine which two of the four members would accompany Rosenstein, but Rosenstein, supported by Singh, who voluntarily recused himself, insisted that Fleischer could not go into the off-the-record sessions. At least one of these sessions lasted close to two hours and included Provost Linda Bell piped in by conference call. Here is where seniority and job security were dismantled in the contract, with long-term faculty offered severance payments if they were not reappointed. Returning from that first, most substantial off-the-record session, Rosenstein commented "this is not

going to be a housecleaning"; but of course it has been. Fleischer challenged Rosenstein, stating "I didn't get into this for people to lose their jobs."

44. At a later point during a similar exchange between Fleischer and Rosenstein over the lack of job security, Rosenstein stated that it's better for the administration to create full-time positions anyway and most people would rather not stay where they are not wanted. Rosenstein seemed to be referring to Fleischer.

45. When bargaining resumed in January 2017, tensions were high. The bargaining committee was preparing for a potential strike. Provost Bell called a meeting of the chairs of departments in which she reportedly told them to prepare to replace the contingent faculty should they go out on strike. Reportedly only one chair stood up and said "I cannot believe you would ask us to do that." Fleischer was alarmed to discover the difference between striking over unfair labor practices versus striking for economic conditions: if the latter rather than the former, an employer can permanently replace strikers. The groundwork for a strike based on unfair labor practices had not been laid at all. Fleischer was mortified that Rosenstein and apparently the others on the bargaining committee were prepared to have the membership move forward with the strike without informing them of the risk to their jobs. Fleischer was being increasingly shut out by Rosenstein with help from the others. For instance, a telephone call to Rosenstein from Bertoncini in which he reportedly threatened to permanently replace all the strikers was shared with the bargaining committee minus Fleischer, because it was called at a time Rosenstein knew Fleischer to be unavailable (in class teaching); indeed, the call had taken place and was over before Fleischer even knew it had happened.

46. Rosenstein and the other members of the bargaining committee would not take Fleischer's calls. If there was an email thread and they did not like what Fleischer was saying, they would ignore her email and pick up the thread with the email that preceded hers.

47. Then Rosenstein scheduled the bargaining sessions for the week of February 6 and February 13, 2017 at times she knew Fleischer could not attend. (Fleischer had been the only member who never missed a session.) Fleischer began to explore with Rosenstein and the committee the possibility of recusing herself because, she explained, she could not in good conscience sign her name to the contract that was emerging, which she could see was going to hurt so many BCF.

48. A federal mediator was brought in. Rosenstein returned from a meeting aglow with pages in her hand in which the administration had assented to impressive salary increases. Rosenstein handed the pages to Burke, who along with Singh had been most interested in per-course salary increases. "They moved," Rosenstein effused. Burke held the pages to her breast.

49. The final blow for Fleischer was language added to an already draconian Management Rights clause (CBA, Article 7, §1), ceding to the administration the right "to determine all matters related to student performance, including but not limited to, attendance, grading, and performance measurement"—which dismantles Academic Freedom. Fleischer persuaded Singh to look on the AAUP website to see what it said about grading, namely that it should be the prerogative of the faculty member. Still he went along with everyone else in voting down Fleischer three to one.

50. During these last weeks Fleischer was involved, the Local 2110-bargaining committee group dynamic turned truly ugly. There were at least two strategy sessions in which Rosenstein and the other members of the bargaining committee mocked Fleischer: "stop being apocalyptic,"

Singh snapped in response to Fleischer's concerns about job security. They all laughed at

Fleischer, and Rosenstein and Singh raised their voices at her and harassed her to the point

where she had to tell them to stop or she would have to leave the room. In hindsight,

Fleischer reflects, that is probably what they wanted.

51. On February 13, 2017, seeing she could do nothing further to benefit the BCF, Fleischer

resigned from her paid position on the bargaining committee, hoping that her disruption

would alert the membership to the landmines in the contract that was emerging.

52. Fleischer wrote an OpEd for *The Columbia Spectator* which was 'killed' a few hours before

it was to go live. She distributed the piece, "Keeping Dissent Alive: Why I Will Vote against

the Barnard Contingent Faculty-UAW Local 2110 Contract," to the BCF by email and in

mailboxes as best she could. "Keeping Dissent Alive" is attached as Exhibit C hereto.

53. On March 21, 2017 the ballot box opened on the contract. That same evening Rosenstein and

the remaining members of the bargaining committee held a Town Hall to discuss the

contract, as Fleischer had insisted there be one session more probing than a couple of

"information sessions." Fleischer was the most active in challenging terms and

misrepresentations put forward. Fleischer was dismayed to see that if the union

representative is not elected by the membership, he or she is chosen by mutual agreement

between the Barnard administration and Local 2110 (CBA, Article 21). When Fleischer

raised a concern about the latter being undemocratic and prone to conflict-of-interest, Singh

assured her that there would be an election. There was not; Singh was chosen by mutual

agreement between the Barnard administration and Local 2110, and served as such for two

years.[5] Fleischer also asked about eligibility for voting for the contract, which had not been

---

[5] Since Singh has been fired, Rouhe and Burke are sharing the position, again by mutual agreement between the
Barnard administration and Local 2110. In light of the fact that these positions are well-compensated (this year,

announced in advance, other than the requirement that one sign a union card. As the session
was breaking up, Fleischer pointed out that at least one ineligible person had voted
inadvertently, i.e., had not known the eligibility parameters since they had not been
announced (Tom Waters from Urban Studies, who had not taught in Academic Year 2016-
2017), and Fleischer asked if Rosenstein would make the list of eligible voters available to
her. Rosenstein was seething as she said "I won't let you have it."

54. Thereafter secret ballots (ballot inside a plain envelope, inside another plain envelope with
voter's name written or signed across the seal) were abandoned in favor of loose ballots with
no markings other than a check mark. Fleischer believed the eligible list of voters had been
changed midstream. Fleischer was concerned that the ballot box had been padded after secret
ballots were abandoned (she taught in and was around Barnard Hall a lot during the times the
ballot box was open at the ground floor entrance and she saw very, very few voters).
Fleischer and two friends, Mehta and Liz Abzug from Urban Studies, attended the vote count
to oversee regularity. Burke glared at Fleischer to the point where Abzug remarked on how
"outrageous" Burke's behavior to Fleischer was.

55. Fleischer raised issues with the Local 2110 Board about the ratification vote, and after she
got no reply, asked for a formal hearing per the Local 2110 bylaws. Ella Wind, a friend from
GSOC, the graduate student organizing committee (NYU graduate students, also organized
under Local 2110), attended to support Fleischer and take notes. Fleischer was promised an
investigation and decision by the Local 2110 Board. She never received a decision and
believes there was no investigation. Fleischer added headings to her March 25, 2017 certified
letter to the Local 2110 Board "NO ANSWER FROM LOCAL 2110 EXECUTIVE

---

$27,000), and are paid by the administration, that the Union failed to announce the opening to allow the broader
membership to consider running for it is problematic.

COMMITTEE OR REGION 9A" and to her April 5, 2017 certified letter to the Local 2110

Board "IRREGULARITIES IN BCF CONTRACT RATIFICATION VOTE: SECRET

BALLOT DISCONTINUED, 11 SECRET BALLOTS MISLABELED 'UNDER

CHALLENGE'" and distributed these materials to the BCF membership. These documents

and the skeletal outline of Fleischer's one-hour oral complaint to the Local 2110 Board of

May 10, 2017 are attached as Exhibit D hereto.

56. Two weeks to the day after the first BCF contract was ratified on April 7, 2017, two faculty

members from the Slavic Department who had two years of consecutive service each and

who had been told they were returning in the Fall were terminated. Fleischer learned of their

terminations because she was continuing to organize the BCF, hoping to run a slate for

leadership positions comprised of faculty who were not on Local 2110 payroll as Singh,

Rouhe, and Burke were.

57. At a small gathering on April 27, 2017 in Sulzberger Tower to celebrate the contract,

Fleischer confronted Rosenstein with the Slavic Department terminations. "There's not much

we can do about it," was Rosenstein's response. Fleischer had also done research with an

attorney who specializes in employer- and union-sponsored health insurance and raised the

fact that Local 2110 had not done due diligence in researching the implications of the partial

health insurance benefits, which only a small fraction of the BCF would be eligible for any

way: married faculty with children especially could wind up being worse off under the

contract because, fractional though they were, in most cases requiring faculty to pay the full

cost of premiums, the contract provisions still constituted an offer of health insurance from

an employer, so some faculty could lose their deep discounts on the Affordable Care market.

Rouhe, who is married with children, raised the possibility that one could simply not tell the government.

58. Right up until she was fired on May 22, 2017, Fleischer continued to organize the BCF for a future election which would never take place. To the extent Local 2110 President Maida Rosenstein and the remaining bargaining committee members gathered around her were aware of Fleischer's activities, she would have been seen yet again as an unwanted irritant to be gotten rid of.

**Fleischer's union organizing of the BCF runs afoul of the Barnard administration**

59. The Court will appreciate from background cited above that Fleischer was not in favor with the Barnard administration, which was well aware of Fleischer's activities on behalf of fairness and justice for herself and the rest of the BCF. The Court will also appreciate that in hiring Jackson Lewis, the most notorious union-busting law firm in the United States, the administration had made a conscious and costly decision to "play hardball" with the Union, as Rosenstein put it.

60. On May 3, 2016, Barnard held its annual fund-raising Gala at the Plaza Hotel. Fleischer was instrumental in organizing the event, reaching out to encourage BCF to attend, creating large Scrabble-like signage that spelled out "B C F  U A W/ F A I R  C O N T R A C T," and approaching guests as they entered the red-carpeted steps of the Plaza to offer flyers and testimony of the administration's intransigence at the bargaining table. While Fleischer was holding signage and chanting "Fair Contract Now!" with fellow BCF, Provost Linda Bell approached the entrance with her male companion.

61. September 2016 was the 20-year anniversary of a successful Local 2110 strike over a contract for Barnard support staff. Rosenstein and the bargaining committee commemorated

the event and used it as a means to fire up the BCF about a potential strike over the stalled BCF contract negotiations. In advance of and to serve as an invitation to the Strike Commemoration, Fleischer published a piece in the Labor and Working Class History Association ("LAWCHA") Contingent Faculty Blog entitled "When Unfair Labor Practices Reify, It's Time to Strike" (September 25, 2016) which was posted on the BCF Facebook page and otherwise distributed broadly; the piece was critical of the Barnard administration.

62. Singh did beautiful work on posters and historical photographs for a slide show that ran during the Strike Commemoration, which was held on the Barnard campus in the Diana Center Oval, Barnard's main event space at that time. Burke was supposed to be the speaker but cancelled because she was running late. Fleischer stepped in at the last minute and gave a very well-received speech to the packed event space, in which she urged the BCF to vote yes for strike authorization and urged other Local 2110-organized workers to support the BCF.

63. Around this time, Wendy Schor-Haim called Fleischer to a meeting to discuss concerns she had about Fleischer's anonymous online student evaluations of teaching ("SET"). The meeting took place on September 26, 2016, the day after Fleischer's LAWCHA piece went live. Fleischer brought Maida Rosenstein to the meeting, who was accompanied by Patrick Gallagher, the Local 2110 Guide, with whom Fleischer had done early organizing of the BCF, who took notes. Schor-Haim brought Andrea Stagg, Barnard's Associate General Counsel and the most senior in-house member of Barnard's bargaining team on the BCF contract.

64. Schor-Haim was hostile to both Rosenstein, whom she "snapped at" (as recorded by Fleischer in her notes of the meeting immediately afterward, which notes were put into the

record of the arbitration), and Gallagher, whom she also snapped at closer to the start of the

meeting, because she found the sound of him typing on his keyboard irritating.

65. Schor-Haim and Fleischer were cordial and collegial in their interchanges. Fleischer put

forward two factors she felt should be taken into account in evaluating her students'

responses to the two questions on SET Schor-Haim was most concerned about, "clarity of

grading standards" and "feedback on [student] work." Fleischer believes that the former is a

proxy for grades, and the latter for the readiness of a writing teacher to praise student work.

Grade inflation at Barnard, and particularly in the First Year English, now First Year

Writing, Program, is steep[6]; Fleischer inflates her grades less than her colleagues do, and

praise for student work is reserved for best efforts. Secondly, Fleischer believes she has a

reputation problem that affects her student evaluations, stemming from a former Columbia

student who beginning in the early aughts filled her CULPA pages with lengthy negative

reviews,[7] mostly for courses he had never taken with Fleischer. Fleischer had not been aware

of this activity until it had been going on for eight or nine years, at which point she enlisted

Columbia Campus Safety and the Ombuds Office to help persuade the student administrators

to take down the most extreme and threatening posts and to trim out other material that was

clearly false and defamatory. In an email exchange around the September 26, 2016

counseling session, Fleischer shared with Schor-Haim an article published by the AAUP

which cautions about using SET for evaluating teaching effectiveness, and which proposes

that anonymous online SET can underwrite the kind of bullying one sees from anonymous

---

[6] As Singh put it to Fleischer once, "A- is a bad grade in First Year English." Or as a Columbia Underground Listing of Professor Ability ("CULPA") review of Fleischer's First Year English class once put it, "[Fleischer's] definitely not like some of the newer FYS/FYE professors who missed the whole 'A-pluses don't exist in college' memo and give good grades to anyone with a pulse." Meanwhile one of Fleischer's former tenure colleagues in the English Department, Bill Sharpe, was at one time allowing students to grade themselves.

[7] CULPA stands for Columbia Underground Listing of Professor Ability, an unofficial online site run by Columbia College students which allows anyone to post reviews anonymously; there is no mechanism for checking identity or authenticity.

internet trolls. Regardless, Fleischer was unreserved in her willingness to implement immediately all changes requested by Schor-Haim, which involved being very explicit in conveying multiple times what her grading standards are, and introducing grammar and sentence structure in small segments, only one or two principles at a time, and factoring in Fleischer's grading only those grammar principles she had introduced in class already. In a follow-up email exchange later that same day, Schor-Haim commended Fleischer "for discussing difficult issues with equanimity and open-mindedness"; a few days later when Fleischer ran into Schor-Haim on Broadway, she commended Fleischer again for having embodied "grace under pressure" in their meeting. Beginning at the Grievance Hearing over Fleischer's termination, on August 14, 2017, Schor-Haim would claim instead that Fleischer's attitude in the September 26, 2016 meeting had been defensive; by the time of her testimony at Arbitration, on December 13, 2018, Schor-Haim's revision would have hardened further, in order to make Fleischer's alleged defensiveness in the one counseling session part of a tripartite reason for terminating her.[8]

66. In November 2016, Provost Bell called a Town Hall in the James Room on the fourth floor of Barnard Hall to discuss the BCF union campaign. Singh, Rouhe, and Fleischer attended. Almost all the other attendees were tenure faculty and members of the "reviewed and renewable" faculty, including Wendy Schor-Haim. Bell took the floor and kept the microphone for perhaps 20 minutes. When she finally ceded the microphone, Fleischer came up to the front of the room and spoke into the microphone for about six minutes rebutting numerous misstatements Bell had put forward. Bell then imposed a two-minute limit on any

---

[8] The three prongs of Schor-Haim's pretext for firing Fleischer are: poor responses on SET to two questions dealing with clarity of grading standards and feedback on student work, alleged student complaints, and Fleischer's alleged defensiveness in the one counseling session.

other speaker. Fleischer was the only speaker aside from Bell to come to the front of the room to speak.

67. At the end of the Town Hall, Fleischer and Singh repaired to their shared office. Stacey McMath, a Barnard alumna who had taught for several consecutive years in the Theatre Department, exited the meeting with her department chair, Bill Worthen, and joined Fleischer and Singh in their office next door. McMath had stood up during the Town Hall in order to praise the BCF bargaining committee's efforts. She would become one of the first casualties of the contract when she was fired at the same time Fleischer was, even though the Directory of Classes for Fall 2017 already listed her popular course with around 50 enrollees.

68. As Fleischer watched the devolution of the contract at the beginning of Spring semester 2017, she realized that it was too late for a strike to do any good. Seniority and job security had been given away already; management rights was the broadest Fleischer had seen in any contract. With the blessing of Rosenstein and the other members of the bargaining committee, and with some help from Burke, Fleischer instrumented a letter drive to President Spar urging her to settle the BCF contract before she left Barnard in March; as such, Fleischer started visiting department chairs in order to solicit signatories to the letter. Undoubtedly, the Barnard administration was made aware of Fleischer's activities. In a meeting with then English Department Chair Lisa Gordis, to which Fleischer had invited her friend and colleague Linn Cary Mehta, Fleischer encountered arctic coldness. Attempting to be collegial, Fleischer supplied Gordis with the current language which demonstrated that department chairs were losing none of their discretionary powers under the contract. Right after their meeting with Gordis, Fleischer conveyed to Mehta her concern that she, Fleischer, could lose her job. Mehta replied that if that happened, she would help Fleischer find an

office job. Fleischer objected. She had spent more than a decade in graduate school at Columbia, was still saddled with mammoth student loan debt, and it seemed cruel to have the career to which she was committed and for which she had made such sacrifices ended against her will.

69. In April 2017, Fleischer published a piece in *International Labor and Working-Class History* entitled "Come Together, Right Now/Over Me, Over You, Over Us: When Corporatization Comes to College, Faculty Unionization Must Follow." As stated at the end of the article, Fleischer's aspiration was for tenure faculty to recognize that they share a greater community of interest with their contingent colleagues than with administrators, and ultimately to join together in a wall-to-wall union, as is already the structure in some public institutions of higher education. Like Fleischer's earlier "When Unfair Labor Practices Reify, It's Time to Strike" from September 2016, the April 2017 piece was posted publicly to the BCF Facebook page, where it undoubtedly did little to endear Fleischer to the Barnard administration.

**Fleischer is fired, along with many others**

70. After the September 26, 2016 counseling session with Schor-Haim and a few email exchanges preceding and following it, Schor-Haim did not communicate with Fleischer at all about her teaching. Fleischer attended every scheduled pedagogy session and participated enthusiastically; she even attended a non-required joint pedagogy session with First Year Writing (as First Year English has been called beginning in Academic Year 2016-2017) and First Year Seminar, and contributed substantially to the discussion. Schor-Haim responded supportively to a concern Fleischer raised during the discussion. There was no indication that anything was amiss.

71. Fleischer recalls an encounter with Schor-Haim in the stairwell of Barnard Hall about two-thirds of the way through Spring 2017 semester, when the first drafts of Fleischer's students' research papers had been due. Fleischer had been disappointed that a third of her students had not handed in the first, ungraded draft of their essays; this had never happened to Fleischer before, though she had certainly noticed that students' performance had become increasingly frayed over time with respect to meeting deadlines and completing work. Fleischer shared this experience with Schor-Haim, with whom she had always had cordial relations. Schor-Haim responded supportively and shared with Fleischer that she herself had come to a class of 15 enrolled students to find only eight attending that day, and had thought, "this is not optional"—meaning, attendance. Schor-Haim shared with Fleischer that she had advised her daughter not to apply to Barnard because of this trend over which they had commiserated.

72. Schor-Haim had never taken up Fleischer on her January 2015 offer to observe her class, nor had she taken up Fleischer's September 2016 offer to share with her student papers with Fleischer's comments on them. Fleischer had never received any feedback on the one paper Schor-Haim had requested in December 2015 of all First Year English faculty, nor to Fleischer's knowledge had anyone else. In the January 2015 email exchange during which Fleischer had congratulated Schor-Haim on her new position and invited her to observe Fleischer's class, Schor-Haim had written that she had read the Yale reviewer Alfred Guy's "glowing report" on Fleischer's teaching, and added "My own interactions with you over the past several years have made it clear to me that you're a creative and dedicated teacher, and I'm looking forward to getting your feedback on the curriculum when the time comes." This material was put forward during the arbitration as Union Exhibit 17.

73. In May 2017 Schor-Haim called Fleischer via email to a meeting to discuss "staffing" for Academic Year 2017. Fleischer did not think she was going to be fired; rather she anticipated that her teaching load of four courses per year might not be maintained and that there might be choices to be made around that scheduling. Fleischer was aware that Mindy Aloff, an equally long-term faculty member who taught literature and writing classes through the Dance Department, and who had also taught no fewer than four courses a year, had had her course load cut in half, had been given a choice about when the two, rather than four, courses would be scheduled, and had elected to teach both courses in one semester and to take the other semester off. Aloff had run but not been elected to the BCF bargaining committee; like Fleischer, she had put out a public candidate statement.

74. When Fleischer arrived at Schor-Haim's office on May 22, 2017, she was surprised to see Robin Beltzer from the Human Resources Department in the hallway looking lost. Fleischer offered to direct Beltzer, having no idea that she was there in order to be part of the firing of Fleischer. Only when Fleischer was invited into Schor-Haim's office and saw Andrea Stagg already in there did she realize something was amiss.

75. Schor-Haim began the meeting by stating that she was going to cut to the chase because "this is hard." She then informed Fleischer that she was not being reappointed. Initially Schor-Haim cited only the reduction of part-time faculty in order to convert to full-time positions out of the bargaining unit, to full-time Lecturers, three of whom had been hired for Academic Year 2017-2018.[9] Then Fleischer asked the reason it was she who had been eliminated as opposed to any other of the 17 part-time First Year Writing faculty from Academic Year 2016-2017; Fleischer did not state the obvious, which is that Fleischer was the faculty

---

[9] Fleischer had applied for one of the full-time Lecturer positions; on information and belief, she was the only internal candidate who was not interviewed and hired.

member in the First Year Writing program with the most seniority and who had shouldered the heaviest teaching load. Schor-Haim cited "really only two questions" on Fleischer's anonymous online teaching evaluations, clarity of grading standards and feedback on student work; as an afterthought, she glancingly referred to student complaints. Fleischer examined the termination letter and the broad waiver attached to the severance pay. Fleischer said to Schor-Haim that she did not know if Schor-Haim knew that Fleischer had an open age discrimination complaint against Barnard before the New York City Human Rights Commission and would not be able to sign the waiver. Brief discussion followed with Beltzer about whether taxes could be deducted from the severance. Stagg had chimed in that the language of the waiver was negotiable; however, when Fleischer's civil rights attorney Patrick DeLince offered alternative language later, the administration would flat-out reject it.

76. The following morning Fleischer sent a scathing email to Rosenstein, Singh, Burke, and Rouhe stating that they and their contract had done for the Barnard administration what it could not do for itself and lambasting them in general for recklessness with other people's lives.

77. In her email response Rosenstein purported to be hearing of Fleischer's termination for the first time. She expressed no surprise, however.

78. One of the most grievous failures of Local 2110's duty of fair representation is that it did not immediately direct every post-probationary terminated faculty member to file internal complaints for discrimination. There were many claims that could have been made for age discrimination and for union activity (CBA, Article 4, §1). The reason this placeholder is so crucial is that the language of §2 of Article 4 of the CBA states that such claims "shall be handled through the procedures available to all members of the College community, except

29

that if the Union is dissatisfied with the final outcome of the College's review of a Unit

Member's claim of discrimination or harassment, the Union may file a demand for arbitration

in accordance with Article 22 – Grievance and Arbitration Procedure alleging that the

College violated Section 1 of this Article." That neither Rosenstein nor her attorney Carl

Levine acted on this imperative is inexcusable. It is the reason the Fleischer arbitration claim

for union animus under Article 4 failed, and it is likely dispositive to the final outcome

against Fleischer. Had Berger been forced to consider union animus he might not have felt he

could get away with ruling in favor of the administration. Whether in this failing Rosenstein

and/or Levine were negligent or acting out of malice toward Fleischer will need to be

adjudicated by the Court. It is possible, too, that Rosenstein embodied the proverbial

'banality of evil': thoughtlessness out of indifference to suffering caused to others by such

thoughtlessness.

79. Within a few days of her own termination, Fleischer would learn that Liz Abzug, an even

more long-term faculty member who also had taught no fewer than four courses a year, had

been terminated; like McMath's, Abzug's Fall 2017 courses were listed in the Directory of

Classes with teeming enrollments. Abzug had contributed substantially to the union effort:

she was one of the first to put her name on a tear-off sheet with the petition cards, i.e., to go

public with her support of the union; Abzug had served as a speaker at a Teach-In event held

in front of the Diana Center, at which Fleischer and Burke had also been speakers; and

Abzug had been the speaker at the aforementioned BCF demonstration in front of the Plaza

Hotel on May 3, 2016 during Barnard's annual fund-raising Gala.

80. It took some time for Fleischer to learn from Abzug that Barnard had changed its mind about

Mindy Aloff, and instead of cutting her course load in half as originally planned, the

administration had terminated her altogether. Fleischer, Aloff, and Abzug, all of whom had given close to 20 years of service to Barnard, no fewer than four courses per year, were arguably most damaged by the contract. In all three cases, the terminations have meant the end of substantial teaching careers.

81. Fleischer believes that a better outcome for these three very long-term terminated faculty would have resulted had Local 2110: 1) immediately filed discrimination complaints for age and union activity and gender through Barnard's internal mechanisms: grievance and arbitration on those counts under the CBA would not then have been foreclosed; 2) not deliberately delayed a meeting Rosenstein promised to call among them and the other terminated faculty to explore Fleischer's desire for a class grievance. For instance, Rosenstein had conveyed to Fleischer that McMath was open to the meeting, and Abzug had communicated to Fleischer her interest.

82. The other post-probationary faculty terminated, in addition to alumna Stacey McMath from Theatre,  were David Parker from Dance and Thomas Kamber from Urban Studies. Even at that time, Fleischer proposed that these younger but still in the protected age category male faculty were collateral damage, chosen in order to protect Barnard from a gender discrimination suit. There was a seventh post-probationary faculty member fired at the same time whose identity Fleischer has never been able to learn. Rosenstein would not tell Fleischer who it was. Certainly Rosenstein acknowledged the blatant age discrimination apparent in the post-probationary faculty fired.

83. The losses to the bargaining unit in the little more than two years since the contract was signed are massive. Based on an informed analysis, Fleischer claims that the bargaining unit is only 53 or 54% of what it was. Of the 179 BCF teaching in Fall 2016, only 46 remain in

Fall 2019. In addition, 15 have been converted into positions outside the bargaining unit, with only two of those being tenure-track positions (one other position converted to tenure-track involved a faculty member who has since left Barnard). Fifty new faculty have come in to replace faculty who were teaching in Fall 2016 but are no more. The most notable losses are to the First Year Writing program.[10] In Academic Year 2016-2017, there were 17 part-time faculty including Fleischer. In Academic Year 2019-2020, there are four, and those are likely to be eliminated soon with the addition of another full-time line outside the bargaining unit. That the unionizing effort started among faculty teaching First Year English suggests that this draconian change is motivated by antiunion animus. More so does the fact that going into this academic year, Sonam Singh, the union representative, was terminated. Fleischer reached out in solidarity and offered to help Singh, including by bringing her daughter to any protests he might organize, but according to Rosenstein during her conversation with Fleischer at the September 9, 2019 Labor Day Parade, Local 2110 negotiated "a nice [severance] package" for Singh, and he seems to be "moving on," which is what any terminated faculty should do, according to Rosenstein.

84. Because the decimation of the bargaining unit would invite negative publicity for both the administration and the Union, it is being suppressed. Indeed, the Union put out a statement in which it describes Singh as 'moving on to other things' rather than referring to a termination.

85. In the second half of 2019 communications to the membership came to a standstill for months, emails to Rosenstein were not returned, and as Fleischer writes this there has been no posting to the previously active BCF Facebook page in two-and-a-half months.

---

[10] Though Architecture, Art History, Biology, and Economics are reduced to half or a third or even less, while Dance, French, Psychology, and Theatre have been reduced to about three-fifths of their 2019 contingent faculty.

### Local 2110 frustrates Fleischer's fight for her job

86. Terminated after 17 years of committed service to Barnard, Fleischer received much sympathy, support, and solidarity, just not from Local 2110.

87. Well over a hundred unique letters, informed, fact-checked, thoughtful, heartfelt, and well written, flowed into the Barnard president's office. The letters came from colleagues, former students, Barnard alumnae; AAUP members, chapters, and state conferences; other faculty bargaining units under Local 2110: the Graduate Workers of Columbia ("GWC") and the Graduate Student Organizing Committee ("GSOC") , NYU graduate students; other New York State unions, including various chapters of the City University of New York ("CUNY") and State University of New York ("UUP") President Fred Kowal; California Scholars for Academic Freedom; editors of *Labor and Working Class History*, and Fleischer's editor at *International Labor and Working Class History*; New York City and State elected representatives, including Debora Glick, Chair of the Higher Education Committee for New York State, and Fleischer's New York State Assemblywoman Yuh-Line Niou. Fleischer's U.S. Representative Jerrold Nadler sent his New York Chief of Staff to deliver remarks in support to a September 12, 2017 Counter-Convocation Fleischer organized in front of Barnard gates: Nadler's statement was that he looks for good faith from Barnard, and he did not see it here, with the firing of a block of contingent faculty, including one of his constituents. After Fleischer's unfair labor practice charges against Barnard were dismissed by an Acting Regional Director of the NLRB, both of Fleischer's U.S. Senators, Kirstin Gillibrand and Charles Schumer, wrote the NLRB National Office to ask why.

88. Press that covered Fleischer's termination and the protests she organized against it was uniformly sympathetic: pieces appeared in *Inside Higher Education*, *The Columbia*

*Spectator*, bwog.com (a Columbia student blog), Paul DeRienzo's *Let Them Talk*,

dnainfo.com, *The Harlem Bee*, the blog of the New York State Conference of the AAUP,

*Academe Blog* (the national publication of the AAUP), and *Politico* (a piece written by

Barnard alumna Madina Touré).

89. After Fleischer was fired on May 22, 2017, she had a meeting with Rosenstein and Rouhe at

the Local 2110 office. Rouhe, to his credit, at least gave Fleischer a hug of sympathy.

Rosenstein was unclear as to what if anything could be done for Fleischer in light of the

contract but initially was thinking along the lines of preserving Fleischer's severance pay

while still challenging the decision. Fleischer would wind up getting nothing.

90. On May 30, 2017, Fleischer met with Rosenstein and her attorney Carl Levine at the offices

of Levy Ratner. Fleischer came prepared with a dossier of printed material, none of which

she gave to Rosenstein and Levine because she left the meeting frustrated by their responses,

from which she concluded that they did not want to do anything to help her. Rosenstein

followed up with an email, and discussions between Fleischer and Local 2110 resumed.

91. From the beginning Fleischer made it unequivocally clear that the best thing Local 2110

could do for her would be to proceed as quickly as possible on challenging her

nonreappointment. By that time, Fleischer had plenty of experience with the Barnard

administration and knew that delay is its favorite tactic (passive-aggressive, maddening, costs

nothing) and that delay always works to the administration's advantage.

92. In a second meeting with Rosenstein and Levine, on June 5th, they mutually agreed to file a

grievance under the CBA at Step 2, in order to move as quickly as possible and in order to

make it possible to do a "class grievance" with other of the BCF who had been fired at the

same time, should they choose to join in. After Fleischer left the Levy Ratner offices, Rosenstein filed the grievance at Step 1. Fleischer only found out later that she had done so.

93. Rosenstein also delayed the promised meeting with the other terminated BCF, for many weeks, by which time the others had almost all gone their own way with accepting the severance. Fleischer believes that Rosenstein deliberately delayed in order to take the wind out of Fleischer's sails with respect to a collective action, because Rosenstein did not want such an action. Indeed, her conduct suggests that she wanted the terminated faculty to go away as quickly and quietly as possible, because these terminations are an embarrassment to Local 2110 and its BCF contract.

94. First Rosenstein held out the possibility of a "July" arbitration, then "probably not before October." Starting on April 25, 2018, nearly a year after termination, was a shock and outrage.

95. Rosenstein blamed the delays entirely on the administration. However, if one goes through the evidence with a comb that does not need to be very fine-toothed, one sees that it was Rosenstein who caused the delay. (Fleischer spoke to a couple of outside attorneys familiar with this area of law, and both advised that it was the Union which had done this and it was the Union which would need to correct it.) What happened is that in September 2017 Berger offered March 1, 2018 and April 25, 2018. Rosenstein should have unequivocally objected then and there and insisted that the parties move to the next arbitrator: Berger was effectively "unavailable" and should have been passed over to go with Daniel Brent, the next arbitrator on the list. Instead, Rosenstein responded before the administration did, accepting both dates. That opened the door for the administration to accept the second, later date. Rosenstein's subsequent suggestions to the administration that they consider going with a different

arbitrator sooner –after Berger had been "scheduled" to begin on April 25, 2018 –were empty gestures for appearance's sake to try to disguise the fact that it was Rosenstein who set the late start date as a means of thwarting and retaliating against Fleischer for pointing out her shortcomings. Rosenstein was motivated by animus toward Fleischer, long-standing animus and contemporaneous animus generated by Fleischer's impatience with Rosenstein's maddening delays every step of the way. This is one of many ways one can see the administration and Rosenstein dovetailing in their objectives and methods, working together to cheat Fleischer of a fair hearing.

96. In addition, Rosenstein neglected to schedule more than one date at a time until well into the process. How else could it have taken from April 25, 2018 until August 19, 2019 to finish the six days of hearings, get the briefs in, and get a decision from Berger?

97. As will be detailed below, more grievous, and dispositive of the negative outcome of the arbitration, is Local 2110's refusal to ask Berger to recuse himself despite evidence Fleischer presented that Berger has a conflict-of-interest with Barnard's antiunion law firm Jackson Lewis.

98. Meanwhile, Rosenstein delayed not only on the arbitration but in other ways. It was not until almost two months after Fleischer was terminated that the BCF-Local 2110 team wrote a publicly shared letter to the administration asking to discuss the Fleischer termination. That might be excused as their having waited for Sian Beilock to assume her role as President at the beginning of July (though they could have written to Rob Goldberg, interim president). But nothing can excuse the delays related to a September 12, 2017 Counter-Convocation Fleischer organized in front of Barnard gates. While news items about every other event would be posted promptly on the BCF Facebook page, Fleischer's announcement was not put

36

up until a day before; as her requests for a prompt announcement were ignored by Local 2110 day after day, Fleischer's anxiety mounted. The delay gave prospective participants no time to plan to attend the event, and there were few people who responded to the Facebook post which invited people to register interest or indicate that they planned to attend; this made the event look bad on the BCF Facebook page, which Fleischer believes was the objective of this particular delay. Fleischer got no help whatsoever in organizing this event; Local 2110 even refused her multiple requests that it send an email blast to the BCF membership inviting them. Rosenstein, Rouhe, and Burke did attend at least,[11] and the latter two held up tiles that spelled out "R E A P P O I N T / F L E I S C H E R" while Rosenstein agreed to be one of the speakers after Julie Kushner, then Region 9A Director, turned out to be unavailable. Fleischer learned from an AAUP chapter chair who was also a speaker at Fleischer's invitation that Rosenstein had said she feared Fleischer would lose the arbitration. Indeed, Rosenstein articulated that same negative prognosis when she came into a GSOC meeting Fleischer attended in order to ask for a letter of support. One wonders, why was Rosenstein so sure going into the arbitration that Fleischer would lose? How much responsibility does Rosenstein have for Fleischer losing?

99. With respect to the epic delays, Fleischer wrote a piece to share with the BCF membership entitled "Union botches first arbitration under the contract, creates terrible precedent for all Barnard Contingent Faculty (BCF)," which urged the membership to write to Rosenstein and Singh, the unelected union representative, and also to Barnard President Sian Beilock, urging that they "EXPEDITE JUSTICE FOR FLEISCHER AND ALL BCF." Fleischer's October 8, 2017 communication to the BCF is attached hereto as Exhibit E.

---

[11] Singh had said he would attend the September 12, 2017 Counter-Convocation but did not show up even though he was teaching on campus that day; later Fleischer discovered that during the time of the Counter-Convocation he was sending an email to the membership about other matters.

100.   Local 2110's participation in a second direct action organized by Fleischer, a Counter-Inauguration for Beilock in front of Riverside Church on February 9, 2018, was equally tepid. The technique seems to be to do as little as possible, just barely enough to fulfill the letter but certainly not the spirit of the law.

**Local 2110's disparate treatment of Fleischer, and refusal to vacate a biased award**

101.   While Local 2110 delayed Fleischer's arbitration unconscionably, even after Berger indicated that if April 25, 2018 was too long to wait to start arbitration, the parties should go with one of the other arbitrators, it brought three other arbitrations under the contract, after the first one over Fleischer's nonreappointment. The Union won every one of three arbitrations that was heard by an arbitrator other than Berger. The first was over the administration's stripping the BCF of the $2000 stipends they had always gotten alongside their tenure and "reviewed and renewable" colleagues. That decision was adjudicated quickly, with the one-day hearing taking place on December 5, 2018, the record closed with the parties' briefs on February 22, 2019, and the second arbitrator, Daniel Brent, issuing a decision on April 5, 2019. The second was over a position in the English Department which the administration had mischaracterized as "supervisory" in order to take it out of the bargaining unit. That decision also was adjudicated quickly, with the third arbitrator, Bonnie Siber Weinstock, issuing a decision on or about July 18, 2019 (the date the announcement went up on the BCF Facebook page). The third, aside from the Fleischer arbitration, was over the Architecture Department's having passed over Richard (Todd) Rouhe for a second course for Fall 2019 for which he was qualified. That decision was adjudicated quickly, on or about September 5, 2019 (the date the announcement went up on the BCF Facebook page). In other words, Rouhe was not appointed to teach his course and likely learned this in late May 2019;

the Union moved for grievance and arbitration quickly and received it quickly; in three months from start to finish Rouhe was made whole with compensation for course pay and any loss of health insurance premiums for him and his family.

102.    What is remarkable and dispositive about the Rouhe arbitration is that it was not decided by Ralph S. Berger, as should have been the case had Local 2110 followed the revolving order of Berger, Brent, Weinstock, and Berger, but rather, it took Brent again *out of order*, who issued a decision in favor of the Union, as all decisions have gone in favor of the Union, except for the Fleischer arbitration adjudicated by Berger.

103.    The Rouhe arbitration demonstrates that Local 2110 President Maida Rosenstein is capable of demanding fairness for a BCF and for a BCF who was part of the bargaining committee, and now, since Sonam Singh was fired, a BCF sharing the position of unelected union representative with Siobhan Burke, once again by mutual agreement between the Barnard administration and Local 2110. Rosenstein as President of Local 2110 engaged in disparate treatment when she treated Rouhe so differently than she had treated Fleischer. Rosenstein did so because Rouhe has been willing to go along with Rosenstein and she continues to need him to do so, while Fleischer has been a thorn in Rosenstein's side.

104.    Further, Fleischer and her small daughter in a stroller marched with Local 2110 in the Fifth Avenue Labor Day Parade on September 9, 2019. Fleischer was the only BCF who marched with Local 2110, as she had been in 2017. During that march, Fleischer conversed with Rosenstein in order to ask her to join Fleischer in vacating the blatantly dishonest Berger decision; Rosenstein put forth various excuses, [12] and as usual, denigrated Fleischer as

---

[12] The excuses were offered in the following order: Local 2110 has spent a lot of money on Fleischer's case already and does not want to spend more; Rosenstein has spoken to attorneys who advise that the chances of successfully vacating an arbitration are low; Rosenstein is happy with the result of the arbitration to the extent that Berger ruled that "good faith consideration" applies to appointment to as well as assignment of classes, and she doesn't want to

"tilting at windmills" when she should be moving on. When their conversation turned to the arbitrators, Fleischer shared with Rosenstein her appreciation for the soundness of the Brent decision on the First Year Seminar stipends, which she had read because Singh had shared it with her.[13] Rosenstein readily admitted that both Brent and Bonnie Weinstock are better arbitrators for the Union.

105.    Both before and after Fleischer's conversations with Rosenstein during the September 9, 2019 Labor Day parade, Fleischer reached out by phone and email to ask that Local 2110 join her in challenging the Berger Opinion & Award. In the last plea Fleischer made, via email on September 28, 2019, Fleischer offered to serve as an unpaid paralegal for Carl Levine on the case, in order to save the Union costs. Fleischer's September 28, 2019 email to Rosenstein is attached hereto as Exhibit F. No answer.

106.    Though one of Rosenstein's reasons given at the September 9, 2019 Labor Day Parade for not joining Fleischer was "legal advice" she has gotten from unidentified sources that winning such cases is very uphill, as anyone familiar with the case law knows, Fleischer had received a different message when she spoke on the phone to Carl Levine for the first and only time after the Opinion & Award was issued. Fleischer stated that the decision was blatantly dishonest and clearly biased; Levine did not deny it. Rather than celebrate the twig Berger had tossed to the Union by ruling that "good faith consideration" applies to

---

lose that, finally, and Rosenstein editorialized that Fleischer was not going to like to hear this, Rosenstein does not want to set a precedent for vacating arbitrations because then the administration may start vacating arbitrations. There are many problems with these excuses, not least of which that the administration is already challenging arbitrations in court in its contentious relationship with TWU Local 264 workers. See *Barnard College v. Transport Workers Union of America, AFL-CIO, Local 264*, U.S. District Court for the Southern District of New York, 2019, Case No. 1:19-cv-00531-AKH.

[13] Though Rosenstein told Fleischer during the September 9, 2019 Labor Day parade that she had no problem sharing the Brent decision on Rouhe, Rosenstein has ignored all of Fleischer's email appeals to produce it; Rouhe too has ignored Fleischer's emailed appeal that he share the decision in light of Rosenstein having said she had no problem with that. Fleischer's telephone messages and email appeals to Rouhe and Burke, the current unelected union representatives, to advocate for Fleischer with Rosenstein with respect to challenging the Berger Opinion & Award have not elicited a reply.

appointments as well as assignments, as Rosenstein was doing, because "messaging" for the Union must always be triumphalist, accuracy notwithstanding, Levine admitted that Berger had taken away with one hand (his ruling on the unlimited broadness of Management Rights (CBA, Article 7)), what he had given with the other. Fleischer believes Levine appreciates the rottenness of the Opinion & Award, and cannot imagine that he would not like to defend the superb work he did on the arbitration hearings and his closing brief. The Union's closing brief is attached hereto as Exhibit G, and Fleischer respectfully pleads with the Court to read it start to finish in order to appreciate how foul the Berger Opinion & Award is.

107.    Levine pointed out that moving to vacate the Award in Court is a decision that only Rosenstein could make. Fleischer said she understood, and immediately reached out to Rosenstein by phone and email. As usual Rosenstein declined to take Fleischer's calls or respond to her emails. Fleischer enlisted help from Mehta, another friend and colleague from First Year Writing, Liz Auran, who herself had been unable to get Rosenstein to reply to an email about another, personal matter, and Mindy Aloff, who managed to get Rosenstein on the phone. Reportedly Rosenstein snapped to Aloff that "Carl doesn't speak for the Union." Later Fleischer tried to calm the waters by assuring Rosenstein that Levine had not put himself forward as speaking for the Union and had been absolutely clear that it was Rosenstein's decision alone.

108.    At the September 9, 2019 Labor Day Parade, at which Fleischer and her daughter's presence took Rosenstein by surprise,[14] Fleischer spoke to Rosenstein again about joining her in legal action. After Rosenstein refused, and they went their separate ways, Fleischer

---

[14] As soon as Fleischer was terminated, Rosenstein must have had her removed from the BCF email lists. Repeatedly Fleischer asked Rosenstein and Shep Clyman, her office manager, to please put her back on the lists. They simply refused. However, Mehta has continued to keep Fleischer in the loop by forwarding invites to the Local 2110 Christmas party, which Fleischer has attended each year, and to the Labor Day Parade, which Fleischer attended, the only BCF there, in 2017 and 2019; apparently there was no announcement that went out for the 2018 Parade.

thought to ask Rosenstein about presenting the question to the Local 2110 Board. Fleischer found Rosenstein again to propose a presentation. "I would advocate against it," was Rosenstein's response. Rosenstein runs Local 2110 autocratically and would never allow anyone on the Board who would not go along with her in all things. Therefore Fleischer's only means of seeking justice on her termination from Barnard and the effective ending of her teaching career is to bring this legal action on her own, and include Local 2110 as one of her opponents.

### Arbitrator Berger's conflict of interest, partiality to Barnard in proceedings

109.    Since Fleischer resigned from the BCF bargaining committee on February 13, 2017, she was not party to the discussions that led to the selection of the three rotating arbitrators: Ralph S. Berger, Daniel F. Brent, and Bonnie Siber Weinstock (Article 22, §4, Step Three). Had Fleischer been party to those discussions, she believes she would have objected to Berger: all one needs to do is google his name to find his AAA Mediation page and see that one of his four recommenders (two management side, two labor side) is Marjorie Kaye, Jr., a senior partner in the Philadelphia office of Jackson Lewis. Berger may have been fine as an arbitrator for Local 2110 in other settings—Berger arbitrates for GSOC (NYU graduate students), and Teacher's College, for instance—but once Barnard moved to Jackson Lewis for its BCF issues, any association with Jackson Lewis became highly problematic.[15]

110.    When Fleischer discovered this conflict of interest going into her arbitration, she immediately pressured Local 2110 to move to the next arbitrator. When Fleischer was unable to move Rosenstein, as usual, she wrote to Julie Kushner, then Director of Region 9A of the

---

[15] Barnard is now using Jackson Lewis to fight labor issues with the Transportation Workers Union ("TWU") Local 265, which represents security, dining services, and housekeeping staff, with whom it has had an equally vexed history. https://www.columbiaspectator.com/news/2019/10/17/they-dont-follow-the-rules-inside-barnards-broken-relationship-with-its-employee-union/

UAW, and Dennis Williams, then President of the UAW International, at Solidarity House in

Detroit. Fleischer received brushoffs from President Williams dated October 16, 2017 and

from Regional Director Kushner on November 1, 2017. Fleischer continued to fight Berger

as arbitrator but turned to pressuring the administration based on delay, rather than conflict of

interest, and enlisted help from many of her supporters cited in paragraph 87 above, under

the theme of "justice delayed is justice denied."

111.    Fleischer's attempts to move Local 2110 and/or the administration to move off of Berger

were unsuccessful. Fleischer's *pro bono* attorney on her unfair labor practice charges, Arthur

Z. Schwartz of Advocates for Justice, had early on suggested to Berger that he might recuse

himself, since he believed Berger, with whom he went to law school, might have animus

toward Schwartz, but Berger denied this.[16] Fleischer had no choice but to go forward with

Berger, since she was technically not a party to the arbitration, which was instead brought by

Local 2110 against Barnard on her behalf.

112.    After Fleischer recovered from the shock of Berger's Opinion & Award, she did further

digging. She found that a search on Nexis Legal for Ralph S. Berger under Federal and New

York State yields six cases; for three of those six cases, Berger was working for Jackson

Lewis clients: in New York County, Westchester County, Suffolk County.[17] Clearly Jackson

Lewis attorneys favor Berger for their employer-side arbitrations. Fleischer noticed that

Felice B. Ekelman, the lead Jackson Lewis attorney for the Local 2110 v. Barnard College

---

[16] Fleischer was surprised that during the second day of arbitration hearings, June 13, 2018, Felice Ekelman, Barnard's lead attorney from Jackson Lewis, asked Fleischer under cross-examination if she had been represented at the NLRB, and by whom. Fleischer of course replied that she had been represented and by Arthur Schwartz. It struck Fleischer as curious that Ekelman would have wanted to bring that up and get it into the record, and it caused Fleischer to feel, as she still feels, continuing concern that Berger may indeed have harbored *animus* toward Schwartz and that Fleischer's association with Schwartz instilled bias or even *animus* against Fleischer from Berger.

[17] The two cases in New York Supreme Court are *Konstantynovska v. Caring Professionals*, 2018 N.Y. Misc. LEXIS 2810, and *Konstantynovska v. Caring Professionals, Inc.*, 2019 N.Y. App. Div. LEXIS 3662; and *Brandofino v. Cryptometrics, Inc.* 2010 N.Y. Misc. LEXIS 328. The federal case is *Surdu v. Madison Global, LLC* 2017 U.S. Dist. LEXIS 142175, and *Surdu v. Madison Global, LLC*, 2018 U.S. Dist. LEXIS 48356.

Arbitration, has authored several recent articles with Noel P. Tripp, the lead Jackson Lewis

attorney in the 2018 New York County Supreme Court, and 2019 First Department Court of

Appeal cases *Konstantynovska v. Caring Professionals, Inc.* The issue was that Jackson

Lewis on behalf of its clients Caring Professionals was seeking to compel Plaintiff home

healthcare workers to have their complaints that they were underpaid heard in final and

binding arbitration in front of Berger, per a Memorandum of Agreement ("MOA") modifying

and amending the CBA, rather than taking their complaints to the courts. In the first instance,

Justice Shlomo Hagler ruled in favor of the home healthcare workers. In the second instance,

Judges Sweeny, Gische, Tom, Gesmer, and Singh modified Hagler's ruling to apply to the

plaintiffs other than the lead plaintiff because the time frame of her employment ran during

the time covered by the MOA.

113.     In another case in State Supreme Court, though one in which Jackson Lewis had no

hand, *Matter of Interview, Inc. v. Fuller*, Supreme Court of New York County, decided

September 18, 2014, Justice Michael D. Stallman ruled in favor of a non-unionized female

employee, Victoria Fuller, to the extent that he vacated two-and-a-half of six contested points

in Berger's arbitration decision. In this case the employer, Interview Magazine and Brant

Publications, Inc., was represented by Kenneth Kirschner, partner in the management-side

firm Hogan Lovells. In *Matter of Interview* an issue arose as to whether Berger as arbitrator

had a conflict of interest with Kirschner, with whom he had gone to college, who had

appeared in front of Berger in employment and arbitration cases, beside whom he had served

on a panel of arbitrators, and with whom he had socialized at alumni functions. Berger had

claimed that "These disclosures do not affect my impartiality in the instant matter in any

way." Fuller's attorney demanded that either Kirschner or Berger recuse themselves from the

case, which Kirschner did; however, Kirschner's co-counsel, a Mr. DeLarco, remained. Berger ruled in favor of employer Interview point-by-point. Fuller's challenge of the arbitration award before Justice Stallman claimed that Berger committed misconduct, was partial, that the Award was indefinite, that the arbitrator exceeded his power, and that the Award was totally irrational and violated public policy. Justice Stallman did not find that Berger had committed misconduct but he vacated several parts of an incomplete award that had ruled relentlessly against a female employee.

114.   In the second case in New York Supreme Court which involved Berger and Jackson Lewis, this time of White Plains, *Brandofino v. Cryptometrics, Inc.*, 2010 N.Y. Misc. LEXIS 328, the issue was that both Jackson Lewis and the American Arbitration Association ("AAA"), of which arbitration group Berger is part, were owed money. Here, "the arbitrator [Berger] issued an order requiring the parties to deposit sums for arbitrator compensation and administrative fees." Justice Alan D. Sheinkman gave the employer "one last chance to express its intent to arbitrate in accordance with the parties' agreement" and granted Brandofino's petition to stay the arbitration and allow him instead to institute an action at law "unless the employer paid the outstanding deposit due to the AAA within 20 days."

115.   In one of the two cases in federal court which come up in a Nexis search for "Ralph S. Berger" and in which Berger was working for Jackson Lewis clients, *Surdu v. Madison Global, LLC*, 2017 U.S. Dist. LEXIS 142175 and *Surdu v. Madison Gobal, LLC*, 2018 U.S. Dist. LEXIS 48356, both phases of the case were adjudicated by Magistrate Judge Henry Pitman. *Surdu* involved a group of apparently immigrant restaurant workers who had been underpaid, both in their hourly wages, which had been below minimum wage, and by having their tips taken from them. Berger presided over an "hours-long mediation session" in which

the employer, Madison Global, LLC, was represented by Noel P. Tripp and Roger H. Briton of Jackson Lewis's Melville, New York office (Suffolk County).

116.    More interesting in this particular case, however, is the fact that the attorney representing the underpaid immigrant restaurant workers, Darren Paul Brian Rumack of the Klein Group, New York, New York, praised Berger as an "experienced and well-known mediator" in wage and hour cases. The settlement negotiated in that hours-long mediation provided for a common settlement fund of $342,500, of which the five lead plaintiffs would each receive an $8,500 service award and all, including those similarly situated, would receive various amounts based upon a point system to reflect length of service, none less than $100. Counsel for plaintiffs were to receive no more than $114,166.66, or one-third of the total settlement amount, subject to the Court's approval. In the second case, however, Magistrate Judge Pitman adjusted the attorney's amount substantially, based on the amount of actual work the attorneys performed (almost all work was performed by one attorney) and in order to ensure that the attorneys did not receive an effective hourly rate in excess of $1,100 and that the immigrant restaurant workers would then recover 69% rather than only 50% of their purloined tips. From Pitman's second decision, it appears that Berger may have helped an attorney take advantage of exploited immigrant workers.

117.    Ralph S. Berger is a very experienced arbitrator and mediator who has been in professional practice for close to 40 years. Throughout the six days of arbitration hearings— April 25, June 13, November 28, and December 13, 2018 and January 30 and March 29, 2019—he was careful to comport himself cordially with both sides. Fleischer proposes that if anything Berger was especially nice to her. Between the first and second day of hearings, for instance, Fleischer gave birth to a daughter. Berger opened the proceedings on the second

day by congratulating Fleischer on "Augusta" and Union attorney Carl Levine on his daughter being valedictorian of her class at Hunter College High School. Berger asked that the record, which was being kept by a court reporter, reflect Berger's congratulations.

118.    However, there are three significant ways in which Berger biased the proceedings: 1) Felice B. Ekelman, lead Jackson Lewis attorney for Barnard, insisted that Fleischer not be allowed to bring her baby to the proceedings, and Berger went along with that. (The Union attorney did not object, and Fleischer felt she could not object because Levine had emphasized that it was important that Berger 'like' her.) 2) After a handful of BCF supporters were slated to attend the hearing the first day, Ekelman insisted the Union not turn the proceedings into "a circus" and that any supporters be required to come in promptly at the start of the proceedings, never once they had begun, no matter how quietly. Again, Berger went along with that. 3) Ekelman insisted there be a gag order imposed on the proceedings and that only the dates of the arbitration hearing could be shared publicly. Purporting to be concerned that future witness testimony could be tainted, Berger granted the administration this third imposition also. (Levine called it "bullshit" but again insisted that the Union side be deferential to Arbitrator Berger.) Indeed there was a dustup over the latter, when on November 26, 2018, a piece by Barnard alumna Madina Touré appeared in *Politico*:

"Arbitration hearings pick up this week on fired Barnard adjunct." Even though Fleischer's and other Union members' statements to Ms. Touré revealed nothing that was not already

part of the public record, Berger scolded the Union side of the table off the record.

119.    The sum and total of these three gifts from Berger to the administration, combined with the inordinate amount of time it took—27 months from termination to get an Opinion & Award—was to take the wind out of Fleischer's sails with respect to maintaining a base of

support from fellow BCF and other sympathizers, and with respect to benefitting from direct
action, like her September 12, 2017 Counter-Convocation and February 9, 2018 Counter-
Inauguration, at which Fleischer is particularly effective.

### Arbitrator Berger's Opinion & Award

120.    Fleischer claims that Berger exceeded his authority when he issued an Opinion & Award
on charges against Fleischer that had not been made at Grievance, which his arbitration
Opinion & Award was supposed to review, and when he allowed the administration to
prevail on an affirmative defense it had not set forth at the time of Grievance.

121.    At Fleischer's May 22, 2017 termination meeting with Schor-Haim, Andrea Stagg
(Barnard General Counsel's Office), and Robin Beltzer (Barnard Human Resources
Department), Fleischer was told that the Article 11, §6 (f)(1), unsatisfactory performance,
reason for nonreappointing her was based "really on only two questions" on anonymous
online SET, "clarity of grading standards" and "feedback on student work." Unspecified
student complaints, which had never been brought to Fleischer's attention, were added as an
afterthought. Never did Schor-Haim claim, until well into the arbitration proceedings, when
she testified on December 13, 2018, 19 months after Fleischer had been fired, that Fleischer
was unable to reorient to a new First Year Writing geared toward "inclusive pedagogy" and
responsive to the diversifying student body at Barnard. That Berger makes a completely
unsubstantiated accusation that Fleischer is insensitive to minorities one of the pillars of his
career-ending Opinion & Award is low. Similarly, he accepts Schor-Haim's claim of student
complaints completely at face value, even though doing so relies on her testimony alone,
with no corroborating evidence, and her credibility was rightly called into question by the
Union.

122.    The August 14, 2017 Grievance which resulted in a rejection by Provost Linda Bell on

August 28, 2017 is attached hereto as Exhibit H. In it, the Court will see that there was no

question raised about the Fleischer's failure to bring a discrimination complaint through

Barnard's internal procedures before grieving it under Article 4 of the CBA. Fleischer

proposes that Barnard may have lost its opportunity to put forward this affirmative defense

by not raising it initially.

123.    Berger applied the wrong standard of proof in the case. Carl Levine, the Union's

attorney, is correct when he states: "Under Article 11, 6 '[t]he standard of review for a

grievance or arbitration alleging a violation of Article 11, Section 6, ¶¶ (e)-(f) shall be

whether the College established by clear and convincing evidence that one of the conditions

set forth in those sections has been met.' This language does not require it to be established

that the Employer had a 'good faith *belief*' that the cited basis for the non-reappointment

existed. It explicitly requires that 'one of the conditions set forth in those sections has been

met.'" (Union Brief, p. 102, emphasis added). Without addressing this signal legal question

of standard of proof, Berger forges ahead to lighten the administration's burden: "For all of

these reasons the Employer has established by clear and convincing evidence that it *believes*,

in good faith, that the Grievant's abilities to fulfill the goals of the redesigned FYW program

were lacking" (Opinion p. 59, emphasis added).[18]

124.    Berger never adjudicated the relative credibility of the witnesses, another sign of his bias

in favor of the administration. The Union correctly raised issues about Wendy Schor-Haim's

credibility; Berger does not mention this in his Opinion. The administration raised issues

---

[18] The Court will note that in addition to this passage demonstrating Berger's mishandling of the burden of proof, it also demonstrates that the charge trumped up against Fleischer only 19 months after she was terminated, that she could not "fulfill the goals of the redesigned FYW program" is simply presumed by Berger to be true. Other than Schor-Haim's self-serving testimony, where is the evidence?

about the credibility of Rosenstein and Singh; Berger does raise this in his Opinion. Had the administration felt it could do so, surely it would have assailed Fleischer's credibility; it did not do so because Fleischer was a highly credible witness; of course Berger would never breathe a word about Fleischer's credibility.

125.    Berger's handling of the expert witnesses in this case is equally biased and unprofessional. Fleischer was frankly embarrassed for the administration and its so-called "expert witness" on SET, Jennifer Frederick. Dr. Frederick is a Chemist; she has published precisely nothing about the use of SET for evaluating teaching; she had never served as an expert witness until the Barnard administration brought her in. Dr. Susan Basow, the Union's witness, is a seasoned psychologist who has published for decades in peer-reviewed journals about the use of SET (11 articles and 11 invited book chapters) and the problems associated with SET, including the problem of gender bias for female faculty, particularly female faculty like Fleischer who do not conform to gender expectations of being very lenient with students. Basow had served as an expert witness twice before, once before the Equal Employment Opportunity Commission on a case involving a female faculty member who was denied tenure and promotion, and once before on a legal case on Ontario, Canada in front of a Human Rights Tribunal, for which Dr. Basow wrote a legal brief. From Berger's Opinion the reader would have no idea of the differences between the respective qualifications, or lack thereof, of the two sides' expert witnesses.

126.    Dr. Basow was asked in her direct testimony about an article by Jeff Gentry in *The Chronicle of Higher Education* that offers a taxonomy of teaching based on various factors; here is Dr. Basow on that article in relation to what she learned about Fleischer as a teacher

from reading Fleischer's SET and reading her testimony about her teaching during the earlier days of arbitration hearings:

"And the argument that [Jeff Gentry] makes is that the best teacher, the intentional educator[,] maintains both high academic standards and high expectations of student learning.

And from the transcript of how Dr. Fleischer described her way of teaching, it seems to me that she would fall into this category of having both high academic standards and high expectations of student learning." (November 28, 2018 Transcript, p. 49.)

127.    Berger claimed at the start of his Opinion that he had "fully considered" the evidence. There is not a shred of evidence in the Opinion that he read a single one of the peer-reviewed scholarly articles on SET that Dr. Basow put into the record. One of those articles argues not just that SET do not reflect teaching effectiveness but rather how satisfied students are with their experience, but goes further, that there is an inverse relationship between high scores on SET and learning, when learning is measured by objective criteria, such as classroom teaching observation (which Schor-Haim refused to do of Fleischer) and students' written work for a writing class (which Schor-Haim refused to take from Fleischer). Students who get high grades may *think* they are learning, but they may not be learning. Students who report frustration because they have to work hard, and for instance, revise deeply and substantially when they are writing, may be learning a lot. Fleischer testified without hesitation that she stands by the quality of the work the students in her classes produce and that she and they are proud of their work. Rather than being supportable on the facts of the case, Berger's Opinion suppresses the facts.

51

128.    During Felice Ekelman's cross-examination of Fleischer, during which Berger overruled every one of Carl Levine's objections, she read *at length* negative comments from Union Exhibit 6, Fleischer's SET from Spring 2016, section 18, filling the record page after page over Levine's objections. The comment which received the most substantial focus was a response to the leading question "What improvements in the instructor's teaching would you recommend?" One response went on for 20 lines and began "Honestly, the way she made me feel was so belittling." Instead of asking a question, Ekelman makes a statement that begs the question: "Q. And this was written by a student who did not grow up with English as a first language in her household." Fleischer' s response is: "A. I would have to review the entry to confirm that." Fleischer indicates that she recalled the student and recalled that the student had been very aggrieved from the beginning of their interactions. Fleischer also points out that the student writes "I thought I was going to walk into a fun, exciting and intellectually stimulating class," and that the order of items in that statement is not what Fleischer would expect from a student oriented toward "a rigorous Liberal Arts education" as Barnard purports to offer, but rather a student oriented toward a "fun, exciting" experience—not that these qualities are mutually exclusive, only that intellectual stimulation would be the first priority, in Fleischer's view, if the focus were on a rigorous Liberal Arts education. In her testimony Fleischer also noted the student's statement "I'm sure that Georgette Fleischer is a wonderful woman with a good heart." (June 13, 2018 transcript, pp. 107-111). But that was not what Ekelman focused on, and it was not what Berger focused on when he quoted the student's comment at length in his Opinion:

"Honestly, the way she made me feel was so belittling. She didn't stimulate my intellectual curiosity at all, rather, she made me feel like I was nothing and that my thoughts were

invalid. . . . Additionally, she corrected my grammar countless times . . . At one point, she

essentially told me that I didn't receive an adequate English education growing up. Well,

Georgette, when you grow up in an immigrant household, with two parents who know

absolutely no English and have no idea what it is to live in America, you end up not having

'perfect grammar.' Ultimately, I didn't enjoy my first year english experience. . . ." (p. 24).

129.      After Fleischer received Berger's career-ending Opinion & Award, she looked up the

student in question. The student has transferred out of Barnard, which suggests that her

grievances at Barnard may not have been limited to Fleischer's First Year English class. The

student has an Indian and British passport. She is a highly successful international fashion

model studying financial economics and she runs her own investment fund. She grew up in

Virginia, the daughter of two doctors. Yet this one student's anonymous online comment

condemns Fleischer for being insensitive to the needs of "disadvantaged" students. These

revelations demonstrate the kind of fact-finding Berger engaged in on Fleischer's case. Not

evidence based. *Ad feminam* character assassination based on innuendo and which casts the

stone-thrower as superior in her or his political correctness. The Berger Opinion is a travesty.

130.      Similarly, Schor-Haim claimed that one of the reasons she terminated Fleischer is that

she believed that Fleischer could not adjust to the changes that were being made under her

helm to First Year English which would then become First Year Writing. Schor-Haim cited

the Academic Curricular Review of 2013-2015 as authority for the proposition that First

Year Writing's new orientation seeks to respond to a changing student body at Barnard that

includes more students from disadvantaged backgrounds (students of color and low-income

students, students who are the first in their families to go to college). However, a word-for-

word reading of the April 10, 2015 Report from the First Year Foundations Subcommittee

and the April 18, 2015 Report from the Academic Curricular Review reveals not a single reference to a changing student body. On the contrary, this is what the First Year Foundations Subcommittee published:

"Our recommendations for a first-year writing course build on the foundation of the current First-Year English program, established and developed over the past 15 years by the current Director, Margaret Vandenburg. We believe that *our recommendations keep in place the many strengths of the current model of First-Year English--specifically, the assigning of challenging texts, the teaching of close reading skills*, the inclusion of writing assignments that encourage skills that can be used across disciplines, the individualized attention to student needs, and the fostering of excellent instruction through careful hiring practices and continued instructor support." (Emphasis added)

131.    The emphasis is rather on the continuity with the First Year English Program into which Fleischer had been hired by Margaret Vandenburg and in which she taught effectively for so many years. Indeed, Provost Linda Bell, in a Youtube posted on the Barnard website on June 15, 2016, "Introducing Foundations," a year after the Curricular Review changes had gone into effect, describes First Year Writing as "a writing-intensive small seminar classroom that teaches students to read literary texts with depth"—precisely the skills Fleischer is known to be expert at.

132.    Schor-Haim's accusation, which Berger swallows hook, line, and sinker, that Fleischer interacts poorly with students from disadvantaged backgrounds, is 'evidenced' by alleged student complaints, none of which Schor-Haim brought to Fleischer's attention. Levine correctly pointed out in the Union's brief that there is only one student who allegedly complained who is identified as a student from a disadvantaged background. Indeed, Schor-

Haim cited one student in Fall 2015 and two in Spring 2016 in her testimony and specifically stated that the two from Spring 2016 were *not* from disadvantaged backgrounds. But Fleischer believes she knows who the student who went to Schor-Haim in Fall 2015 is. If Fleischer is correct, this student came to Fleischer early in the semester to share with her the terribly stressful time she was having with her suite-mate, about which Fleischer was sympathetic and supportive. Thereafter, the student's strife became increasingly directed at Fleischer. After Fleischer received the career-ending Berger Opinion, she looked the student up, and discovered that she has apparently taken time off in the middle of her four years at Barnard, which again suggests that this student's issues may not have been restricted to Fleischer's First Year English class. The student appears to be of mixed race, but she has an international baccalaureate from a high school that costs $45k per year: not exactly disadvantaged. Fleischer would propose that this is yet another example of relying on non-evidence-based assumptions in order to smear Fleischer's character.

133.    About the 19-months-after-the-fact claim that Fleischer is too racist and elitist for the First Year Writing Program, none of the countervailing evidence from Fleischer's direct and rebuttal testimony and the documentary evidence put into the record by the Union's attorney is so much as mentioned by Berger. That evidence included emails from then First Year Dean Lisa Hollibaugh asking Fleischer to work with a colleague who had a former student of Fleischer's with whom Fleischer had worked particularly well whose disability made it difficult for her to engage in class discussion. It included email exchanges demonstrating that Fleischer went out of her way to help a native Spanish-speaking student get additional help with language skills beyond the parameters of Fleischer's class. It included Fleischer's own testimony under oath that she does some of her best work with non-traditional students whom

she appreciates for their strong work ethic. It includes Fleischer's testimony that she tries to expand the curriculum of First Year Writing in her out-of-classroom activities to respond to the diversity of the changing student body: Fleischer testified that in the last year she taught, she took students to the Onassis Cultural Center for a production of *Antigone Now!* which revises Sophocles's play within the context of Black Lives Matter, and a documentary film entitled *City of Joy* which follows women survivors of civil war in the Eastern Congo as they heal from their trauma in order to return to their communities to help others who have been victims of assault and sexual violence. Berger refers to none of this.

134.    Absent from Berger's Opinion is any adjudication of the crucial question of Fleischer having high standards for her students and inflating her grades less than her colleagues do. One of the Opinion's most mystifying moments is when Berger writes "It should also be noted that Schor-Haim clearly indicated that she did not attribute Grievant's poor student evaluations to low grades or expectations of low grades" (p. 61). Berger seems to suggest that just because Schor-Haim does not attribute Fleischer's SET scores to low grades or expectations of low grades that means the SET scores are not so attributable. In this Berger enables Schor-Haim's irrationality by endorsing it with his own. Would anyone deny that there is a correlation between grades and SET scores? Berger continues: "The record reflects that during the September 2016 counseling meeting [Schor-Haim] stated that she had analyzed grades in the FYW Program and that Grievant's grades were slightly higher than average" (p. 61). Exactly. But Berger seems out of touch with reality when he fails to note that the evidence indicated that Schor-Haim was not telling the truth in that September 2016 meeting when she told Fleischer (with Rosenstein present) that there had been four First Year English faculty in Fall 2015 and about eight First Year English faculty in Spring 2016 who

had given lower grades than Fleischer had. Fleischer went to the trouble of digging out her handwritten notes of the meeting, copying them for the Union to put into evidence, creating a typed transcript of the hand-written notes so the record would have clear text, and presenting the original pages for the administration's attorneys to examine. Apparently Berger cannot be bothered to handle hard evidence or listen to, let alone credit, testimony based on fact-checking and documentary proof. Nor could Berger be bothered to look at the Union's analysis of the data the administration finally produced at arbitration which indicated that in Spring 2016, there were not about eight First Year English faculty who gave lower grades than Fleischer did; rather, Fleischer gave the lowest grades. The same is true of grade expectations, even though Schor-Haim had lied a second time in the September 2016 counseling session when she claimed that Fleischer's students' grade expectations were on par with others'. These facts are memorialized in the email exchanges between Fleischer and Schor-Haim that preceded and followed the one counseling session and which the Union made part of the record as its Exhibit 13. Could Berger be bothered to look at the Union's evidence?

135.    Berger's Opinion descends into complete illogic when it allows the language of Article 7, Management Rights, to wipe out the burden of proof the administration bore to demonstrate "by clear and convincing evidence" that it terminated Fleischer after 17 years because her teaching was inadequate. Berger correctly acknowledged the Union's position that the qualifier at the start of the second, page-long sentence of Article 7, §1 "Except as otherwise provided in this Agreement" means that despite the very wide berth of Article 7, Management Rights, the administration bears a burden of proving by "clear and convincing evidence" when nonreappointment falls under Article 11, Appointments and Assignments,

§6, (e) and (f). In Fleischer's case, the administration claims that Fleischer's performance was unsatisfactory (CBA Article 11, §6(f)(1)). Yet Berger's Opinion makes that important qualifier, "Except as otherwise provided in this Agreement," completely meaningless.

136.    Berger's circularity is illogical, irrational sophistry. Yes, he claims, the Union is correct that the phrase in Article 7, Management Rights "Except as otherwise provided in this Agreement" means that the administration has a burden of proof by "clear and convincing evidence" that Fleischer's performance was unsatisfactory. But no, the discretion allowed the administration in Article 7, Management Rights is so broad that the administration can do whatever it wants. One might write it out as A, except for B; but only A. In this faulty syllogism, what is the point of even having B?

137.    Here is where one sees Berger's bias peeking out from the whirl he spins in the final career-ending six pages of his Opinion. Berger's is an Opinion which gives one to the Union (denies a blanket motion to dismiss), one to the administration (dismisses the Union's Article 4 claim), one to the Union (administration bears burden of proving unsatisfactory performance), and one to the administration (Fleischer's performance was unsatisfactory *by the administration's unprofessional standards*). In reality it gives everything to the administration; nothing Berger concedes to the Union will be useful going forward because everything is trumped by Berger's gift to the administration of *carte blanche*: untrammeled discretion to terminate as it sees fit, no matter how quixotic, vindictive, and downright unfair.

138.    The language Berger uses does not disguise his irrational capriciousness, which perfectly matches the administration's: "the Employer was under no contractual obligation to take any particular steps or use any specific metric in determining not to reappoint Grievant. . . . it is within the College's discretion, pursuant to the Agreement's Management Rights provision,

to make a final decision regarding an appointment using the assessment method of its choice" (p. 60), and "it is within the Employer's discretion, pursuant to the Management Rights provision, to make a final decision regarding an appointment using assessment tools of its choosing" (p. 62).

139.    Equally dispiriting are the seven lines at the end of the penultimate page of the Opinion which dismiss with a flick of the back of Berger's wrist Fleischer's claim that the administration breached Article 9, Academic Freedom and Responsibility, §1 and §3. The former states that Fleischer should have been "judged as a teacher on the basis of legitimate intellectual and professional criteria," the latter that Fleischer should have had "the same rights as all other College faculty to establish standards of behavior in the classroom and determine appropriate methods of evaluation, [and] assign grades." Schor-Haim, with Provost Linda Bell behind her, took those rights from Fleischer, as they have and continue to take them from others. The new standardized corporate and consumerist model of First Year Writing at Barnard has institutionalized conformity, and it is the death of real critical thinking. Fleischer doubts that treating first year college students like high school students in need of remediation is yielding excellent learning outcomes,[19] even if all the students are being kept "comfortable."[20]

140.    Meanwhile, Barnard's Code of Academic Freedom and Tenure states in its opening paragraph: "The College endorses the five principles contained in the Statement of Professional Ethics of the American Association of University Professors." The fourth and

---

[19] During her testimony, Schor-Haim stated that First Year Barnard students are really high school students after summer vacation, and that the job of a First Year Writing teacher is to turn high school students into college students. She suggested that non-traditional students, such as those who are first in their families to go to college, do not have mothers they can call up to guide them and such guidance therefore needs to be provided institutionally, by First Year Writing faculty.

[20] In an interview on the Brian Lehrer Show (public radio, WNYC) on November 21, 2017, Barnard President Sian Beilock stated how important it is that all students, especially those from non-traditional backgrounds, feel "comfortable."

fifth of these principles are particularly compelling in this context: ". . . professors seek above all to be *effective* teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. . . ." (emphasis added); ". . . . As citizens engaged in a profession that depends on freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom."

141.    Fleischer argues to the Court that but for Berger being the arbitrator, the Union's arbitration over her nonreappointment after 17 years of dedicated service would have been won.

## FIRST CAUSE OF ACTION, AGAINST DEFENDANT LOCAL 2110

142.    Fleischer repeats and realleges each and every allegation contained in paragraphs 1 through 141 as if fully set forth herein.

143.    Local 2110's treatment of Fleischer while she was organizing and bargaining on behalf of the BCF and while she fought for her job was motivated by discriminatory and retaliatory intent, *animus* and malice in violation of §8(b)(1)(A) of the NLRA.

144.    Fleischer has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as the result of Local 2110's bad faith acts unless and until this Court grants her the requested relief.

145.    As a result of the foregoing, Fleischer is entitled to the costs of this action together with reasonable attorneys' fees.

146.    As a result of the foregoing, Fleischer is entitled to punitive damages in an amount to be determined at trial.

147.    As a result of the foregoing, Fleischer is entitled to compensatory damages in the amount of $114,000, representing minimum course pay for a 3-credit course in Academic Year 2019-2020 ($9000), in Academic Year 2020-2021 ($9500), and in Academic Year 2021-2022 ($10000) x 4 courses per year, Fleischer's customary course load, the total representing the salary due Fleischer had she been awarded the three-year contract beginning in Academic Year 2019-2020 demanded by the arbitration per Article 11, §5 (e) (1) of the CBA.

## SECOND CAUSE OF ACTION, AGAINST DEFENDANT BARNARD

148.    Fleischer repeats and realleges each and every allegation contained in paragraphs 1 through 147 as if fully set forth herein.

149.    Barnard's treatment of Fleischer while she served as an adjunct college professor in the Department of English was motivated by discriminatory and retaliatory intent, *animus* and malice in violation of Article 4, §1 of the collective bargaining agreement.

150.    Fleischer has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as the result of Barnard's bad faith acts unless and until this Court grants her the requested relief.

151.    As a result of the foregoing, Fleischer is entitled to the costs of this action together with reasonable attorneys' fees.

152.    As a result of the foregoing, Fleischer is entitled to punitive damages in an amount to be determined at trial.

153.    As a result of the foregoing, Fleischer is entitled to compensatory damages in the amount of $62,000, representing minimum course pay for a 3-credit course in Academic Year 2017-2018 ($7000), and in Academic Year 2018-2019 ($8000) x 4 courses per year, Fleischer's customary course load.

### THIRD CAUSE OF ACTION, AGAINST DEFENDANT BARNARD

154.    Fleischer repeats and realleges each and every allegation contained in paragraphs 1 through 153 as if fully set forth herein.

155.    Defendant Barnard deprived Fleischer of Academic Freedom when it failed to judge her teaching based on legitimate intellectual and professional criteria, in violation of Article 9, §1 of the CBA.

156.    Defendant Barnard deprived Fleischer of Academic Freedom when it punished her with termination after she exercised her right "to establish standards of behavior in the classroom and determine appropriate methods of evaluation, [and] assign grades," in violation of Article 9, §3 of the CBA.

157.    Fleischer has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as the result of Barnard's discriminatory and retaliatory practices unless and until this Court grants her the requested relief.

158.    As a result of the foregoing, Fleischer is entitled to the costs of this action together with reasonable attorneys' fees.

159.    As a result of the foregoing, Fleischer is entitled to punitive damages in an amount to be determined at trial.

160.    As a result of the foregoing, Fleischer is entitled to compensatory damages in the amount of $62,000, representing minimum course pay for a 3-credit course in Academic Year 2017-2018 ($7000), and in Academic Year 2018-2019 ($8000) x 4 courses per year, Fleischer's customary course load.

### FOURTH CAUSE OF ACTION, AGAINST DEFENDANT BARNARD

161.    Fleischer repeats and realleges each and every allegation contained in paragraphs 1 through 160 as if fully set forth herein.

162.    Defendant Barnard deprived Fleischer of good faith treatment, in violation of Article 11,

§6 (f) (1) of the CBA; instead, for years, Barnard acted in bad faith in its dealings with

Fleischer, with discriminatory and retaliatory intent, *animus* and malice.

163.    Fleischer has and will continue to suffer monetary damages, irreparable injury, mental

anguish and personal and professional humiliation as the result of Barnard's discriminatory

and retaliatory bad faith acts unless and until this Court grants her the requested relief.

164.    As a result of the foregoing, Fleischer is entitled to the costs of this action together with

reasonable attorneys' fees.

165.    As a result of the foregoing, Fleischer is entitled to punitive damages in an amount to be

determined at trial.

166.    As a result of the foregoing, Fleischer is entitled to compensatory damages, in the amount

of $62,000, representing minimum course pay for a 3-credit course in Academic Year 2017-

2018 ($7000), and in Academic Year 2018-2019 ($8000) x 4 courses per year, Fleischer's

customary course load.

### FIFTH CAUSE OF ACTION AGAINST RESPONDENT ARBITRATOR BERGER

167.    Fleischer repeats and realleges each and every allegation contained in paragraphs 1

through 166 as if fully set forth herein.

168.    Respondent discriminated against Fleischer by failing to recuse himself for conflict of

interest with Barnard's new union-busting law firm, Jackson Lewis, and potential conflict of

interest with Fleischer's *pro bono* attorney on charges against Barnard at the NLRB, Arthur

Z. Schwartz of Advocates for Justice.

169.   As an attorney and therefore an officer of the court, Respondent failed to fulfill his duty to conduct himself honestly and with integrity when he issued an Opinion & Award based on misstatements proved to be untrue during the course of the six days of arbitration hearings.

170.   As a member of the American Arbitration Association, Respondent failed to comport himself in accordance with the AAA Code of Ethics for Arbitrators.

171.   Fleischer has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as the result of Respondent's discriminatory and unprofessional practices unless and until this Court grants her the requested relief.

172.   As a result of the foregoing, Fleischer is entitled to the costs of this action together with reasonable attorneys' fees.

173.   As a result of the foregoing, Fleischer is entitled to punitive damages in an amount to be determined at trial.

174.   As a result of the foregoing, Fleischer is entitled to compensatory damages.

**WHEREFORE,** Fleischer demands judgment against the Defendants/Respondent:

a.   directing defendants/respondent to pay to Fleischer compensatory damages including, but not limited to, emotional distress damages, in an amount to be determined by a jury on each of the five causes of action stated herein; and

b.   directing defendants/respondent to pay punitive damages to Fleischer on each of the five causes of action stated herein in an amount to be determined by the jury;

c.   awarding Fleischer the costs of this action together with reasonable attorneys' fees;

    d.  vacating the Arbitration Opinion & Award, granting the Grievance and ordering

        Defendant Barnard to reinstate Fleischer with a three-year contract, per Article

        11, §5(e)(1) of the CBA.

**JURY DEMAND**

Fleischer hereby demands a trial by jury on all claims so triable.


Dated: November 19, 2019
       New York, New York


                  Respectfully,


                  Georgette Fleischer
                  19 Cleveland Place, apt. 4A
                  New York, NY 10012
                  gf24@columbia.edu
                  (212) 966-3474

# EXHIBIT A

-----------------------------------------------------------------------x

In the Matter of the Arbitration between

**BCF-UAW, LOCAL 2110**,

- and -

**BARNARD COLLEGE**,

<u>**OPINION & AWARD**</u>

RALPH S. BERGER
Arbitrator

Re:    **Non-reappointment of Georgette Fleischer**
-----------------------------------------------------------------------x

<u>APPEARANCES</u>

<u>For the Union:</u>
Carl J. Levine, Esq.
Levy Ratner, P.C.

<u>For the Employer:</u>
Felice B. Ekelman, Esq.
Rachel E. Munoz, Esq.
Jackson Lewis P.C.

The undersigned, pursuant to the selection of the parties, was duly designated to serve as Arbitrator of the dispute described below.   Hearings were held in New York City on April 25, June 13, November 28, and December 13, 2018, and January 30 and March 29, 2019.   Both parties were afforded a full opportunity to examine and cross-examine witnesses, submit evidence, and present arguments in support of their respective positions.   Post-hearing briefs were received by the undersigned on or about May 25, 2019.   The record was closed at that time.   The parties granted the undersigned an extension of time for rendering the instant decision. The evidence

adduced and the positions and arguments set forth by the parties have been fully

considered in preparation and issuance of this Opinion and Award.


**THE ISSUE:**

The parties stipulated to the following issue for arbitral determination:

Did the Employer violate the collective bargaining agreement when it did not offer Georgette Fleischer an appointment for the 2017-18 academic year?  If so, what shall be the remedy?

(Transcript ("Tr.") Day 1, p. 10.)


**RELEVANT CONTRACT PROVISIONS:**


**ARTICLE 4**
**NON-DISCRIMINATION**

Section 1- Neither the Union nor the College shall discriminate on the basis of race, color, religion, creed, national or ethnic origin, sex, sexual orientation, age, disability, alienage or citizenship status, gender (including gender identity or expression), marital partnership status, union activity, political belief, military status, predisposing genetic characteristics or domestic violence victim status, or on the basis of any characteristic protected under applicable law or College policy.  The Union and the College further agree not to retaliate against persons who in good faith report discrimination or testify, assist or participate in any investigation, proceeding or hearing involving a complaint of discrimination.  The College's policies on discrimination and harassment are applicable to all members of the College community, may be found on the College's website, and may be revised by the College from time to time.  The College will distribute a copy of the policy to Unit Members in the same manner as the College distributes the policy to other faculty members.  As a condition of employment, all Unit Members must attend/complete all mandatory training/reviews required of College employees and faculty regarding the College's policies on discrimination and harassment.  The College will notify Unit Members of any such mandatory training/reviews.

Section 2- A Unit Member's claim of discrimination or harassment in violation of this Article shall be handled through the procedures available to all members of the College community except that if the Union is dissatisfied with the final outcome of the College's review of a Unit Member's claim of discrimination or harassment, the Union may file a demand for arbitration in

accordance with Article 22 – Grievance and Arbitration Procedure alleging the College violated Section 1 of this Article.  Such a demand for arbitration must be requested by the Union within 30 days of the College's review under the College's procedures is complete and the appeals process is exhausted if applicable.  These procedures may be found on the College's website and may be revised by the College from time to time.  Nothing herein is intended to prevent a Unit Member from filing a claim of unlawful discrimination or harassment with any administrative agency or court of competent jurisdiction. Nothing herein is intended to prevent a Unit Member from filing a grievance challenging any discipline issued as a result of the final outcome of the College's review of the claim of discrimination or harassment.

## ARTICLE 7
## MANAGEMENT RIGHTS

Section 1- Management of the College is vested exclusively in the College.  Except as otherwise provided in this Agreement, the Union agrees that the College has the right to establish, plan, direct and control the College's missions, programs, objectives, activities, resources, and priorities; to establish and administer procedures, rules and regulations, and direct and control College operations; to alter, extend or discontinue existing equipment, facilities, and location of operations; to determine or modify the number, qualifications, scheduling, responsibilities and assignment of Unit Members; to establish, maintain, modify or enforce standards of performance, conduct, order and safety; to evaluate, to determine the content of evaluations, and to determine the processes and criteria by which Unit Members' performance is evaluated; to establish and require Unit Members to observe College rules and regulations; to discipline or dismiss Unit Members; to establish or modify the academic calendars, including holidays and holiday scheduling; to assign work locations; to schedule hours of work; to recruit, hire or transfer; to determine how and when and by whom instruction is delivered; to determine in its sole discretion all matters relating to facility hiring and tenure and student admissions; to introduce new methods of instruction; or to subcontract all or any portion of any operations; to lay off Unit Members; to expand and contract the College and its operation and business by acquisition, sale, merger or other means; to require the participation of Unit Members in assessments of student learning; to determine all matters related to student performance, including but not limited to, attendance, grading, and performance measurement; and to exercise sole authority on all decisions involving academic matters.

Section 2 – Decisions regarding who is taught, what is taught, how it is taught, and who does the teaching involve academic judgment and shall be made a the sole discretion of the College.

3

Section 3 – No action taken by the College with respect to a management or academic right shall be subject to the grievance or arbitration procedure or collateral suit unless the exercise thereof violates an express written provision of this Agreement.

Section 4 – The above enumeration of management rights set forth in this Article 7, Section 1 is not exhaustive and does not exclude other management rights not specified herein, nor shall the exercise or non-exercise of rights constitute a waiver of any such rights by the College.

## ARTICLE 9
## ACADEMIC FREEDOM AND RESPONSIBILITY

Section 1 – Subject to legal restrictions and the terms of this Agreement, Unit Members enjoy the academic freedom to express themselves without unreasonable restriction and to be judged as a teacher on the basis of legitimate intellectual and professional criteria.

Section 2 – Subject to the terms of this Agreement, Unit Members shall have the same duties and responsibilities under College policies in connection with their teaching, grading, and professional conduct as other College faculty, including but not limited to the duty to responsibly and effectively fulfill their teaching and other job responsibilities.

Section 3 – Subject to College policies and the terms of this Agreement, Unit Members shall gave the same rights as all other College faculty to establish standards of behavior in the classroom and determine appropriate methods of evaluation, assign grades, select course material where appropriate, and plan off-campus activities or other course enhancements.

Section 4 – Unit Members are expected to deliver the course assigned and make themselves available to students on a regular basis, including outside class meeting time. Unit Members shall prepare for their classes and conduct them in an appropriately professional manner, including but not limited to meeting classes on time, holding all scheduled classes for the full period except in the event of an emergency or as a practice approved by the academic unit head, and evaluating academic performance fairly and reasonably.

Section 5 – In communicating outside the classroom and the College, Unit Members shall not represent their personal views as those of the College unless expressly authorized in writing by the College to do so.

**ARTICLE 11**
**APPOINTMENTS AND ASSIGNMENTS**

Section 1 – All appointments and/or assignments of Unit Members shall only be made by the Provost or their designee.  All appointments and assignments shall be made in writing by no later than June 1 prior to the academic year the appointment commences and will set forth the job title, rate of pay and shall specify that the position is covered by this Agreement.  This document shall constitute an official hiring document.  It is understood that appointments and/or assignments may include preparation and follow-up work performed outside the semester, such as course preparation, attendance at meetings, course assessment, grading assignments and exams, and resolution of incomplete or disputed grades.  Except as otherwise specifically provided in this Agreement, no appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment, including any particular course load, beyond its specific term as identified in a hiring document addressed to the Unit Member and signed by the Provost or their designee.  The listing of a course and/or designation or identification of a particular Unit Member in the schedule of classes does not constitute an appointment or assignment.

Section 2 – Nothing in this Agreement shall be construed as guaranteeing that any number of courses or any particular courses will be assigned to Unit Members, including but not limited to past assignments.  The College retains the right to modify the department or program, title and/or content of a course that a Unit Member has been assigned to teach.  The College reserves the right to cancel any course for any reason at any time, including but not limited to low enrollment.

Section 3 – A Unit Member's first four (4) semesters of teaching at the College are considered a probationary period.  After completing the probationary period, the College may discharge a Unit Member during the term of their appointment only for just cause.

Section 4 – In order to assess a Unit Member's teaching effectiveness, the College may observe a Unit Members' class or classes.  A Unit Member will have advance notice of such action.  A Unit Member may request a post-observation conference with the observer relative to a class observation.  They may submit a written response to any written findings associated with the observation.  Such response shall be maintained in the Unit Member's record.  A Unit Member may request an additional classroom observation by a faculty member.  For this purpose, the Unit Member shall submit to the Unit Member's Chair or Program Director three proposed observers who are full-time Barnard College Faculty who are members of the Unit Member's department or program and are not Unit Members.  The College will not unreasonably deny such a request.

Section 5 –

(a)    Commencing with the Fall of 2017, the College will give good faith consideration (as defined in Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course, as defined by course number and/or other published course identifier, for seven (7) semesters within no more than seven (7) academic years.  For purposes of this Article 11, Section 5, "course" will mean a classroom instruction course of at least one (1) point.

(b)    Appointments offered to Unit Members hired and paid on a per course basis who have completed their probationary period and have taught fewer than seen (7) semesters at the College over consecutive academic years will be for a duration of one academic year.  Such appointments will be offered by June 1 and will not include any guaranteed minimum course load or a guarantee of classes offered in both semesters of the academic year.  If the College cancels a course that was part of such one-year appointment, the Unit Member will be eligible to be paid a cancellation fee in accordance with Article 11, Section 9.  Nothing herein precludes the College from offering appointments to Unit Members who become employees after June 1 or from offering courses to Unit Members after June 1 in addition to those offered to them on or before June 1.

(c)    After teaching a total of seven (7) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis will be offered one of the following:

(1)    a one-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director.  A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)    no further class assignments but a separation payment equivalent to the monetary compensation they were paid for teaching at the College, payable in a lump sum after executing a release of claims against the College.

(d)    After teacher a total of fourteen (14) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1)    will be offered a two-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director.  A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)    will be offered no further class assignments but a separation payment equivalent to the monetary compensation they

6

were paid for teaching at the College in the most academic year in which they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3)   if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the most recent academic year in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

(e) After teaching a total of twenty-eight (28) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1)   will be offered a three-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director. A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)   will be offered no further class assignments, but a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the two (2) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3)   if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the two (2) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

(f)   After teaching a total of forty-two (42) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1)   will be offered a four-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director.  A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)   will be offered no further class assignments, but a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the three (3) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3)   if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive separation payment equivalent to the monetary compensation they were paid for teaching at the College in the three (3) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

Section 6- Good faith consideration means the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances:

(a)   Elimination or downsizing of an academic unit or program and/or merging of an academic unit or program within another academic unit or program which results in the elimination of a course taught by the Unit Member;

(b)   Creation of a full-time faculty position that absorbs an existing course taught by Unit Members or any other circumstance in which a course previously taught by a Unit Member will be taught by a full-time faculty member or non-bargaining unit member;

(c)   A reduction in the number of courses or sections offered in an academic terms or the cancellation of a course or section as determined by the College in accordance with applicable policies and procedures as they may be amended by the College from time to time, which results in the elimination of a course taught by the Unit Member;

(d)    Elimination, decrease or modifications in course offerings due to changes in core curriculum requirements, or major or minor program requirements, which impacts the course taught by the Unit Member;

(e)    Availability of another individual(s) with significantly more relevant credentials and experience;

(f)    Non-reappointment based on:

1.    Unsatisfactory performance or conduct of a Unit Member:

2.    The Unit Member's failure to meet any of the responsibilities set forth in Article 9 – Academic Freedom and Responsibility; and

3.    Misconduct of a Unit Member that is outside the scope of their employment with the College which would adversely affect the Unit Member's ability to teach or be a member of the College community.

Each appointment ceases at the end of the designated appointment period. Denials, reductions, or cancellations of appointments or assignments based on Article 11, Section 6 shall be subject to grievance and arbitration under Article 22.  The sole issue subject to grievance or arbitration over the denial, reduction or cancellation of an appointment or assignment under Article 11, Section 6, ¶¶(a)-(d) shall be whether the College established that the conditions set forth therein existed or occurred, and if they did not, the applicable remedy.  The standard of review for a grievance or arbitration alleging a violation of Article 11, Section 6, ¶¶(e)-(f) shall be whether the College established by clear and convincing evidence that one of the conditions set forth in those sections has been met.

\*    \*    \*

<u>Side Letter 1</u>

\*    \*    \*

Dear Maida:

I am writing to confirm the agreement of Barnard College and the Barnard Contingent Faculty Union, UAW, Local 2110 that for purposes of Article 11, Section 5(a) of the parties collective bargaining agreement for the term April 7, 2017 through June 30, 2022, courses whose course numbers or course titles changed without substantive change to the course content shall be treated as if they were the "same course."

9

*   *   *

Very truly yours,

JACKSON LEWIS P.C.
Michael R. Bertoncini

(Joint Exhibit 1.)

**REMEDIES SOUGHT**:

The Union requests that the Arbitrator sustain the grievance and that the Employer "be found to have violated the CBA when it did not offer Georgette Grievant an appointment for the 2017 Academic Year, that the Employer should be ordered to offer a three-year appointment to Dr. Grievant beginning in the Fall 2019 semester, per Article 11.5e.1 of the CBA, and that she otherwise be made whole."

(Union Brief pp. 109-10.)

<strong>BACKGROUND</strong>

The undersigned held six days of hearing in this matter resulting in a transcript of over 800 pages and nearly 100 exhibits.   The relevant facts are as follows:

The BCF-UAW Local 2110 ("Union") represents contingent faculty members at Barnard College ("Employer," "College," or "Barnard").   The Union and the Employer are parties to a collective bargaining agreement, effective April 7, 2017 ("Agreement").

The grievant, Dr. Georgette Fleischer, taught at Barnard for 17 consecutive years commencing in 2000.  As a contingent employee, she was reappointed by the College

10

each consecutive semester for a total of 33 semesters until she was notified of her non-reappointment in May 2017.  During her tenure at Barnard, Grievant taught primarily freshman students in courses titled First Year English, which became First Year Writing in 2016, First Year Seminar, and Critical Writing.  For 15 years prior to the summer of 2016, Grievant was supervised by the Director of the First Year English Program, Margaret Vandenberg.  During this period, she was observed twice – in 2004 and 2011.  The first observation was conducted by Vandenberg and First Year Dean Hilary Link following complaints from students about grades they received on prospectuses for a research paper.  Grievant testified that after observing her class, Link was very positive and told Grievant that if students come to complain about her she would be able to say that she observed the class and knew Grievant to be a strong teacher.  The latter observation was conducted by an outside observer from Yale University, who offered positive feedback.

Siobhan Burke is an adjunct lecturer at the College and dance writer, as well as a former student of Grievant's who credits her ability to become a successful writer to what she learned in Grievant's class.  Burke testified that she took First Year English with Grievant in 2005 and that, although expectations and standards for the class were high, "it was clear what was expected of us" and she received "detailed feedback" on papers.  (Tr. Day 4, p. 5.)

Notwithstanding Grievant's consistent reappointments by the College and praise for her teaching by Vandenberg and others, including students and former students, her tenure evidences a pattern of student complaints and negative feedback in end of semester course evaluations.  Grievant testified that the College made her aware of

11

student complaints on three occasions prior to 2016.  In 2004, according to Grievant and as stated above, some students were upset about grades they received and complained to Dean Link.   In 2007, three students expressed concerns to Lisa Hollibaugh, the first year Dean at that time.  As Hollibaugh conveyed to Grievant, "they do not understand what you expect from their papers but that their efforts to ask you for further explanation are discouraged or refused."   (Union Exhibit 28.)   Grievant responded to Hollibaugh's concerns in a detailed email, in which she explained her position and stated that she had spoken with Vandenberg and "will try to be as generous as possible in grading FY students." (Union Exhibit 28.)  Grievant testified that in 2014, Vandenberg referenced student complaints related to her first year seminar but Grievant never received specifics about the complaints and it wasn't clear that the complaints related to the issue raised.   Grievant was never disciplined while teaching at the College for student complaints or any other matter.

In addition to teaching, Grievant was extremely active in organizing the College's contingent faculty members.   She was the founding member of the Union and the person who initially reached out to Union President Maida Rosenstein to ask that she explore organizing the College's contingent faculty.   After the organizing campaign became public in 2015, Grievant attended every hearing before the National Labor Relations Board ("NLRB"), and testified as a witness for the Union.  After the Union was certified, she was elected with the most votes to the bargaining committee.    Her Barnard colleague and fellow bargaining committee member, Dr. Sonam Singh, characterized her as "by far, the most publicly identified member of the union organizing" committee.  (Tr. Day 4, p. 23.)  Grievant participated in bargaining sessions

12

from the onset of negotiations in February 2016 until she resigned from the bargaining committee on February 13, 2017 in protest over certain matters to which the bargaining committee had agreed.    She subsequently campaigned against ratification of the Agreement and worked to overturn the vote after the Agreement was ratified.[1]

Grievant also published several articles that were critical of the College.    In one of those articles, "Keeping Dissent Alive," which was published after she resigned from the Union's bargaining committee on February 13, 2017 and prior to the ratification vote thereafter, Grievant stated in reference to the negotiations over the Agreement's terms:

> Let me be clear: there is no job security in this contract.    A "just cause" standard applies only to mid-semester terminations, not for non-reappointment (Article 12, section 2).    An attempt to close that loophole with standard contract language that would have prohibited the administration from acting "in an arbitrary and capricious manner" was given up. . . .    The administration, department chairs, and program directors retain full and complete "discretion" in deciding who will stay and who will go, and in deciding of those who stay, how much they will teach (course load) as well as what they will teach and how they will teach it.

(Employer Exhibit 1.)    Grievant testified that her statement in the last sentence, above, regarding discretion was a reference to the administration's ability to decide on appointments.

Counseling Meeting with Dr. Wendy Schor-Haim

The College hired Dr. Wendy Schor-Haim in September 2008 and appointed her as Director of the First Year Writing Program ("FYW Program") in July 2015.    Prior to that appointment, Schor-Haim served as Associate Director of the Writing Program and had also taught in the Program for several years.[2]    Schor-Haim testified that when she

---

[1] Grievant filed unfair labor practice charges with the NLRB against the Union and the College.    The NLRB dismissed all the charges.    The dismissal of the charges against the College was upheld on appeal.
[2] Schor-Haim continues to teach in the FYW Program.

became Director of the FYW Program in July 2015, there were approximately 13 or 14 instructors, all of whom were adjuncts except for her.

Beginning in the summer of 2015, Schor-Haim initiated steps to transition the FYW Program from a literature focus to a writing focus based on an Academic Curriculum Review.  The reasons for the change were two-fold, according to Schor-Haim.  First, it was determined that the focus of the FYW Program should be shifted more clearly to writing.  (Tr. Day 4, p. 70.)  Second, it was difficult to develop a coherent program-wide philosophy and pedagogy due to the reliance on adjunct instructors and the amount of "movement between instructors." (*Id.*)  The decision was therefore made to move to a "full-time staffing model," which meant hiring full-time faculty with long-term contracts instead of adjunct instructors section per section that are rehired for a course each semester.  (*Id.*)  The College hired its first full-time instructor in the FYW Program in July 2016 and an additional three full-time instructors, also in the FYW Program, in July 2017.  Two of those three instructors had been adjunct professors in the English Department.

Schor-Haim testified that upon assuming the position of Director of the FYW Program, she undertook a review of student evaluations of lecturers in the Program for the previous five or six years.  She testified that she read the comments of students who took Grievant's classes and was struck by the detailed, thoughtful, and consistent nature of the comments, and the fact that they were "very negative." (Tr. Day 4, p. 82.)  Specifically, Schor-Haim stated that the comments "established an overwhelmingly negative pattern with very clear, focused areas of student concern . . . that really get to the heart of what we are doing in the First-Year Writing Program, especially as I was

14

reorienting the Program." (*Id.*)  The main areas of concern expressed in the comments, according to Schor-Haim, were primarily about the lack of clarity of Grievant's expectations.

Schor-Haim did not bring these concerns to Grievant's attention in the fall of 2015 because, she testified, she believed that her first responsibility was to lay the pedagogical groundwork for the reorientation of the FYW Program.  She also did not visit Grievant's classroom in the fall of 2015, despite an invitation from Grievant to do so, because she believed that the "patterns of student concerns" in Grievant's evaluations were not about what was happening in the classroom but rather about her feedback on written work and her expectations for students as writers.  (Tr.  Day 4, p. 84.)

Schor-Haim testified that from the time she became Director of the FYW Program until Grievant's non-reappointment, one or two students came to her every semester to complain about Grievant.  Schor-Haim acknowledged that students complained about other faculty members as well, but not with the same frequency.  She offered as a example a student who approached her in the fall of 2015.  Schor-Haim testified that this student was from an "underprivileged academic background" and expressed that she was struggling in the class and didn't understand what Grievant's expectations were and what she was supposed to be doing to be an effective college-level writer.  (Tr. Day 4 p. 86.)  She testified that the two students who approached her the following spring of 2016 expressed similar concerns, including the complaint that the feedback they were receiving on their drafts was both vague and demoralizing.   Schor-Haim testified that

she advised all of the students to consult with Grievant regarding their concerns and that none of the complaining students returned to Schor-Haim with follow up complaints.

In December 2015, Schor-Haim asked that all instructors in the FYW Program provide her with a copy of a draft of a randomly selected student essay and a final draft of that same student essay with instructor comments on both.  She testified that the purpose of this exercise was to get a sense of how instructors were commenting on drafts because feedback that students get on their writing is an important part of writing pedagogy.   Schor-Haim stated that she was particularly interested in Fleisher's feedback because she felt that she would probably be meeting with her in the future and "wanted to gather more evidence for what student evaluations and students themselves were telling me were central concerns in the classroom." (Tr. Day 4, p. 97.)

Schor-Haim testified that Grievant told her that she couldn't give her the drafts for the randomly selected student because she had already returned them to that student. According to Schor-Haim, Grievant stated that she had another student whose draft she happened to have presently, so Schor-Haim accepted that draft.  However, Schor-Haim testified that she wound up getting drafts from Grievant of yet another student entirely. Grievant testified that she did not produce the draft of the student whose essay she had originally offered to give Schor-Haim because that student changed their agreement so that wasn't able to produce what Grievant needed to give Schor-Haim.  However, she stated that when she offered Schor-Haim the drafts of a different student, Schor-Haim told Grievant that it was "exactly what she was looking for, that's great." (Tr. Day 5, p. 125; see Union Exhibit 76.)

16

Schor-Haim first placed Grievant on notice of her concerns in the fall of 2016.    In a September 9, 2016 email to Grievant, Schor-Haim asked to meet to discuss her student evaluations from the Fall 2015 and Spring 2016 semesters.    The email stated that "[s]ome comments and student concerns come up over and over, and I would like to address those and discuss strategies for improving the classroom experience without compromising rigor or your priorities for your classroom." (Union Exhibit 13.)    In response, Grievant wrote in a September 11, 2016 email that she would be happy to meet with Schor-Haim and that she appreciated Schor-Haim's willingness with work with her on strategies that would not compromise the "rigor of the course as I teach it." (Union Exhibit 13.)    Grievant also noted in the email her position that "it is not the classroom experience that students complain of, but rather grades and what they experience as high expectations and 'harsh' feedback on their work."    (Union Exhibit 13.)

Grievant met with Schor-Haim on September 26, 2016.  Also in attendance at the meeting were Union President Maida Rosenstein, Union Representative Patrick Gallagher, and College Deputy General Counsel Andrea Stagg.[3]    The parties agreed that the tone of the meeting was "collegial." (*See* Tr. Day 4, pp. 41, 89.)  Schor-Haim testified that she raised concerns at the meeting about Grievant's student evaluation responses, particularly with regard to clarity of grading standards, improving writing skills, and instructor feedback on work.  According to Rosenstein, Schor-Haim made several suggestions for which Grievant asked for explanations, and they "discussed it

---

[3] The Union takes the position that Schor-Haim held anti-union views, which the Employer denies.  It is undisputed that Schor-Haim was active in a group of Barnard full-time line faculty members that opposed their inclusion in the Union.  Schor-Haim did not deny that she endorsed the group's efforts but explained that she always supported the Union's drive for adjunct instructors.

very thoroughly." (Tr. Day 4, p. 41.)  Rosenstein stated that Grievant took notes on everything that Schor-Haim was suggesting and was "attentive and interested" in the suggestions." (*Id.*)  Rosenstein also testified that Schor-Haim said she had analyzed grades in the FTW Program in advance of the meeting and that Grievant's grades were slightly higher than average.  Rosenstein stated that Schor-Haim also said that some students had come to her office to complain about Grievant, but did not offer details on those meetings.

Schor-Haim further testified that Grievant told her during the meeting that all of the evaluations reflected the concerns of one mentally unstable student from 2002 who had written a negative review of Grievant in CULPA[4] and poisoned all her future students.  Schor-Haim added that Grievant also informed her that she had convinced CULPA in 2009 to remove that student's reviews; thus, Schor-Haim believes that Grievant's statements were unreasonable and contradictory.  Schor-Haim testified that one of the things that struck her about the meeting was Grievant's insistence that "none of these many hundreds of student evaluations over all of these nearly two decades accurately reflected anything about her class or herself as a teacher." (Tr. Day 4, p. 90.)  Schor-Haim believed that Grievant's response was unreasonable given the number of student responses and the "clear and consistent pattern" over many years. (*Id.*)

In contrast, Grievant testified that there was no discussion of student complaints at the meeting.  She testified that the first time Schor-Haim told her that a student or students came to her every semester to complain since she became Director was on May 22, 2017 when she was not reappointed.  Fleisher further testified that during the

---

[4] CULPA is an unofficial, unsanctioned student evaluation website.

meeting she was not dismissive of Schor-Haim's concerns and that it was only in an October 3, 2016 email where she raised the possibility that "because there were reputational issues that were impacting my student evaluations, in my opinion, that making changes that I was fully prepared to make, that I already immediately put into effect, might not make significant changes in my evaluations."  (Tr. Day 5, p. 105.)

In a follow-up email to the meeting, Schor-Haim thanked Grievant for "discussing issues with equanimity and open-mindedness" and summarized the strategies they discussed at the meeting for "developing, clarifying and communicating reasonable expectations to our first-year students . . . ."  (Union Exhibit 13.)  She then listed the strategies.   Grievant responded by email dated October 3, 2016, in which she thanked Schor-Haim for her kind words and stated that she was "already implementing the requests you have made in order to make First Year Writing more manageable for the students in my classes . . ." (*Id.*).  She further stated, in part:

> One concern is that my classes will be less rigorous than they have been, even though in your earlier email you indicated that such is not your intention.   Second, I am concerned that your requests convey a lack of confidence in my teaching that conflicts with the robust confidence you expressed in it only a little more than a year ago.
>
> One point of clarification: I never claimed that my grades are outliers, though I was surprised to learn that my students' expectations of their final grades are in keeping with others' [sic] students' expectations.  What I had claimed in my email before we met is that students complain a lot about grades in their evaluations of me, which suggests that grades are a primary issue for them.  It could be that students need to work harder in my classes than they do in others' in order to get grades at a certain level.
>
> As I conveyed when we met, I see the problematic elements in my evaluations as a reputation problem stemming originally from the mentally unstable student of approximately 15 years ago who filled my CULPA pages with vicious and threatening smears, of which Barnard has been aware since at least Spring, 2009.   Thus, I do not believe that my evaluations are an accurate reflection of my teaching effectiveness, and

therefore, implementing your requests may have little effect on my evaluations.

(Union Exhibit 13.)  Schor-Haim responded in an October 10, 2016 email stating, in

part:

> I really appreciate that you've already begun implementing these strategies in the classroom.  I specifically did not and would not ask you to give higher grades or to lower the bar for your students.  I calculated the other sections' GPA's to make sure that I was being fair and to get a sense of the general correlation, in FYW at least, between final grades and student evaluations.  I raised the issue in our meeting to show that the grades that you gave last year, even with perceived grades factored in, do not in themselves explain the negative patterns in your evaluations.
>
> Thank you for sending the article from *Academe*.  I do consider it my responsibility to understand the most current research into student evaluations, and I assess evaluations with that research in mind.  As I said, I find evaluations most meaningful when they reveal stable, long-term patterns, as do yours.  Even after our meeting, I didn't quite understand, as I do now from your email, that you're attributing a lot of this long-term pattern to the influence of one student.  Without minimizing the distress that student caused or rejecting the idea that his or her Culpa reviews had an impact, I'm not prepared to ignore or dismiss the concerns of so many students, especially because, as I said in the meeting, your evaluations are outliers.  I think it's appropriate as well to tell you that these concerns aren't just expressed in student evaluations; students have expressed similar sentiments to me.  I advised these students to take their concerns directly to you, as I do in almost all cases, and I'm telling you about these students now only so that you'll understand that there is a broader context for my attention to these patterns.

(Union Exhibit 13.)  It is undisputed that Schor-Haim did not request additional work

samples nor did she ask to meet with Grievant again after the September 2016 meeting

and prior to her non-reappointment in May 2017.

Schor-Haim testified that she made the decision not to reappoint Grievant after

reviewing her Spring 2017 semester evaluations.  She testified however that, in

reaching her decision, student evaluations were "part of a larger puzzle" and that

20

student complaints, Grievant's response to the student evaluations, and "student feedback in general" all factored into her decision.  (Tr. Day 4 p. 112.)

Schor-Haim notified Grievant of the decision at a May 22, 2017 meeting at which she was advised that she was not being reappointed due in part to the hiring of full time lecturers and because of her scores on student evaluations.  The College confirmed Grievant's non-reappointment in a May 22, 2017 letter that stated: "the College is not offering you an appointment to teach for the period beginning with Fall 2017."  (Joint Exhibit 6.)  It further stated that Grievant was entitled to separation pay on condition that she completes a release of claims against the College.

At the time of her non-reappointment, Grievant was the most senior adjunct in the FYW Program.  In addition to Grievant, Schor-Haim did not reappoint another adjunct instructor, Professor Anne Donlon, to the FYW Program after the Spring 2017 semester.  Two other adjunct instructors did not return.  Schor-Haim testified that she alone made the decision to not reappoint both Grievant and Donlon.

In reaching her decision not to reappoint Grievant, Schor-Haim testified that she considered whether Grievant "was able to make this reorientation, whether she was able to effectively teach the changing student body at Barnard, whether she was able to make her expectations really clear to students, and whether she cared to do so."  (Tr. Day 4, pp. 112-13.)   According to Schor-Haim, her conclusion was that Grievant "continually said that all of this evidence, even with its caveats which I recognized, doesn't reflect anything about whether or not students really are unclear on expectations, really do not feel demoralized in her classroom, that none of it is meaningful or relevant."  (*Id.* at 113.)   Schor-Haim elaborated on these statements in

testimony in which she noted that the College has accepted larger numbers of "first-generation low-income" students who bring a "host of insecurities and concerns" to the College. (*Id.* at 116.)  Having developed a program particularly for this student body, Schor-Haim testified, she is familiar with their insecurities and concerns.  Further, as part of the effort to diversify, she stated that there is a need to "develop a pedagogy that is explicitly more inclusive and that gives these students a very clear understanding of our expectations." (*Id.* at 116-17.)  Schor-Haim testified that Grievant's dismissal of these concerns was "not acceptable" to her. (*Id.* at 118.)  She ultimately concluded that Grievant was not an effective teacher in the FYW Program.[5]  Grievant, however, testified that Schor-Haim never discussed her concerns about international students or students from underprivileged academic backgrounds with her at the September 2016 meeting.

On cross-examination, Schor-Haim conceded that Grievant's evaluations did improve after the September 2016 meeting, but stated that "[i]t was a very small improvement from very, very bad to bad." (Tr. Day 4, p. 126.)  She acknowledged that students did give Grievant positive comments in areas where they felt she was effective, but that these comments were "enormously outweighed" by negative comments. (Tr. Day 4, p. 135.)  She also maintained that she could judge teaching effectiveness without observing Grievant's teaching because she believed that the issue in this instance was not one that was observable in the classroom.

---

[5] Schor-Haim stated that she did not believe that Grievant was effective in "turn[ing] high school students into college students," in the FYW Program. (Tr. Day 4 p. 133.)  By way of example, she testified that Grievant takes her first year, first semester students to the specialist librarian that works with Columbia University graduate students, and that this was a "signal" to her that Grievant was not an effective teacher in the FYW Program. (*Id.* at 134.)

22

Grievant's Student Evaluations

Students at the College are provided the opportunity to anonymously complete evaluations at the end of each semester but prior to receipt of their final grades. The evaluations consist of questions intended to elicit narrative responses as well as "Concise Course Questions" in multiple-choice format. (Union Exhibit 2.) While students provided many positive comments about Grievant and her class, the College was concerned with what it considered to be a strong and consistent pattern of negative comments, particularly with regard to clarity of grading standards and feedback, over a period of many years.

In one of two of Grievant's Spring 2016 semester classes, 13 of the 15 students submitted evaluations. In response to the question, "What improvements in the instructor's teaching would you recommend?" some of the student responses were as follows:

- I learned a lot in class during our discussions. But in terms of my writing, I wish Professor Fleischer focused more on improving my writing. Even though I would receive some comments for writing, I would not get very much specific help on how I can improve. FYE is really about students learning and transforming their writing, but I felt like I just got criticism without help for how to improve. I felt like a lot of feedback focused more on grammar (although that is of course important), rather than the actual strength of my arguments. Professor Fleischer is clearly a really intelligent professor and I really wanted to learn from her but I felt like I was not able to. I really respect Professor Fleischer's opinion but I felt like she did not help me improve. I would have liked more constructive criticism that would have transformed my writing. Also, providing a grading rubric of some kind would be really helpful to provide guidance for what constitutes what grade. I do not feel like my grade on essays reflects my understanding of the material. I really wanted to grow as a writer in this class but my ability to do so was hindered by Professor Fleischer's inability to communicate helpful tips for me to improve. Rather, I lost my confidence in my writing (which is really sad because I really wanted to major in English).

- She does not always give adequate feed back on papers.

23

- Honestly, the way she made me feel was so belittling.  She didn't stimulate my intellectual curiosity at all, rather, she made me feel like I was nothing and that my thoughts were invalid. . . . Additionally, she corrected my grammar countless times . . . At one point, she essentially told me that I didn't receive an adequate English education growing up.  Well, Georgette, when you grow up in an immigrant household, with two parents who know absolutely no english and have no idea what it is to live in America, you end up not having "perfect grammar." Ultimately, I didn't enjoy my first year english experience.  . . .

(Union Exhibit 6.)   In response to the question: "What did you value most about this course?  In what ways did the course meet your expectations?  Explain why you would or would not recommend this course?" some student responses from the same Spring 2016 class were as follows:

- I would recommend this course but only to people who aren't that concerned about their grades.

- It made me work harder on my writing even though the grades did not reflect my improvement.

- I value the readings we did, as most of them were very engaging and my first experience analyzing literature from a feminist lens.

- I would not recommend this class – Although it was interesting, I would have preferred a class that did not make me lose confidence in my writing abilities. But rather, I would have preferred a class that focused on helping me improve.

(*Id.*)  Students in the same Spring 2016 section provided the following responses to the question: "How would you rate this course on the following dimensions?" when provided with the following options: poor; fair; good; very good; excellent; and n/a.

|  | Poor | Fair | Good | Very Good | Excellent |
|---|---|---|---|---|---|
| The clarity of course requirements | 6 students (46%) | 3 students (23%) | 1 student (8%) | 2 students (15%) | 1 student (8%) |
| The clarity of grading standards | 9 students (69%) | 1 student (8%) | 0 students (0%) | 3 students (23%) | 0 students (0%) |
| The instructor's feedback on your work | 8 students (62%) | 1 student (8%) | 2 students (15%) | 1 student (8%) | 1 student (8%) |

(Union Exhibit 6.)

In one of the two Spring 2017 semester classes taught by Grievant, 9 of the 11 students submitted responses to the evaluations. In response to the question, "What improvements in the instructor's teaching would you recommend?" some of the student responses were as follows:

- Being more clear about what is expected of each assignment and allowing a student to pursue an idea or theory without giving a criticism that basically tells them to get rid of their idea.

- Professor Fleischer needs to work on her communication skills with students.

- Less vague responses on essays.

- Explain what she is looking for in assignments.

(Union Exhibit 2.)

In response to the question: "What did you value most about this course?  In what ways did the course meet your expectations?  Explain why you would or would not recommend this course?" some student responses from that same Spring 2017 section were as follows:

- In Class discussion.  The grading standards were not super clear. . .

- I valued the intimacy of the classroom and the enthusiasm of the professor with regards to the theme of the course.  It met my expectations of a writing class that taught us correct form and writing formats.  I would recommend this class if you want to learn how to perfectly create an MLA citation.

(*Id.*)  Students in the same Spring 2017 section provided the following responses to the question: "How would you rate this course on the following dimensions?":

|  | Poor | Fair | Good | Very Good | Excellent |
|---|---|---|---|---|---|
| The clarity of course requirements | 1 student (11%) | 1 student (11%) | 5 students (56%) | 1 student (11%) | 1 student (11%) |
| The clarity of grading standards | 5 students (56%) | 1 student (11%) | 2 students (22%) | 1 student (11%) | 0 students (0%) |
| The instructor's feedback on your work | 3 students (33%) | 2 students (22%) | 2 students (22%) | 2 students (22%) | 0 students (0%) |

(Union Exhibit 2.)

Both the Union and the College produced charts summarizing Grievant's student evaluation scores.  The Union produced data that Grievant created by comparing her evaluation scores in the 2015-16 and 2016-17 academic years on the multiple-choice questions.  According to the Union's data summaries, Grievant's student ratings on the questions "The clarity of course requirements," "The clarity of grading standards," and "The instructor's feedback on your work" improved by 30%, 29%, and 24%, respectively, in the four sections she taught during the 2016-17 academic year over the four sections she taught in the prior academic year.[6]  (Union Exhibit 27.)

The Employer produced charts summarizing Grievant's student evaluation scores over her last three years at the College, created by witness Dr. Carolina Tamara, a senior analyst at Barnard's Office of Institution Research Assessment.  (*See* Employer Exhibits 9, 10.)  Tamara testified that in order to create the charts, she had to assign numerical equivalents to the ratings terms (poor, fair, good, etc.).  Tamara created two sets of charts.  The first set of charts summarizes in bar graph form the average scores and standard deviations on all the multiple-choice student evaluation questions.  There

---

[6] Percentages calculated are reflective of the "average mean" of the four sections per academic year. (*See* Union Exhibit 27.)

is a bar graph for each of Grievant's final three academic years at the College (2014-15, 2015-16, and 2016-17).   The first chart in this set of charts compares Grievant's average evaluation scores with the average of all other instructors for each of the three academic years.   The second chart in the first set compares the average evaluation scores for men versus women using the same multiple-choice questions and the same time periods.   The third chart in the first set compares the average evaluations scores for men, women, and Grievant using the same multiple-choice questions and the same time periods.

The second set of charts consists of two bar graphs.   The first bar graph shows the average expected grade by appointment status for the academic years 2015-17 for three groups: FYW professors who were appointed, FYW professors who were not reappointed, and Fleischer.   The bar graph reflects that the average expected grade for this time period for students in each of these categories is 3.5 for appointed and not appointed, and slightly higher than 3.0 for Grievant.   The second chart in the set reflects this information by number of sections.   Tamara testified that in creating this set of charts, she did not take into account the reason for non-reappointment and acknowledged that a professor may have found another job but was counted as non-reappointed.

Expert Testimony on Student Evaluations

Two expert witnesses testified regarding the use of student evaluations in assessing teaching effectiveness.   The Union's witness, Dr. Susan Basow, is a professor of psychology and researcher of gender issues at Lafayette University.   She also founded Lafayette's Women and Gender Studies Program.   Basow conducts most

of her research "in a professional context, especially evaluation context, and more specifically student evaluations of professors." (Tr. Day 3, pp. 10-11.) Basow testified that she does not believe that student evaluations measure teaching effectiveness. She testified that there are studies showing that students do not accurately assess their own learning and that if a teacher is concerned about student evaluations, he or she may decrease their expectancies for a student. Basow testified that student evaluations are often related to whether students are happy with the grade they receive or expect to receive. She also testified that studies show that the correlation between student evaluations and grade expectations can differ based on gender. Specifically, Basow testified that to the extent female professors are expected to be "nurturing, kind, understanding, warm, and so on," their rating standings can often be expected to be more lenient. (Tr. Day 3 p. 28.) To the extent a female professor gives negative comments or is perceived as a harsh grader, Basow believes that students would react more negatively to her than to her male counterpart.

Basow testified that both questions in the student evaluations on which the College based its decision not to reappoint Grievant "probably are highly correlated with each other, and they're both correlated with grade expectations, as well as influenced by gender and professor." (Tr. Day 3 p. 43.) Basow further testified that she would not make a recommendation that someone not be reappointed solely on the basis of student evaluations but would obtain other information that "might suggest they're not doing a good job in the classroom." (Tr. Day 3 p. 83.)

On cross-examination, Basow agreed that student evaluations can serve a purpose for faculty members of seeing how students feel about certain aspects of

instruction and for "developmental purposes". (Tr. Day 3 p. 56.) She acknowledged that Grievant's student evaluations are mixed and that many students made frequent complaints that they didn't find there was enough guidance, or that the guidance was vague or unclear and that the existence of a pattern of these complaints over time could indicate an "absence of development" in the faculty member teaching the course. (Tr. Day 3 p. 69.)

Dr. Jennifer Frederick testified on the Employer's behalf. Frederick is the founding executive director of Yale University's Center for Teaching and Learning, which supports teaching and learning across campuses. One of the Center's units is the academic strategies program that, Frederick testified, was created to meet the needs of "populations of students who are not highly represented in higher education." (Tr. Day 3 p. 89.) She testified that she has practical experience with student evaluations through her involvement with Yale's project to revise its student course rating form.

Frederick testified that the current research on the use of student evaluations is that they shouldn't be used as the sole source of information for high-stakes decisions on instructors. She agreed that there is credible evidence to support bias in course evaluations. However, she also stated that certain evaluation questions are more reliable than others in terms of what students are able to report on teaching effectiveness. She testified that the only questions that students could answer are those about the "dimensions of the student learning experience," such as "the requirements and the clarity, and the details of the course experience". (Tr. Day 3 pp. 104, 114.)

29

After reviewing some of Grievant's student evaluations, Frederick testified that she could see that there were some "strong red flags" about the need for attention to what was happening with the course. (Tr. Day 3 p. 119.) She stated that questions about the clarity of objections, clarity of requirements, and clarity of grading standards in particular came up repeatedly. She further testified that there appeared to be a "strong over-representation" of negative comments versus positive comments. (Tr. Day 3 p. 120.) Specifically and based on her reading of narrative comments, there were many students who "weren't sure what the instructor wanted, who were struggling, who felt discouraged and who really tried to pay attention to feedback and accommodate it, but then were continuously surprised about that they weren't meeting the standard, whatever the standard was." (*Id.*) Frederick testified that she reviewed Grievant's student evaluations chronologically and did not see a particular change one way or the other over time.

Contract Negotiations/Bargaining History

The Union and the Employer commenced bargaining over the Agreement in February 2016 and concluded in February 2017. Representatives of the Union and the College offered divergent testimony regarding many aspects of the negotiations.

Deputy General Counsel Stagg, who attended negotiations on behalf of the College, testified that among other issues, the Union raised concerns during negotiations about course assignments and in particular about instructors who wanted to continue to teach a particular course but subsequently were assigned to a different one. She stated that the College did propose applying the concept of good faith consideration, but that it was to address a concern about course assignments. She

testified that the College explained during negotiations that it would give good faith consideration for these assignments to contingent faculty who taught the same course for a certain amount of years, with some exceptions.  Those exceptions included unsatisfactory performance and the hiring of a full-time instructor to teach the course.

According to Stagg, in response to the Union's continued concerns about job security with regard to appointments, the College stated that it could not offer job security but that it would agree to longer appointments for instructors with longevity teaching at the College.  She stated that if the College decided it wouldn't offer an appointment to an instructor with longevity, it would offer a severance payment and that the Union agreed to this concept.  Stagg also testified that there was no discussion of guaranteed appointments because the parties agreed on the longer appointment or severance concept.  She opined that another reason there was no discussion of this topic was because the College had consistently maintained that no one could usurp the authority of the department chair to determine appointments.  Thus, if a chair decides not to reappoint someone with longevity, they will receive an offer of severance.  Stagg testified that the College never indicated that appointments would receive good faith consideration.

Union President Rosenstein, the Union's chief negotiator, testified that the Union's main concerns during negotiations were maintenance of a course load and ongoing employment. Union bargaining committee member Singh similarly testified that the Union insisted during negotiations on some form of job security. He stated that both sides eventually compromised and moved away from their initial positions on this issue; that is, the Union moved away from a "pure seniority system with a just cause

standard," and the College moved away from "unlimited rights to do as they pleased". (Tr. Day 6, p. 8.)  Singh testified that the parties wound up with a "series of good faith considerations that the College must meet in order to reappoint." (*Id.*)

With regard to bargaining over appointments and assignments, Singh testified that Stagg mischaracterized the Union's proposals on assignments because the Union's focus was not on "owning courses," but rather on protecting and maintaining course load.   (Tr. Day 6, p. 12.)  He further testified that he had no recollection of course preferences being the focus of good faith consideration, and that such a focus would have gone against what was "in front of us in black and white," which said appointments and assignments.  (Tr. Day 6, p. 13.)

Singh further testified that the parties moved away from the concept of reserving to the College sole discretion for reappointment, to a compromise in which the College had to meet a good faith consideration standard with an enumerated list of categories and then a severance.  With regard to the concept of good faith consideration, both Rosenstein and Singh testified that the Union maintained that it was referring to its application to reappointment rights.  Rosenstein testified that the final language in the Agreement reflects that good faith consideration applies to appointments and that "that was always our understanding." (Tr. Day 6, p. 42.)

The Grievance

On June 5, 2017, the Union filed a grievance on behalf of itself and Grievant citing violations of Articles 4 and 11 of the Agreement.   It subsequently notified the Employer that it was also alleging a violation of Article 9.  The grievance initially alleged that one of the reasons for Grievant's non-reappointment was due to age discrimination.

However, Grievant also filed an age discrimination claim against the Employer before the New York City Commission on Human Rights; therefore, the Union is no longer pursuing that claim in this forum.

## POSITIONS OF THE PARTIES

### The Union's Position

The Union argues that the grievance should be granted because the Employer failed to give Grievant good faith consideration for reappointment, as required by the Agreement. It contends that the factual record demonstrates that the Employer cannot meet its burden of demonstrating by clear and convincing evidence that Grievant's performance was unsatisfactory and that such unsatisfactory performance justified her non-reappointment.

The Union's initial claim is that the Employer discriminated against Grievant, pursuant to Article 4 of the Agreement, by not re-appointing her after the Spring 2017 semester due to her union activity. While it does not dispute that Grievant failed to file a separate internal complaint alleging discrimination based on union activity, it maintains that filing such a complaint is not determinative to an Article 4 claim in this matter. Instead, the Union argues that to the extent that discrimination based on union activity is not addressed by a College policy outside of the Agreement, filing an internal complaint is not a prerequisite to asserting a claim through the Agreement's grievance and arbitration procedure.

The Union next asserts that the plain language of the Agreement requires that the Employer may only deny reappointment to a Unit Member with seniority if it has a

good faith basis for doing so.  It contends that the Employer's claim that the Agreement permits it to non-reappoint any adjunct for any reason whatsoever and that "good faith consideration," as defined in Article 11.6, means only that in the event it decides to reappoint a Unit Member, it must consider assigning them to the course they previously taught, is unsupported by the Agreement's plain language, internally inconsistent, and illogical.

The Union argues that the language of Article 11.5.a. is "absolutely clear" that the College must give good faith consideration to the appointment of a course.  (Union Brief p. 92.)  It contends that the terms "appointments" and "assignments" are used throughout Article 11, and that the two words are distinct from each other.   This is apparent from the first sentence of the article, which begins with "[a]ll appointments and/or assignments shall be made by the Provost or their designee." In addition, the "disjunctive formulation" of these terms, "appointment or assignment," is used repeatedly in Article 11.  The Union argues that such use demonstrates that the parties treated these terms as reflective of separate concepts.

The Union further argues that the fact that Article 11.5 defines "good faith consideration," by explicit reference to Article 11.6, eliminates any possible lack of clarity regarding the meaning of Article 11.5.   It offers multiple bases to support its argument.  First, the Union asserts that Article 11.6 is "absolutely clear" that "[g]ood faith consideration means that the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances."   The fact that this provision uses the term "or" in "appointment or assignment" shows that these terms are disjunctive and refer to two separate things.   It contends that to read the term

34

"appointment" as referring only to assignment would make the term "appointment" "meaningless surplusage" and is a "strained and illogical" reading of this phrase. Moreover, the Union notes, Article 11.6.f., the provision pursuant to which the Employer justified its non-reappointment of Grievant, specifically refers to "[n]on-reappointment based on (1) Unsatisfactory performance or conduct of a Unit Member . . ." and makes no reference to "assignment" whatsoever.   (Union Brief p. 93.)

Second, the use in Article 11.6 of the terms "deny, reduce, or cancel" also shows that this provision refers to more than just an adjunct's preference for assignment to a particular class.  The Union contends that the choice of one class over another is a qualitative preference, not a quantitative one; thus, whether an adjunct is assigned to one course or another, they are still assigned to a single course.  It notes that the use of the word "reduce" in particular denotes that the parties were referring to something quantitative; that is, an appointment to a particular course load, not assignment to one class over another.  Third, the section defining "good faith" is lengthy and detailed.  It includes a list of reasons that permit the Employer to "deny, reduce or cancel an appointment," as well as "distinct standards of proof" applicable to grievances challenging the existence of such claimed reasons.  The Union argues that the nature of these reasons, set forth in Article 11.6, as well as the requisite standards of proof for establishing that such reasons exist, logically support a conclusion that the intent of this language was to address the denial, reduction or cancellation of an appointment, rather than simply the issue of whether someone happens to be assigned to their preferred course in the event the College elects to reappoint them.

As to Article 7, the Management Rights provision, any reliance on such language by the Employer is misplaced, according to the Union.  This is because the enumerated rights in that article are qualified by the phrase, "[e]xcept as otherwise provided in the Agreement . . . ."  The Union maintains that Article 11 therefore provides for good faith consideration for appointment and "trumps" Article 7.  (Union Brief p. 94.)  It contends that Article 7.3 is similar in that its statement that actions taken by the College pursuant to its rights shall not be subject to the grievance and arbitration procedure is qualified by the clause, "unless the exercise thereof violates an express written provision of the Agreement."  A statement of the Employer's rights in Article 11.1 is accompanied by a similar caveat that "[e]xcept as otherwise specifically provided in this Agreement, no appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment . . ." The Union argues that such a phrase would not be necessary as written if Article 11 did not create such rights, interests or expectancies in "further appointments."  (Union Brief p. 95.)

Should the Arbitrator find the contract language ambiguous, the record evidence concerning bargaining history supports the Union's position and compels a finding that the Employer committed itself to give good faith consideration for reappointment to unit members with seniority.   The Union argues that while it is apparent from witness testimony that the parties disagree about much of which transpired during negotiations, it is uncontested that job security was a major focus for the Union throughout negotiations.  The fact that the parties negotiated the good faith provision in such detail and included language setting forth varying degrees of proof required to establish the existence of the eleven bases for making decisions about appointments or assignments

36

in the event a grievance is filed, provides additional support for its position.  According to the Union, it "stretches credulity" that the parties would have drafted such a "complex and nuanced provision" to address the "very limited issue" of whether a reappointed faculty member was assigned to their preferred course.  (Union Brief p. 98.)

The Union argues that it is uncontested that the language forming the basis for the "good faith consideration" provision of the Agreement in Article 11.6 was initially proposed by the Employer.  Citing *How Arbitration Works*, it contends that, accordingly, under the principle of *contra proferentem*, if language supplied by one party is reasonably susceptible to two interpretations, the one less favorable to the party supplying the language is preferred.  The Union further argues that had the Employer intended its proposal to apply good faith consideration only to the continued assignment to particular courses, it could have drafted a proposed that clearly provided for such an outcome.

The fact that language granting "absolute discretion" to the Employer was eventually modified by adding caveats to the Management Rights article provides additional evidence, according to the Union, that as the parties moved towards final agreement, the Employer agreed to limit its discretion.  The Union argues that the modifications were necessary to ensure that language concerning management's discretion would not undo the Employer's negotiated commitment to good faith consideration to the reappointment of Unit Members with seniority.

The Union next asserts that the Employer has failed to establish by clear and convincing evidence that Grievant's performance was unsatisfactory pursuant to Article

11.6.[7]  It argues that Grievant has always been a dedicated and hardworking faculty member and notes that the Employer has recognized this in "countless" ways, including by reappointing her 34 consecutive times.  (Union Brief p. 103.)  The Union further contends that Grievant's knowledge of her field has never been questioned nor has she been accused of misconduct.  Moreover, it asserts, many of her students have credited her with facilitating major improvements in their writing ability.

The Union recounts the events leading to Grievant's non-reappointment as follows: she was called to a meeting in September 2016 where her supervisor expressed concerns based nearly exclusively on the responses to two questions in the student evaluations and made two specific suggestions about how Grievant could improve the classroom experience for her students.  Fleisher discussed the issues raised "with equinanimity and open-mindedness," agreed to implement the suggestions, and did so.  (Union Brief p. 103.)  Her scores on those two questions and others "improved markedly" that academic year.  (Union Brief pp. 103-04.)  Between the September meeting and notification of her non-reappointment, Schor-Haim did not speak with Grievant again about any perceived problems in connection with her teacher, and there was no further counseling or disciplinary action or any kind.  Schor-Haim did not observe Grievant's teaching or review any work by her students or Grievant's written feedback on this work.

Moreover, the Union argues that there is "abundant evidence" in the record that student evaluations of teaching ("SET") do not measure teaching effectiveness, and that SET scores reflect various biases.  It asserts that there also exists gender stereotypes

---

[7]  The Union does not dispute one of the College's two stated contractual grounds for Grievant's non-reappointment, that is, the creation of new full-time faculty positions that reduced the need to appoint adjuncts.

involving expectations that women who do not exhibit expected female behaviors receive lower SET scores, and that this is particularly true with regard to questions involving grades and feedback.  In addition, there is consensus among experts that institutions of higher learning should not rely primarily on SET for making "high-stakes personnel decisions," which is what was done in this instance.  (Union Brief p. 105.)

The Union asserts that Schor-Haim, in apparent recognition of the "inadequacy of SET" as an evaluative tool for making personnel decisions, now claims that she based her decision on student complaints and Grievant's alleged unwillingness to change, in addition to the SET.  (Union Brief p. 105.)  The Union contends that the record reflects that Schor-Haim's assertion that Grievant was defensive and unwilling to change have no basis in fact and, to the extent one or two students per semester complained to Schor-Haim about Grievant, she either never brought these complaints to Grievant's attention or raised them in a perfunctory manner.  Schor-Haim also belatedly claimed that Grievant was insensitive to the needs of academically challenged students.  Yet, the evidence does not support such a claim and these concerns were never raised with Grievant.  Thus, the Union maintains, even if they were valid, she was never given the opportunity to address them.  The Union asserts that if Schor-Haim was concerned about whether Grievant's teaching was satisfactory, she could have reviewed the work produced by her students, observed her classroom, and communicated her concerns about additional changes to Grievant.  However, Schor-Haim took none of these actions.[8]

---

[8] As stated previously, the Union asserts that Schor-Haim harbors "significant animus towards the Union" and it can be inferred that her decision not to reappoint Grievant was motivated at least in part by her animus.  In support of this argument, the Union cites the fact that Schor-Haim "endorsed" statements

The Union also argues that the Employer violated Grievant's academic freedom under Article 9 of the Agreement.  It contends that the evidence shows that Grievant's performance was not judged "on the basis of legitimate intellectual and professional criteria," and that she was denied her right to establish appropriate methods of evaluation and to assign grades, in violation of Article 9 Sections 1 and 3, respectively. To the extent that Grievant's lower student evaluation scores resulted from her "rigorous standards" and that they were relied upon as the primary justification for not reappointing her, the Union asserts that she was unfairly penalized for exercising her Article 9 rights.  (Union Brief p. 109.)


**The Employer's Position**

Initially, the Employer argues that the grievance should be denied with prejudice as untimely because the Union failed to pursue Grievant's discrimination claim through the College's internal grievance procedure, pursuant to Article 4 of the Agreement, prior to filing its arbitration demand.  Assuming, *arguendo*, that the Arbitrator declines to deny the grievance as untimely, it should nonetheless still be denied because there is no evidence that the College's action was motivated by anti-union animus.  The Employer argues that the contract language is clear that there is no right to an appointment and, therefore, since the College offered Grievant separation pay, there is no contractual violation unless it did not offer her an appointment as a result of her union activity.

The Employer contends that the Union has failed to demonstrate that Schor-Haim singled Grievant out for non-reappointment based on her union activity.  To

---

accusing the Union and its organizers of "misinformation and outright lies" and of "harassing and intimidating faculty members."  (Union Brief p. 107.)

support this argument, the Employer points to the fact that Schor-Haim, the individual responsible for determining who would receive appointments to the FYW Program for the 2017-18 academic year, appointed other active Union supporters to the FYW Program, including two Union members who were given full time positions for the 2017-18 academic year. It further argues that Schor-Haim supported the Union's organizing efforts at Barnard as well as NYU, when she was a graduate instructor there. Moreover, the Union offered no evidence that Schor-Haim took steps to discourage any member from supporting the Union or otherwise interfering with or retaliating against a member.

The Employer argues that Schor-Haim's decision not to offer Grievant an appointment was based on "legitimate, non-discriminatory" reasons, which included the number of "serious and credible complaints and concerns" raised by Grievant's students over a period of time. (Employer Brief p. 11.) Grievant was on notice of these issues when they were discussed at the September 2016 meeting with Schor-Haim, during which Schor-Haim explained to Grievant that she was concerned about serious issues raised by students in their online evaluations and in person complaints. The Employer asserts that Grievant's rebuttal testimony, during which she read from notes she took at the meeting, supports Schor-Haim's account and that the testimony about the meeting establishes that Schor-Haim made a sincere effort to place Grievant on notice of the seriousness of her concerns regarding student experiences.

According to the Employer, Grievant's student evaluations showed no improvement in the Spring 2017 semester and her lack of improvement and "continued

pattern of overwhelming negative student evaluations" are additional legitimate non-discriminatory reasons that Schor-Haim did not reappoint her. (Employer Brief p. 13.)

The Employer further argues that Schor-Haim's reliance on student evaluations was appropriate and does not support a discrimination claim. Rather, the Employer contends that the student evaluations support a conclusion that Grievant's teaching effectiveness was insufficient. Student evaluations are an appropriate evaluative tool; Article 7 of the Agreement gives the College the right "to determine the content of the evaluations." (Employer Brief p 13.) The Employer contends that Dr. Frederick confirmed that student evaluations are "useful tools in ascertaining the effectiveness of teaching" and that it is important for institutions to hear from students regarding their experience. (*Id.*) It states that Frederick opined that the Grievant's student evaluations raised "strong red flags," regarding her pedagogy and student experiences in her classroom. (Employer Brief p. 13.) Dr. Basow did not offer any opinion that would call the College's consideration of the Grievant's student evaluations into question and endorsed the "responsible" use of student evaluations to see how students feel about instructors and courses. (Employer Brief p. 14.)

The Employer argues that the Agreement's language is clear and does not provide a right to an appointment. The language of Section 2 of Article 7, the Management Rights provision, is clear, and is not subject to any proviso nor is it otherwise modified. The Employer contends that accepting the Union's theory would require the Arbitrator to ignore Section 2 of Article 7. With regard to Article 11, the two terms, appointments and assignments, are "different and cannot be interchanged." (Employer Brief p. 15.) They "address two different concepts" but are "interrelated".

(*Id.*)  The Employer argues that Article 11, Section 4.a. addresses course assignments and is specific that good faith consideration applies "only in the case of appointment **and** assignment, because the first step in deciding what a unit member will teach is deciding whether that unit member will be appointed to teach."  (Employer Brief p. 16.)  (emphasis in brief).  The Employer asserts that Side Letter 1 to the Agreement is a "critical component" to understanding Section 5.a. This is because the "expansive definition" of "same course" in Side Letter 1 demonstrates the importance of the term to the application of Section 5.a.  (*Id.*)  If Section 5.a. related to appointments and not to assignments, the term "same course" would be meaningless.  In contrast, the Employer maintains, if Section 5.a. requires that good faith consideration be applied to appointments and not assignments, then most of the words in Section 5.a. would have no meaning and would render Side Letter 1 superfluous.

Further support for its interpretation of Section 5.a. can be found by examining the seven-semester requirement in that Section, the Employer argues.  The requirement in Section 5.a. is different from the other provisions of Article 11 that discuss minimum numbers of semesters because the requirement in Section 5.a. requires seven semesters of teaching the "same course."  The Employer asserts that none of the other references to longevity in Article 11 includes a requirement that a particular course or courses be taught to trigger the application of the longevity requirement at issue.  It also argues that the fact that good faith consideration in Section 5.a. addresses course assignments only makes sense given the language of Section 2, which provides that Unit Members are not guaranteed the assignment of "any number of courses or any particular courses."  Regarding Section 6 of Article 11, the Employer maintains that this

43

section also refers to course assignments.  It contends that the fact that the language of that Section focuses on reasons why a course is not available for a Unit Member to teach indicates that the intent was to set forth acceptable reasons to deny a Unit Member assignment to a course.

The Employer contends that the Union's position that good faith consideration applies to both appointments and assignments makes no sense given the language of the Agreement as a whole.  It argues that since it is undisputed that a Unit Member with longevity who is not offered an appointment will be entitled to separation pay, good faith consideration has no relevance.  The Agreement recognizes longevity by increasing appointment length or separation pay based on the number of semesters taught, as reflected in Sections 5.b.-5.f.  It asserts that the Union's interpretation would lead to an unjust result for Unit Members because longer serving instructors who taught a variety of courses would not have a right to an appointment because such right, according to the Union, belongs to instructors who consistently teach the same courses.

In the event that the Arbitrator considers external evidence in interpreting the meaning of Article 11, the Employer contends that the bargaining history supports its position that there is no right to good faith consideration for an appointment.   The College initially proposed the addition of Sections 5.a. and 6 and argues that the fact that Sections 5.b. - 5.f. were proposed after it proposed the addition of Sections 5.a. and 6 is significant in determining the meaning of Article 5.a.  This is because, according to the Employer, when viewed together as initially presented, Section 5.a. and Section 6 "clearly" addressed only course assignments. (Employer Brief p. 19.)  The Employer contends that the parties' bargaining proposals point to the conclusion that the good

faith consideration language in Section 6 was proposed in connection with Section 5.a. which discussed appointment and assignment where the Unit Member taught the "same course". (Employer Brief p. 20.)

As further proof that Section 5 was intended to refer only to assignments, the Employer argues that the initial proposals reflect that good faith consideration applied only to the assignment of three courses. For months, the existing proposal on the table limited good faith consideration to only three courses, and it was only at the "11th hour" that good faith consideration was expanded to include courses College-wide. (Employer Brief p. 20.)

To the extent there was any ambiguity in Article 11, the Employer argues that the January 13, 2017 email from the Employer's lead negotiator, Michael Bertoncini, to Rosenstein, establishes that good faith consideration applies only to a course assignment. Specifically, the email, to which was attached the Employer's new Article 11 proposal, states that Sections 5 and 6 provide certain bargaining unit members "certain rights to be appointed to teach courses that they have taught before," as outlined in the Employer's December 15 proposal. (Employer Brief p. 20.) The Employer contends that this explanation is consistent with its position that Sections 5.a and 6 relate to the assignment of an adjunct to a particular course they have already taught. It contends that the email explains that the intent of the second section of the proposal does not relate to course assignments but rather to multiyear appointments and course loads, and that Section 5, subsections 5.b. through e., address a different concept of multiyear appointments with a guaranteed course load based on longevity. Thus, the Employer asserts, the email clarifies that the purpose of subsections 5.b.

45

through e. was a compromise intended to "reward Members' longevity". These subsections were also intended to break the bargaining "log jam" between the parties in which the Union sought job security and the College was unwilling to consider seniority in its appointments and insistent on maintaining academic discretion to decide who to appoint.  (Employer Brief p. 21.)

The Employer further argues that the testimony of Union witnesses Rosenstein and Singh was not credible and that the Arbitrator should credit only Stagg's testimony. It asserts that both Union witnesses sought to minimize the importance of course assignments and did not discuss the proposals with regard to Article 11 or why the Union accepted some and rejected other key proposals to the instant dispute. The Employer also notes that Rosenstein did not dispute the explanation in the January 13, 2017 email regarding the College's new Article 11 proposal.

The Employer contends that, even if the College was required to give good faith consideration to Grievant when it elected not to reappoint her, there was no violation of the Agreement. First, the College demonstrated both that offers of full-time employment were extended to three instructors and thus fewer adjuncts were appointed to teach FYW. Second, Grievant's performance was unsatisfactory, as demonstrated by her "lengthy pattern" of poor student evaluations and student complaints, her "insistence that student feedback was not reflective of her teaching," and her unwillingness to make the changes required to be effective for a changing student body.  (Employer Brief p. 24.)

## DISCUSSION

The issue to be resolved in this matter is whether the Employer violated the Agreement when it did not offer Grievant reappointment for the 2017 academic year. The Union alleges that in failing or refusing to reappoint Grievant, the Employer violated Articles 4, 9, and 11 of the Agreement. [9]

Initially, the undersigned must address the Employer's timeliness allegation. The Employer alleges that the Union's claim that the College discriminated against Grievant for her union activity when it did not offer her a reappointment for the 2017 academic year must be dismissed because the Union did not follow the procedural requirements of Article 4 of the Agreement and is now time-barred from doing so. The Union acknowledges that Grievant never filed an internal complaint alleging discrimination based on union activity, but contends that, to the extent that discrimination based on union activity is not addressed by any non-contractual Employer policy, filing an internal complaint over such allegations is not a prerequisite to asserting a claim through the Agreement's grievance and arbitration procedure.

Article 4, Section 2 provides, in pertinent part, as follows:

> A Unit Member's claim of discrimination or harassment in violation of this Article shall be handled through the procedures available to all members of the College community except that if the Union is dissatisfied with the final outcome of the College's review of a Unit Member's claim of discrimination or harassment, the Union may file a demand for arbitration in accordance with Article 22 – Grievance and Arbitration Procedure alleging the College violated Section 1 of this Article. Such a demand for

---

[9] During the course of the arbitration, the Employer made motions to dismiss the grievance under Articles 4 and/or 11 three separate times. It alleged that the grievance should be dismissed under Article 4 because Grievant failed to use the internal grievance procedures, a mandatory condition precedent to pursue a claim under that provision. To the extent the Union alleges that Grievant was not reappointed because of her union activity in violation of Article 11, the Employer moved to dismiss the allegation on the same ground. Each time, the Arbitrator stated that the motion would be determined in the Opinion and Award. The motions to dismiss are, accordingly, addressed in the appropriate section of the Discussion herein.

arbitration must be requested by the Union within 30 days after the College's review under the College's procedures is complete and the appeals process is exhausted if applicable.

The Agreement controlling herein, at Article 4, is clear that complaints of discrimination on account of Union activity "shall" be handled through the College's internal procedures before a party can file a demand for arbitration.  It is undisputed that Grievant and the Union did not avail themselves of the College's internal dispute resolution mechanism prior to filing an arbitration demand pursuant to Article 22 of the Agreement.  The undersigned is without authority to alter the clear and unambiguous terms of the Agreement.   Accordingly, and in light of the undisputed facts, I am precluded from addressing allegations of discrimination based on union activity or anti-union animus in this proceeding.  The Union's claim that the Employer discriminated against Grievant for her union activity by not re-appointing her as an adjunct professor is therefore dismissed and the Employer's motion to dismiss the Article 4 claim is granted. Notwithstanding this finding, the Employer has offered no support for its claim that all of the remaining allegations should be dismissed on the basis of timeliness.  A failure to comply with the provisions of Article 4 does not preclude hearing the other alleged contractual violations.

The next issue for determination is whether Article 11 of the Agreement mandates that the Employer give Grievant good faith consideration when it determined not to reappoint her.  The parties disagree over the meaning and intent of Sections 5 and 6 of Article 11, which address the circumstances pursuant to which good faith consideration must be given to Unit Members.  Specifically, they dispute whether the terms of the Agreement provide that good faith consideration must be given for both

course assignments and appointments or whether it is only applicable to preference for course assignments.  Both sides argue that the language is clear and that the two terms are separate and distinct.   Nonetheless, the Union takes the former position, arguing that good faith consideration must be given to adjunct professors for both appointments and assignments for adjuncts with longevity.   The Employer argues that good faith consideration is not applicable to appointments of adjuncts and that it must only give good faith consideration with regard to course assignments.

Article 11 provides, in relevant part:

Section 5 –
(a)     Commencing with the Fall of 2017, the College will give good faith consideration (as defined in Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course, as defined by course number and/or other published course identifier, for seven (7) semesters within no more than seven (7) academic years. For purposes of this Article 11, Section 5, "course" will mean a classroom instruction course of at least one (1) point.

(b)     Appointments offered to Unit Members hired and paid on a per course basis who have completed their probationary period and have taught fewer than seen (7) semesters at the College over consecutive academic years will be for a duration of one academic year.  Such appointments will be offered by June 1 and will not include any guaranteed minimum course load or a guarantee of classes offered in both semesters of the academic year.  If the College cancels a course that was part of such one-year appointment, the Unit Member will be eligible to be paid a cancellation fee in accordance with Article 11, Section 9. Nothing herein precludes the College from offering appointments to Unit Members who become employees after June 1 or from offering courses to Unit Members after June 1 in addition to those offered to them on or before June 1.

(c)     After teaching a total of seven (7) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis will be offered one of the following:
            (1)     a one-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director.  A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)    no further class assignments but a separation payment equivalent to the monetary compensation they were paid for teaching at the College, payable in a lump sum after executing a release of claims against the College.

(d)    After teacher a total of fourteen (14) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1)    will be offered a two-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director.  A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)    will be offered no further class assignments but a separation payment equivalent to the monetary compensation they were  paid for teaching at the College in the most academic year in which they taught at the College, payable in a lump sum  after executing a release of claims against the College; or

(3)    if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the most recent academic year in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

(e) After teaching a total of twenty-eight (28) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1)    will be offered a three-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director.  A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2)    will be offered no further class assignments, but a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the two (2) most

recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3)  if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the two (2) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

\*     \*     \*

Section 6- Good faith consideration means the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances:

(a)  Elimination or downsizing of an academic unit or program and/or merging of an academic unit or program within another academic unit or program which results in the elimination of a course taught by the Unit Member;

(b)  Creation of a full-time faculty position that absorbs an existing course taught by Unit Members or any other circumstance in which a course previously taught by a Unit Member will be taught by a full-time faculty member or non-bargaining unit member;

(c)  A reduction in the number of courses or sections offered in an academic terms or the cancellation of a course or section as determined by the College in accordance with applicable policies and procedures as they may be amended by the College from time to time, which results in the elimination of a course taught by the Unit Member;

(d)  Elimination, decrease or modifications in course offerings due to changes in core curriculum requirements, or major or minor program requirements, which impacts the course taught by the Unit Member;

(e)  Availability of another individual(s) with significantly more relevant credentials and experience;

(f)  Non-reappointment based on:

1.    Unsatisfactory performance or conduct of a Unit Member:

2.    The Unit Member's failure to meet any of the responsibilities set forth in Article 9 – Academic Freedom and Responsibility; and

3.    Misconduct of a Unit Member that is outside the scope of their employment with the College which would adversely affect the Unit Member's ability to teach or be a member of the College community.

Each appointment ceases at the end of the designated appointment period. Denials, reductions, or cancellations of appointments or assignments based on Article 11, Section 6 shall be subject to grievance and arbitration under Article 22.  The sole issue subject to grievance or arbitration over the denial, reduction or cancellation of an appointment or assignment under Article 11, Section 6, ¶¶(a)-(d) shall be whether the College established that the conditions set forth therein existed or occurred, and if they did not, the applicable remedy.  The standard of review for a grievance or arbitration alleging a violation of Article 11, Section 6, ¶¶(e)-(f) shall be whether the College established by clear and convincing evidence that one of the conditions set forth in those sections has been met.

The undersigned finds that the plain language of Article 11 of the Agreement clearly and unambiguously provides that the College must give good faith consideration to a Unit Member with the requisite longevity for assignments as well as for appointments, inclusive of reappointments. Section 6 explicitly states: "Good faith consideration means the College many deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances . . . ." The presence of the connector term "or" between "appointment" and "assignment" requires that the sentence be interpreted to provide that good faith consideration is being applied separately and distinctly to both an appointment and an assignment.  The clause simply cannot logically be read any other way.  Both parties in this instance had sophisticated negotiators on their respective bargaining teams.  It must therefore be assumed that if they mutually intended for good faith consideration to apply only to the failure or refusal

to assign an instructor to a particular course, and not to appointments, they could easily have stated this.  They did not.

Additional support for this interpretation can be found elsewhere in Article 11.  In Section 6, for example, the Agreement provides that "[d]enials, reductions, or cancellations of appointments or assignments based on Article 11, Section 6 shall be subject to grievance and arbitration under Article 22."  It further provides that the "sole issue subject to grievance or arbitration over the denial, reduction or cancellation of an appointment or assignment under Article 11, Section 6  ¶¶ (a)-(d) shall be whether the College established that the conditions set forth therein existed or occurred and, if they did not, the applicable remedy."   Both clauses use the connector term "or" between the words appointment and assignment, an additional indication that good faith consideration is intended to apply to both terms separately.  If good faith consideration were intended to apply only to the denial, reduction or cancellation of an assignment, the inclusion of the word "appointment" would be both unnecessary and meaningless since an adjunct professor could not be assigned a course without already having been appointed to teach.

Moreover, as the Union points out, the use of the phrase "deny, reduce, or cancel," in the context of an appointment or assignment in Article 11, Section 6 reflects that the parties were referring to a quantitative decision such as an appointment to a particular course load, not a qualitative decision of the assignment to one class over another.  More specifically, the Employer contends that the only instance in which good faith consideration would be applicable is in the determination of whether an instructor is assigned to course A over course B, a qualitative decision.  The Employer's argument is

illogical when placed in context with the phrase "deny, reduce, or cancel" because the terms are inapplicable to the determination of whether the adjunct is assigned to one particular course over another.

It is true that the phrase "appointment and assignment" is also used in Article 11. Indeed, Article 11 is entitled "Appointments and Assignments," and the phrase is referenced in Section 5.a., which provides that "the College will give good faith consideration (as defined in Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course . . ." The Employer relies on this phrase to argue that good faith consideration is limited to course assignments because the first step in deciding what a Unit Member will teach is determining whether that member will be appointed to teach.  This argument must fail however, because it is clear from reading Article 11 as a whole that the references to the terms "appointments" and "assignments" are meant to be considered as separate concepts that are not contingent or dependent on one another.  The fact that Article 11 addresses appointments and assignments as separate concepts, particularly in the context of good faith consideration, is reinforced by the first line of the entire Article, which states: "All appointments and/or assignments of Unit Members shall only be made by the Provost or their designee."  (emphasis added.)

If the Employer's interpretation were to prevail, references to the term "appointments" in the phrase "appointment and assignments" would be meaningless because, as the Employer stated, there can be no course assignment in the absence of an appointment.  Thus, an appointment must be assumed when discussing good faith consideration for assignments.  Finally, the clause stating that "the College will give

good faith consideration . . . to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course . . ." can be interpreted to mean that the College will give good faith consideration to the appointment, the assignment, or both; however, the same is not true if one substitutes the phrase "appointment or assignment".  That is, the latter phrase cannot be read to mean that there must be both an appointment and an assignment in order to receive good faith consideration.

To the extent the Employer relies on Article 7, the Agreement's Management Rights provision, to argue that good faith consideration does not apply to appointments of adjunct professors with longevity, such an argument cannot prevail because that provision does not conflict with Article 11.  There is no dispute that the Agreement does not provide an absolute right to an appointment.  This is made clear by Article 7, Section 2 which states: "Decisions regarding who is taught, what is taught, how it is taught, and who does the teaching involve academic judgment and shall be made at the sole discretion of the College."  However, the parties agreed to give good faith consideration to instructors with longevity in certain, enumerated circumstances, and this is what Article 11 does.  Moreover, Article 7, Section 1, which lists the matters over which the College is vested with exclusive management authority, carves out an exception to that authority where "otherwise provided in the Agreement."  Article 11, Section 6 provides one of these exceptions by mandating that the College give good faith consideration to adjunct professors with longevity when determining not to offer them re-appointment under certain specified circumstances.  For all of these reasons, the Union's claim that the College must give good faith consideration under Article 11 of the Agreement to a

Unit Member with the requisite longevity for both appointments and assignments is granted.

Having determined that the Agreement requires the College to give good faith consideration to the appointment of a Unit Member with longevity under certain enumerated circumstances, the undersigned must now determine whether any of those circumstances were met under the facts presented. The Employer has asserted that Grievant was not offered reappointment after the Spring 2017 semester pursuant to two of those enumerated circumstances, which are set forth in Article 11, Article 6. They are: Article 11, Section 6.b, where "[c]reation of a full-time faculty position that absorbs an existing course taught by Unit Members. . . ." and 6.f., "[n]on-reappointment based on: 1. Unsatisfactory performance or conduct of a Unit Member". The Union does not dispute that the College created full-time faculty positions that reduced the need to appoint adjunct professors to teach sections of the FYW Program. Accordingly, the remaining issue for determination is whether the College "established by clear and convincing evidence" that it did not reappoint Grievant due to unsatisfactory performance.

Critical to the analysis of this issue is recognition of the fact that the Employer is vested with the sole discretion, through the Management Rights provision of the Agreement, to decide "who does the teaching," and to "determine the processes and criteria by which Unit Members' performance is evaluated". It also must be emphasized that the Agreement guarantees no right to future employment nor does it provide a contractual obligation to offer a Unit Member reappointment notwithstanding the number of years that he or she has taught at the College. Section 1 of Article 11 explicitly states

that, "no appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment . . . beyond its specific term as identified in a hiring document . . . ." It should also be noted that the matter before the undersigned is not a discharge case (Article 12). Thus, there is no requisite just cause standard to be applied.

With this framework in mind, and having thoroughly reviewed the testimony and evidence, the undersigned finds that the Employer has met its burden of demonstrating by clear and convincing evidence that it did not reappoint Grievant due to unsatisfactory performance. Schor-Haim, the sole decision maker in the determination not to reappoint, testified that she evaluated Grievant in the context of whether she was able to "effectively teach the changing student body at Barnard." Immediately prior to Schor-Haim's assumption of the position of Director of the FYW Program, the Program had been restructured to meet the needs of a diversifying student body. As part of the College's effort to diversify, Schor-Haim testified that there was a need to "develop a pedagogy that is explicitly more inclusive and that gives these students a very clear understanding of our expectations." She stated that in reaching her decision not to reappoint Grievant, she considered whether Grievant "was able to make this reorientation, whether she was able to effectively teach the changing student body at Barnard, whether she was able to make her expectations really clear to students, and whether she cared to do so." In making her assessment, Schor-Haim relied primarily upon student evaluations, but also considered student complaints she had consistently received and Grievant's own statements about her teaching style, Grievant's

assessment of the reasons for the poor evaluations, and her perceived ambivalence regarding the effectiveness of implementing changes in her teaching style.

Schor-Haim explained that, upon becoming Director of the FYW Program, she was troubled by a long-term pattern in Grievant's student evaluations indicating that students did not feel that they received clear expectations from her regarding grades nor did they receive clear feedback on their work. Schor-Haim counseled Grievant in September 2016, provided her with strategies to improve her pedagogy targeted to the areas of concern, and engaged in a dialogue with Grievant over these concerns. She provided Grievant an opportunity to improve in these areas. Schor-Haim acknowledged that Grievant had implemented some of the strategies in her classroom following the September 2016 meeting and that her student evaluations showed some improvement in the stated areas of concern  - clarity of grading standards and instructor feedback on work during the 2016-17 academic year. Ultimately, however, Schor-Haim made the determination that the improvements in student evaluations were simply not significant enough. In her words, "[i]t was a very small improvement from very, very bad to bad." While there is no dispute that some students gave Grievant positive comments in areas where they felt she was effective, Schor-Haim assessed that such comments were "enormously outweighed" by negative comments even after the September 2016 meeting.

In determining not to reappoint Grievant, Schor-Haim also took into consideration Grievant's own assessments of the student evaluations and her attitude towards the strategies provided to improve her teaching effectiveness in the stated areas of concern. Specifically, Schor-Haim expressed concern over Grievant's statements that

she did not believe the evaluations accurately reflected her teaching effectiveness and that implementing the strategies may have little effect on her evaluations because Schor-Haim felt such statements indicated Grievant's belief that they were not meaningful or relevant.   Perhaps more troubling to Schor-Haim was Grievant's insistence that the poor student evaluations were attributable to a "reputation problem" stemming from the comments of an unstable student that she taught in 2002.

Schor-Haim clearly demonstrated her strong belief that Grievant's dismissal of the evaluations on their face and her reluctance to change her approach in order to offer clearer expectations to a changing student body were red flags indicating that she could not be effective in meeting the FYW Program's goals.   Schor-Haim convincingly stated the basis for her negative assessment of Grievant's attitude, outlook, and ability to change when faced with a new program-wide focus and philosophy and a diversifying student body. Given the totality of the circumstances, the Employer has demonstrated a good faith belief that Grievant's performance was unsatisfactory.   For all of these reasons, the Employer has established by clear and convincing evidence that it believes, in good faith, that the Grievant's abilities to fulfill the goals of the redesigned FYW program were lacking.

The Union offers numerous reasons why the Employer cannot demonstrate that it gave Grievant good faith consideration in determining not to reappoint her. Initially, to the extent the Union contends that the College did not reappoint Grievant based on discrimination due to union activity or animus in violation of Article 11, the Employer's motion to dismiss is granted as a result of the failure of Grievant and the Union to abide by the provisions contained in Article 4, as discussed above.

The Union asserts that the first time it put Grievant on notice that her performance needed improvement was in September 2016 and that it never communicated with her about her performance again before deciding not to reappoint her. It maintains that between September 2016 and the date Schor-Haim notified Grievant of her non-reappointment, Schor-Haim did not observe her teach, did not review her work samples, and did not even speak to her again. The Union also contends that the Employer failed to provide Grievant with an opportunity to address concerns about student complaints and insensitivity to academically challenged students, which it raised only in a perfunctory manner.

In point of fact, the Employer was under no contractual obligation to take any particular steps or use any specific metric in determining not to reappoint Grievant. While the Union and the Grievant may not agree with the College's assessment of her abilities as an adjunct professor and whether she improved her performance after the September 2016 meeting, it is within the College's discretion, pursuant to the Agreement's Management Rights provision, to make a final decision regarding an appointment using the assessment method of its choice.

The Union further contends that the Employer's nearly exclusive reliance on two questions in the student evaluations to assess Grievant's teaching effectiveness proves that the Employer failed to meet its burden of demonstrating unsatisfactory performance. It points to the abundant evidence in the record, provided by experts and others, urging that student evaluations do not measure teaching effectiveness and reflect various biases including stereotypes against female professors who are less lenient in grading. It also contends that the Employer relied on such evaluations to the

60

exclusion of other evaluative tools to gauge teaching effectiveness such as classroom observations and portfolio reviews.

The record, however, reflects that the Employer used the evaluations as the primary, but not the only, tool to determine whether Grievant was making improvements in the specified areas at issue. Indeed, Schor-Haim also relied on student complaints and, importantly, her own assessment based on communications with Grievant, of Grievant's ability to adapt to the changes in the FYW Program and the student body as a whole. It is clear that the parties in this matter place different weight on the use of student evaluations to assess teaching effectiveness. Notwithstanding how the parties and others value student evaluations in assessing teaching effectiveness, the reliance primarily on such evaluations in and of themselves is not evidence of bad faith on the part of the Employer.

Moreover, the Employer never indicated that the student evaluations reflected that Grievant was wholly ineffective in teaching writing skills, that the evaluations demonstrated a lack of improvement in student writing, or that the teaching environment in Grievant's classroom was toxic or otherwise inappropriate. In fact, Schor-Haim explicitly stated that she did not feel the need to observe Grievant in the classroom because these were not her concerns.

It should also be noted that Schor-Haim clearly indicated that she did not attribute Grievant's poor student evaluations to low grades or expectations of low grades. The record reflects that during the September 2016 counseling meeting she stated that she had analyzed grades in the FYW Program and that Grievant's grades were slightly higher than average. In a follow up email to Grievant in October 2016,

Schor-Haim stated that she raised the issue of grades during the meeting "to show that the grades you gave last year, even with perceived grades factored in, do not in themselves explain the negative patterns in your evaluations."

In short, while the Union and the Grievant may not agree with the College's assessment of her abilities as an adjunct professor and whether she improved her performance, it is within the Employer's discretion, pursuant to the Management Rights provision, to make a final decision regarding an appointment using assessment tools of its choosing. For all of these reasons, the undersigned cannot credit the Union's argument that the Employer failed to meet its burden of demonstrating by clear and convincing evidence that Grievant's performance was unsatisfactory.

Finally, the undersigned rejects as lacking in merit the Union's claims that the Employer violated Grievant's rights under Article 9 of the Agreement by failing to judge her "on the basis of legitimate intellectual and professional criteria," and denying her the right to establish appropriate methods of evaluation and to assign grades. There is simply no evidence in the record to support these claims. In fact, with regard to the latter claims of denying her academic freedom, the record is clear that the College never interfered with the rigor of her courses or any aspect of her teaching style and priorities. Accordingly, such claim is denied.

Therefore, based on the record before him, and for the reasons stated hereinabove, the undersigned renders the following

**<u>AWARD:</u>**

The grievance is denied.  The Employer did not violate the collective bargaining agreement when it did not offer Georgette Fleischer an appointment for the 2017-18 academic year.


DATED:      August 19, 2019
            Brooklyn, New York


                              _____
                              RALPH S. BERGER
                              Arbitrator

I, RALPH S. BERGER, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Opinion and Award.

Dated:     August 19, 2019
           Brooklyn, New York

_____
RALPH S. BERGER
Arbitrator

# EXHIBIT B

## Georgette Fleischer, Candidate for BCF-UAW Bargaining Committee



For sixteen consecutive years, I have proudly served as an adjunct in the English Department at Barnard. I hold a B.A. from the University of Michigan, Ann Arbor and a Ph.D. from Columbia University in English and Comparative Literature (February, 2002). I was the first faculty member to go on the "cold calls" (office hours, later classroom visits) that started the BCF-UAW campaign at Barnard; I am the only faculty member who attended every informal meeting held in 2014 and over the course of the Spring, 2015 semester; I both testified on behalf of the union at the NLRB hearings at 26 Federal Plaza, and attended every day of those hearings in order to fact-check for the UAW's attorneys. A tenant and political activist who has served my community for decades, including as Founder of Friends of Petrosino Square, and a Democratic County Committee member, I have a proven record of hard work, strong leadership, and integrity.

With other members of the BCF-UAW bargaining committee and help from the BCF-UAW organizing committee, I am committed to forging a contract driven by the collective will of the faculty.

"It took a lot of courage and fortitude for contingent faculty at Barnard to organize into a union," English adjunct lecturer Georgette Fleischer said. "I hope we will inspire other faculty, including our tenured colleagues at Barnard, to stand up for due process and fair treatment, and to exercise vigorously the principles of shared governance and academic freedom."—*Columbia Spectator*, September 30, 2015

# EXHIBIT C

Keeping Dissent Alive:

# Why I Will Vote against the Barnard Contingent Faculty-UAW Local 2110 Contract

## Georgette Fleischer

I have been part-time faculty in the English Department at Barnard College for seventeen years, and I was a primary mover of the union drive, until after weeks of being voted down 3 to 1 on pretty much everything, I resigned from the bargaining committee on February 13th. The three main improvements sought by the membership were higher salaries, benefits, and a modicum of job security [link: http://2110uaw.org/BCF-UAW_Barnard_Contract_2017.03.08.pdf]. Let me take them in order.

Salaries. Arriving at a $10k per 3+-credit course minimum by Academic Year 2020-2021 looks impressive, but it will benefit future more than current faculty (see Job Security below), and the UAW, which takes 2% of each member's gross annual salary. Flat minimum salary increases efface distinctions that used to prevail for faculty with a Ph.D. and those with long-term service to the College. Further, for the first year of the contract, AY2017-2018, my best estimates are that only 52% of the membership will receive a salary increase above the fallback 3%, or possibly only 2% for our full-time Term Professors, and two-thirds of that 3% will go to the UAW.  A 0% to 1% net increase is not an impressive result for 48% of the membership. Average net increases will be 6%, but disparities in distribution are huge, ranging from over 40% to 0%. Moreover, before the contract, Term Professors received annual salary increases of around 3%. For the upcoming academic year, the 76% of Term Professors who will receive only the 3% increase will, because of the contract, lose two-thirds of their customary increase to union dues. Keep in mind that Barnard Contingent Faculty won the right to collectively bargain on October 2, 2015, but protracted negotiations have delayed our hoped-for gains. Two years is a long time to wait for a salary increase to begin with, so it is disappointing that only slightly better than half our membership will enjoy anything above 0% to 1% even then.

Benefits. Two years is a long time to wait for health insurance, and the contract's provisions delay that benefit an additional two years for most part-time faculty who stand to be eligible, ever, for a premium subsidy equal to one-half that of our full-time colleagues, until Fall 2019. To be eligible for the subsidy one must teach a minimum of 9 credits in AY2017-2019, and a minimum of 6 credits in AY2019-2022. All faculty may buy into the College health insurance plan at full fare, but it appears to cost about $12k in yearly premiums for an individual in 2017—provided the less costly Emblem Plan can be implemented (Article 14, section 3). Whether Emblem or Cigna A, the full-fare cost of Barnard-sponsored health insurance will exceed the cost of most, if not all, policies under Affordable Care, even in pricey New York State. Though members who responded to our December 2015 survey stated that retirement benefits were a priority, none of the part-time membership will receive employer contributions, ever. The 10% employer contribution the bargaining committee proposed was given up wholesale in favor of aiming for health insurance. Tuition assistance, child care subsidy, and paid sick, bereavement, parental, and academic leaves were additionally given up in favor of health insurance, and professional development was decimated from about $1053 to $132 per part-time faculty member. Health Insurance was the single highest priority benefit for the membership, and the benefit in favor of which all these other benefits were given up. What does it look like in the contract? "Weak" as a long-term colleague put it to me. Only 12% of the part-time membership will be eligible for a partial health insurance subsidy for AY2017-2019. When one deducts from that 12% those who will not assert their eligibility, and projects eliminations due to course load reductions in AY2017-2019 (see Job Security below), it seems inevitable that the figure will fall to single-digit percentage points. "Underwhelming," as another colleague put it.

Job Security. Let me be clear: there is no job security in this contract. A "just cause" standard applies only to mid-semester terminations, not for non-reappointment (Article 12, section 2). An attempt to close that loophole with standard contract language that would have prohibited the administration from acting "in an arbitrary and capricious

manner" was given up. Job security is what caused one colleague to call the contract "bruising," and yet another, long-term colleague to call it the contract's "greatest weakness"— precisely where he had "hoped it would be strongest." The administration, department chairs, and program directors retain full and complete "discretion" in deciding who will stay and who will go, and in deciding of those who stay, how much they will teach (course load) as well as what they will teach and how they will teach it. "Discretion" and "flexibility" are buzz words used by right-to-work proponents and administrations bent on undermining tenure, shared governance, and academic freedom [link: https://www.insidehighered.com/news/2016/03/11/u-wisconsin-board-regents-approves-new-tenure-policies-despite-faculty-concerns; link: https://www.aaup.org/report/academic-freedom-and-tenure-bennington-college]. If you are favored by your department chair, you may be fine: but keep all those fingers and toes tightly crossed. Job security being what it isn't, those flashy salary increases will be cold comfort for many of us.

I have never heard of a faculty contract in which those who have done the most service to the College receive the worst possible terms of employment, whose only incentive is to leave the College forthwith with a small severance payment that has a tall order attached to it: "executing a release of claims against the College" (Article 11, section 5). What if there are outstanding or future discrimination, unfair labor practice, or retaliation claims? If you want to understand how sad sack the BCF Local 2110 contract is, read the New School's, another UAW contract but under Local 7902: [link: http://www.actuaw.org/wp/wp-content/uploads/2016/06/TNS-PTF-CBA-2014-2019.pdf]. Part-time faculty enjoy multi-year contracts in which their course loads are preserved, longevity increases to their salaries, increasing health insurance subsidies starting at 80% for individual coverage, 10% employer contribution for retirement, and paid academic leave. And then there is academic freedom: "The University and the Union agree that academic freedom is essential to the fulfillment of the purposes of the University. University policies on Academic Freedom. . . shall be in effect for all Faculty" (Article VIII).

<u>A Note on Academic Freedom</u>. The Barnard *Code of Academic Freedom and Tenure* [link: https://barnard.edu/provost/institutional-policies/academic-code] could have been incorporated into the BCF contract, as it was in language I drafted but was jettisoned. Instead, BCF faculty have freedom only "to express [our]selves without unreasonable restriction and to be judged as a teacher on the basis of legitimate intellectual and professional criteria" (Article 9, section 1). Should we not worry about what kinds of *reasonable* restrictions the administration might impose on our expression? And who will decide what constitutes *reasonable*? Situated as we are in the age of Trump, this slippery language could become a slippery slope. Additionally troubling is a late addition to Management Rights, which hands over to the administration the right "to determine all matters related to student performance, including but not limited to, attendance, grading, and performance measurement" (Article 7, section 1). After I protested this give-away, a fellow bargaining committee member asked my basis, and I directed him to the American Association of University Professors policy on assignment of course grades, "which argues that the faculty member offering a course should be responsible for the evaluation of student course work and, under normal circumstances, is the sole judge of the grades received by the students in that course" [link: https://www.aaup.org/issues/grading]. My colleague acknowledged the point, and then affirmed his decision to align with the others in voting me down 3 to 1. For me, the casualness with which my fellow bargaining committee members tossed that hunk of our academic freedom over their shoulders, without a backward glance, hit a new low.

<u>How did this happen?</u> It would take more space than I have here to narrate the ins and outs, but I will point out what I pointed to internally in the weeks before I resigned, when the writing appeared on the wall: the UAW receives 2% of our salaries regardless of who teaches the courses, it does not receive 2% of health insurance premiums, and it does not receive 2% of job security or academic freedom. As a final note I would ask, especially of those of you who will be voting on this contract: did the corporate objectives of the UAW dovetail with the corporate objectives of the College to result in a future in which long-term Barnard Contingent Faculty will be left out in the cold?

# EXHIBIT D

**Georgette Fleischer**
**19 Cleveland Place, apt. 4A**
**New York, NY 10012**
**(212) 966-3474**
georgette.fleischer@verizon.net

March 25, 2017

<u>via certified mail</u>
Maida Rosenstein (maidarosenstein@2110uaw.org)
President, Local 2110 UAW
256 W. 38th Street, Suite 704
New York, NY 10018

Booker Washington
Vice President, Local 2110 UAW
256 W. 38th Street, Suite 704
New York, NY 10018

Michael Cinquina (michaelcinquina@2110uaw.org)
Secretary-Treasurer, Local 2110 UAW
256 W. 38th Street, Suite 704
New York, NY 10018

Re:    Vote to ratify Barnard Contingent Faculty, Local 2110 UAW contract

Dear Ms. Rosenstein, Mr. Washington, and Mr. Cinquina:

I write with concerns about the ratification vote that took place on March 21-March 24, 2017 for the Barnard Contingent Faculty Local 2110 first contract.

1. there were no observers;
2. the ballots were not securely housed;
3. at least one faculty member voted from off campus;
4. at least one faculty member voted before the ballot box opened on March 21;
5. some votes were cast not in the lobby of Barnard Hall but rather from other locations on the Barnard campus;
6. the method of casting ballots was changed after the start of balloting, from a ballot inside of two sealed envelopes with signature or hand-printed name on the outer seal, to loose ballots;
7. aside from signing a union membership card, eligibility for voting (having taught in Academic Year 2016-2017) was not announced;
8. I believe the list of eligible voters was changed after the start of the election;
9. my request to see the list of eligible voters was denied; and
10. the terms of the contract were misrepresented, at the March 21 Town Hall and the March 23 information meeting, and possibly on other occasions.

I request that the vote be retaken after suitable time for full, open, and accurate discussion of the contract's terms.

I look forward to your timely reply.

Sincerely yours,

Georgette Fleischer

ccs: Julie Kushner, Region 9A UAW Director: jkushner@uaw.net
Carl Levine, Levy Ratner, P.C.: clevine@levyratner.com

SECRET BALLOT DISCONTINUED, 11 SECRET BALLOTS MISLABELED "UNDER CHALLENGE"

**Georgette Fleischer**
**19 Cleveland Place, apt. 4A**
**New York, NY 10012**
**(212) 966-3474**
georgette.fleischer@verizon.net

April 5, 2017

<u>via certified mail</u>
June Benjamin
Recording Secretary, Local 2110 UAW
256 W. 38th Street, Suite 704
New York, NY 10018

Re:  <u>Vote to ratify Barnard Contingent Faculty, Local 2110 UAW first contract, etc.</u>

Dear Ms. Benjamin:

Per Article XIV of Local 2110's bylaws I write to appeal the denial of my request that the March 21-24, 2017 contract ratification vote be retaken (please see enclosed certified mail of March 25, 2017, to which I have received no reply).

Per Article VI, section 4. (a) of Local 2110's bylaws, I understand that the Executive Board meets once a month, and I request that I be given a "full opportunity to be heard" (XIV, section 1. (b)) on this appeal and additional grievances listed below at the next Executive Board meeting, and that I be allowed to bring someone with me:

1. per Article X, section. 9 of Local 2110's bylaws, "the Executive Board or its designee" was required to hold an election to replace the only bargaining committee member who was full-time faculty and the only faculty from the Social Sciences (there were never any from the Sciences), Term professor of Economics Núria Quella, within 30 days of her permanent vacancy on July 1, 2016: that was not done;
2. beginning in at least November 2016 Local 2110 President Maida Rosenstein engaged in several "side bar" conversations and "off-the-record" bargaining sessions with the administration's outside counsel, at least one of which lasted close to two hours, from which she specifically excluded me;
3. Ms. Rosenstein called an important conference call on January 23, after the administration's attorney threatened to permanently replace all faculty should we go out on strike, at a time she knew I could not participate: indeed, the call happened so quickly it was over before I even knew it had taken place;
4. Ms. Rosenstein scheduled the last two weeks of bargaining sessions (weeks of February 6 and February 13, 2017) at times she knew I could not attend; and
5. in addition to misrepresentations of the contract referred to in item 10 of my March 25 certified mail, Ms. Rosenstein, Ted Feng (Region 9A Associate Director), and the three remaining bargaining committee members misrepresented, in a March 26 email to the membership that is still live on Facebook, the 99 ballots of the ratification vote as "representing over half the membership": on the contrary, my best educated estimates are that for AY2016-2017 our membership consists of 190 part-time and 36 full-time faculty; therefore, even if all counted ballots were legitimate (at least two "under challenge" came from clearly ineligible voters), the contract was ratified by only 39% of the membership (89), and the total potentially legitimate votes cast (97) represent only 43% of the membership and 72% of the votes cast for the strike authorization vote in December 2016 (135 = 119 yes, 15 no, 1 blank).

I look forward to your timely reply.

Sincerely yours,

Georgette Fleischer

ccs: Maida Rosenstein, Local 2110 President: maidarosenstein@2110uaw.org
Julie Kushner, Region 9A UAW Director: jkushner@uaw.net

To: Local 2110 UAW Executive Board (Maida Rosenstein, President; Booker Washington, Vice President; Michael Cinquina, Secretary-Treasurer; June Benjamin, Recording Secretary; Sharon Walls, Trustee; Jesus Diaz, Trustee; Stacy Thomas, Trustee; Julie Wokaty, Sergeant-at-Arms; Patrick Gallagher, Guide; Chair of the Retiree Chapter)[1]

From: Georgette Fleischer, Barnard Contingent Faculty Local 2110 UAW

Date: May 10, 2017

Re: Complaint against Local 2110 President Maida Rosenstein and Region 9A Associate Director Ted Feng

This complaint relates to actions taken or failed to be taken beginning in early 2015 related to the campaign to organize the Barnard Contingent Faculty, both part-time and off-ladder full-time faculty, into a collective bargaining unit under Local 2110 of the UAW.

I repeat all the items I complain of in my March 25 and April 5, 2017 letters to the Executive Board.

Since I am allotted a short a time to air my complaint, I will collect items under three rubrics, the last of which introduces a new category of complaint beyond my March 25 and April 5, 2017 letters:

1) Incompetence, negligence, collusion with management, and misrepresentations to the BCF membership, resulting in the worst faculty contract I have ever seen, and one which, aside from minimum salary increases for most—which themselves level senior part-time faculty to the pay scale of new hires—makes the conditions of our employment worse than they were without the BCF first contract, signed April 7, 2017 by Maida Rosenstein, Ted Feng, Sonam Singh, Siobhan Burke, and Todd Rouhe on behalf of BCF-UAW;

2) Election fraud during the contract ratification vote of March 21-March 24, 2017; and

3) Miscarriage of fiduciary responsibility/misappropriation of union funds beginning in June or July 2015 through the present.

---

[1] Per Article VI, section 5 of the Local 2110 By-laws, "All decisions and recommendations of the Executive Board shall be referred to the next regular Joint Council meeting."

# EXHIBIT E

# Union botches first arbitration under the contract, creates terrible precedent for all Barnard Contingent Faculty (BCF)

"Justice deferred is justice denied."—Barnard College alumna, an attorney, when she learned that my arbitration is not scheduled to begin until April 25, 2018

Dear BCF colleagues,

At least nine BCF were fired in the wake of the first contingent faculty contract under Local 2110 of the UAW, seven of us long-term, one an alumna, and three of us very long term: close to 20 years of service to the College and no fewer than four courses a year. It appears that two or three have accepted or come to accept what has happened, but most of us have struggled. To my knowledge I am alone in grieving my termination, but the majority who decided not to go this route express bitterness over their mistreatment by the union leadership; some have accepted money from the College but feel "drained," angry, "sad" not to be teaching at Barnard any more. For at least three of us, these ruthless terminations have ended our teaching careers and taken our livelihoods. Meanwhile, the union leadership has done little for us. At least three of the nine terminated faculty got no more than one telephone call from Local 2110 President Maida Rosenstein; it could be that one or two did not even get that.

As BCF's founding member I may have done the most to promote the union, but several other of the faculty I refer to above, including those who express emotional distress over this terrible experience, contributed significantly and publicly to the union formation and its resulting contract, in most cases because Maida had asked them directly and specifically to do so. Disregard for our outcomes after these terminations, which resulted from weak job security in the contract the union leadership unfortunately accepted, is therefore selfish in addition to being cruel.

After months of delay, I finally had a first hearing on August 14th; two weeks later Provost Linda Bell rejected the union's grievance on my behalf. Unconscionably, my arbitration is currently scheduled for April 25, 2018, nearly a year after termination, with an arbitrator I believe has a conflict of interest because of his tangential but troubling association with Jackson Lewis, the union-busting firm which fought us for 18 months on the contract and which is also representing the College in fighting unfair labor practice charges brought on my behalf at the National Labor Relations Board.

In written responses to me and a couple of other BCF who were nice enough to write the union leadership on my behalf, the union has made its position clear both through Maida and Sonam Singh:

a. the union has no responsibility whatsoever for the delay in my arbitration (only the College does); and

b. there is nothing the union can do about it.

For the past five months since I was fired, none of the union leadership has taken or returned a single one of my telephone calls; they have failed to answer my emails for days and weeks at a stretch, if at all; Maida in particular refused to respond to two written requests for a timeline for my grievance (June 16th, June 22nd). I believe there is a direct correlation between Maida's refusal to provide a standard timeline, and the fact that my arbitration is scheduled for a year after termination.

Please rest assured that this is not standard operating procedure for faculty unions generally. On the contrary, based on my discussions with members of other locals both in and out of the UAW, BCF Local 2110 strikes a new low for lack of professionalism.

Neither the union nor the College administration wants the bother or expense of a grievance let alone arbitration. Both have made the process as dilatory and frustrating as possible for me as the first grievant, in order to chill arbitration by any potential future grievant.

It is not too late to change this.

If you feel it's important for BCF present and future to have grievance and arbitration that is more than a sham and an opportunity to abuse the grievant, please write:

maidarosenstein@2110uaw.org
sonam.singh@gmail.com

with the subject line:

# E X P E D I T E   J U S T I C E   F O R   F L E I S C H E R   A N D   A L L   B C F

Tell Maida and Sonam to launch a social media campaign to pressure the administration to declare the first arbitrator unavailable and move to the next who is timely available. Supporters of the social media campaign should also email beilock@barnard.edu with the same demand.

You have paid your union dues or agency fees, and you have a right to demand something for yourself and other BCF members in return.

A Partial Timeline of Union Delay:

Delay 1:  On May 31st I made a written request to Maida to meet with the other terminated faculty to explore a class grievance. However, Maida delayed and the meeting was not arranged until June 26th, more than a month after we had been fired, and by that time each terminated faculty member had gone his or her own way in isolation, and there was no way to bring us together anymore.

Delay 2: On June 5th Maida and I met with her attorney and agreed to file the grievance on my behalf at Step 2 instead of Step 1, in order to expedite my grievance and also to keep open the possibility of a class grievance with other terminated faculty. After I left they filed the grievance at Step 1 regardless.

Delay 3:  Though we filed the grievance on June 5th and I wanted to move forward as quickly as possible the union froze my grievance for two months. If the grievance had been heard on June 19th at Step 2 as planned, it would have been decided by July 3rd at latest, at which point we could have proceeded immediately to arbitration, which I was led to believe could happen first as early as "July," later as early as "September," and even later "unlikely. . . before October." The April 25, 2018 date came as a shock.

Delay 4: Even after the College rejected the grievance on August 28th, the union dragged its feet for more than two weeks before moving for arbitration, and it moved then only because I repeatedly kept pressuring the union about the passage of time, in response to which all I got was annoyance.

Delay 5: Over my vigorous objections to the first arbitrator, expressed in person at the September 9th Labor Day parade, at which I was the only BCF marching, Maida "accepted" on September 19th both the arbitrator's late dates, inviting the Barnard administration to choose the latest, and announcing on September 23rd  that April 25, 2018 had been "officially scheduled."

# EXHIBIT F

Re: Photo of Augusta
Sat, Sep 28, 2019 9:24 am
georgette.fleischer (georgette.fleischer@verizon.net)To:MaidaRosenstein Details Slideshow
Hi Maida,

Thanks for sharing this photo, which is lovely also. The one I was referring to, however, is posted on the Local 2110 Facebook page (Sept. 9 @ 7:55 a.m.); I attach a snip of the photo so you can see which one it is.

Please reconsider joining me in fighting Barnard. I know the case is uphill, but I cannot let that blatantly dishonest Berger decision stand as a precedent which will be used against other Local 2110 workers who teach. The ruling on the use of SET alone demands a challenge, whether successful or not.

I have started annotating the decision for Hank Reichman of the national AAUP who will be writing another piece for *Academe* blog about my case (he wrote that great piece in 2017, Barnard Adjunct Fights for Her Job). That is just the beginning of the leg work I would do for Carl to use as little of his time as possible. Carl aced this case. Carl would ace a challenge in court, whether successful or not. Such challenge would demonstrate to the membership and hostile administrations how far Local 2110 will go to defend the lion's share of its workers on issues that are sure to arise again and again.

I have been looking for a *pro bono* attorney, unsuccessfully so far and it's not looking good. Having talked to several who are experts in this area, it appears that if I challenge the Berger decision on my own I will have no choice but to sue Local 2110 alongside Barnard, in order to gain standing. I do not want to do that. I want to work with Local 2110 against Barnard. The other suggestion I got is to bring a charge against Local 2110 at NLRB for DFR for not defending the CBA by moving to vacate the foul Berger decision. Again, I do not want to do that. But these are my only choices if I do this challenge solo.

I have thought very carefully about this. I cannot in good conscience let the Berger decision stand. If I have to challenge it on my own, I will. But I really, really, really would rather work with Local 2110. I will do everything I possibly can to save resources. Simply put, Carl can use me as an unpaid paralegal.

Please reconsider.

In solidarity,

Georgette

# EXHIBIT G

```
------------------------------------------------------------X
```
In the Matter of the
Arbitration Between

BCF-UAW LOCAL 2110,

       -and-                              **Before Arbitrator**
                                                    **Ralph S. Berger**

BARNARD COLLEGE

Re:  Non-Reappointment of Georgette Fleischer

```
------------------------------------------------------------X
```

"[W]hen I think back on kind of my early development as a writer, I really do think back specifically to Georgette Fleischer's class and how much I learned there. . . . I remember it was a steep learning curve.  I remember thinking at the end that I had really improved. And as I moved through college, I remember feeling grateful, that even though this had been a difficult class, that I had had the kind of rigor and attention of her eyes on my work."   Professor Burke, Tr. 4:50:10-20.

"I honestly think that Professor Fleischer is an amazing professor. She knows how to lead discussions and she knows what she is talking about. However, my only 'complaint' is that she can be a harsh grader. When I got my first essay back, I cried because of the poor grade. But I realized that I didn't put as much effort as I thought I did. So I worked so much more on the second essay and the research paper, and I am very happy with the results. I feel that as long as she knows you're putting in effort and doing your best, she will reward you. I became a better writer because of her." U-4 at p.20.

"The professor provides constructive criticism on my work; I did not realize how much my essay writing had improved until the end of the course." U-4 at p.19.

Carl J. Levine
Levy Ratner PC
80 Eighth Avenue, 8th Floor
New York, NY  10011
(212) 627-8100

**TABLE OF CONTENTS**

## Contents

THE ISSUE TO BE RESOLVED ................................................................................1

COLLECTIVE BARGAINING AGREEMENT.........................................................1

PROCEDURAL HISTORY ...................................................................................12

INTRODUCTION ................................................................................................13

STATEMENT OF FACTS .....................................................................................17

    A. Georgette Fleischer's Work History at Barnard: 2000-2015 ..........................17

    B. The 2015-2016 Academic Year ...................................................................20

    C. The September 2016 Meeting .....................................................................22

    D. The 2016-2017 Academic Year and the Decision Not to Reappoint Professor Fleischer....26

    E. Professor Fleischer's Student Evaluations ...................................................29

    F. Data on Professor Fleischer's Grades and Expected Grades................................50

    G. Work-Related Issues Raised Only After the Notice of Non-Reappointment .......................53

        1. Claims That Professor Fleischer Was Not Responsive to International Students and Academically Disadvantaged Students.........................................................53

        2. Student Complaints .............................................................................56

    H. Professor Fleischer's Union Activity...............................................................58

    I. Wendy Schor-Haim's Anti-Union Animus ....................................................60

    J. The Grievance ...............................................................................................62

    K. Expert Testimony...........................................................................................64

        1. The Experts ............................................................................................64

        2. The Use of Student Evaluations of Teaching To Assess Teaching Effectiveness.............66

        3. The Relationship Between Grades, Expected Grades, Grading Standards, and Student Evaluations of Teaching .......................................................................71

        4. Reaction to Professor Fleischer's Evaluations................................................73

    L. Bargaining History ........................................................................................76

        1. The Employer's Position .........................................................................77

        2. The Union's Position ..............................................................................81

ARGUMENT.........................................................................................................89

I. UNDER THE COLLECTIVE BARGAINING AGREEMENT THE EMPLOYER NEEDED A GOOD FAITH REASON FOR NOT REAPPOINTING PROFESSOR FLEISCHER ................................................................................................89

A. The Plain Language of the CBA Requires the Employer To Have a Good Faith Reason to Deny a Unit Member with Seniority Reappointment ........................................................ 89

B. If the Applicable Provisions of the CBA Are Determined to Be Ambiguous, the Bargaining History, and Generally Applicable Rules of Contract Interpretation, Further Corroborate that the Employer Was Required to Have a Good Faith Reason to Deny Professor Fleischer an Appointment.................................................................................................................. 96

II. THE EMPLOYER DID NOT HAVE A GOOD FAITH REASON FOR NOT REAPPOINTING PROFESSOR FLEISCHER.................................................................... 101

A. The Applicable Standard of Proof.................................................................................... 101

B. The Employer Has Failed To Establish Clear and Convincing Evidence that Professor Fleischer's Performance Was Unsatisfactory. ................................................................. 103

C. The Role of Anti-Union Animus in the Decision Not To Reappoint Professor Fleischer . 106

III. THE EMPLOYER VIOLATED PROFESSOR FLEISCHER'S ACADEMIC FREEDOM 108

CONCLUSION............................................................................................................................. 109

# TABLE OF AUTHORITIES

Cases

Anchor Glass Container Corp.,
    136 L.A. (Miles, 2016) .................................................................. 89
Anderson-Tully Co.,
    88 L.A. 7 (Hart, 1986) ................................................................ 108
City of Duluth, Minn.,
    100 L.A. 309, 312 (Ver Ploeg, 1992)............................................. 93
City of Vallejo,
    86 L.A. 1082, 1085 (Bogue, 1986) ............................................... 95
Clifton Paper Bd. Co.,
    11 L.A. 1019, 1020 (Stein 1949) ................................................ 101
Contract Carpets,
    68 L.A. 1022 (Finston, 1977)...................................................... 108
Dresser-Rand Co.,
    100 L.A. 333 (Pribble, 1992) ........................................................ 90
Geauga Co.,
    92 L.A. 54, 58 (Fullmer, 1988)................................................... 108
Great Atlantic & Pacific Tea Co.,
    70 L.A. 1003 (Horowitz, 1978) ..................................................... 90
Gulf Printing Co.,
    92 L.A. 893 (King, 1989)............................................................... 90
In the Matter of City A and Union,
    2017 AAA LEXIS 39 (Renovitch, 2017)...................................... 102
John Deere Tractor Co.,
    5 L.A. 631 (Updegraff, 1946) ....................................................... 91
Kahn's and Co.,
    83 L.A. 1225, 1230 (Murphy, 1984)............................................. 97
Klein Tools,
    90 L.A. 1150 (Poindexter, 1988) ................................................... 95
Madison Warehouse Corp.,
    112 L.A. 300 (Suardi, 1998) ......................................................... 97
Nassau Inn, Inc. (Palmer Square, Inc.),
    45 L.A. 530, 531 (Kerrison, 1965)................................................ 95
Progress Energy Florida, Inc.,
    2010 Lab. Arb. LEXIS 20 stet (Jennings, 2010)........................... 102
Riley Stoker Corp.,
    7 L.A. 764 (Platt, 1947) ................................................................ 90
U.S.W. Communications,
    114 L.A. 752 (Monat, 2000) ......................................................... 90

Zircoa, Inc.,
    136 BNA LA 105 (Szuter, 2016)…………………………………………………...102


Other Authorities

Cogent Education
    "Student evaluations of teaching are an inadequate assessment tool for evaluating faculty
    performance", Henry A. Hornstein (2017) 4:1304016……………………………….....35
How Arbitration Works, Elkouri and Elkouri (8th ed. 2016) ……………………………..passim
Restatement (Second) of Contracts, § 202 ……………………………………………………90

```
-----------------------------------------------------------------X
```
In the Matter of the
Arbitration Between

BCF-UAW LOCAL 2110

   -and-

BARNARD COLLEGE

Re:  Non-Reappointment of Georgette Fleischer
```
-----------------------------------------------------------------X
```

              **Before Arbitrator**
              **Ralph S. Berger**

## THE ISSUE TO BE RESOLVED

Did the Employer violate the CBA when it did not offer Georgette Fleischer an appointment for the 2017 Academic Year, and if so what shall be the remedy?

## COLLECTIVE BARGAINING AGREEMENT[1]

### ARTICLE 4
### NON-DISCRIMINATION

   <u>Section 1</u> —Neither the Union nor the College shall discriminate on the basis of race, color, religion, creed, national or ethnic origin, sex, sexual orientation, age, disability, alienage or citizenship status, gender (including gender identity or expression), marital partnership status, union activity, political belief, military status, predisposing genetic characteristics or domestic violence victim status, or on the basis of any characteristic protected under applicable law or College policy. The Union and the College further agree not to retaliate against persons who in good faith report discrimination or testify, assist or participate in any investigation, proceeding

---

[1] The Collective Bargaining Agreement is in the record as Joint Exhibit 1 (J-1).  Hereafter Joint Exhibits shall be designated as J-___, Union Exhibits as U-___, and Employer Exhibits as E-___.

1

or hearing involving a complaint of discrimination. The College's policies on discrimination and harassment are applicable to all members of the College community, may be found on the College's website, and may be revised by the College from time to time. The College will distribute a copy of the policy to Unit Members in the same manner as the College distributes the policy to other faculty members. As a condition of employment, all Unit Members must attend/complete all mandatory training/reviews required of College employees and faculty regarding the College's policies on discrimination and harassment. The College will notify Unit Members of any such mandatory training/reviews.

Section 2 — A Unit Member's claim of discrimination or harassment in violation of this Article shall be handled through the procedures available to all members of the College community, except that if the Union is dissatisfied with the final outcome of the College review of a Unit Member's claim of discrimination or harassment, the Union may file a demand for arbitration in accordance with Article 22 - Grievance and Arbitration Procedure alleging the College violated Section 1 of this Article. Such a demand for arbitration must be requested by the Union within 30 days after the College's review under the College's procedures is complete and the appeals process is exhausted if applicable. Those procedures may be found on the College's website and may be revised by the College from time to time. Nothing herein is intended to prevent a Unit Member from filing a claim of unlawful discrimination or harassment with any administrative agency or court of competent jurisdiction. Nothing herein is intended to prevent a Unit Member from filing a grievance challenging any discipline issued as a result of the final outcome of the College's review of the claim of discrimination or harassment.

ARTICLE 7
MANAGEMENT RIGHTS

Section 1 — Management of the College is vested exclusively in the College. Except as otherwise provided in this Agreement, the Union agrees that the College has the right to establish, plan, direct and control the College's missions, programs, objectives, activities, resources, and priorities; to establish and administer procedures, rules and regulations, and direct

2

and control College operations; to alter, extend or discontinue existing equipment, facilities, and location of operations; to determine or modify the number, qualifications, scheduling, responsibilities and assignment of Unit Members; to establish, maintain, modify or enforce standards of performance, conduct, order and safety; to evaluate, to determine the content of evaluations, and to determine the processes and criteria by which Unit Members' performance is evaluated; to establish and require Unit Members to observe College rules and regulations; to discipline or dismiss Unit Members; to establish or modify the academic calendars, including holidays and holiday scheduling; to assign work locations; to schedule hours of work; to recruit, hire or transfer; to determine how and when and by whom instruction is delivered; to determine in its sole discretion all matters relating to faculty hiring and tenure and student admissions; to introduce new methods of instruction; or to subcontract all or any portion of any operations; to lay off Unit Members; to expand and contract the College and its operations and business by acquisition, sale, merger or other means; to require the participation of Unit Members in assessments of student learning; to determine all matters related to student performance, including but not limited to, attendance, grading, and performance measurement; and to exercise sole authority on all decisions involving academic matters.

Section 2 — Decisions regarding who is taught, what is taught, how it is taught, and who does the teaching involve academic judgment and shall be made at the sole discretion of the College.

Section 3 — No action taken by the College with respect to a management or academic right shall be subject to the grievance or arbitration procedure or collateral suit unless the exercise thereof violates an express written provision of this Agreement.

Section 4 — The above enumeration of management rights set forth in this Article 7, Section 1 is not exhaustive and does not exclude other management rights not specified herein, nor shall the exercise or non-exercise of rights constitute a waiver of any such rights by the College.

3

ARTICLE 9
ACADEMIC FREEDOM AND RESPONSIBILITY

Section 1 — Subject to legal restrictions and the terms of this Agreement, Unit Members enjoy the academic freedom to express themselves without unreasonable restriction and to be judged as a teacher on the basis of legitimate intellectual and professional criteria.

Section 2 — Subject to the terms of this Agreement, Unit Members shall have the same duties and responsibilities under College policies in connection with their teaching, grading, and professional conduct as other College faculty, including but not limited to the duty to responsibly and effectively fulfill their teaching and other job responsibilities.

Section 3 — Subject to College policies and the terms of this Agreement, Unit Members shall have the same rights as all other College faculty to establish standards of behavior in the classroom and determine appropriate methods of evaluation, assign grades, select course material where appropriate, and plan off-campus activities or other course enhancements.

Section 4 — Unit Members are expected to deliver the course assigned and make themselves available to students on a regular basis, including outside class meeting time. Unit Members shall prepare for their classes and conduct them in an appropriately professional manner, including but not limited to meeting classes on time, holding all scheduled classes for the full period except in the event of an emergency or as a practice approved by the academic unit head, and evaluating academic performance fairly and reasonably.

Section 5 — In communicating outside the classroom and the College, Unit Members shall not represent their personal views as those of the College unless expressly authorized in writing by the College to do so.

4

ARTICLE 11
APPOINTMENTS AND ASSIGNMENTS

Section 1 — All appointments and/or assignments of Unit Members shall only be made by the Provost or their designee. All appointments and assignments shall be made in writing by no later than June I prior to the academic year the appointment commences and will set forth the job title, rate of pay and shall specify that the position is covered by this Agreement. This document shall constitute an official hiring document. It is understood that appointments and/or assignments may include preparation and follow-up work performed outside the semester, such as course preparation, attendance at meetings, course assessment, grading assignments and exams, and resolution of incomplete or disputed grades. Except as otherwise specifically provided in this Agreement, no appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment, including any particular course load, beyond its specific term as identified in a hiring document addressed to the Unit Member and signed by the Provost or their designee. The listing of a course and/or designation or identification of a particular Unit Member in the schedule of classes does not constitute an appointment or assignment.

Section 2 — Nothing in this Agreement shall be construed as guaranteeing that any number of courses or any particular courses will be assigned to Unit Members, including but not limited to past assignments. The College retains the right to modify the department or program, title and/or content of a course that a Unit Member has been assigned to teach. The College reserves the right to cancel any course for any reason at any time, including but not limited to low enrollment.

Section 3 — A Unit Member's first four (4) semesters of teaching at the College are considered a probationary period. After completing the probationary period, the College may discharge a Unit Member during the term of their appointment only for just cause.

5

Section 4 — In order to assess a Unit Member's teaching effectiveness, the College may observe a Unit Member's class or classes. A Unit Member will have advance notice of such action. A Unit Member may request a post-observation conference with the observer relative to a class observation. They may submit a written response to any written findings associated with the observation. Such response shall be maintained in the Unit Member's record. A Unit Member may request an additional classroom observation by a faculty member. For this purpose, the Unit Member shall submit to the Unit Member's Chair or Program Director three proposed observers who are full-time Barnard College Faculty who are members of the Unit Member's department or program and are not Unit Members. The College will not unreasonably deny such a request.

Section 5—

(a) Commencing with the Fall of 2017, the College will give good faith consideration (as defined in Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course, as defined by course number and/or other published course identifier, for seven (7) semesters within no more than seven (7) academic years. For purposes of this Article 11, Section 5, "course" will mean a classroom instruction course of at least one (1) point.

(b) Appointments offered to Unit Members hired and paid on a per course basis who have completed their probationary period and have taught fewer than seven (7) semesters at the College over consecutive academic years will be for a duration of one academic year. Such appointments will be offered by June 1 and will not include any guaranteed minimum course load or a guarantee of classes offered in both semesters of the academic year. If the College cancels a course that was part of such a one-year appointment, the Unit Member will be eligible to be paid a cancellation fee in accordance with Article 11, Section 9. Nothing herein precludes the College from offering appointments to Unit Members who become employees after June 1 or from offering courses to Unit Members after June 1 in addition to those offered to them on or before June 1.

6

(c) After teaching a total of seven (7) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis will be offered one of the following:

(1) a one-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director. A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2) no further class assignments but a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the most recent semester in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

(d) After teaching a total of fourteen (14) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1) will be offered a two-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director. A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2) will be offered no further class assignments but a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the most recent academic year in which they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3) if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the most recent academic year in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

(e) After teaching a total of twenty-eight (28) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1) will be offered a three-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director. A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2) will be offered no further class assignments, but a separation payment equivalent to the monetary compensation they were paid for teaching

8

at the College in the two (2) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3) if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the two (2) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

(f) After teaching a total of forty-two (42) semesters at the College over consecutive academic years, a Unit Member who is hired and paid on a per course basis:

(1) will be offered a four-year appointment guaranteeing assignment of up to three (3) classes for each academic year during the term of the appointment, at the discretion of the Chair or Program Director. A Unit Member may be assigned to teach more than the number of classes guaranteed in the appointment at the discretion of the Chair or Program Director; or

(2) will be offered no further class assignments, but a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the three (3) most recent academic years in which

they taught at the College, payable in a lump sum after executing a release of claims against the College; or

(3) if offered a course load for the academic year that is less than the average course load per academic year over the previous three (3) academic years, have the option to decline the class assignments and instead elect to be offered no further class assignments and receive a separation payment equivalent to the monetary compensation they were paid for teaching at the College in the three (3) most recent academic years in which they taught at the College, payable in a lump sum after executing a release of claims against the College.

Section 6 — Good faith consideration means the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances:

(a) Elimination or downsizing of an academic unit or program and/or merging of an academic unit or program within another academic unit or program which results in the elimination of a course taught by the Unit Member;

(b) Creation of a full-time faculty position that absorbs an existing course taught by Unit Members or any other circumstance in which a course previously taught by a Unit Member will be taught by a full-time faculty member or non-bargaining unit member;

(c) A reduction in the number of courses or sections offered in an academic term or the cancellation of a course or section as determined by the College in accordance with applicable policies and procedures as they may be amended by the College from time to time, which results in the elimination of a course taught by the Unit

10

Member;

(d)  Elimination, decrease or modifications in course offerings due to changes in core curriculum requirements, or major or minor program requirements, which impacts the course taught by the Unit Member;

(e)  Availability of another individual(s) with significantly more relevant credentials and experience;

(f)  Non-reappointment based on:

   1.  Unsatisfactory performance or conduct of a Unit Member;

   2.  The Unit Member's failure to meet any of the responsibilities set forth in Article 9 — Academic Freedom and Responsibility; and

   3.  Misconduct of a Unit Member that is outside the scope of their employment with the College which would adversely affect the Unit Member's ability to teach or be a member of the College community.

Each appointment ceases at the end of the designated appointment period. Denials, reductions, or cancellations of appointments or assignments based on Article 11, Section 6 shall be subject to grievance and arbitration under Article 22. The sole issue subject to grievance or arbitration over the denial, reduction or cancellation of an appointment or assignment under Article 11, Section 6, ¶¶(a)-(d) shall be whether the College established that the conditions set forth therein existed or occurred, and if they did not, the applicable remedy. The standard of review for a grievance or arbitration alleging a violation of Article 11, Section 6, ¶¶(e)-(f) shall be whether the College established by clear and convincing evidence that one of the conditions set forth in those sections has been met.

Section 7 — A Unit Member who receives an offer of an appointment or assignment must indicate their acceptance of that offer in accordance with applicable College policies as they may be amended by the College from time to time.

Section 8 — In the event a Unit Member cannot complete an appointment or assignment, the College shall compensate that Unit Member on a pro rata basis for the portion of the appointment or assignment they completed. The Provost or their designee, in their sole discretion, will appoint an individual to complete the Unit Member's appointment or assignment.

Section 9 — A Unit Member who timely accepts an offer of appointment or assignment of a course will be paid a cancellation preparation fee equivalent to twenty-five percent (25%) of the total course compensation when a course is cancelled on or within fourteen (14) days prior to the first scheduled class meeting or after a course is begun. If cancellation occurs after a course begins, the Unit Member will also receive pro-rated course pay for sessions taught.

Section 10 — Term/full-time faculty must be notified of non-renewal of their contract by no later than August 30 of the year before their term ends.

## **PROCEDURAL HISTORY**

The initial Collective Bargaining Agreement ("CBA") between BCF-UAW Local 2110 (the "Union") and Barnard College ("Barnard" or "College" or "Employer") was effective April 7, 2017. J-1. Forty-five days later Professor Georgette Fleischer was informed that she would not be reappointed to teach at Barnard.

On June 5, 2017, the Union filed a First Step Grievance alleging that the "failure/refusal to reappoint" Dr. Fleischer violated the new CBA "including but not limited to Articles 4 and 11." J-2.[2] On June 15, 2017, the Grievance was amended to include an explicit reference to

---

[2] Professor Fleischer did not file an internal complaint with the office (continued on next page)

Article 9, Academic Freedom. J-3. On August 3, 2017, the Union requested that the Grievance be heard at Step 2 of the grievance process. The Employer subsequently granted this request. J-4. A grievance hearing was held on August 14, 2017, and an Answer, denying the Grievance was issued on August 28, 2017. J-4. A timely demand for arbitration was filed on September 11, 2017. J-5.[3]

Pursuant to the terms of the CBA Arbitrator Ralph Berger was appointed to hear the case. Six hearings were held on April 25, 2018, June 13, 2018, November 28, 2018, December 13, 2018, January 30, 2019, and March 29, 2019, when the record was closed. The parties agreed to submit briefs by May 17, 2019, a date subsequently extended until May 24, 2019, at the request of the Union. Given the length of the hearing and the size of the record the parties mutually agreed to allow the Arbitrator more than the contractually specified 30 days to render a Decision.

## INTRODUCTION

For 17 years Professor Fleischer worked at Barnard teaching First Year English, First Year Writing, First Year Seminar and Critical Writing. She served throughout this period pursuant to one semester appointments. Thirty-three consecutive times the Employer made the

---

of equity alleging anti-union animus before filing the present grievance. Tr. 2:34:15-18, 5:81:17-20.

[3] Both Dr. Fleischer and the Union filed charges against Barnard with the National Labor Relations Board alleging, *inter alia*, that Dr. Fleischer's non-reappointment was retaliation for her protected union activity. These charges were ultimately dismissed. Tr. 2:25:15-24, 2:27:11-29:8, 2:34:6-14. Dr. Fleischer, acting *pro se*, also filed a charge against the Union, alleging that it had failed to negotiate a CBA that adequately protected long term faculty. This charge was also dismissed. Tr. 2:29:9-18, 2:31:21-25, 2:33:3-24. The Union objected to the admission of evidence concerning these charges, and will address their relevance to this proceeding, or lack thereof, below.

affirmative decision to reappoint her. For the first 16 of these 17 years she was recognized as an exemplary, hard-working member of the faculty. She was never disciplined. Indeed, she was chosen to showcase Barnard's programs, both to outside evaluators, and to prestigious alumnae. But then she decided to organize a union, and everything changed.

On September 26, 2016, less than a year after the Union she fought for was certified, Professor Fleischer was called into a meeting with her supervisor, who shared purported concerns with her about student responses on two questions contained in her student evaluations. Her supervisor made specific suggestions about how Professor Fleischer should address these concerns. Dr. Fleischer agreed to implement these suggestions, and did so. Her supervisor praised her willingness to discuss "difficult issues with equanimity and open-mindedness."

Nonetheless, less than eight months later, without having receiving any additional warnings or discipline, and without any review of her work whatsoever, Professor Fleischer was told that her services were being terminated. After serving for 17 years, she was denied reappointment for the fall 2017 semester, the first semester covered by the terms of the new CBA she had helped to negotiate.

Despite the Employer's claims to the contrary, the CBA is clear that the Employer must give "good faith consideration" to the appointment and assignment of a Unit member to a course when the unit member has taught the same course for seven or more semesters. Good faith, in this case, means something more than its normal dictionary definition. Rather, the term is explicitly defined, in great detail, in the CBA. Good faith consideration is defined in Article 11 Section 6, which begins: "Good faith consideration means the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances:" The CBA goes on to define in considerable detail what those circumstances are.

While the Employer claims, despite this language, that it had unfettered discretion to not reappoint Professor Fleischer, it also apparently argues, in the alternative, that it had good faith reasons within the meaning of Article 11.6. First, it relies on the fact that it hired new full-time faculty to teach in the First Year Writing program, reducing the number of sections available for adjuncts. J-1 at Article 11.6.b. In addition, to explain why Dr. Fleischer was chosen for non-reappointment, over others with less seniority, they cite her alleged unsatisfactory performance. J-1 at Article 11.6.f.1. Under the CBA, the standard of review for establishing a good faith basis for non-reappointment based on allegedly unsatisfactory performance is "clear and convincing evidence." The Employer has failed to meet its burden in this case.

The *first time* that Professor Fleischer was ever told that there was anything about her performance which needed to be improved was in her 2016 meeting with her supervisor Dr. Schor-Haim. This was also the *last time* that the Employer ever communicated with her about her performance before deciding to discontinue her employment. The only substantive issue raised at that meeting was Professor Fleischer's scores on two student evaluation questions. Dr. Fleischer listened respectfully, she implemented the changes in her teaching suggested by her supervisor, and her scores on the two questions at issue improved. Nonetheless, without observing her teach, reviewing any work samples, or even speaking with her again, Dr. Schor-Haim made the decision to not reappoint her eight months later.

Perhaps recognizing, after the fact, that student evaluations alone form an inadequate basis for making personnel decisions, particularly given the facts in this case, the Employer has tried belatedly to revise the record. It now argues that its decision was based not only on student evaluations, but also on student complaints, and on Dr. Fleischer's purported unwillingness to

address issues of concern that were raised with her.  However, the record simply does not support these claims.

In the first place, however, the weight of the evidence supports a conclusion that individual student complaints were never raised with Professor Fleischer, or if they were, they were raised well after the fact, and in no more than a perfunctory manner. The Employer did not seem to be overly concerned about such complaints at the time they were made, and certainly did not give Dr. Fleischer an opportunity to address any concerns raised by her students.

But of even more significance is the Employer's belated attempt, despite overwhelming evidence to the contrary, to portray Professor Fleischer as dismissive of the Employer's concerns and unwilling to change.  Indeed, even the Employer's *own expert witness*, Dr. Jennifer Frederick, confronted with evidence of Dr. Fleischer's willingness to implement changes suggested by her supervisor, evidence withheld from her when she was preparing for her testimony, concluded that, in light of Dr. Fleischer's apparent willingness to implement changes in her teaching, it would have been a good thing for the Employer to at least review student outcomes from her last academic year of teaching before making the decision to not reappoint her. Dr. Frederick also concluded, despite Dr. Schor-Haim's testimony to the contrary, that it did not appear that Dr. Fleischer had been defensive in the 2016 meeting. Dr. Schor-Haim's reliance on Dr. Fleischer supposed unwillingness to change, in the face of the evidence to the contrary, calls her credibility as a witness into question.  It also undermines her stated rationale for not reappointing Professor Fleischer after 17 years of service to the College.

Barnard College did not give good faith consideration to Dr. Fleischer for reappointment. It based its decision exclusively (or at least overwhelmingly) on her scores on two questions from her student evaluation.  It failed to credit, in any way, her willingness to implement

suggested changes in her teaching, and the resulting improvement in her student evaluations. It made the decision, eight months after an oral counseling, without any further discussion or discipline, without observing her teach, and without reviewing her student work. In light of these facts the Employer cannot meet its burden of proof of showing, by clear and convincing evidence, that Professor Fleischer's performance was unsatisfactory, and that this justified her non-reappointment.

## STATEMENT OF FACTS

### A. Georgette Fleischer's Work History at Barnard: 2000-2015

Dr. Fleischer began teaching at Barnard in September of 2000.[4]  Tr. 1:61:21-24.[5]  For 17 years she taught each semester for a total of 34 consecutive semesters. Throughout this period she was a non-union, at-will employee. She was never given appointments of longer than one semester. Nonetheless, 33 consecutive times the Employer made a decision to appoint her. Tr. 1:64:3-8.

Professor Fleischer has taught writing since she began at Barnard. It was initially called First Year English, and became First Year Writing in 2016. She also taught First Year Seminar and Critical Writing. Tr. 1:63:19-64:2. Throughout her time at Barnard Dr. Fleischer taught courses covered by the Side Letter: ENGLBC 1201 and 1210. Tr. 2:8:10-9:12, J-1 (Side Letter

---

[4] Dr. Fleischer has a Ph.D in English and Comparative Literature from Columbia University, and an extensive record of scholarly publication. In addition to teaching at Barnard College she has taught at Columbia University, where she continues to teach periodically to date, Montclair State University, City College (CUNY) and Brooklyn College (CUNY). U-14.

[5] References to the Transcript ("Tr.") will designate the hearing date, followed by the page, followed by the lines in the Transcript. Thus, for example, Tr. 1:61:21-24 indicates that the reference is to the first hearing day (April 25, 2018), Page 61, Lines 21-24.

1, "Same Courses"). For her first 16 years her record was exemplary, and her teaching was consistently praised. Prior to September of 2016, she was never disciplined. Tr. 1:103:15-104:5.

In her 17 years at Barnard, Dr. Fleischer has had only had two formal classroom observations. Most recently, in 2011, Dr. Fleischer's class was observed as part of an outside review of the First Year English Program. Dr. Fleischer was selected by the then Director of the Program Margaret Vandenberg as one of two faculty members from the Program to be observed. Tr. 1:64:9-11-67:10, U-15, U-16. She was observed by Alfred Guy, Director of Writing and Assistant Dean from Yale University. U-16. In thanking her for agreeing to be observed Dr. Vandenberg expressed her "appreciation of how you teach every day, no matter who is in the room." U-15. She received very positive feedback from the outside observer. Tr. 1:67:16-68:9, U-16. Dr. Schor-Haim subsequently described the resulting report as "glowing." U-17.[6]

Based on the strength of her teaching Margaret Vandenberg, Professor Fleischer's supervisor for 15 years, recommended that she be assigned to teach First Year Seminar and Critical Writing, in addition to First Year English. Tr. 1:70:4-8. Because she was respected as a teacher she was also invited to teach a "Revisiting the Classics" seminar, offered to alumnae. Tr. 1:70:21-71:6, 1:74:19-75:19, U-19. A Barnard Trustee who took the class wrote to praise her teaching (Tr. 1:76:4-22, U-20), and she was subsequently invited to teach another seminar. Tr. 1:77:6-24, U-21 ("Thank you again for your wonderful contribution . . . Thanks to you, this alumnae seminar was a great success.").

---

[6] The other time she was formally observed was in 2004, after some students complained about grades. Both Dean Link and Margaret Vandenberg observed her separately. She was also asked to provide samples of student work with comments. Dean Link was very positive following the observation, and described Professor Fleischer as a strong teacher. Tr. 1:72:14-74:14, 1:90:19-91:6, 1:98:15-22.

Peter Platt, at the time Chair of the English Department, used to listen to her teach from the hallway. In 2013 he wrote to her: "I always love listening to you teach," describing Dr. Fleischer as "a real master of her craft." Tr. 1:70:9-15, 1:78:25-79:12, U-18.

Professor Siobhan Burke, who has taught in Barnard's Dance Department since 2013, and who had Dr. Fleischer as a professor for First Year English (the predecessor course to First Year Writing) when she was an undergraduate at Barnard in 2005, testified in support of Dr. Fleischer. Tr. 4:45:13-22, 4:47:13-18-48:13. Professor Burke, an award-winning professional writer who is a frequent contributor to the New York Times (Tr. 4:46:25-47:7, 4:49:15-20, U-67), credits Dr. Fleischer with having had a major influence on her success as a writer. Tr. 4:48:21-50:5.

> "[W]hen I think back on kind of my early development as a writer, I really do think back specifically to Georgette Fleischer's class and how much I learned there. . . . I remember it was a steep learning curve. I remember thinking at the end that I had really improved. And as I moved through college, I remember feeling grateful, that even though this had been a difficult class, that I had had the kind of rigor and attention of her eyes on my work."

Tr. 4:50:10-20.

Professor Burke was asked about the quality of Dr. Fleischer's feedback, and the clarity of her grading expectations, the two areas that form the purported bases for her non-reappointment. She responded that Dr. Fleischer had high standards and expectations, but that they were clear. She further testified that she gave very good detailed feedback on written work. "I remember . . . detailed comments that helped me to improve my papers as I moved forward through the class." Tr. 4:50:25-51:6, 4:51:15-22.

Shortly before assuming her position as Director of FYW Dr. Schor-Haim, who had worked with Professor Fleischer for many years, wrote to her: "My own interactions with you over the past several years have made it clear to me that you're a creative and dedicated

19

teacher, and I'm looking forward to getting your feedback on the curriculum when the time comes." U-17.

## B. **The 2015-2016 Academic Year**

Wendy Schor-Haim became Director of the First Year Writing Program ("FYW") in the summer of 2015.   Tr. 4:64:2-7.   She testified that during that summer, after assuming her position as Director, she reviewed the student evaluations of teaching ("SET") for all of the FYW faculty, including Dr. Fleischer.   Tr. 4:68:7-24.   She testified that, in her view, Dr. Fleischer's SET established "an overwhelmingly negative pattern" with concerns that focused on areas that go to the heart of program, mainly about clarity of expectations.   Tr. 4:82:5-23.   But despite the depth of her claimed concerns, and the fact that she did discuss SET with at least one other instructor during her first year (Tr. 4:83:19-23), she did not discuss her concerns with Dr. Fleischer that fall.   Tr. 4:83:8-18.   Indeed, she did not raise her concerns with Professor Fleischer until more than a year later.   Tr. 4:84:21-85:18, U-13.    Dr. Schor-Haim also observed the teaching of other adjuncts during her first year as Director, but testified that she did not observe Dr. Fleischer's class because the concerns she had about Dr. Fleischer's evaluations "were not about what was happening in the classroom."   Tr. 4:84:14-20, 4:94:2-95:3.

Dr. Schor-Haim testified that her main focus during her first year as Director was to complete a program review.   Tr. 4:80:13-18.   During that time she held small and large group sessions to work on the new pedagogy for FYW, sessions in which Dr. Fleischer actively participated.   Tr. 4:80:13-81:6.   Indeed, Dr. Schor-Haim conceded that Professor Fleischer was a hard-working committed instructor, who attended and actively participated in program meetings.   Tr. 4:122:14-24.

In the late Fall of 2015, shortly before the end of the semester, Dr. Schor-Haim asked the FYW faculty for randomly selected drafts of student work with comments. Tr. 1:81:22, 4:95:9-96:10, U-23. She testified that she was particularly interested in seeing Dr. Fleischer's sample, because of concerns students had expressed about the quality of her feedback on written work. Tr. 4:97:5-8, 4:97:20-25.

Professor Fleischer produced a sample, as requested. Tr. 1:82:25-83:19, U-24. However, she was unable to produce a randomized sample, both because the request was made late in the semester, and she had already returned early drafts of work back to the students, and also because she did not know how to use Excel to generate the random selection as requested.[7] She explained these facts to Dr. Schor-Haim, and told her that she *would* have another student sample available, and Dr. Schor-Haim told her it was fine for her to hand in that draft. Tr. 1:85:2-86:7, 4:98:2-17, U-75 ("No problem, Georgette, I's draft will be fine. Thank you.").[8] In the end the sample Professor Fleischer handed in was from a third student. Tr. 4:98:18-25. She was not able to hand in the one she originally offered, because that student had not handed in her draft when she had agreed to do so. Tr. 5:124:20-125:3, U-76. At the time, Dr. Schor-Haim did not express displeasure about the sample Dr. Fleischer ultimately produced. Rather, she was appreciative. Tr. 5:123:21-124:8. Dr. Fleischer explained the circumstances to Dr. Schor-Haim when she sent the sample of the third student, and Dr. Schor-Haim, upon receiving the sample, wrote: "What I really needed was a draft with comments and a final, so what you've sent is

---

[7] The request for a work sample was sent on December 2nd, about a week before the end of the semester. Tr. 4:123:16-21. It is not surprising that a faculty member, particularly one known for promptly evaluating and returning student work, would have already returned early drafts of student work that late into the semester. Tr. 4:124:6-17.

[8] The names of students contained in emails have been redacted, other than their first initials, by agreement of the parties, in order to maintain confidentiality.

great." Tr. 5:125:15-127:13, U-76. Dr. Schor-Haim never gave Professor Fleischer any feedback on the sample she produced. Tr. 1:84:20-22, 4:129:24-130:3.[9] Professor Sonam Singh, who also taught in the FYW Program, similarly testified that Dr. Schor-Haim did not give him any feedback on the essay she collected from him. Tr. 4:11:25-12:5.[10]

Dr. Schor-Haim suggested in her testimony that Dr. Fleischer's "failure" to produce a sample in the manner requested was unacceptable, and provided an additional basis for concluding that Dr. Fleischer was uncooperative. Dr. Fleischer's alleged failure in this regard was also cited in the Employer's Grievance Answer. J-4. However, the evidence, as detailed above, shows that Dr. Schor-Haim expressed no displeasure at the time, and never raised this issue with Professor Fleischer later, until after the decision not to reappoint her was grieved.

### C. <u>The September 2016 Meeting</u>

At the beginning of fall 2016 semester Dr. Schor-Haim emailed Dr. Fleischer asking to meet to discuss "comments and student concerns" and "strategies for improving the classroom experience" in her classes. U-13 (September 9, 2016 email). The resulting meeting, which took place on September 26, 2016, did not result in any formal disciplinary action. Rather, it can be characterized as involving, at most, an oral counseling. Tr. 1:79:22-80:2.

The September meeting focused entirely, or almost entirely, on the response of Dr. Fleischer's students to two questions in her student evaluations: Tr. 2:75:4-9, 4:111:7-21, U-13.

---

[9] In contrast, the prior Director, Margaret Vandenberg, had a practice of asking for three papers at the end of each semester, which would then be discussed at a pedagogy meeting. Tr. 1:86:11-20, 4:11:4-13.

[10] Professor Singh, who has a Ph.D. in English Language and Literature from Cornell University, began teaching at Barnard in January of 2013, and has taught every semester since. In his time at Barnard he has never been observed by an administrator or received a written evaluation. Prior to teaching at Barnard he was a Lecturer at the University of Nebraska-Lincoln. Tr. 4:6:6-11, 4:10:3-10, U-56.

22

The questions at issue involved clarity of grading standards, and instructor's feedback on work. Tr. 4:110:21-111:3. The parties dispute whether individual student complaints were also addressed, though they appear to have been addressed, if at all, in no more than a perfunctory manner.[11]

Despite the fact that Dr. Schor-Haim testified that she was particularly interested in seeing a sample of Dr. Fleischer's students' work, because of the responses students gave on their evaluations concerning the quality of Professor Fleischer's feedback (Tr. 4:97:5-8, 4:97:20-25), there is no evidence that either the sample that Professor Fleischer had produced the previous December, or Dr. Fleischer's alleged failure to properly produce the requested sample, were raised at the September meeting.  Nor did Dr. Schor-Haim ask for any additional samples, despite Professor Fleischer's stated willingness to produce such samples. U-13 (September 11, 2016 email).

Before, during and after the meeting Dr. Fleischer exhibited openness to working with Dr. Schor-Haim to address her concerns.  On September 11, 2016, Dr. Fleischer wrote to Dr. Schor-Haim: "I really appreciate your willingness to work with me on strategies that would not compromise the rigor of the course as I teach it, which continues to yield exceptionally strong essays each semester." U-13.  Shortly after the meeting ended, on the very same day, Dr. Schor-Haim wrote to Dr. Fleischer and thanked her "for discussing difficult issues with equanimity and open-mindedness" (U-13), and a few days later when they ran into each other on Broadway Dr. Schor-Haim praised Professor Fleischer for exhibiting "grace under pressure." U-13.  Following the meeting Professor Fleischer took immediate steps to implement the specific suggested

---

[11] The issue of alleged student complaints is addressed in more detail in Statement of Facts E.2, *infra*.

changes – being more explicit about what factors she considered in calculating student grades, and introducing grammar in more manageable pieces. Tr. 1:93:15-94:8, 2:128:8-129:15. One week later she wrote to Dr. Schor-Haim: "I am already implementing the requests you have made in order to make First Year Writing more manageable for students in my classes, and as I said when we met, I am more than willing to do so." U-13 (October 3, 2016 email). A week later, on October 10, 2016, Dr. Schor-Haim replied: "I really appreciate that you've already begun implementing these strategies in your classroom." U-13.[12]

Maida Rosenstein, who was present at the meeting, also testified that "the tone of the meeting was very cordial and collegial. . . . Georgette took notes on everything that Ms. Schor-Haim was suggesting and, in every way, showed herself to be attentive and interested in the suggestions." Tr. 4:40:21-41:20. Ms. Rosenstein testified that she thought it was a very productive meeting, and that Professor Fleischer subsequently discussed with her what she was doing to implement Dr. Schor-Haim's suggestions. Tr. 4:41:21-42:11.

Nonetheless, despite overwhelming evidence to the contrary, the Employer now claims that Dr. Fleischer was defensive, and communicated an unwillingness to change. In fact, perhaps recognizing that student evaluations alone constitute a wholly inadequate basis for concluding that a faculty member's teaching is ineffective, the Employer now claims that its decision not to reappoint Dr. Fleischer was based not only on her evaluations, but also, in part, on her purportedly inflexible attitude. Tr. 4:112:14-113:12. Notwithstanding concerns that Dr. Fleischer raised, after the meeting, about the validity of SET in general, and issues that might

---

[12] Faced with clear documentary evidence (U-13), Dr. Schor-Haim reluctantly acknowledged thanking Dr. Fleischer for her equanimity, which she said she "admired." Tr. 4:92:11-13. She also acknowledged that Dr. Fleischer had agreed to implement the strategies she had suggested in her classroom. Tr. 4:9214-16, 4:125:17-20.

affect her SET in particular, the evidence shows that she was not defensive, and was willing to implement the suggested changes.13  U-13.

The Employer's *post-hoc* attempt to revise what actually took place in this regard, to justify Dr. Fleischer's non-reappointment, is perhaps best exemplified by the fact that, in preparing their expert for her testimony, they apparently told her that Dr. Fleischer was not open to implementing proposed changes. Thus, the Employer's expert, Dr. Frederick, when asked about her understanding of the Employer's reasons for not reappointing Dr. Fleischer, testified that the decision was based, in part, on a lack of willingness to make suggested changes. Tr. 3:122:4-19. The Employer apparently did not share with her evidence suggesting that this was not the case. For example, Dr. Frederick was not shown U-13, the correspondence in which Dr. Fleischer reiterated her willingness to implement changes, and in which Dr. Schor-Haim thanked her for this willingness, and for her equanimity. Tr. 3:146:9-11. After she was asked to review U-13, Dr. Frederick acknowledged that Dr. Fleischer had, in fact, shown a willingness to work with Dr. Schor-Haim, and a willingness to engage. Tr. 3:146:12-19. After looking specifically at the September 26th email Dr. Frederick acknowledged that the email showed that Dr. Schor-Haim did not believe that Professor Fleischer had been defensive in the meeting. Tr. 3:147:8-21.

---

[13] Dr. Schor-Haim claims that Professor Fleischer insisted that none of her student evaluations "accurately reflected anything about her class or herself as a teacher" and that she claimed that all of the negative evaluations could be traced to what one unstable student posted to a website in 2002. Tr. 4:89:24-90:5, 4:90:15-24. Dr. Fleischer, however, insists that she "was not dismissive," that she listened very carefully and took notes. Further, she testified that she raised the issue of the student who had immediately put negative things about her for many years, some of them involving classes the student never took, not in the meeting, but in a follow-up email dated October 3, 2016. In that email she raised the possibility that because there were reputational issues that were impacting her student evaluations, making the changes that she was prepared to make, that she had already immediately put into effect, "may have little effect on my evaluations." Tr. 5:105:10-20, U-13 (emphasis added). In that email she also cited the academic literature questioning overreliance on SET as a measure of teaching effectiveness. U-13.

Dr. Frederick was asked, *before reviewing* U-13, whether her conclusion that the decision not to reappoint Dr. Fleischer was justified would be different if Dr. Fleischer had not been defensive, and had tried to implement changes, she responded: "I think if there were outcomes to show that that made a difference, absolutely." She acknowledged that "to know whether there were outcomes, you'd have to look for those outcomes." Tr. 3:145:3-13. Asked, *after reviewing* U-13, whether, given Professor Fleischer's professed willingness to implement changes, there should have been a follow-up to look at outcomes, Dr. Frederick responded that it would have been "a good thing to do." Tr. 3:147:23-148:15.

It is beyond dispute that Dr. Fleischer showed a willingness to implement suggested changes, and in fact did so. However, the Employer did not bother to look to see whether her outcomes, the work produced by her students, changed as a result.

### D. The 2016-2017 Academic Year and the Decision Not to Reappoint Professor Fleischer

As shown above, following the September 2016 meeting Professor Fleischer moved immediately to implement the changes Dr. Schor-Haim had suggested, as she had said she would do. And these changes had an effect.

In the academic year following her meeting with Dr. Schor-Haim, Professor Fleischer's SET scores improved markedly. Tr. 1:95:20-96:2, 2:151:7-8, U-27. More specifically, there was significant improvement on the two questions highlighted by Dr. Schor-Haim, clarity of grading standards and feedback on student work. Tr. 1:96:3-14. Her average score on the question about Feedback improved by 24%, and on the question about the clarity of grading standards her scores improved by 29%. In addition, on the question "overall quality of course" went from a 2.1625 to 2.8675, an improvement of 33%. Tr. 2:151:11-15, 2:153:20-154:4, U-27. Even Dr. Schor-Haim has acknowledged that there was improvement following the meeting. Tr.

4:125:24-25. Dr. Fleischer was rightfully proud of these improvements. "I was asked to take certain steps. I took those steps. And it demonstrates that there was significant improvement after those steps were taken." Tr. 2:156:10-13, 2:160:6-9.

After Dr. Schor-Haim's appointment as Director of FYW was announced, Professor Fleischer sent her a syllabus for her class and invited her to observe her classroom whenever she wanted. U-17. Dr. Schor-Haim never took her up on this offer. Tr. 1:79:13-21. However, she testified that she was aware of the positive observation Professor Fleischer received as part of an outside program review. Tr. 4:135:9-19. She testified that she did not need to observe Professor Fleischer's teaching because her concerns were focused on comments on written work. Tr. 4:136:9-15.

Despite her testimony that her concerns were focused on Dr. Fleischer's feedback on written work, however, Dr. Schor-Haim never asked for additional work samples. Tr. 4:136:16-21. As noted above, on September 11, 2016, Professor Fleischer offered to share student work with Dr. Schor-Haim, who replied the next day, thanking her for her offer to share student essays, but saying "I don't think that's necessary at this time." U-13. Despite this standing offer, Dr. Schor-Haim never asked for any additional student work before deciding not to reappoint Professor Fleischer. Tr. 1:80:10-21, 4:128:17-21, 4:130:4-17. Her excuse for not doing so was Professor Fleischer's alleged failure to provide a proper sample in the fall of 2015. As shown above, however, the evidence shows that, at the time, Dr. Schor-Haim was satisfied with the sample produced, and never communicated anything to the contrary to Dr. Fleischer.

From the time of the September 26th meeting, until the day Dr. Fleischer received her notice of non-reappointment eight months later, Dr. Schor-Haim said nothing further to Professor Fleischer about her performance, never once meeting with her or expressing further concerns. Tr.

1:93:10-14, 1:95:8-15, 2:170:25-171:5, 4:99:3-11, 4:128:22-129:10.   She did not observe her classroom teaching despite her early invitation to do so.  Tr. 2:161:11-14, U-17.   Dr. Schor-Haim also never gave her a formal teaching evaluation. Tr. 1:90:15-18.

On May 22, 2017, Professor Fleischer attended a meeting that she was told would be to discuss staffing for FYW.   At the meeting, attended by the Employer's Director of Human Resources and its Deputy General Counsel, she was handed her letter of non-reappointment, with a release attached.  She had not been advised to bring a Union representative to the meeting, and none was present.  Tr. 1:91:12-93:9, J-6, U-26.  At the meeting Dr. Fleischer was told that her non-reappointment was due in part to the hiring of new Lecturers, and that she had been selected over others for elimination because of her scores on the two SET questions discussed at the September 2016 meeting.[14]  There was no further discussion of the reasons for her non-reappointment.  Tr. 1:108:17-109:8, 4:121:4-122:5.  On May 23, 2017, Maida Rosenstein wrote to Andrea Stagg, asking what the reason was "for not offering [Dr. Fleischer] an appointment after seventeen years of teaching."  Ms. Stagg responded that the reasons were the hiring of new Lecturers, and "student evaluations and feedback."  She claimed that, even after Dr. Schor-Haim's discussion with Dr. Fleischer, Dr. Fleischer's performance "remained unacceptably low." U-64.

---

[14] The fact that additional full-time instructors were hired, beginning in the 2016-2017 academic year, is not in dispute.  Tr. 2:23:22-24:7, 4:69:3-10, 4:74:2-16, 4:77:20-78:4, 4:142:13-143:3. Because two of the three of the new full-time positions were filled by former adjuncts, and other adjuncts left Barnard for other reasons, these hires resulted in a need to non-reappoint only two adjuncts.  One of the adjuncts not reappointed was Dr. Fleischer.  The other, Anne Donlon, did not have enough seniority to have job security.  Tr. 4:74:17-75:25, 4:76:19-77:19.  The issue here is whether the Employer had a good faith reason within the meaning of the CBA, to not reappoint Dr. Fleischer, the most senior adjunct in FYW, rather than another adjunct with less seniority.

Dr. Schor-Haim testified that she made the decision not to reappoint Professor Fleischer on her own without consulting with the Provost or anyone else. Tr. 4:76:2-15, 4:118:15-119:2, 4:137:12-20. It was her "professional decision" not to reappoint Professor Fleischer after 17 years, without any further discussion, despite improvements in her student evaluations, without asking for any additional work samples, and never having observed her teach, notwithstanding Dr. Fleischer's demonstrated commitment to implementing the suggested changes in her teaching methods. Tr. 4:129:11-23. Dr. Schor-Haim testified that her decision was based on Dr. Fleischer's student evaluations, student complaints, and her reactions when approached about these issues. Tr. 4:132:2-133:13. As previously noted, there is no evidence that Dr. Schor-Haim ever discussed these concerns with Professor Fleischer, prior to May 22, 2017, except to the extent that they were raised at the September 2016 meeting.[15]

Professor Fleischer last taught at Barnard in the spring 2017 semester. Tr. 1:61:25-62:3. During her last four semesters she taught two writing courses each semester. Tr. 2:61:20-62:15, 1:63:12-15.    At the time she was non-reappointed, she was the most senior Adjunct in FYW. Tr. 1:62:3-15.

### E. Professor Fleischer's Student Evaluations

The facts in this case clearly establish, notwithstanding claims to the contrary, that Professor Fleischer's non-reappointment was premised exclusively (or nearly exclusively) on her student evaluations. Professor Fleischer's non-reappointment was premised on her student evaluations even though the overwhelming consensus among experts on SET, supported by

---

[15] Despite the hyperbolic terms in which Dr. Schor-Haim criticized Dr. Fleischer's performance during the Hearing, she apparently did not think that her performance was so poor that she would not have reappointed her had it not been for the hiring of full-time instructors to teach in the FYW program. Tr. 4:136:22-137:3.

research findings, is that SET do not measure teaching effectiveness, and form a wholly inadequate basis for making personnel decision in the academy. *See*, Statement of Facts, K, *infra*. Significantly, Dr. Schor-Haim testified that she was familiar with this research. Tr. 4:138:13-139:8. Further, the evidence shows that Professor Fleischer's evaluations, while generally lower than average, a fact likely correlated with the fact that her expectations are generally higher, and hence her grades lower than those of other FYW faculty, were not as bad as suggested by the Employer. In fact, as shown below, other less senior unit members were reappointed despite having equivalent and/or lower scores.

Each semester students have the opportunity to anonymously evaluate instructors. Evaluations are completed before students are given their grades. Tr. 2:75:13-20, 2:93:25-94:4. Dr. Fleischer testified that she reviews her SET carefully, thinks about them, and discusses them with her colleagues. She also testified that she uses her evaluations to try to improve her teaching. Tr. 2:76:3-5, 2:77:2-9, 2:88:25-89:6, 2:113:24-114:25, 2:118:5-8. "I use them to guide my teaching to become the best teacher I can possibly be." Tr. 2:125:19-23. For example, in response to complaints about the legibility of her handwriting she now types all end comments, and will, on request, type all comments. Tr. 5:130:10-131:21. "[I am] always, always interested in improving my teaching, which is one of the reasons why I love pedagogy sessions and interacting with my colleagues, and one of the reasons why I do read evaluations very carefully at the end of every semester." Tr. 2:160:20-25.

As discussed above, in the academic year following her meeting with Dr. Schor-Haim, Professor Fleischer's SET scores improved markedly. Tr. 2:151:7-15, U-27. While the Employer has discounted Dr. Fleischer's improvements, and claims that her scores were still too low, the evidence shows that the improvement was substantial. For example, her scores on

"Overall Quality of the Course" improved by 33%, on "Clarity of Course Objectives" by 28%, on "Clarity of Course Requirements" by 30%, and significantly, on "Overall Quality of Instructor's Teaching" by 38%. As to the questions that had been specifically highlighted by Dr. Schor-Haim as needing improvement, her scores on "Clarity of Grading Standards" improved by 29% and her scores "Instructor's Feedback on Your Work" by 24%. U-27 (Summarizing data from U-1, U-2, U-3, U-4, U-5, U-6, U-7, U-8). Interestingly, while her scores for "Clarity of Grading Standards" remained relatively low, notwithstanding significant improvement, during her last year at Barnard her scores on "Clarity of Course Requirements" averaged between "good" and "very good" for 3 of her 4 sections. U-1, U-2, U-3, U-4. There is every reason to believe that, given an opportunity to continue implementing the teaching strategies suggested to her by Dr. Schor-Haim, her scores would have improved further over time.

Not only did Dr. Fleischer's scores significantly improve during her final year, they were equivalent to, if not better than, those of other less senior unit members who were re-appointed as adjuncts. Tr. 2:154:23-155:17. In the Spring 2017 semester six (6) adjuncts taught who were later reappointed in an adjunct capacity. U-48.[16] One of these adjuncts, who was reappointed, had scores that were lower on most substantive questions, often markedly lower, than Dr. Fleischer's. Specifically, that adjunct's scores were worse on the following questions: "Clarity of Course Objectives," "Organization of Course," "Clarity of Course Requirements," "Increase Your Interest in the Field," "Increase Your Understanding of the Broader Intellectual Field," "Overall Quality of the Instructor's Teaching," "Ability to Stimulate Your Intellectual

---

[16] The Employer produced SET for 18 sections of FYW from the spring 2017 semester. Of these, six (6) were listed as "appointed." U-48 at 15, 151, 165, 189, 199, 228. Two of the remaining sections were listed as taught by Dr. Fleischer. U-48 at 28, 40. The other 10 sections were listed as taught by "not appointed," "FT employee," or "FT successful candidate." U-48 at 1, 52, 65, 80, 94, 109, 123, 136, 176, 212.

31

Curiosity," "Ability to Stimulate Student Participation in Class," and "Effectiveness in Answering Questions." The same individual had scores that were roughly equivalent to those of Dr. Fleischer on questions including "Overall Quality of Course," "Improve Writing Skills," and "Effectiveness in Communicating the Subject Matter." *Compare,* U-1 and U-2 *with* U-48 at 199-211. Another adjunct, who was also reappointed, also had lower or equivalent scores on multiple questions that semester. *Compare,* U-1 and U-2 *with* U-48 at 165-175.

The Employer produced SET for 20 sections of FYW for the fall of 2016. Seven of these sections were taught by adjuncts who were subsequently reappointed in an adjunct capacity. U-49 at 278, 315, 324, 358, 377, 397, 416. Of these, more than half, had scores that were worse or equivalent, on most substantive questions, to the scores attained by Dr. Fleischer in one of the two sections she taught that semester. *Compare,* U-4 *with* U-49 at 315-323, 324-330, 377-385, 397-405. In fact, one adjunct who was not only reappointed but actually re-hired into a full-time position, scored worse, often substantially worse, than Dr. Fleischer did in one of her two sections (Section 008) that semester. Specifically, that individual scored worse on "Overall Quality of Course," "Increase Your Interest in the Field," "Increase Your Understanding of the Broader Intellectual Field," "Effectively Communicating Subject Matter," "Ability to Stimulate Your Intellectual Curiosity," and "Ability to Stimulate Student Participation in Class." *Compare,* U-4 *with* U-49 at 368-376.

It should also be noted that the responses to specific SET questions can vary greatly, not only within sections, but also between sections of the same class. Dr. Fleischer testified that, in her experience: "one can have very different responses from different sections of the same course that one is teaching simultaneously." 2:157:6-158:23, U-5, U-6. Sonam Singh similarly noted that, in his experience, his SET have been inconsistent, and that changes in scores do not reflect

32

changes in his teaching. Tr. 4:12:17-13:7. Thus, for example, asked to rate the "Overall Quality of Course" for one section of FYW taught by Dr. Fleischer in spring 2016, seven (7) students rated it as poor or fair, and the remaining six (6) rated it as good or very good. But in another section the same semester seven (7) students rated the quality of the course as good or very good, and only three (3) as poor or fair. *Compare*, U-5 and U-6. Then, in one section the following semester, seven (7) students rated the overall the quality of her course as good, very good or excellent, and only two (2) as poor or fair. U-4. During her final two years at Barnard her average score on this question ranged from a 1.6 (in the fall of 2015) to a 3.3 (in the fall of 2016). *Compare*, U-7 and U-4. Similarly, during the fall 2016 semester, asked to rate her class on how much their writing improved, one section's students gave her scores averaging 1.63 (between poor and fair), and another section scores averaging 3.56 (between good and very good). *Compare*, U-3 and U-4. The low score in this latter example is an outlier. It is telling that despite the fact that her students must work harder, and receive lower grades, they fairly consistently credit her with having helped improve their writing skills. U-1, U-2, U-3, U-4, U-5, U-6, U-7, U-8.

The Employer produced its own charts summarizing Dr. Fleischer's SET scores over her last three years at Barnard, which were entered into evidence through Carolina Tamara.[17] E-9. These charts compare Dr. Fleischer's SET scores with those of all other FYW faculty, taken as a group. They do not show, as the raw data summarized above does, the extent to which individual faculty members appointed rather than Dr. Fleischer had scores that were lower or equivalent to hers. Thus, for example, the representation contained on the first of these charts to

---

[17] Carolina Tamara is a Senior Analyst at Office of Institution Research Assessment. Tr. 5:8:15-19. She created E-9. 5:10:6-9.

the effect that "there are statistically significant differences" between Dr. Fleischer and "all other instructors" does not mean that there are significant differences between Dr. Fleischer and each other individual instructor. Rather, it is a claim that there are significant differences between her scores, and the *average score* for the other instructors taken collectively. Further, even if differences remained between Dr. Fleischer's scores, and the average score for all FYW faculty, a review of the data contained in the first chart confirms that there were substantial improvements in Dr. Fleischer's SET score in the year after her meeting with Dr. Schor-Haim.

In addition, representations concerning statistical significance and standard error, in reference to these charts, are misleading for other reasons. Ms. Tamara testified that, in order to create these charts, she had to "come up with a number." Tr. 5:11:8-13. She explained that, in order to do so she used something called a "Likert scale," which is used in Barnard's SET. Tr. 5:12:6-17. The problem with the Likert scale, however, which is widely used in SET, is that it assigns numerical equivalents to what are qualitative statements, e.g., poor, fair, good, etc. As elucidated in a recent research paper which addresses, *inter alia,* the statistical inadequacies inherent in using the Likert scale to measure teacher performance:

> "Students are expected to rate on a Likert scale their instructors using a number of statements ostensibly pertaining to teaching behavior in the classroom. The data are then collected and a set of categories with ordinal values are presented and assessed. That is, currently, the specific rating categories used at most institutions in North America by students to assess teaching competence are/resemble the following: 'unacceptable,' 'very poor,' 'poor,' 'satisfactory,' 'good,' 'very good,' and 'outstanding.' These categories differ in quality, not in quantity or magnitude. In other words the 'interval distance' between the categories is undefined. Usually, numbers are attached to each category to make it appear as an interval level of measurement so that statistical analyses can be applied. . . . However, when this is done, good judgment and understanding must be applied in the interpretation of any statistical analyses. For example, any statistical evaluation of categorical data (like the SETs) should not include measures of central tendency like means or averages that are appropriate only for quantitative data. An average calculated on categorical data is quite meaningless and misleading."

34

*See*, Henry A. Hornstein, "Student evaluations of teaching are an inadequate assessment tool for evaluating faculty performance," Cogent Education (2017) 4:1304016.[18] Ms. Tamara did not create Barnard's SET, or the numerical values assigned to the qualitative terms used therein, and was not in a position to evaluate the validity of those numerical equivalents. Thus, as conceded by the Employer's counsel:

> "[T]he witness simply presented the information from the charts. . . . [T]he witness didn't testify that she analyzed or evaluated the information on the chart, only that she reflected it in the exhibit. . . . The witness doesn't have any information about the actual questions on the chart. . . . She is not the expert on whether or not the questions in the student evaluations are reasonably designed to elicit a numerical response."

Tr. 5:28:22-29:23, 5:30:7-9, 5:35:7-10. Ms. Tamara, asked directly about the validity of converting a subjective term into a numerical equivalent responded: "I would say that goes into the validity of how evaluations are constructed, yes. It is beyond what I'm assessing here." Tr. 5:31:6-25.[19]

---

[18] A copy of this article is included in the Appendix of Cases and Other Authorities, submitted with this brief. In referring to this article here, the Union notes that, on the first day of the hearing, counsel for the Employer indicated that, in her view, it would be appropriate for the parties to "refer to whatever is out there in terms of academic viewpoints on this issue" in their briefs. Tr. 1:88:21-90:6.

[19] The Employer's second and third charts compare FYW SET scores for men and women professors, and for Dr. Fleischer with other men and women, collectively, teaching in the program. This data, in addition to suffering from the same statistical issues addressed above, fails to address the salient issue concerning gender-based bias in SET scores. As addressed in the testimony of the Union's expert, Dr. Susan Basow, summarized below (*see*, Statement of Facts K.3, *infra*), gender bias is not necessarily expressed in overall SET scores, particularly when the scores are assigned by an exclusively female group of students. Rather, female professors are given lower scores when they fail to meet gender-based expectations. In other words, a female professor, like Dr. Fleischer, who is perceived as being a hard grader, or as being critical in her feedback, is given lower SET scores than male professors with equivalent behavior. This effect is more pronounced for questions addressing behavior tied to gender-based expectations, and can only be expected to manifest itself in connection with female professors (continued on next page)

In addition to its categorical/numerical rankings, Barnard's SET provides an opportunity for students to write comments. Whereas the SET produced for Dr. Fleischer (U-1 through U-12) contained such comments from every section she taught during her final three academic years, those produced for other FYW instructors (U-48 through U-53) only included comments for the 2016-2017 academic year, and for some sections of the Spring 2016 semester. As discussed below, as with numerical SET scores, Dr. Basow testified that SET comments are subject to biases, and that she would not expect them to be correlated with teaching effectiveness. *See*, Statement of Facts, K.2, *infra*.

During the Hearing, the Employer "cherry-picked" negative comments from Professor Fleischer's evaluations, repeatedly reading them into the record (or having witnesses do so), even though they were already in the record in the form of documentary evidence.[20] The Employer often ignored more positive responses. It did this, not only by reviewing only some comments made in response to particular questions, but also through its selection of the questions it chose to review. For example, it highlighted responses to the question, "What improvements in the instructor's teaching would you recommend?," a question designed to elicit criticisms, while failing to review responses to the question "What do you value most about your instructor's teaching methods?" It is not surprising that students will make more negative comments when asked about what improvements they would like to see in an instructor's teaching, than when asked what they most value in an instructor's teaching methods. A careful

---

whose conduct defies gender-based expectations. The second and third charts in Employer's Exhibit 10 fail to provide sufficient information to either confirm or refute this effect in the present case.

[20] During her cross-examination of Dr. Fleischer, Employer's counsel read, or had Dr. Fleischer read, 54 distinct narrative comments that were already in the record, and would have read even more if it were not for the Union's repeated objections.

review of Professor Fleischer's evaluations reveals a far more nuanced picture than the one which the Employer tried to present.

To cite one example of the approach used by Employer's counsel, she had Dr. Fleischer read the tenth comment from the question soliciting suggestions for improvements, from one section taught by Dr. Fleischer in the Spring of 2016, while ignoring the overwhelmingly positive comments to the previous question about what the students valued about her teaching. Tr. 2:107:4-10, U-6.[21]  Nine of eleven responses to that question, from the same section, were positive.  For example:

- "I really appreciated how she facilitated conversations in an interesting way and pushed me to be a better writer."

- "My professor is incredibly knowledgeable.  Every class I was stunned by the depth and breadth of her knowledge. I learned to pay more attention to details and felt I learned a lot of interesting analysis and insight on all of these readings."

- "Professor Fleischer definitely taught me a lot.  She always pointed out very interesting information in the text and I learned a lot from hearing her interpretations and discussions.  She forced me to think very attentively about the material."

- "Professor Fleischer facilitated interesting discussion in class, and provided a lot of helpful criticism on my writing."

U-6 at p. 13.

While there were clearly students who had concerns, for whatever reason, about Dr. Fleischer's teaching, there were also many students who appreciated her teaching and said so. There are far too many positive comments to cite all of them here, but a sample of such comments is included below, limited to Dr. Fleischer's final three semesters at Barnard, starting, for each question reviewed, with the most recent semester.

---

[21] While the Employer asked about the "third entry," this is the third entry on the third page of responses to that question, and the tenth response to that question overall.

In response to what is arguably the most important question, "To what extent do you think this course has helped to improve your writing?" students responded:

- "I had pretty good grammar before, but it is even better now. I think that I can also better flesh out analysis within a paragraph. Finally, the requirements of multiple drafts for each essay increased my understanding of my writing process." U-1 at p.7

- "My writing improved in that I learned how to better connect different texts." U-3 at p.14.

- "My writing has definitely improved from this course." U-3 at p.14.

- "Quite a lot, in terms of literary analysis and grammatical understanding." U-4 at p.13.

- "It has helped me be more aware of when I use passive voice and how I structure arguments and summaries in relation to one another." U-4 at p.13.

- "A lot grammatically! I also have this habit of writing excess information and I think I've learned to make my writing more concise over the duration of this course." U-4 at p.13.

- "This course improved my writing immensely. In high school, I was a very good writer, or so I thought. This course taught me how to analyze the text structurally, with the help of Professor Fleischer of course." U-4 at p.13.

- "This course gave me a much better understanding of how to write a good academic paper, what verb tenses to avoid, how to introduce works and cite correctly, etc." U-5 at p.4.

- "Very much. This course really taught me to read and re-read a text to develop an interesting argument about it. It also helped me notice bad habits I fall into in my writing and watch out for them." U-5 at p.4.

- "I found that the process of three drafts and the way the professor expected us to have revised our papers really pushed me to make big revisions and find new ideas - - something I hadn't really done with my papers in the past which I believe was incredibly helpful." U-6 at p.6.

- "I think it helped improve how I think about writing. I already expressed myself relatively well so my teacher did not make a lot of comments about that (though I know she did for others) but her philosophy on writing helped me in how I approach writing." U-6 at p.6

- "It helped me see revising as a very helpful and important process." U-6 at p.6.

- "A lot." U-6 at p.7

- "This course definitely helped improve my writing. Because there were three drafts for each paper, I had to assess what needed to be improved from one draft to the next on a fairly regular basis." U-6 at p.7.

In response to "What did you value most about the course?"

- "I valued the professor's close attention to detail and I truly feel that my writing process and style has benefited from her critique." U-1 at p.5.

- "I valued the intimacy of the classroom and enthusiasm of the professor with regards to the theme of the course. It met my expectations of a writing class that taught us correct form and writing formats. I would recommend this class if you want to learn how to perfectly create an MLA citation." U-2 at p.5.

- "I valued the texts in this course, which were intriguing and good texts to have under the belt of a college student. This course met my expectations since it was writing intensive and focused on textual analysis. I would recommend the course for the text and the writing opportunities." U-3 at p. 17.

- "I valued the feedback I got on my work and the ability to write several drafts. I would recommend it for someone looking to learn more about writing as an extended process." U-3 at p. 17.

- "I enjoyed the final research project because I was able to learn about something I am interested in in a more in-depth way. I also think it was a good introduction to the research process in college." U-3 at p. 17.

- "I really enjoyed being able to read works that spanned many years and experiences. The course met my expectations in that I got to learn about and think critically about the way women have been represented in writing over the course of history." U-4 at p.15.

- "I learned a lot about the texts we read. I thought that they were very thought provoking and engaging. . . ." U-4 at p.15.

- "I think that the professor had high expectations and that during the course it felt difficult to meet them but in the long run comparing myself at the beginning of the course to the end, I've improved significantly and I have gained much insight on various topics." U-4 at p.15.

39

- "I loved the discussion aspect, and was glad to have such a bright and interesting group of classmates!!! The reading was all very interesting, and I appreciate that almost every class was a primarily student-led discussion. I would recommend this class to any first year looking to read an eclectic spread of texts and work very, very hard on their writing." U-4 at p.16.

- "I learned ways to improve my writing style and sentence structure." U-5 at p.7.

- "I thought the material we read did meet most of my expectations and we had a lot of interesting discussion on the female characters in each piece.  I would recommend this course but only to people who aren't that concerned about their grades . . ." U-6 at p.9.

In response to "What did you value most about your instructor's teaching methods?"

- "Professor Fleischer is a very good discussion leader. She stimulated my intellectual curiosity through our discussions, and her passion for the subject is clearly evident and exciting to see as a student." U-1 at p.15.

- "I guess I valued her immense knowledge on the subject matter." U-1 at p.15.

- "She was very approachable in class and the outside of class trips were interesting and well organized" U-1 at p.15.

- "She had a lot of background knowledge on the reading we did, which enriched our experience when reading these texts." U-1 at p.15.

- "Professor Fleischer was very clearly excited about the material and taught us a lot about writing styles and grammar. Professor Fleischer is also very accommodating and understanding to students experience[ing] difficulties outside the classroom." U-1 at p.15.

- "I valued the importance of discussions and how she allowed students to lead certain classes." " U-2 at p.15.

- "I valued her personal fascination with the topic and thorough knowledge of the area of study." " U-2 at p.15.

- "Professor Fleischer is an extremely caring and intelligent woman. Clearly, she cares a lot about the course as well as her students." " U-2 at p.15.

- "Her knowledge of the subject matter" U-3 at p.9.

40

- "I really valued Professor Flei[sch]er's attention to grammar in this course. Although I still feel uneasy with some grammatical concepts, this course was really my first introduction to grammatical rules. I also really enjoyed the provocations that each student had to prepare and Professor Fleischer's help in facilitating those discussions. I also loved the idea of multiple drafts of an essay, and thought Professor Fleischer was very generous with her time in the amount of feedback she gave." U-3 at p.9.

- "I like that she was very thorough in grading your papers." U-3 at p.9.

- "Her knowledge of the material and interest in the improvement of my writing skills." U-3 at p.9.

- "The professor provides constructive criticism on my work; I did not realize how much my essay writing had improved until the end of the course. The class discussions are very relaxed and intellectually stimulating at the same time." U-4 at p.19.

- "My instructor was very knowledgeable about the course material. Her passion for the texts came across in her discussion of them and the grammar workshops where we looked at individual sentences were useful in helping me identify weaknesses in the structure of my writing." U-4 at p.19.

- "I really value that Prof Fleischer is very open to all ideas and is never dismissive towards a comment made in class. She is always very available for meetings about current & past papers, and has made a real effort to get the class to a variety of performances and exhibits related to the course material." U-4 at p.19.

- "I appreciate Professor Fleischer's ability to stimulate thought provoking conversations and the additional knowledge she had on each subject/text. It is clear she is very passionate about the texts that we read." U-4 at p.19.

- "The instructor clearly knew the subject well and was able to communicate the course material effectively." U-4 at p.19.

- "She is incredibly knowledgeable in the subjects we discussed in class, which I admire. She goes in depth most of the time. I find myself listening attentively because of how interesting the discussions are.  However, sometimes we as a class go on tangents, but other than that, I enjoyed the seminar very much." U-4 at p.19.

- "Professor Fleischer is obviously very knowledgeable and passionate about her subject matter.  She is able to offer many tidbits of information that make discussions more interesting." U-5 at p.11.

- "She helped bring clarity to the reading assignments and class discussions were interesting." U-5 at p.11.

41

- "I really valued the organization of the class where the professor would provide us with extensive background knowledge of a work/author before we began reading followed by a student-led provocation. I also enjoyed the session where we worked on grammar and improving our writing." U-5 at p.11.

- "She is a very good writer and pointed out ways I could improve my writing, which I appreciated." U-5 at p.11.

- "I valued Professor Fleischer's vast knowledge on many of the works that we read that provided interesting context to our class discussions. I also valued her high expectations for our writing assignments. She really pushed us to do our best work. She gave good feedback on first drafts and pointed out weaknesses in our writing. I feel like my writing and ability to closely work with a text improved a lot in Professor Fleischer's class." U-5 at p.11.

In response to: "How often did you meet with your instructor during office hours? How helpful

were these meetings?

- "I meet with the instructor once during office hours, and twice outside of office hours as per required during the revision of the first and third essays. These meetings were extremely helpful." U-1 at p.9.

- "I went to office hours only when they were required for 2/3 papers. Each meeting was helpful and Professor Fleischer seemed interested and eager to help with the papers." U-1 at p.9.

- "I went to her office hours maybe six times the whole semester. They are HELPFUL. Yes, she is fair and she voices her expectations clearly, which makes it easier for me so that I know what I have to do." U-4 at p.12.

- "I've met with the instructor on occasion. These meetings were quite helpful, especially when discussing essay drafts." U-4 at p.12.

- "I met with my instructor about every other week and felt that, although grading might have been harsh, she always made it clear how I could personally improve my writing in ways that will stick with me beyond the class." U-4 at p.12.

In response to "Did you come to class prepared to engage in discussion? Was the class format

and atmosphere conducive to discussion?

- "The class format was great because I loved that everyone got the opportunity to lead a discussion during one class, which made at least one student really informed on at least [one] of the books that we read." U-1 at pp. 9-10.

42

- "I always did the readings before class. The discussion was pretty great in class. The provocations made it easy to engage everyone." U-1 at p.10.

- "Yes. The class discussions were lovely. The provocations were a great set-up to encourage discussions." U-1 at p. 10.

- "The class atmosphere was conducive to discussion thanks to the provocations and controversial themes of the works studied." U-2 at p.10.

- "I really enjoyed the class discussion and wished that we even went deeper into some of the texts. I loved the format of the provocations and enjoyed the round table." U-3 at p.11.

- "Yes, and there were a lot of great discussions" U-3 at p.11.

- "I always came to class prepared to discuss, and I think the format was rather conducive to discussion. I liked that we each had a turn doing a discussion provocation because it ensured that everyone engaged in discussion at some point." U-3 at p.11.

- "Yes and yes!! This was my favorite part of the course. Prof. F created an awesome, welcoming, engaging discussion atmosphere." U-4 at p.9.

- "I tried to be prepared. The class format was nicely oriented for discussion, we had some good talks." U-4 at p.9.

- "Yes, I did. It is always easy to throw in opinions because the atmosphere is very relaxed largely due to the other students and the professor as well." U-4 at p.9.

- "The environment was very conducive to discussion." U-5 at p.1.

- "Yes, I came prepared. There was definitely good discussion so I enjoyed that." U-6 at p.1.

- "Yes, I came to class prepared for the discussion. The class was run like a seminar, and it was very productive." U-6 at p.1.

- "I thought our class discussion[s] were generally really thoughtful. The format definitely worked as a seminar style discussion class." U-6 at p.1.

In response to the Question "How were the instructor's suggestions for revision," one of the questions specifically cited as a reason why Dr. Fleischer was not reappointed:

- "Most of the time her suggestions for revision were quite concrete although sometimes they were a little more difficult to follow." U-1 at 8.

43

- "I was always able to follow them and they were helpful." U-2 at p.9.

- "I think that all of the suggestions had merit and I agreed that all of them were aspects of my paper that needed work; [h]owever, I had a hard time moving forward from the comments and revising my essay to Professor Fleischer's standards." U-3 at p.12.

- "Very helpful" U-3 at p.12.

- "Very helpful. The professor looks to improve writing structure and challenges your arguments." U-4 at p.11.

- "They were helpful but difficult to read." U-6 at p.3.

- "Very helpful.  Sometimes her handwriting was difficult to understand but she offered to clarify whenever needed." U-6 at p.3.

Asked whether Dr. Fleischer evaluated their work fairly the responses included the following:

- "Yes, I think the professor expects a lot from us which can be frustrating because everyone wants a good grade but it pushes you to work harder and not expect good grades to come easily. Revision details were very helpful, they were concrete and if something was unclear I just asked the professor during office hours." U-4 at p.10.

- "At first, I thought that she was a very harsh grader. Now, I think that she is fair. I didn't put in as much work in my first essay as I did on my second and third essays, which is evident in my grades. I found that going to her office hours are the most helpful. I followed what she suggested and I did fine." U-4 at p.10.

- "I do.  Professor Fleischer has high expectations, but her grading is honest." U-5 at p.1.

- "Professor Fleischer grades very harshly but it is fair.  She holds her students to high standards and that is the only way they will improve their writing." U-6 at p.2.

Indeed, given the irrefutable evidence, and the sheer volume of countervailing positive comments, even Dr. Schor-Haim had to acknowledge that Dr. Fleischer's SET contained positive comments.  "So there were positive comments, students did give Dr. Fleischer credit in areas where they thought she was an effective teacher." Tr. 4:134:24-135:3.  At another point in her testimony, after explaining that "[i]t's really important that the students get feedback in time to

revise," Dr. Schor-Haim acknowledged that Dr. Fleischer was very timely in returning student work. Tr. 4:103:3-64:124:6-12.

It also must be noted that, just as Dr. Fleischer received many positive comments in addition to the negative comments she received, other adjuncts *who were reappointed* received negative comments in addition to the positive comments they received. A few examples, from the 2016-2017 academic year, the only academic year for which the Employer provided comments for faculty other than Dr. Fleischer, are included below:

- "I did not value much from this course. It really negative affected my semester." U-48 at 201.

- "This course caused me to become very frustrated with the whole process of writing. The Professor only criticized my writing and never presented constructive criticism of how I could personally improve my papers or my topics and writing. I do not think that my writing has become particularly better this semester." U-48 at 203.

- "Teacher's comments were always very critical and very rarely constructive or helpful. Her comments would often confuse me or lead me down a dead end path for an idea. . . . She did not work with me to be a better writer, she simply told me everything I did wrong . . ." U-48 at 205.

- "The class atmosphere was NOT conducive to productive discussions. My professor has a nasty penchant for shutting down people's ideas. . . . [S]tudents were afraid to share their ideas. Not once did she express even a modicum of enthusiasm during class discussions. Her countenance while students shared their ideas resembled that of a patient undergoing an intensely painful root canal." U-48 at 207.

- "She was impersonable (sic), unapproachable, and just not really nice. . . . She would often refute, in a very demeaning and embarrassing manner, our ideas or comments in front of the class. . . . I came out of meetings with her wanting to cry and feeling even more confused and lost." U-48 at 211.

- "Sometimes the criticism seemed more harsh than it does constructive; judgmental/cold." U-48 at 211.

- "The teacher is very vague about requirements and students almost always have to rewrite drafts blindly. She gives copious notes that are unclear and she is very difficult to hold a conversation with." U-49 at 317.

- "I told everyone not to take this course.  I class was dry and unengaging. . . . [T]he professor loves to open class criticizing the papers handed in, but never gives alternatives. . . . She always seems annoyed when I ask for help." U-49 at 318.

- "Many times the students were confused but she would deal with the confusion by making our questions seem stupid." U-49 at 323.

- "[The] Professor would seem visibly annoyed whenever  a student asked a clarifying questions (sic).  Often he would appear insulted.  He should allow more discourse in class rather than constantly interrupting and shooting down student's ideas." U-49 at 367.

- "In much of our discussion students, including myself, have been made to feel foolish for suggesting an interpretation that differs from his." U-49 at 367.

- "I would not recommend the course with this professor because it was so confusing and I felt very badly about myself and my writing a lot of the time." U-49 at 379.

- "She's very confusing a lot of the time.  Many of the other girls in my class that I have talked with have all felt the same; so many times we sit there not knowing what is going on or what she wants from us. . . .There have been many times where many of us have felt ashamed or embarrassed because we felt as though what we answered got written off and dismissed as wrong.  U-49 at 384.

- [S]he would often times critique to a point that would make students feel hopeless.  Her critiquing was often times harsh, and she would call people out in class in a way that was sometimes embarrassing to students." U-49 at 405.

The point of highlighting these comments is not to criticize these faculty members, but to point out that all faculty members receive critical comments.  Some of the negative comments included above contained language similar to that included in student criticisms of Dr. Fleischer, for example criticisms of their professors as harsh and overly critical, and even blaming their professors for making them cry.  Indeed, Dr. Fleischer testified that it is not unusual for students to cry in connection with other FYW faculty members' classes, a statement supported by the testimony of Professor Singh who admitted that his students have cried in his office over grade-related concerns.  Tr. 2:110:18-111:3, 4:30:25-31:13.  These statements also further highlight the

46

Employer's inconsistency in using critical comments as a purported basis for not reappointing Dr. Fleischer, but not others.

While Professor Fleischer does not relish receiving negative comments from students, is concerned about such ratings, and, as discussed above, uses comments in her SET to try to improve her teaching, she does not necessarily believe that all of these comments are accurate reflections of her teaching. Specifically, asked about her reactions to some of the more negative student comments contained in her SET, Professor Fleischer stated that her focus was "helping the students develop themselves to the greatest degree," and that she was more concerned with the work she helped her students produce than with the results of student evaluations. She repeatedly expressed pride in the work that her students produce. She acknowledged that students in her class have to work very hard in order to do well, but that she believes there are benefits to the students from her approach. While she believes that students often complain about hard graders, she is more concerned with what they learn than whether or not she is liked. Tr. 2:97:16-18, 2:99:8-10, 2:99:16-100:3, 2:112:14-21, 2:113:7-13, 2:121:11-16. "My concern is to be an effective teacher. That isn't necessarily going to be reflected in responses from students, in my view." Tr. 2:120:25-121:4. "I don't view my objective as trying to get the students to like me. My objective is to be an effective teacher. And in my experience, sometimes these two are in competition with each other." Tr. 2:136:25-137:5. Students complete their SET a couple of weeks before the end of classes. Tr. 2:135:11-16. Professor Fleischer testified that she believed that her students might express more positive views about the extent to which their writing improved if they were asked after they had completed their final projects and received their final grades. Tr. 2:131:10-12, 2:131:16-23, 2:133:15-134:23. "The writing that was produced by the end of the course demonstrates that the students writing improved." Tr. 2:130:14-20.

47

Dr. Fleischer was specifically questioned, on cross-examination, about her scores on the two questions that form the purported basis for her non-reappointment  She testified that while she acknowledges that clarity of grading standards is important, she worries that concerns about grades usurps a focus on the work. Tr. 2:67:11-25.  Professor Fleischer believes that "clarity of grading standards" is a proxy for grading, and that some students who get bad grades seek to place blame elsewhere.  Tr. 2:161:19-162:7.  This belief was supported by the testimony of expert witness Dr. Basow. *See,* Statement of Facts, K.3, *infra.*

As to her feedback on written work, she absolutely agrees that feedback on work is important.  Tr. 2:68:11-13.  However, she believes that comments about her feedback do not reflect that she does not give it, or its quality, but that some students are frustrated that her feedback is not more complimentary.  Tr. 2:165:7-14.  Dr. Fleischer testified that she tries not to give specific suggestions but rather to give direction to help students figure out how to move forward on their own.  Tr. 2:101:9-23.  "I am very proud of the work that the students in my classes produce.  I understand that the way I work with them can be challenging and frustrating.  I'm inclined to see this [their comments] more of a reflection of that.  I again stand by the work that they produce.  They produce very good work."  Tr. 2:104:23-105:5.

Finally, the role that reputational issues, and a prior campaign against her by a disgruntled student, play in affecting Dr. Fleischer's SET scores, should not be discounted.  The Employer claims that Dr. Fleischer attributed her relatively low SET scores, and negative SET comments, to a single disgruntled student from a course she taught over 15 years ago.  This is simply not true.  What is true is that she has said she believes that this student, and their multi-year campaign against her, have *contributed* to her SET scores.  Specifically, when Dr. Fleischer taught a course at Columbia in 2000, she had a student who was very upset about receiving a

grade of B+ in the course. For many years he posted very hostile reviews to an unofficial website, Columbia Undergraduate Listing of Professors Ability (CULPA) (http://culpa.info/), that allows anyone to post comments about professors anonymously. Many of the reviews he posted were about courses he never took. These comments were traced back to him and were mostly, but not entirely, taken down in 2009. Tr. 2:85:12-87:20, 2:167:3-168:14, 2:169:7-23. Professor Fleischer believes that these comments continued to influence her evaluations, citing the fact that some of these comments were still available as recently as 2015 and 2016, as well as a recent reference by one of her students to these previous reviews. Tr. 2:87:21-88:24, U-4 at 16 ("Please hire a new professor. All the reviews on CULPA are negative, so why is she still teaching????").

In addition, the comments from one section, from the Fall of 2015, show that students were spreading rumors and misinformation among themselves to the effect that Barnard had previously tried to fire Professor Fleischer, but that she was still teaching because of a lawsuit she filed.[22] *See e.g.,* U-7 at 19 ("I am unsure if the department believes that students are unaware that she remains a teacher at the school because of a lawsuit after an attempted firing or not, but let me clarify - - WE DO KNOW."); U-7 at 31 ("First of all, we all discovered that Barnard attempted to fire Professor Fleischer a few years ago very early into the semester . . . We all believe the college should work harder in attempting to bar her from teaching courses because it's simply not fair to all of us to have had a teacher that the college had recognized as ineffective and disliked by students."). To her credit, one student who was clearly privy to these discussions, nonetheless defended Professor Fleischer:

---

[22] This is absolutely untrue, and there is no record evidence to support it.

> "Okay, so I have some things to say about this course and Professor Fleischer. I know some people are torching her, saying she's insensitive and mean and unfit to be a teacher, but that just isn't true. Is she a hard grader, yes, but is she a fair grader? Yes. . . . There was never a moment in class where she was deliberately rude to a student unless the student was rude to her first (and that did happen). . . . People who are bashing her for things that don't have to do with the actual class are being unfair. Georgette is a fine person, a hard teacher and a hard grader, but a fine person."

U-7 at 30.

However, regardless of whether her SET are affected by the fact that she has high expectations, or by reputational issues and misinformation, as discussed above, Dr. Fleischer reviews her SET carefully, takes them seriously, and sometimes uses them to adjust her teaching.

### F. Data on Professor Fleischer's Grades and Expected Grades

Dr. Schor-Haim testified that she reviewed Dr. Fleischer's grades in advance of the September 2016 meeting because Dr. Fleischer had asserted that her SET scores reflected the fact that she was a harder grader and expected more of her students. Tr. 4:108:16-109:5. Maida Rosenstein testified that at the September 2016 meeting Dr. Schor-Haim claimed that Dr. Fleischer's grades were actually slightly higher than average. Tr. 4:42:12-20. Dr. Fleischer testified that Dr. Schor-Haim specifically claimed that there were five (5) FYW faculty members with lower grades in the fall of 2015, and eight (8) in the spring of 2016, and that the grade expectations of Dr. Fleischer's students were not markedly different than those for other instructors. Tr. 5:122:9-24, 5:123:3-8, 5:141:21-25, U-78. Dr. Schor-Haim denied these characterizations during her testimony. She says she actually concluded that Dr. Fleischer was "towards the bottom" but that several instructors gave lower grades. Tr. 4:109:6-13. "I didn't say her grades were higher than average, but I did say that she was not among the lowest graders." Tr. 4:109:19-21.

The record evidence clearly shows, however, that the grades given by Professor Fleischer were lower than those given by almost all of the other FYW faculty. Tr. 2:84:10-85:8. This fact is demonstrated by the data produced to the Union by the Employer. This data shows that Dr. Fleischer's grades were actually the fourth lowest of all FYW faculty during her final three years at Barnard. Tr. 4:20:7-16, U-58, U-59. [23] To put this in perspective, however, this does not mean that Professor Fleischer was failing multiple students. To the contrary, in all of her years at Barnard she only remembers ever failing one student, and giving two or three 'C's. Tr. 5:129:22-130:9. Nonetheless, as discussed above, Dr. Fleischer does have high expectations. Tr. 2:170:4-16 (Dr. Fleischer testifying that she thinks there is serious grade inflation at Barnard, and that students have to work harder in her class to get good grades). Dr. Schor-Haim agreed that it is probably possible to improve SET by giving higher grades. Tr. 4:139:5-8.

As discussed below (see, Statement of Facts, K.3, *infra* ), expected grades are even more highly correlated with SET than actual grades. Using data provided by the Employer, the Union

---

[23] The Union requested grade data for FYE faculty in advance of the Grievance Hearing but had not received it by the date of that hearing. Tr. 4:14:7-12, 4:38:3-8, U-65. While this data was subsequently given to the Union the month before the commencement of the Arbitration Hearing, shortly thereafter the Employer indicated that the data it had produced was erroneous, and it provided corrected data. Tr. 4:14:9-16, U-57, U-58. However, when the Union tried to put in the "corrected" data produced by the Employer after the commencement of this proceeding (U-58), and its analysis of this data (U-59), the Employer objected claiming, incredibly, on the fourth day of the Hearing, more than 7 months after the Hearing commenced, that its own corrected data was still incorrect, insofar as it included information for English 1204, a course which the Employer maintained was distinct from FYW. For similar reasons the Employer objected to the admission of data by the Union concerning expected grades. Tr. 4:16:13-20:4, 4:24:21-27:16, U-60, U-61. Not only was this data produced *by the Employer*, but the inclusion of English 1204 is consistent with the Side Letter to the CBA entitled "Similar Classes" which lists it as in the same cohort of classes as FYW. J-1. Ultimately the Arbitrator admitted U-58 and U-59 into evidence. As for the expected grade data, The Union agreed to put in separate analyses of the data, with and without English 1204 included, both of which were admitted into evidence. U-60, U-61, U-62, U-69, U-70, U-71.

also showed that Dr. Fleischer's expected grades were even lower than her actual grades.  Tr. 4:20:20-22:14, U-60, U-61, U-62, U-69, U-70, U-71.[24]

The employer also submitted charts, prepared by Carolina Tamara, comparing Dr. Fleischer's expected grade data with that of other FYW faculty.  E-10.  These charts, and Ms. Tamara's testimony concerning them, are misleading in a number of ways.  Ultimately, however, they are not inconsistent with the data submitted by the Union.  As an initial matter, before reviewing the individual charts, it must be noted that the two charts use inverse numerical scales.  Whereas the first chart purports to compare student's expected grades using grade point average, i.e., the higher the number the higher the expected grade, the second chart uses SET scores where the significance of the numbers is reversed, i.e., the higher the number, the lower the expected score.  Tr. 5:26:18-27:17.

As to the first of these two charts (E-10, Page 1), Ms. Tamara initially testified that Dr. Fleischer's scores were different than those of other FYW faculty.  Tr. 5:24:22-25:6.  However, she then claimed that there is "no difference" between Dr. Fleischer and other faculty members. Tr.  5:26:3-7.  Putting aside this conflicting testimony, a review of the chart shows that the average expected grade of Dr. Fleischer's students is approximately a 3.0, which translates as a 'B.'  In contrast. The average expected grade for the students of all other faculty members is a 3.5, a grade midway between a 'B+' and an 'A-.'   Anyone with any familiarity with student grades, especially at the college level, knows that this is a significant difference.  The size of this difference is minimized graphically in this chart because it begins at '0.'  However, as Dr.

---

[24] Under cross-examination Professor Singh explained how he prepared U-62 using data provided by the Employer.  Tr. 4:31:20-32:17, 4:33:17-34:2.  Asked about statistical significance of the data he questioned the value of the concept when dealing with qualitative statements (e.g., good, very good, excellent) rather than quantitative measurements.  Tr. 4:32:22-33:16.

Fleischer testified, in her 17 years at Barnard she only remembers giving 3-4 students grades of 'C' or lower, the equivalent of a 2 on this chart. One can infer that the meaningful range of scores, for any individual student for whom data is included on this chart, is between 2 and 4. This being the case, the difference between a 3 and a 3.5 becomes more significant. Finally, the distinction made in this chart between "appointed" and "not appointed" has little meaning in light of the fact that there is no information concerning why individuals were not appointed, e.g., whether they found new jobs, did not want to return, or wanted to return but were not reappointed. Tr. 5:28:8-21.

The differences in the second chart (E-10, Page 2) are even more dramatic. In the first place, it must again be noted that Ms. Tamara testified that she does not know why any given individual was not reappointed. Therefore, any inferences concerning this "distinction" are meaningless. A review of the Chart shows that it reflects data from 113 distinct sections of FYW taught between 2014 and 2017.[25] Of these, 14 were taught by Dr. Fleischer. What is significant is that the scores the chart shows that the expected grades for these 14 sections are among the 16 sections with the lowest expected grades, including the seven (7) lowest.

### G. Work-Related Issues Raised Only After the Notice of Non-Reappointment

#### 1. Claims That Professor Fleischer Was Not Responsive to International Students and Academically Disadvantaged Students

At the arbitration hearing Dr. Schor-Haim testified that she allegedly discerned a pattern in Professor Fleischer's SET involving international students and other academically disadvantaged students who did not feel prepared for Dr. Fleischer's teaching. Tr. 4:107:4-8.

---

[25] While E-10 refers to "AY 2015-2017," on information and belief the chart analyzes the data provided to the Union which covers Academic Years 2014-2015, 2015-2016, and 2016-2017, Dr. Fleischer's final three years teaching at Barnard.

53

She claimed that, in deciding to not reappoint Dr. Fleischer, she considered whether she believed Professor Fleischer could effectively teach Barnard's changing student body. Tr. 4:112:14-113:12. However, there is no evidence whatsoever that this issue was ever raised before the arbitration hearing. Dr. Schor-Haim never testified that she raised this issue, and Dr. Fleischer specifically testified that she had not. Tr. 5:106:8-107:3. Nor was this issue addressed in the Employer's Grievance Answer. J-4.

If Dr. Schor-Haim was genuinely concerned that Professor Fleischer was insensitive to the needs of international and other academically disadvantaged students it is hard to fathom why she felt that it was unnecessary to observe her interactions with such students in the classroom, where, according to Dr. Fleischer's testimony, she specifically worked to empower such students. Yet, Dr. Schor-Haim testified that she did not have concerns about what was happening in Dr. Fleischer's classroom. Tr. 4:84:14-20. Nonetheless, the only specific example Dr. Schor-Haim provided concerning Professor Fleischer's alleged insensitivity to the needs of academically disadvantaged students was the fact that she encouraged first year students to meet with specialist librarians at Columbia. Tr. 4:133:23-134:12. Professor Fleischer, in rebuttal testimony, explained why it was useful to expose students to specialty libraries and librarians, including those with expertise in foreign languages and literature, exposure that one might infer would be especially useful for international students. Tr. 5:119:4-122:8.

Further, there is record evidence to support a conclusion that Dr. Fleischer, far from being insensitive to the needs of challenged students, worked hard to address their needs, and liked working with such students. For example, in one case Dr. Fleischer's creative teaching strategies, used to help a student with a disability that made it hard for her to participate in class, were acknowledged by her supervisors when, during the following year, she was asked to assist a

professor who had the same student.  Tr. 1:101:3-102:4, 5:112:20-113:23, U-29.  There are other examples in the record of Dr. Fleischer recognizing students who required academic intervention, including one who was a native Spanish speaker, and assisting them.  Sometimes she reached out to supervisors to arrange for such assistance.  Tr. 5:111:6-112:10, 5:117:14-118:17, U-72, U-73, U-74.[26]  In her final semester one student noted on her SET, "Professor Fleischer is also very accommodating and understanding to students experience[ing] difficulties outside the classroom."  U-1 at p.15.

Professor Fleischer testified that she thinks that she does some of her best work with international students and students from less privileged backgrounds, who are among her "most treasured students" because of the variety of experiences, backgrounds and languages they bring, adding that she often finds that they are the hardest workers.  Tr. 5:107:10-19, 5:113:24-114:15.  She noted that the writing sample she gave to Dr. Schor-Haim in December of 2015 was from a Filipina student who developed well in her course, and ultimately earned an 'A.'  Tr. 5:127:22-129:3.

In support of her claims concerning her work with international students Professor Fleischer also noted that her curriculum included translated Spanish language literature, and poetry by Chinese women, and that she encouraged her students from those backgrounds to contribute their expertise on language and translation issues.  Tr. 5:107:20-109:9. As she explained it: "So it is really a means for these students to use something that is particular about them and to enhance our classroom experience with that particular background and expertise,

---

[26] These examples, of Dr. Fleischer recognizing her need for assistance in addressing challenges she faced with particular students, also run counter to Dr. Schor-Haim's claims, discussed elsewhere, that Dr. Fleischer was not open to seeking and receiving assistance and guidance from her supervisors.

that I think is very helpful in developing a sense of authority that I believe translates into the written work that they do." Tr. 5:108:21-109:4.  Professor Fleischer also testified that she tries to take her students to cultural events that highlight diverse cultures. Tr. 5:109:15-111:5.

## 2. **Student Complaints**

Margaret Vandenberg, while serving as Professor Fleischer's supervisor from 2000-2015, referred to the fact that, in her view, a "culture of complaint had . . . developed at Barnard." Tr. 1:102:20-103:14.  Professor Singh testified, in a similar vein, that at the first faculty meeting he attended with Margaret Vandenberg as his supervisor, "she justly warned us that [complaints] were prevalent and referred to a culture of potential backstabbing at the college amongst students." 4:12:12-16.  This testimony is unrebutted.

Dr. Schor-Haim testified that, from the time she took over as Director until Dr. Fleischer stopped teaching at Barnard, one or two students came to her every semester to complain about Professor Fleischer.  Tr. 4:85:21-86:15, 4:99:12-15, 4:100:19-21.[27]  While Dr. Schor-Haim conceded that students complained about other faculty members as well, she claimed that they did not do so with the same frequency. Tr. 4:144:24-145:3, 4:147:10-18.  However, this might have been, at least in part, due to the fact that Professor Fleischer taught more sections of FYW than any other adjunct. Tr. 4:148:13-22.[28]  Dr. Schor-Haim testified that when students come to

---

[27] Dr. Fleischer, while denying that Dr. Schor-Haim ever discussed student complaints with her, does acknowledge that student complaints were periodically brought to her attention during the 15 years when Dr. Vandenberg was her supervisor, including the complaints that led to her 2004 observation.  It is not surprising that there were some student complaints given the fact that she taught every semester, often multiple sections, for so many years, particularly in light of the "culture of complaint" that existed at Barnard according to Dr. Vandenberg. Tr. 1:102:20-104:, 4:12:12-16.  However, there is absolutely no evidence that any of these complaints were ever found to be meritorious.

[28] Dr. Schor-Haim identified one, but only one, of the students who (continued on next page)

her with complaints, she always encourages them to try to resolve the issue directly with their teacher.[29] None of the students at issue ever came back to her to tell her that their issues had not been resolved. Tr. Tr. 4:87:12-18, 4:88:7-8, 4:88:24-89:5, 4:126:8-127:9. She also invited them to return with any written work from the class. Again, none did so. 4:127:22-128:7.

However, to the extent that there were some complaints made concerning Professor Fleischer, despite Dr. Schor-Haim's claims to the contrary, the evidence supports a conclusion that no such complaints were brought to Dr. Fleischer's attention prior to the decision being made not to reappoint her. Nonetheless, Dr. Schor-Haim testified that she discussed student complaints with Professor Fleischer at the September 2016 meeting, and that Dr. Fleischer was completely dismissive, which Dr. Schor-Haim said was not acceptable to her. Tr. 4:118:2-8, 4:132:7-11. However, it is hard to reconcile Dr. Schor-Haim's claim that Dr. Fleischer was "completely dismissive," which she found "unacceptable," with Dr. Schor-Haim's contemporaneous descriptions of the meeting, and Dr. Fleischer's "openness and equanimity."

In addition, while Dr. Fleischer initially testified that there "may have been" a reference to student complaints at the September 16th meeting "but never any specifics" (Tr. 1:97:23-98:9), she subsequently testified that "I actually don't recall that there was any discussion of student complaints," adding that the first time Dr. Schor-Haim brought student complaints to her attention was at the May 22, 2017 meeting at which she was non-reappointed. Tr. 1:98:10-14, 1:105:10-106:5, 2:82:21-83:13. Later, after reviewing her notes from the September 2016

---

had complained to her about Dr. Fleischer, as coming from an academically underprivileged background. Tr. 4:86:16-22.

[29] Dr. Fleischer also testified that she encourages students to ask questions, and to meet with her. She tells students that they can email her anytime and gets back to them promptly. Tr. 2:147:25-148:12.

meeting (U-78), and re-reading her contemporaneous correspondence with Dr. Schor-Haim (U-13), Dr. Fleischer testified more definitively that: "There was no discussion on September 26, 2016 of student complaints." Tr. 5:102:24-103:55:103:14-15.[30]  While Maida Rosenstein, for her part, was uncertain about whether complaints were raised at the September 2016 meeting, she testified that if they were mentioned, Dr. Schor-Haim "didn't offer any details on that." Tr. 4:42:21-43:2.

Professor Fleischer also reiterated her testimony that no complaints were raised with her after the September meeting, until they were referenced at the May 2017 meeting, when she was informed of her non-reappointment.  Tr. 2:161:15-18, 5:104:16-21.  Further, while student complaints were brought up at the May 2017 meeting, they were mentioned only in passing with no details provided concerning the nature of the alleged complaints. Tr. 1:109:9-12. "I've never been told specifics by Dr. Schor-Haim of what complaints were made and what the nature of the complaints were." Tr. 2:83:22-24.  The Grievance Answer also refers to a long-term pattern of student complaints. J-4.  However, Professor Singh testified that at the grievance hearing there was only one passing reference to the fact that in-person complaints had been made, and no details were provided. Tr. 4:13:8-23.

### H. Professor Fleischer's Union Activity

Professor Fleischer was not just a Union activist, she was the faculty member who was far and away the most active in the contingent faculty union drive.  She was the founding

---

[30] In response to this testimony by Dr. Fleischer the Employer's counsel asked the Union to produce the notes of the September meeting by former Union Organizer Patrick Gallagher. Tr. 5:136:9-13, 5:151:5-13.  These notes were ultimately produced to Employer's counsel who did not seek to have them put into evidence.  An inference can be drawn from this fact that these notes would not have supported the Employer's contention that student complaints were discussed at the meeting.

member of Union at Barnard, the one who reached out to Maida Rosenstein, President of UAW Local 2110, to ask her to explore organizing Barnard's contingent faculty.  She was involved from the beginning, and collected more cards than anyone else.  The campaign became public in June 2015. After that Dr. Fleischer attended every hearing at the National Labor Relations Board ("NLRB"), and testified as a witness for the Union.[31]  After the Union was certified, she was elected with the most votes to the bargaining committee, and very involved in negotiations.  Tr. 1:109:13-110:7, 1:110:25-111:6, 2:35:24-25, 4:40:3-19, 4:52:10-13. *See* also, Tr. 4:23:15-20 (Sonam Singh testifying that Dr. Fleischer "was, by far, the most vocal among us" and that "[s]he was, by far, the most publicly identified member of the union organizing committee."), Tr. 4:40:12-20 (Maida Rosenstein testifying that she was extremely prominent in the campaign, the most persistent, "the most visible person."), Tr. 4:52:8-10 (Siobhan Burke testifying that Dr. Fleischer was "the most involved of all of us; certainly the most outspoken.").

In November of 2016 Dr. Fleischer attended a faculty meeting called by Provost Linda A. Bell to discuss negotiations with the Union.  Professor Fleischer came to the front of the room immediately after the Provost was done with her presentation and spent 5-6 minutes rebutting Bell's claims point by point.  Tr. 1:111:20-112:14, 5:132:12-25.  Dr. Schor-Haim was at that meeting. Tr. 5:133:2-4.  Dr. Fleischer was visible in other ways.  She spoke at a rally in September of 2016.  She also published several articles that were critical of Barnard including "When Unfair Labor Relations Reify, It's Time to Strike," and "Come Together Right Now:

---

[31] The Employer, in an effort to rebut any implication that it retaliated against Dr. Fleischer for her Union activism, has highlighted the fact that other adjuncts who testified before the NLRB, and became members of the bargaining team, were nonetheless reappointed. Tr. 2:35:20-23, 2:36:2-37:18, 2:2:37:25-38:9.  However, the record evidence shows that Dr. Fleischer's role was unique among unit members.  She was, more than anyone else, the face of the Union movement at Barnard.

When Corporatization Comes to College, Faculty Unionization must Follow." Tr. 1:113:1-20.

Later Dr. Fleischer was visible as a Union dissident. She resigned from the Union's bargaining team because she objected to things being agreed to, and until the day she was non-reappointed, was actively trying to put together a slate to run for union office. Tr. 1:110:7-18. Also, unlike other Union activists who were reappointed, she campaigned against ratification of the CBA, an agreement that Barnard supported, and after the CBA was ratified, she worked to overturn the ratification vote. Tr. 2:53:14-54:5, E-1, E-2, E-3.

## I. **Wendy Schor-Haim's Anti-Union Animus**

Despite her claims to the contrary, Dr. Schor-Haim, Professor Fleischer's supervisor, and the person who by her own admission made the decision to end Professor Fleischer's employment at Barnard, exhibited significant hostility towards the Union. Dr. Schor-Haim signed a petition demanding to be excluded from the proposed bargaining unit (Tr. 4:29:16-30:17, U-63), and attended the pre-election representation hearing at the NLRB, where Dr. Fleischer was present, and where she was regularly observed handing notes to Barnard's attorneys. Tr. 1:111:12-19, 2:14:6-11.

By her own admission she was part of a group of Barnard full-time non-tenure line faculty members ("BFTNTLF") that created a website to oppose their inclusion in the bargaining unit. She was active in that effort, and she "supported the efforts of that group as reflected on [its] website."[32] Tr. 4:141:2-11. As detailed below, and as acknowledged by Dr. Schor-Haim,

---

[32] While Dr. Schor-Haim claimed that the group that created the website was a pre-existing group (or cohort) of full-time non-tenure line faculty (Tr. 4:140:13-16), the record evidence is to the contrary. Specifically, their website states: "Our coalition formed in the summer of 2015 in direct response to the unionization campaign of the United Auto Workers Local 2110." U-33.

the views expressed on the website expressed hostility to the Union.[33] Tr. 4:141:12-19. *See also,* Tr. 2:10:19-11:11.

The following statements and claims were posted by the website, and specifically endorsed by Dr. Schor-Haim:

- "This is deeply concerning to us, and confirms our certainly (sic) that the UAWs (sic) goals are not to serve the best interests of the employees of Barnard College." U-33.

- In a piece titled: "Grading the Union: Misinformation, inaccuracy and dishonesty earn the UAW a grade of D," BFTNLF states: "The union's attempt of a hostile takeover of our faculty group requires a lot of misinformation and even outright lies." It goes on to say: "[t]he same 'democratic' union that claims that we don't have a strong voice without it is cynically misrepresenting our work in order to profit off of our salaries and benefit from our importance to the college." U-37.

- A reference to "misinformation . . . being supplied by outside groups (specifically the UAW, its representatives and various adjunct organizers) . . ." U-33.[34]

- Claims that members of their group, if included in the bargaining unit, would have to pay "hefty fees" in order to "opt out" of the Union, rather than properly characterizing these fees as fees to cover representational services, not fees required to purchase the right to "opt out" of union activities. U-34, U-35.

- "The UAWs (sic) unrelenting push to include our cohort in the bargaining unit against our expressed choice to not unionize has been surprisingly distressing and deeply demoralizing for us." U-34.

---

[33] Dr. Schor-Haim also claimed that she was not hostile to the Union's efforts to organize adjuncts (as distinct from full-time contingent faculty). She attempts to support this by pointing to her alleged support for unionization efforts at New York University ("NYU") while she was a graduate student, 15 (or more) years ago. Tr. 4:64:19-65:16. She concedes that she had no official role in connection with those efforts (Tr. 4:65:20-22) but cites two letters she wrote to the New York Times supporting the union drive at NYU. Tr. 4:119:11-120:9. One of those letters, entered into evidence by the Union, shows she was, at best, a reluctant supporter of the union effort at NYU. U-77. In any event, that was many years ago, and before she became a supervisor. The evidence detailed here suggests that her views have changed since that time.

[34] Apparently even adjunct organizers, including the lead adjunct organizer Professor Fleischer, were defined by BFTNTLF as "outsiders."

- "From the beginning of its efforts to unionize Barnard faculty, the UAW has used misinformation and/or intentional obfuscation of key data to avoid any challenges to its desired bargaining unit." U-35.

- Claims that the organizers often "outright misled faculty" and "harassed and intimidated" faculty members in connection with the Union drive. U-35.

- Claims that the UAW told them that it was unconcerned with the will of their cohort, and that they were "indistinguishable from adjunct faculty." U-36.

While Dr. Schor-Haim testified that she first learned about the union drive from others (Tr. 4:66:8-18, 4:67:5-10) she conceded that she learned at some point that Dr. Fleischer had initiated the drive. Tr. 4:78:5-10. There can be no doubt that she was aware of this fact by the time she counselled Dr. Fleischer, and when she subsequently made the decision not to reappoint her.

## J.   **The Grievance**

Rather than accepting a severance payment and signing a release, Professor Fleischer opted to file a grievance challenging the decision not to reappoint her. While there were other adjuncts with reappointment rights who were not reappointed, none of the other affected adjuncts opted to file grievances. Tr. 4:43:14-24, 5:80:7-81:3. In order to elect a severance payment, Dr. Fleischer would have had to sign a release, effectively walking away from an age discrimination claim which is pending with the New York City Human Rights Commission. U-26. Not only was she unwilling to do so, she also wanted to continue teaching at Barnard. Tr. 1:107:19-108:16. On information and belief, none of the other affected adjuncts had pending litigation. Tr. 5:87:13-88:2.

The Grievance Hearing was held on August 14, 2017. Tr. 4:37:18-20. As of the day of the hearing the Union still had not received the grade data, or the complete set of student evaluations from the FYW Program that it had requested months earlier. Tr. 4:38:3-21, U-66.

62

At the hearing, there was no discussion concerning Dr. Fleischer's teaching of international and academically underprivileged students. Tr. 5:107:4-9. As discussed above there was, at most, a passing reference to student complaints. At the hearing, as at the September 2016 meeting, Dr. Schor-Haim claimed that Professor Fleischer's grading was not significantly different than that of others teaching in FYW. Tr. 4:13:24-14:6. As shown above, this claim was not accurate.

In its Grievance Answer the Employer's primary claim continued to be that Professor Fleischer was not an effective teacher, a claim that it based primarily on her scores on the two student evaluation questions cited by Dr. Schor-Haim at the September 2016 meeting, and her alleged response to the concerns raised by Dr. Schor-Haim at that meeting. J-4 at 2-3. The Grievance Answer refers to student concerns about "lack of clarity and expectations" (J-4 at 2), rather than lack of clarity of grading expectations, the issue raised at the September 2016 meeting. Tr. 1:104:6-23, 1:105:4-9.

No reference was made in the Answer to any alleged specific failure to meet the needs of international and/or academically challenged students. The references to "complaints" appear to relate to Dr. Fleischer's SET rather than to any specific in-person complaints lodged by her students. The Employer also claimed, as it has throughout the arbitration proceeding, that it has the untrammeled right to not reappoint any adjunct for any reason whatsoever, regardless of seniority.

The Grievance Answer contained several misrepresentations of fact. For example, it states that Professor Fleischer said that she did not believe that implementing the changes suggested by Dr. Schor-Haim would make a difference. J-4 at 2. This claim has been addressed above, as has the claim that Dr. Fleischer attributed her SET scores to a single 15 year old student review. The Answer inaccurately claims, as well, that there was "no improvement" on

the two evaluation questions at issue.  It also states, contrary to the facts reviewed above, that Dr. Fleischer's grades were not significantly different than those of others.

In the Answer, Provost Bell also stated that, because the issues of concern "were not observable in the classroom" Dr. Schor-Haim "instead reviewed students' written work (even though Dr. Fleischer failed to provide a random sample as requested) and student evaluations." J-4 at 3.  Yet, as shown above, Dr. Schor-Haim, despite indicating satisfaction with the writing sample provided by Dr. Fleischer, never claimed that it provided evidence of inadequate feedback, or even claimed that she evaluated it at all.  Nor did she evaluate any other written work even though Dr. Fleischer offered to provide it.

## K. **Expert Testimony**

### 1. **The Experts**

Two experts testified at the Hearing, primarily to address the validity of student evaluations of teaching, and the proper role of SET in evaluating teaching and making employment-related decisions.  It was stipulated that the Union's expert witness, Susan Basow, is an expert in psychology and pedagogy, and the Employer's expert witness, Jennifer Frederick, is an expert in chemistry and pedagogy.  Tr. 4:4:16-5:4.  However, despite this stipulation, it must be noted that the relevance of the experts' specific expertise, to the issues being considered, varies significantly.

Dr. Basow's research focuses on gender, perception, and the evaluation of professionals.  Moreover, she has specific expertise and has conducted research on the topic of student evaluations of teaching.  Tr. 3:10:20-11:20, U-38, U-43.[35]  She has been qualified as an expert on

---

[35] Dr. Basow is a Professor of Psychology, with an endowed chair at Lafayette University, where she has taught since 1977.  She served as Chair of the Psychology (continued on next page)

related topics on two previous occasions.[36]  Tr. 3:11:21-12:5.  In contrast, Dr. Frederick's academic and professional background is in biology and chemistry.  Tr. 3:88:3-11, E-7.  As Director of the Center for Teaching and Learning at Yale University, she has worked on issues concerning graduate student training and faculty development, and testified that she has "practical experience with student evaluations."  Tr. 3:88:12-17, 3:92:2-5.  However, unlike Dr. Basow, she has never done research on student evaluations.  Tr. 3:136:3-7.  Nor has she conducted research on pedagogy outside of STEM instruction.  Tr. 3:136:8-10.  When asked whether she was familiar with the concept of "expectancy violations," a key topic covered by Dr. Basow in her testimony, she said she was familiar with the term "expectation bias" from a psychology course she had taken in the 1990s, but acknowledged that, unlike Dr. Basow, she is "not a social scientist."  Tr. 3:134:22-135:5.

Not surprisingly, Dr. Frederick is familiar with the research of Dr. Basow, alluding to her as "a giant" in the field, and acknowledging her expertise in researching biases in SET.  Tr. 3:103:13-21, 3:111:15-112:13.  Also not surprisingly, Dr. Basow was unfamiliar, before the current Hearing, with the work of Dr. Frederick.  Tr. 3:12:6-8.

In contrast to Dr. Basow, who supported each of her conclusions with specific research citations, the only article referenced and put into evidence through Dr. Frederick was not a research paper but a discussion piece.  Tr. 3:136:11-14, E-8.  Thus, while Dr. Frederick made numerous assertions concerning SET, some of which were in agreement with the views of Dr.

---

Department for seven years.  She also founded and was head of the Women and Gender Studies Program at Lafayette.  Tr. 3:10:8-19, U-38.

[36] Dr. Basow also has experience as a Chair using SET to help instructors improve their teaching. Tr. 3:79:25-80:8.

Basow, and some of which were not, none of these assertions were supported by specific citations to research in the field.

### 2. The Use of Student Evaluations of Teaching To Assess Teaching Effectiveness

Dr. Basow testified both that SET do not measure teaching effectiveness, and that they are open to many sources of bias. Tr. 3:12:19-25. This conclusion is derived from multiple studies involving one course with multiple sections and a common exam, as well as studies that look at how well students do in subsequent higher-level courses. Studies using both designs show that ratings of teaching effectiveness are not correlated with performance, either on common exams, or in subsequent courses. Tr. 3:13:12-14:25, U-39, U-40, U-41, U-42, U-43, U-44. The evidence shows that students do not accurately assess their own learning. U-40.

It is worth noting that many of these studies cited by Dr. Basow, in support of her conclusions, were also cited by Dr. Frederick, when she was asked about the studies she reviewed while preparing to revise Yale's SET. Tr. 3: 94:7-10 ("So, we heard about the highly cited papers earlier today, so they're certainly part of the canon."). Some of the researchers relied on by Dr. Basow to support her conclusions, e.g., Uttl, Boring, Stark, were also cited by the Employer's expert as researchers current in the field. Tr. 3:114:10-16. Dr. Frederick acknowledged that the work of these researchers "raised really important concerns about - - especially over-reliance on student evaluation data." Tr. 3:114:22-25. Further, Dr. Frederick did not claim that any of the studies cited by Dr. Basow were flawed or inaccurate, and cited no studies that contradicted the findings of the studies cited by Dr. Basow.

Perhaps the most significant of the studies cited is "Meta-analysis of faculty's teaching effectiveness: Student evaluation of teaching ratings and student learning are not related" by Bob

Uttl, Carmela White, Daniela Gonzalez." U-39. This study, published in 2017, examined "almost all of the existing research." It found that "there's no relationship between student evaluations and actual performance on - - especially on a common exam." Tr. 3:15:19-17:9. This study not only was cited by the Union's expert, but is cited as a resource on the website of the Center which the Employer's expert directs. U-55.

Evaluations can also be affected by biases that further compromise their validity. These include biases based on such factors as gender, race, ethnicity, age, attractiveness and grade leniency. Tr. 3:31:23-3:33:3, U-43. Another study, cited by Dr. Basow, "Student evaluations of teaching (mostly) do not measure teaching effectiveness," by Anne Boring, Kellie Ottboni and Phillip Stark, reanalyzed data from a large data set using a multiple section design, also found no relationship between SET and teaching effectiveness. Tr. 3:23:17-24:16, U-41. In addition, the researchers found gender bias, with male professors being rated higher even though the performance of their students was actually worse. Tr. 3:24:16-25:12. The Employer's expert also acknowledged the existence of bias in SET: "there's a lot of research, and I think there are great concerns in the literature and a lot of credible evidence to support bias in course evaluations, and we've heard about some of those papers earlier today, and we have an expert who's done research in that area in the room, as well. And I think that that's very credible and important to take into consideration." Tr. 3:103:13-21.

Thus, it is not surprising that SET of women instructors are even less representative of student learning than those of men. Tr. 3:26:4-10. When women act in ways that are not expected, based on stereotypes, they may be penalized by both male and female students. This is based in the concept of expectancy violations. When women do not fit the female stereotype, are not seen as nurturing, kind and understanding, they are viewed more negatively than men

exhibiting the same behaviors. This is true for both male and female evaluators. Tr. 3:26:18-28:8. "[B]ehaviors by women that contradict or violate that stereotype are often seen much more negatively than the same behaviors engaged in by men . . . ." Tr. 3:27:17-20. Women, even those who self select to go to a women's college, would still be affected by these stereotypes. Tr. 3:52:11-53:2. "Most research in the area suggests that there are correlations between student evaluations and non-teaching related factors, such as grading leniency, students' attitudes towards professor characteristics such as gender, age, race, ethnicity, attractiveness, expected grade." Tr. 3:13:3-8. Dr. Basow testified that she would expect to see this effect in connection with questions concerning both clarity of grading standards and the quality of feedback on written work, and would expect the results for these two questions to be highly correlated. This would be particularly true where students are expecting poor grades and are looking for ways to protect their self esteem by blaming the faculty member's teaching. Tr. 3:42:9-43:14. In subject areas where grading can be seen as less inherently objective, like writing, this effect would be more pronounced. Tr. 3:43:15-44:4.

Dr. Basow testified that she would expect the incidence of student complaints also to be affected by expectancy violations. Tr. 3:44:23-45:9. "All of what's in the student comments are the students' opinions and attitudes. Measures of actual benefit, again, would be more aptly measured in more of an objective way." Tr. 3:73:10-13.

While maintaining that SET do not measure teaching effectiveness, Dr. Basow did acknowledge that a college should consider patterns of negative comments. However, in her view such patterns should trigger, at most, more objective evaluation of the matters being evaluated. For example, if students complain about the quality of suggestions for revision of written work, this might reasonably lead a supervisor to conduct her own evaluation of the

quality of such suggestions. As previously noted, the record makes it abundantly clear that the Employer did not conduct any independent investigation into any concerns raised by Dr. Fleischer's evaluations.

"I think teaching effectiveness is a complex concept, and student evaluations are deceptively easy as a proxy for measuring something that's complex." Tr. 3:18:6-9. Teaching effectiveness is a hard concept to get at. "[S]tudent evaluations are deceptively easy and they're deceptively objective. You can get numbers, numbers look like they're serious . . ." Tr. 3:35:11-14. "Again, teaching effectiveness is best measured by actual performance, so that's really the best criteria, to see if the student really has improved over the course of a semester, has learned something." Tr. 3:45:14-18.

Colleges truly interested in measuring teaching effectiveness need to use more time-consuming methods such as reviewing portfolios of student work to see how they have progressed, and having trained observers observe teaching. Tr. 3:18:4-20. For a writing course portfolio review would be an ideal basis for evaluation. Tr. 3:19:4-18.[37] Dr. Basow testified that, at her university, the faculty look at student evaluations as part of the evaluation process, but that they also do peer reviews, they have faculty members write their teaching philosophy and self-evaluation, they review course assignments and syllabi, and they talk to alumni of the faculty member. "So, [SET] is part of a multi-factor system of assessment." Tr. 3:80:9-23. As a faculty leader with expertise in pedagogy, assessment and SET, Dr. Basow testified that she would never make a decision concerning reappointment solely, or primarily, on the basis of student evaluations. She would want corroborating information, even if there were also one or

---

[37] Some schools are no longer using SET to measure teaching effectiveness. In one case this was the result of an arbitration decision. Tr. 3:35:20-38:6, U-45.

two student complaints.  She would want to get more information: "sit in on the class, review actual assignments and syllabus, review revisions, whatever the areas that were of some question." Tr. 3:79:7-243:82:25-83:6, 3:82:25-83:15.

Significantly, Dr. Frederick agreed that SET "should not be the sole source of information about high-stakes decisions about teaching for instructors." Tr. 3:99:8-18.  She testified that, while SET can serve as a "red flag" or the "beginning of the conversation," she thought that "it's really important to not over-rely on course evaluation and to take it into context with other sources of information." Tr. 3:96:24-97:5, 3:109:10-110:12.  She further conceded that students are not qualified to evaluate teaching, and that there are others who are more qualified to do so. Tr. 3:92:22-23, 3:104:2-8, 3:104:18-21.  She also testified that evaluating outcomes is important in evaluating teaching effectiveness, a position she argued in a paper she wrote: "Teach the Prof How to Teach." Tr. 3:129:2-8, U-54.

Other experts in the field have reached similar conclusions.  Tr. 3:38:23-40:7, 3:82:25-83:6, U-40, U-46 (concluding that relying on SET to make employment related decisions harms students, resulting in a lowering of expectations and grade inflation.).  An "overwhelming majority" of those who have done research in this area agree that if SET is used at all "it should never be the sole basis for evaluating a person's teaching effectiveness." Tr. 3:15:2-18, 3:17:15-22.[38]

---

[38] Dr. Basow testified that, as a part of holistic assessment of teaching effectiveness, SET may contribute a piece. Tr. 3:55:6-9.  "I think there's a distinction between developmental purposes of student feedback and evaluative purposes.  So I think they have a role in developmental purposes for a faculty member." Tr. 3:55:25-56:5.  Like Dr. Fleischer, Dr. Basow did not entirely discount the value of SET: "So, I think that . . . student evaluations can serve a purpose for faculty members to see how students, in fact, feel about certain aspects of instruction.  But that's not to be confused with a measure of teaching effectiveness." Tr. 3:54:13-18.

### 3.    The Relationship Between Grades, Expected Grades, Grading Standards, and Student Evaluations of Teaching

Research shows that there is a significant correlation between grades and SET, but that SET are more correlated with expected grades than with actual grades. According to Dr. Basow, this "suggests that they're measuring something about student attitude, but not actually student performance." Tr. 3:20:8-14. SET are usually completed before students receive their actual final grade. "[S]tudent evaluations are vulnerable to student biases [because] if they're unhappy with their grade, they may blame the faculty member for that, as opposed to more internal attribution." Tr. 3:20:18-21:6. This correlation, raised initially by Dr. Basow was also acknowledged by Dr. Frederick (Tr. 3:130:12-15), and is referenced on her Center's website. Tr. 3:130:22-131:10, U-55.

Students who get, or expect, a good grade, have the illusion that they learned more. Tr. 3:22:7-20. If a faculty member is concerned about their SET scores, this may lead to decreased student expectations. Tr. 3:21:9-22:6, U-40. Wolfgang Stoebe, who studied this phenomenon, is, according to Dr. Basow, "particularly concerned, as others are in the field, about grade inflation that many attribute to the widespread and heavy use of student evaluations." She testified that she agrees with these conclusions. Tr. 3:22:21-23:9, U-40.

Further, there is evidence that students, both male and female, penalize female professors more if they expect low grades. This is linked to the concept of expectancy violations discussed above. Women are expected to be more lenient graders and are judged more harshly when they do not live up to this expectation. Tr. 3:28:9-25.[39] Thus, for example, one research study

---

[39] Dr. Basow was asked whether a student's comments might change after they receive their final grade. She responded: "So, I think that comments regarding helpfulness can certainly be affected by a student's final grade. . . ." and that a student who thought (continued on next page)

showed, not only that students getting lower grades gave their professors lower ratings, but also that this effect was more marked for female professors. U-42 ("Motivated Stereotyping of Women: She's Fine if She Praised Me but Incompetent if She Criticized Me" by Lisa Sinclair and Ziva Kunda), Tr.3:29:8-22.  Apparently students who get poor grades look to explain this fact by reference to external factors, in order to protect their egos.  One way to do so is to rely on gender-based stereotypes. Tr. 3:30:13-31:12.

In fact, one study, "Students' stereotypes of professors: an exploration of double violations of ethnicity and gender" by Kristin Anderson, showed that students enter a course, before the course has even commenced, with gender-based biases that are affected by information provided about how lenient their professors are. Tr. 3:33:10-34:18, U-44.

Asked how she would expect SET scores on clarity of grading standards to be affected by grade expectations, Dr. Frederick initially testified that she did not know why expected grades would affect response to clarity of grading standards.  However, presented with an explanation for why there might be such a correlation, she responded:  "I'm hesitant to answer the question from a basis of social scientific research, in which I'm not an expert." Tr. 3:135:6-20 (emphasis added).  Later she acknowledged that it is possible that students expecting a low grade might blame this on clarity of grading standards.  3:144:7-18.  Asked the same question, Dr. Basow, who *is unquestionably an expert in the social science research* underpinning the issue, testified that she thought that scores for that question would correlate with whether a student expected a good grade or not.  Tr. 3:40:15-41:6, 3:41:20-42:7.  She also thought that this effect would be even more pronounced for female professors. Tr. 3:42:9-20.

---

a professor's comments were not helpful, but then got a better than expected grade, might change their view. Tr. 3:72:6-22.

4. **Reaction to Professor Fleischer's Evaluations**

Prior to testifying Dr. Basow reviewed Dr. Fleischer's complete SET.  Shortly before appearing she also specifically reviewed negative comments that Dr. Fleischer was asked about during her cross-examination, as well as more positive comments highlighted for her by Union counsel. Asked about the comments made by Professor Fleischer's students, Dr. Basow noted that: "there are students who noted that Professor Fleischer was – had very high standards or was a strict grader, but that they also felt that that helped them write better and become better writers, and they were really notable in saying that they learned a lot from her." Tr. 3:45:24-46:15.  She added that she did not think such variation, between the negative and more positive comments, was unusual. Tr. 3:46:17-47:11.

On cross-examination Dr. Basow was asked to review selected negative comments made during Dr. Fleischer's last two years at Barnard, in response to a question about how helpful Dr. Fleischer's suggestions for revision were. Asked about the comments from one section from 2015, (U-10, Q.3: How helpful were suggestions for revision?), Dr. Basow, after first noting that only half of the students responded, said that if she had been Professor Fleischer's supervisor she would want to look at how the instructor made suggestions for revision, independent of the students' comments. U-10, Tr. 3:58:21-59:8, 3:59:15-21.  She added that, as a professor, she would consider whether changes were needed but wouldn't automatically conclude that this was the case, noting that the comments might be correlated with unhappiness with grades.  Tr. 3:59:22-60:24.  Asked about selected comments from another section taught the same semester she responded: "Again, without having other validating information, I'm not sure I would conclude that [Dr. Fleischer's] comments actually could not have been helpful.  There are some comments here that indicate that the comments were helpful." Tr. 3:61:8-23, U-9.  And, in

response to her review of selected comments from the spring of 2016, Dr. Basow noted: "helping students develop what they want to say, their point of view, their way of expressing themselves, may be perceived as vague and yet, actually - - can lead them to become better writers." Tr. 3:66:3-7, U-6. After reviewing comments from the same question from the fall of 2016, and being asked for her reaction, Dr. Basow responded: "from a teaching point of view, the proof of teaching feedback should be that it's actually improving their writing or not. So that would be a key component that's not actually addressed here." Tr. 3:70:3-7, U-3. Finally, Dr. Basow concluded that the fact that students say that Professor Fleischer's comments are not helpful does not mean that this is the case. Tr. 3:71:20-72:5.

On re-direct Dr. Basow was shown more positive comments made in response to the same question about suggestions for revision and observed, not surprisingly, that student opinion appeared to be mixed. Tr. 3:74:3-76:2. Dr. Basow also noted that many students from multiple sections said that their writing had improved as a result of taking Dr. Fleischer's course. Tr. 3:76:3-77:2. Asked to explain why students might claim that a professor's suggestions for revision were not helpful, but nonetheless acknowledge that their writing had improved, Dr. Basow stated that she would expect the question about helpfulness to be more correlated with expected grade. Tr. 3:77:3-18.

Summarizing her reactions to Professor Fleischer's SET, and her testimony about her teaching style, Dr. Basow opined that while grade leniency and lower expectation may result in better scores on SET, setting high standards and being a harder grader may be better for learning. Tr. 3:47:12-18, 3:49:14-19, U-47. Based on her review of the record evidence, including Dr. Fleischer's SET, Dr. Basow concluded that Professor Fleischer is a teacher with high expectations and high standards. Tr. 3:48:19-49:13. "Again, I think there are different

74

pedagogical strategies, and whether they're effective or not is judged by whether the students actually do better in writing, not just whether they're happy with a particular comment on the particular paper." Tr. 3:66:21-67:2. "Students being unhappy by itself is not necessarily an indicator of lack of effectiveness. I think that this is a debatable point about whether or not the job of a professor is to make their students happy . . . ." Tr. 3:67:7-11.

Dr. Frederick, for her part, based her initial assessment of the decision not to reappoint Professor Fleischer on the information provided to her by the Employer. Tr. 3:125:12-20. This information included the Employer's representations that Dr. Fleischer had been defensive and expressed an unwillingness to change at the September 2016 meeting.[40] As shown above, the information provided did not include clear evidence of Dr. Fleischer's lack of defensiveness, and her willingness to work with Dr. Schor-Haim on implementing new teaching strategies. *See,* Statement of Facts, C, *supra.* She also was not shown the work sample collected by Dr. Schor-Haim in December of 2015, but was told, again contrary to the evidence, that the sample was not helpful because of Dr. Fleischer's non-compliance with the request. Tr. 3:128:2-25, 3:142:25-143:5.

Significantly, when Union counsel showed Dr. Frederick the evidence kept from her by the Employer, rebutting claims that Dr. Fleischer had been defensive and unresponsive, she seemed to acknowledge that the Employer should have reviewed additional information, such as student outcomes, before making its decision on non-reappointment. Tr. 3:145:3-13, 3:147:23-148:15. Asked if looking at SET and talking to some students was an adequate basis for

---

[40] Under cross-examination Dr. Frederick acknowledged that her conclusions concerning the fact that faculty members who were defensive about criticism would not improve, was based on her experience with just two faculty members, both of whom were referred to her for reasons in addition to poor scores on SET. Tr. 3:131:23-133:18. Further, even with these two individuals her assessment that they did not improve was based on more than just SET. Tr. 3:133:19-134:8.

evaluating teaching she testified: "In a perfect institution, in an ideal world, then, no, it's not, it's not a great deal of action." Tr. 3:134:13-21.

Asked what advice she would give a supervisor who was concerned about an instructor with 17 years of seniority, referred to her because the supervisor thought their SET was inadequate, Dr. Frederick responded: "So I might ask them to look for other sources of evidence, given that that's the best practice than not just relying on course evaluations . . ." Tr. 3:140:16-141:3. She added, "[w]ell, I think the best thing that would happen would be that the supervisor has a conversation with the instructor, and together they come up with an agreed upon plan to address the concerns, and that's - - they pay attention to outcomes based on that change." Tr. 3:141:17-22.

Finally, Dr. Frederick was asked about a situation in which a faculty member, approached about problems with their teaching, had made some change but not, in her opinion, enough.

> "Q. How would a supervisor evaluate whether they were willing to make changes or not?  A. By the nature of their interactions with that person.  Q. So they would have follow-up interactions with them?  A. I would hope so."

Tr. 3:142:18-23.  In the present case there was no further assessment, no observation, no review of student work, and no follow-up interactions.

## L. Bargaining History

Negotiations between the parties for an initial CBA commenced in February of 2016, and ended a year later in February of 2017.  Tr. 5:41:13-17.  Andrea Stagg testified for the Employer concerning bargaining history.  Sonam Singh and Maida Rosenstein testified for the Union.[41]

---

[41] Sonam Singh was a member of the team and attended all but one session. Tr. 6:4:20-24. Maida Rosenstein was chief negotiator for the Union and attended every session. Tr. 6:31:15-22. The Employer's Deputy General Counsel Andrea Stagg testified that she attended all but one bargaining session.  Tr. 5:40:24-41:12.

Dr. Fleischer was also a member of the Union's team until she resigned and stopped attending negotiations in early 2017, before the final agreement was reached. Tr. 2:41:4-24, 2:72:6-11, 5:341:18-25. However, she did not testify concerning bargaining history.[42]

Article 11.5.a of the CBA provides that "the College will give good faith consideration (as defined in Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course . . . for seven (7) semesters within no more than seven (7) academic years." Article 11.6 states that "[g]ood faith consideration means the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances." Under Article 11, if a Unit Member is not offered an appointment, for reasons set forth in Article 11.6, they are entitled to a severance payment in return for signing a release. J-1. The good faith language contained in Article 11.5 and 11.6 of the CBA was first proposed by the Employer. Tr. 6:12:8-10, 6:36:16-18.

### 1. The Employer's Position

It is undisputed that the Employer initially took the position that it should have complete discretion concerning appointments. What is in dispute, is its current claim that it never altered this position, and that the untrammeled discretion it sought is reflected in the final language of

---

[42] Documents were entered into evidence by the Employer in which Dr. Fleischer expressed her pre-ratification vote views concerning provisions of the tentative agreement. The Union objected to the admission of these documents, arguing that it was not Dr. Fleischer's role to interpret the CBA and that her interpretation, either in 2017 or the present, was not relevant to the Hearing. The Arbitrator, while stating that the Union's "point is well-taken regarding the meaning of the language," nonetheless accepted the exhibits. Tr. 2:41:25-43:16. In Employer Exhibit 1, for example, drafted after Dr. Fleischer resigned from the Union's team, Dr. Fleischer expressed the view that the contract lacked job security. No one from Union's team assisted her in drafting this document, nor did she discuss it ahead of time with anyone from the Union. Tr. 2:44:15-24. Dr. Fleischer's post-ratification views concerning the meaning of the Agreement, as expressed, for example, in Employer Exhibit 5, are similarly irrelevant to the present case.

the CBA. It apparently asserts that the final agreement gives its chairs and directors complete discretion concerning appointments, and that if the decision is made not to reappoint someone with seniority, its only obligation is to make a severance payment, contingent on the signing of a broad release. Tr. 5:64:25-65:11, 5:89:12-16 (On February 13, 2017, "there was [n]o discussion of guaranteed appointments, because the concept was if you had that longevity, you will either get an appointment or a buyout of this amount."); Tr. 5:90:9-14 ("[W]e always talked about that we - - the College, the people at the table could not step in for the authority of the department chair or program director and mandate who would be appointed."); Tr. 5:90:16-19; Tr. 5:91:4-10 (management rights was the only place where the right to not reappoint was addressed); 5:95:2-7; Tr. 5:98:23-99:3 (the College never indicated that it would give good faith consideration for appointments).

Explaining the addition of proposed language, during negotiations, addressing longer appointments and severance payments, Andrea Stagg testified:

> "So here we're saying we're going to have longer appointments. And we said we can't offer you job security, you will work here forever, because this is not a tenure track job. But we can say if you've been here a certain number of semesters, consecutive academic years, you have longevity here, longevity is the word we used at the table. If you have longevity here we will offer you a longer appointment. . . ."

Tr. 5:74:3-13. She added: "and if we decide we don't want to give you a [longer] appointment *for whatever reason*, then we're going to buy you out, offer you a severance payment." Tr. 5:74:3-13 (emphasis added). It is worth noting that Andrea Stagg was testifying here about the Employer's proposal of January 20, 2017. While on that date the Employer made its first proposal for longer appointments or severance, its good faith consideration proposal still only applied to three programs. E-12 at 50-54. Thus, arguably, at that point, the Employer's proposal did provide an exclusive option of longer appointments or a buyout at the Employer's discretion,

for those *not teaching in the three covered programs*. However, the Union never agreed to that proposal, and the good faith consideration language was extended to all programs less than a month later. E-12 at 74.

The Employer claims that "good faith consideration" (CBA Article 11.5 and 11.6) only provides that, if the Employer *chooses to reappoint someone*, at its sole discretion, regardless of seniority, they would be assigned to the same course, absent the existence of one of the exceptions specified in Article 11.6. Andrea Stagg claimed that the applicable language was meant to address a concern raised by the Union about particular course assignments:

> "We explained that by giving good faith consideration for these assignments, we would - - the chairs would look to, okay, we're offering this course, and this person has good faith consideration for this course. I will think about assigning them to teach the course if they are here."

Tr. 5:67:16-68:4. *See also*, Tr. 5:66:20-67:15.[43]

> "[T]here were people at the table who felt particular about which course they taught; and the preference to teach some courses more than other courses; for prestige or other reasons, but they wanted to teach certain courses over other courses during the length of their appointment. So this would say, if you taught this course you have consideration for this course because you taught it many times over many years, you will be asked to teach the course; with all these exceptions."

Tr. 5:68:9-20.

---

[43] Oddly, Andrea Stagg, while testifying that the Employer's "good faith" proposal only applies to whether someone whom the Employer chooses to reappoint is reappointed to the same course, claimed that this proposal addressed the Union's concerns about "job security" even though, under her interpretation of this provision, it provides no job security whatsoever. Tr. 5:66:20-67:5. Also, notwithstanding last minute changes negotiated in the language governing good faith consideration, language that the Employer insists only applies to course assignment, Ms. Stagg testified that there was no discussion of course assignment in early February "because we were talking about appointments." Tr. 5:94:13-25. But see modifications proposed in Article 11.5 and 11.6 proposed on February 7, 2017 and February 12, 2017 (E-12 at 74, 78-79, 81) which were ultimately incorporated into the CBA.

The Employer bases its claim that the Union accepted its view of what Article 11 means largely on the fact that the Union ultimately accepted its language, albeit with modifications.

| Stagg: | "[T]hat was the day, February 13[th] . . . when the Union . . . embraced that concept by giving us the proposal that incorporated that concept. |
| Levine: | "Did anybody from the Union make any statement about embracing the concept you have described?" |
| Stagg: | "I don't know if they used the phrase, 'we embraced your concept' but they used our language.  They used the language that we gave them on the appointments and assignments . . ." |

Tr. 5:84:10-22. *See also*, Tr. 5:77:17-25. Andrea Stagg did also claim that the Union made *some* more affirmative statements accepting its position.  For example, she stated: "I remember Maida saying, '[w]ell, then if you don't want to appoint someone you're just going to buy them out.'" Tr. 5:86:22-24.[44] As detailed below, the Union strenuously denies that the Employer ever stated that it had complete discretion, under the final language of the CBA, to not reappoint faculty members with seniority for any reason, no less that that the Union affirmatively accepted such a position.

Finally, the Employer relies on the fact that Article 11.5.a specifies that "the College will give good faith consideration (as defined in Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course" for a requisite period of time.  The Employer highlighted this provision in its cross-examination

_____

[44] Andrea Stagg claimed that the idea of a provision which provided no job security beyond severance payments for faculty with seniority was "not an unusual scheme," adding that she thought there was a similar provision in the Union's contract for the adjuncts at New York University ("NYU"). Tr. 5:93:3-12. Asked if she was aware of the fact that the NYU contract *also* contained a good faith provision, she testified that she was not. Tr. 5:97:25-98:11.  A review of that contract, available at http://www.actuaw.org/contracts/ shows that a provision, Article VI, states: "Adjunct or part- time faculty who are no longer probationary will receive good faith consideration for reappointment to courses offered by the University, which are to be taught by adjunct or part-time faculty, where he/she has previously taught the course."

of Maida Rosenstein, and entered an email from Michael Bertoncini to Maida Rosenstein into evidence, dated January 13, 2017. E-13. However, as discussed below, there is nothing in this provision, or the January email, that suggests that they address assignments alone. Rather, they explicitly reference appointments.

### 2. The Union's Position

For the Union, the issue of job security was the central issue of the negotiations. Tr. 6:4:25-7:4, 6:31:25-32:2. The Union initially sought seniority rights and just cause. In contrast, as discussed above, the Employer sought no job security and complete discretion in appointments. In the end the final deal represented a compromise. The parties ended up with what is in the final contract. The Union "argued strenuously that there had to be consideration given to existing unit members' rights to continue in the job [and] [u]ltimately [the parties] reached a compromise on good faith consideration language, proposed by the College." Tr. 6:7:19-8:24, 6:32:3-11, 6:34:2-14. As explained by the Union's witnesses, while the Employer initially took the position that appointments were at its sole discretion, there were negotiations back and forth, and ultimately the parties agreed on good faith consideration and did not leave it to the College's sole discretion. Tr. 6:20:13-21:2, 6:37:22-38:8. The parties moved away from leaving the reappointment decision to the College's sole discretion. Tr. 6:14:4-11. "We ended up with a good faith consideration standard with an enumerated list of categories which narrowed over the course of bargaining to meet some of the Union's concerns, the right to grieve, and then a severance." Tr. 6:15:15-19.

The Union, by accepting language that the Employer proposed concerning good faith consideration, albeit with negotiated modifications, was not accepting the interpretation of that language now being advanced by the Employer. To the contrary, based on the language of the

proposal, *and what was said at the bargaining table*, the Union understood that the College had offered good faith consideration for reappointment, and this is what it accepted. Tr. 6:23:4-6. Asked how the College indicated that good faith consideration for reappointment would be required, Ms. Rosenstein responded:

> "Well, the language of the agreement that we reached, which was proposed by the College, reflects that. It says it applies to appointments, and that was always our understanding. . . . All of the discussion that we had back and forth at the table was always all over the issue of job security and how much job security people would have. It was all about being able to maintain course load for adjuncts. The whole gist of this debate at the table was about what kinds of - - how much job security adjuncts could have, and we ultimately reached a compromise."

Tr. 6:42:43:9. "The Union side said repeatedly that we were talking about reappointment; that when we were talking about Article 11 and the shape of Article 11 took, over the various compromises, and as it became essentially the job security provision of the contract, we were talking about reappointment rights." Tr. 6:16:22-17:9.

Significantly, both Maida Rosenstein and Sonam Singh testified definitively that, when the Employer first presented its proposal concerning good faith consideration for appointment, six months after the commencement of negotiations, it stated that the language at issue provided unit members with a measure of job security. Tr. 6:12:14-22, 6:36:25-37:3. This testimony was unrebutted. In contrast, Andrea Stagg conceded that she did not recall the Union's response to the proposal at the time it was made. Tr. 5:69:22-70:3.

While the Union later proposed a severance provision the Union proposed severance payments as what came at the end of the process if the job security provision had not led to reappointment. Tr. 6:13:8-17, E-11 (Union's 8/2/16 proposal). Later, the understanding was that "[s]everance would kick in if you were - - if the good faith consideration did not lead to reappointment." Tr. 6:13:21-14:2. "[T]he agreement was that the College would give longer

appointments based on longevity, could only not reappoint if they met the good faith consideration test, and in those instances, would pay severance based on the longevity of the person." Tr. 6:39:24-40:5. "[U]ltimately, we agreed that the College had to give good faith consideration to reappointment." Despite Andrea Stagg's claims, the Union never said anything to the contrary. Tr. 6:40:11-17, 6:43:10-18.

The interpretation of Article 11's "good faith consideration" advanced by the Employer, that it applies only to course selection if the Employer chooses to appoint someone, is contrary to the plain language of the Agreement, is internally inconsistent and illogical, and misrepresents what occurred during negotiations. As explained by Unit Chair Sonam Singh, when asked to respond to the Employer characterization of discussions during negotiations:

> "It's not an accurate reflection of what occurred. Again it's a mischaracterization of the Union's position which was focused on course load, the direct relationship to one's income, among other factors. It's also a mischaracterization of the written proposal which was not only about assignments."

Tr. 6:11:14-20. He testified that, at most, the issue of assignment to specific courses was raised by the Union in passing. Tr. 6:11:21-12:2. He further testified that he has no recollection of the Employer saying anything about course preferences being the focus of good faith consideration which "would have gone against what was in front of us in black and white." Tr. 6:12:23-13:7. Similarly, Maida Rosenstein testified that Ms. Stagg's characterization of the discussions concerning Article 11:

> "[Is] not an accurate reflection of the entirety of our position. That was one of the concerns that people had, that assignments might be taken away arbitrarily from them. But it certainly wasn't the overarching concern that we had. The overarching concern was about being able to maintain course load and having ongoing continued employment and continued job security, not assignments."

Tr. 6:36:7-15.

The Section of the CBA that defines "good faith" is lengthy and detailed. It includes a long list of reasons that permit the Employer to "deny, reduce or cancel an appointment."[45] It also includes distinct standards of proof applicable to grievances challenging the existence of such claimed reasons. Thus, when the College cites Article 11.6.a-d, as the basis for such a decision, and the Union grieves this determination, the College need only establish "that the conditions set forth therein existed or occurred." However, when the College cites Article 11.6.e or f, as the basis for its decision, which between them include four distinct bases for non-reappointment, and the Union grieves this determination, the College must establish "by clear and convincing evidence that one of the conditions set forth in those sections has been met." J-1.[46]

The nature of the reasons that allow the College to "deny, reduce or cancel an appointment or assignment" set forth in Article 11.6, as well as the required standards of proof for establishing that such reasons exist, logically support a conclusion that this language was intended to address the denial, reduction or cancellation of an appointment, as stated, rather than just the issue of whether someone happens to be assigned to their preferred course if the College, at its sole discretion, *decides* to reappoint them. Thus, for example, under the College's claimed interpretation of the applicable language, if the College wanted to assign a Unit Member to a course other than a course they had previously taught, it would have to prove by clear and convincing evidence that a Unit Member had engaged in misconduct "outside the scope of their

---

[45] While Article 11.6 contains six (6) subsections defining bases that constitute "good faith reasons" for making the listed decisions (i.e., denial, reduction or cancellation of an appointment or assignment), a review of those subsections shows that they contain eleven (11) distinct bases for making such decisions.

[46] The meaning of the CBA's language, and its context, is further addressed below. *See*, Argument at I.A, *infra*.

employment with the College which would adversely affect the Unit Member's ability to teach or be a member of the College community." J-1 at Article 11.6.f.3. The idea that the College would jump through such hoops to change someone's assignment, if they also had untrammeled discretion to simply not reappoint them, is incredible at best. Further, why would the College *ever* consider reappointing someone who had engaged in misconduct so severe that it would adversely affect their ability to be "a member of the College community"? It is simply not credible that the parties would have negotiated such language, and other language contained in Article 11.6, to address no more than course preferences.[47]

However, the Union was never looking for ownership of courses, or for the equivalent of tenure, as the Employer has asserted. These are mischaracterizations of its position. Tr. 6:8:25-9:11, 6:34:15-24. There was considerable back and forth, and in the end the Union agreed, through the manner in which "good faith was defined," to give the Employer considerable discretion. The Union never claimed that good faith consideration provided guarantees of appointments, it provided for good faith consideration. Tr. 6:41:19-25. As Sonam Singh testified:

> "[i]t's a pretty wide variety of factors that gave the College - - again, this is something we compromised on - - a fair amount of leeway. But it still gave us rights for reappointment and the right to grieve. What it did not include was what was in the initial list of good faith factors, not an unlimited right at its sole discretion."

Tr. 6:19:3-9. The Employer's initial proposal had included under "good faith consideration," the right to deny an appointment for "any other change in the academic, fiscal or organizational needs of the College as determined by the College in its sole discretion," a right which would

---

[47] Asked to address this logical inconsistency Andrea Stagg struggled to respond coherently. Tr. 5:95:13-96:16.

have largely rendered the obligation meaningless. Tr. 6:19:17-20:3, E-12 at 23. This broad right was not included in the final CBA.

Maida Rosenstein testified that Article 11.5a defines seniority for purposes of Article 11, by reference to the teaching of specific courses, and that this language was proposed by the Employer.[48]  Tr. 6:55:21-56:13.  She testified that there is nothing in Section 5 that gives the Employer the unilateral right to decide whether to appoint someone or not, nor did the Employer ever say anything suggesting that it gave them such a right. Tr. 6:57:8-13, 6:59:3-9. "Section 5 represents a compromise by the parties in which unit members get reappointed based on good faith consideration, and if they don't get reappointed because the College has a good faith reason, they get a severance package." Tr. 6:57:13-18. The proposal referenced in E-13, and on the table from the Employer at that time, only extended good faith consideration to faculty in three programs – FYW, First Year Seminar, and Dance Technique. E-12 at 40. The Employer's rationale for this limitation was its claim that staffing in these programs was more predictable. Tr. 6:23:20-24:9, 6:25:5-12. "So we were moving towards the final compromise. They were acknowledging that they did not have untrammeled rights to appoint or not appoint or reappoint, but they tried to limit it to three programs . . ." Tr. 6:24:14-18.

The parties' back and forth about reappointment rights, and the ultimate compromise agreed to by the parties, is also reflected in changes made during negotiations in the CBA's Management Rights provisions, and ultimately in the interaction between this language and the language of the Appointments Article.  Taken together these changes also reflect a meeting of

---

[48] The CBA contains a Side Letter which gives faculty credit, for purposes of Article 11.5.a, for having taught the "same course" in an ongoing way, if there are courses where the number of courses changed over time. J-1, Side Letter One.

the minds concerning the fact that the final Agreement modified the Employer's rights concerning appointments.

The Employer's original Management's Rights proposal included language giving it the unlimited right to determine or modify course load.  E-12 at 1 (2/19/16).  This language remained in the Employer's next 11 proposals.  Finally, however, in its November 11, 2016 proposal, this language was modified by adding the significant caveat: "consistent with Article __ - Appointments and Assignments."[49] E-12 at 35 (11/11/16).[50]  As explained by Sonam Singh, this change, proposed by the Union, was the result of the negotiation process and the compromise the parties were working towards.  Specifically, the College was moving away from its insistence on untrammeled rights concerning appointments.  Tr. 6:7:4-10.  "This was in response to the Union's demand that there be some form of job security in the contract, and that management rights not trump what that form of job security would look like."  Tr. 6:7:11-18.  In the final CBA, both the reference to "course load" and this caveat were removed from the Management Rights article.  In its place the following language was included: (1) more general language specifying that enumerated management rights were "[e]xcept as otherwise provided in this Agreement" (J-1 at Article 7.1), and (2) language in the Appointments article stating that "[e]xcept as otherwise specifically provided in this Agreement, no appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment, including any particular course load, beyond its specific term as identified in a hiring document . . . ."  J-1

---

[49] Andrea Stagg incorrectly testified that there were no changes to the Employer's Management Rights proposal, originally made on February 19, 2016, in its November 11, 2016 proposal.  Tr. 5:60:11-17.  As detailed here, that was not the case. Tr. 6:5:15-7:3, E-12 at 1-2, 35-36.

[50] In the Union's copy of Employer Exhibit 12 the handwritten page numbers added by the Employer are out of order.  Thus, its Page 35 is the second page of the Employer's November 11th Proposal which actually begins on Page 36.

at Article 11.1.

The Employer's initial Appointments and Assignments proposal (3/11/16) included language stating that "[n]o appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment beyond its specific term . . ." E-12 at 7. In the final CBA, however, that language was modified to begin with the phrase: "[e]xcept as otherwise specifically provided in this Agreement . . ." E-12 at 73; J-1, Article 11.1. Language in that proposal stating that "[n]othing in this Article [Appointments and Assignments] shall be construed as limiting the rights set forth in [the Management Rights] Article" (E-12 at 8) also did not survive into the final CBA.

Also significant is the fact that on February 12, 2017, shortly before the language of the CBA was finalized, management agreed to move the following language from the Appointments and Assignments Article, with some modifications, into Management Rights:

> "Decisions regarding who is taught, what is taught, how it is taught and who does the teaching involve administrative and academic judgment and shall be made at the sole discretion of the Provost or his/her designee."

E-12 at 69-73 (7/12/17 proposal), Tr. 5:79:11-21. By moving this language to Management Rights, the caveat contained in that Article, "[e]xcept as otherwise provided in this Agreement," became applicable. It is also significant that reference to *administrative* judgement was removed from the language. These changes, mutually agreed to by the parties, were necessary to ensure that language concerning management discretion would not undo the Employer's negotiated commitment to good faith consideration to the reappointment of Unit Members with seniority, as specifically provided for and defined in Article 11.5 and 11.6.

## ARGUMENT

### I.   UNDER THE COLLECTIVE BARGAINING AGREEMENT THE EMPLOYER NEEDED A GOOD FAITH REASON FOR NOT REAPPOINTING PROFESSOR FLEISCHER

#### A.   The Plain Language of the CBA Requires the Employer To Have a Good Faith Reason to Deny a Unit Member with Seniority Reappointment

A review of the applicable provisions of the CBA, and the plain meaning of the words contained therein, and an analysis of these words taken in context, lead to an inexorable conclusion – given Dr. Fleischer's 17 years of service at Barnard, the Employer was required to give her "good faith consideration" for reappointment.

If the meaning of a provision of a collective bargaining agreement can be reasonably determined from the language itself, an arbitrator, as a general matter, should not look to extrinsic evidence.  Under the "plain meaning rule" the existence of ambiguity, or lack thereof, must be determined within the four corners of the agreement without reference to extrinsic evidence.

> "[T]he well-established majority view remains that the existence of an ambiguity must be determined from the 'four corners of the instrument' without resort to extrinsic evidence of any kind.  This is the so-called 'plain meaning rule,' which states that if the words are plain and clear, conveying a distinct idea, there is no occasion to resort to interpretation, and their meaning is to be derived entirely from the nature of the language used."

How Arbitration Works, Elkouri and Elkouri (8th ed. 2016) ("How Arbitration Works") at 9.2.A (citing cases).

> "Typically applying the plain and most common meanings of the words promotes stability in contractual relationships and minimizes the need for extended factual inquiry into what the parties may have intended or believed."

Anchor Glass Container Corp., 136 L.A. 823 (Miles, 2016).  A party that claims that words in

the Agreement should be given a meaning other than their plain meaning, bears the burden of proof. *See*, Gulf Printing Co., 92 L.A. 893, 895 (King, 1989).

In determining the meaning of a contract, arbitrators look both to the language of individual provisions, and also to how the language is used in context. "[T]he concept that the disputed portions must be read in light of the entire agreement has received widespread acceptance." How Arbitration Works, at 9.3.A.viii (citing cases).

> "Meaning is inevitably dependent on context.  A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.  A longer writing similarly affects the paragraph . . . Where the whole can be read to give significance to each part, that reading is preferred . . ."

How Arbitration Works, at 9.3.A.viii (*citing* Restatement (Second) of Contracts, § 202, cmt. (1981)).

> "[T]he primary rule of construction for a labor agreement . . . is to determine from the instrument(s) as a whole the true intent of the Parties and to interpret the meaning of a questioned word or part with regard to the context in which it is used, the subject matter and its relation to all other parts or provisions, and to apply it accordingly."

Dresser-Rand Co., 100 L.A. 333, 335-36 (Pribble, 1992).

> "The primary rule in construing a written instrument is to determine, not alone from a single word or phrase, but from the instrument as a whole, the true intent of the parties, and to interpret the meaning of a questioned word or part, with regard to the connection in which it is used, the subject matter and its relation to all other parts or provisions."

Riley Stoker Corp., 7 L.A. 764, 767 (Platt, 1947). *See also*, U.S.W. Communications, 114 L.A. 752, 753-54 (Monat, 2000); Great Atlantic & Pacific Tea Co., 70 L.A. 1003, 1006 (Horowitz, 1978).

> "If an arbitrator finds that alternative interpretations of a clause are possible, one
> of which would give meaning and effect to another provision of the contract,
> while the other would render the other provision meaningless or ineffective, the
> inclination is to choose the interpretation that would give effect to all other
> provisions. . . . The principle extends not only to entire clauses, but also to
> individual words.  Ordinarily, all words used in an agreement should be given
> effect.  The fact that a word is used indicates that the parties intended it to have
> some meaning, and it will not be declared surplusage if a reasonable meaning can
> be given to it consistent with the rest of the agreement."

How Arbitration Works, at 9.3.A.viii.a (citing cases).

> "It is axiomatic in contract construction that an interpretation that tends to nullify
> or render meaningless any part of the contract should be avoided because of the
> general presumption that the parties do not carefully write into a solemnly
> negotiated agreement words intended to have no effect."

John Deere Tractor Co., 5 L.A. 631, 632 (Updegraff, 1946) (*cited in*, How Arbitration Works, at

9.3.A.viii.a.).

The Employer claims that the CBA allows it to non-reappoint any unit adjunct for any

reason whatsoever.  It claims that the agreement negotiated by the parties provides no job

security at all, other than providing for slightly longer appointments to adjuncts with seniority, if

it chooses, at its unfettered discretion, to reappoint them.[51]  It further claims that "good faith

consideration," as defined in Article 11.6, only means that it *if* it decides to reappoint a unit

member, it must consider assigning them to the course that they previously taught.  As shown

below, the Employer's interpretation of the CBA is not supported by the plain language of the

Agreement, is internally inconsistent, and is illogical.

Article 11.5.a provides that "the College will give good faith consideration (as defined in

---

[51] The CBA provides that post-probationary unit adjuncts will receive appointments covering a
full academic year.  Once an adjunct has completed a minimum of 14 semesters of service they
become eligible for 2-year appointments.  This ultimately increases to 4-year appointments for
adjuncts with 42 semesters (21 years) of service.  J-1 at Article 11.5.

Article 11, Section 6) to the appointment and assignment of a Unit Member to a course where the Unit Member has taught the same course . . . for seven (7) semesters within no more than seven (7) academic years." This language is absolutely clear. The College will give good faith consideration to the appointment and assignment of a course.[52] This provision does not say the Employer will give "good faith consideration to the assignment of an adjunct to a particular course, if and only if we choose to reappoint them." It requires the Employer to give good faith consideration to the *appointment* of a course.[53] If the Employer's interpretation of the CBA was correct, there would be no need to include the word "appointments."

However, Article 11, taken as a whole, is entitled "Appointments and Assignments" and these two terms are used throughout the article. These words are distinct. The fact that they are distinct is made apparent in the very first sentence of the article which begins "[a]ll appointments and/or assignments shall be made by the Provost or their designee." J-1 at Article 11.1 (emphasis added). Significantly, the disjunctive formulation of these terms "appointment or assignment" is used repeatedly in Article 11, demonstrating that the parties treated these terms as

---

[52] The Union has never claimed that the CBA *guarantees* anyone a course. The fact that there are no such guarantees was agreed to as part of Article 11.2. The CBA provides only for good faith consideration for an appointment as defined by Article 11.6. Indeed, the Union agreed to give the Employer considerable leeway concerning the bases for non-reappointment. But these bases are not unlimited.

[53] There is no dispute over the fact that unit members attain seniority by teaching the same course for a requisite period of time. That does not mean that their resulting rights are limited to assignment to the same course if the Employer *chooses* to reappoint them. The fact that having accrued requisite seniority under Article 11.5.a, an adjunct is entitled to good faith consideration for reappointment, is beyond serious debate. An argument could be made that the use of the phrase "appointment and assignment to a course" should be construed to mean, appointment to the same course that the adjunct taught in attaining reappointment rights. Such an interpretation would be strained given the reference to "a course" rather than "the course" or "the same course." However, given the fact that the present case is about the refusal to reappoint Dr. Fleischer to the same course she previously taught, this is not an issue that needs to be, or should be, reached in the present case.

reflecting separate concepts. *See*, J-1, Article 11.1, 11.6, 11.7, 11.8, 11.9.

Further, if the Arbitrator might otherwise be inclined to find ambiguity in the language of Article 11.5, its explicit reference to Article 11.6, eliminates any possible lack of clarity. Article 11.5 references "good faith consideration" in its first sentence, and defines it explicitly by referencing Article 11.6. Where, as here, the parties have defined a word or phrase in their agreement, an arbitrator should not look outside the agreement for a definition. How Arbitration Works at 9.3.A.i.b (citing, City of Duluth, Minn., 100 L.A. 309, 312 (Ver Ploeg, 1992)).

Article 11.6 is absolutely clear: "Good faith consideration means that the College may deny, reduce, or cancel an appointment or assignment of a Unit Member in the following circumstances." In the first place the fact that this provision says "appointment or assignment" shows that these terms are disjunctive, and refer to two separate things. To read the term "appointment" as referring only to "assignment" is a strained and illogical reading of this phrase. It would make the term "appointment" meaningless surplusage. Further, Article 11.6.f, the specific provision pursuant to which the Employer justifies its non-reappointment of Professor Fleischer, specifically refers to "[n]on-reappointment based on: (1) Unsatisfactory performance or conduct of a Unit Member . . ." J-1 at Article 11.6.f (emphasis added). This provision makes no reference to "assignment" whatsoever. It is specifically Dr. Fleischer's non-reappointment that is being challenged in the present case. It is hard to fathom, in light of this language, how the Employer can continue to maintain that this "non-reappointment" is not subject to the grievance and arbitration procedure, despite the CBA's clear language to the contrary.

Further, the use of the terms "deny, reduce, or cancel," in Article 11.6, also show that this provision was written to refer to more than just an adjunct's preference for assignment to a particular class. The choice of one class over another is a qualitative preference, not a

93

quantitative one.  Whether an adjunct is assigned to course "x" or course "y" they are still assigned to a single course.  The use of the word "reduce," in particular, shows that the parties were referring to something quantitative, i.e., appointment to a particular course load, not assignment to one class rather than another.  This formulation is also repeated later in Article 11.6: "Denials, reductions, or cancellations of appointments or assignments based on Article 11, Section 6 shall be subject to grievance and arbitration under Article 22."

In addition, as discussed above, the Section of the CBA that defines "good faith" is lengthy and detailed.  It includes a long list of reasons that permit the Employer to "deny, reduce or cancel an appointment," as well as distinct standards of proof applicable to grievances challenging the existence of such claimed reasons.  The nature of the reasons that allow the College to "deny, reduce or cancel an appointment or assignment" set forth in Article 11.6, as well as the required standards of proof for establishing that such reasons exist, logically support a conclusion that this language was intended to address the denial, reduction or cancellation of an appointment, as stated, rather than just the issue of whether someone happens to be assigned to their preferred course if the College, at its sole discretion, *decides* to reappoint them.  *See*, Statement of Facts, L.2, *supra*.

Finally, any reliance by the Employer on Article 7 (Management Rights) is misplaced. The long list of enumerated rights in that Article, including rights involving the assignment of unit members, and determinations about who will deliver instruction, are qualified by the phrase, "[e]xcept as otherwise provided in the Agreement . . ." Thus, Article 11 provides for good faith consideration for appointment and trumps Article 7.  Similarly, Article 7.3 states that actions taken by the College pursuant to its rights shall not be subject to the grievance and arbitration procedure "unless the exercise thereof violates an express written provision of the Agreement."

Here, the exercise of management's purported "right" to non-reappoint Dr. Fleischer violates the express written provisions of Article 11. Finally, a similar statement of the Employer's "rights," accompanied by a similar caveat, is included in Article 11.1: "[e]xcept as otherwise specifically provided in this Agreement, no appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment . . . " This phrase would be unnecessary as written if Article 11 did not create such rights, interests or expectancies in *further appointments*. As shown above, it does. Dr. Fleischer's right to good faith consideration for reappointment *is* specifically provided for in the Agreement.[54]

A contract is not ambiguous just because one party fails to adequately express the meaning it intended. *See*, <u>Klein Tools</u>, 90 L.A. 1150, 1153 (Poindexter, 1988). "The parties are presumed to have understood the terms used, and there can be no relief to one because he failed to realize the full implication of the language used." <u>Nassau Inn, Inc. (Palmer Square, Inc.)</u>, 45 L.A. 530, 531 (Kerrison, 1965). Further, a party cannot create an ambiguity simply by claiming that one exists. *See*, <u>City of Vallejo</u>, 86 L.A. 1082, 1085 (Bogue, 1986) ("[a] dispute over the meaning of a term does not render it ambiguous. That determination must come from an examination of the agreement itself to see if more than one plausible meaning can be given to the

---

[54] The Employer also claims that Article 11.5c-f, by providing for either appointments or separation payments (in return for signed releases), for adjuncts with seniority, somehow establishes that the Employer has the unilateral right to choose to buy out an adjunct rather than to reappoint them. In light of the explicit requirement that the Employer must give good faith consideration for reappointment, such a reading of these provisions is not sustainable. Rather, as the Union has maintained, these provisions provide for severance payments when a long-term adjunct is not reappointed for one of the many "good faith" reasons set forth in Article 11.6. For example, under Article 11.5.e, had Dr. Fleischer been non-reappointed because all FYW adjuncts were replaced by full-time instructors, and there were no positions available for her, she would have been entitled to a severance payment in recognition of her 17 years of service. *See*, Statement of Facts L.2, *supra*.

term."). Even if the outcome does not reflect an employer's actual intent, clear and unambiguous language prevails.

The plain language of the CBA supports a conclusion that the Employer may only deny an appointment to an adjunct in the bargaining unit, who has taught at least seven (7) semesters over seven (7) academic years, if it has a good faith basis for doing so, as defined by Article 11.6. As will be shown below, no such good faith basis existed in this case.

> **B.** **If the Applicable Provisions of the CBA Are Determined to Be Ambiguous, the Bargaining History, and Generally Applicable Rules of Contract Interpretation, Further Corroborate that the Employer Was Required to Have a Good Faith Reason to Deny Professor Fleischer an Appointment**

Even if the contract language is found to be ambiguous, notwithstanding the Union's arguments to the contrary, the Union respectfully contends that the interpretation of the contract propounded by the Union more logically flows from the language agreed to by the parties. Therefore, absent compelling evidence to the contrary, the Arbitrator should find that the contract required that the Employer give Dr. Fleischer good faith consideration for reappointment. A review of the evidence concerning bargaining history, much of it contradictory, does not provide any such compelling basis for accepting the Employer's strained reading of the CBA. To the contrary, this evidence, summarized in Statement of Facts, L, *supra*, lends further support to the Union's position.

When contract language is found to be ambiguous, arbitrators normally look to bargaining history and past practice to try to resolve such ambiguities. How Arbitration Works at 9.3.A.ii. In the present case, given the fact that Dr. Fleischer was non-reappointed shortly after the ratification of the parties' initial CBA, there is no relevant past practice.

96

> "The intent manifested by the parties to each other during negotiations by their communications and by their responsive proposals - rather than undisclosed understandings and impressions – is considered by arbitrators in determining contract language."

Kahn's and Co., 83 L.A. 1225, 1230 (Murphy, 1984) (*cited in* How Arbitration Works, at 9.3.A.ii.b). "Whatever their views on the 'plain meaning principle.' Arbitrators are in agreement that a party's uncommunicated or 'subjective intent' is irrelevant." How Arbitration Works, at 9.2.A.i. "[A]n equivocal statement made by a party during negotiations will not establish that the party agreed to the other's position." How Arbitration Works, at 9.3.A.ii.b (citing Madison Warehouse Corp., 112 L.A. 300 (Suardi, 1998).

Based on the testimony of their witnesses it is apparent that the parties disagree about much of what transpired during negotiations. They disagree concerning whether the Employer did or did not ultimately agree to cede some of its discretion over appointments. They disagree over the degree of the Union's concern over whether adjuncts, if they were reappointed, would be assigned to the same courses they previously taught. The Employer claims that, by accepting its language concerning good faith, the Union was accepting the interpretation of that language which it now advocates. The Union claims that, by proposing that very same language, the Employer was forfeiting absolute discretion. The Employer claims that Union representatives made statements that seemed to reflect the fact that they accepted the Employer's interpretation of Article 11. The Union representatives deny this, and claim that they made it clear that they were talking about reappointment rights. The Employer testified that they explained that the options, for those with seniority, would be either an appointment or a separation payment. The Union's witnesses, while agreeing that something like that may have been said, assert that, in

97

light of the language of the proposal itself, they never understood this to mean that good faith consideration for reappointment was not required.[55]

What is uncontested, however, is that job security was a major focus for the Union throughout negotiations. Further, both of the Union's bargaining team members who testified about negotiations testified that, when the "good faith consideration" proposal was first presented by the Employer, Employer representatives stated that it would provide a measure of job security. This testimony was unrebutted. Yet, the position now advocated by the Employer is that the "good faith consideration" provision of the CBA provides no job security whatsoever.

Further, the fact that the parties negotiated the good faith provision of the CBA in such detail, including eleven (11) distinct bases for making decisions about "appointment[s] or assignment[s], and including language setting forth varying degrees of proof required to establish the existence of such bases, in the event a grievance is filed, based on which rationale is cited by the Employer, provides additional evidence in support of the Union's position. It stretches credulity to think that the parties would have drafted such a complex and nuanced provision to address the very limited issue of whether a faculty member who was reappointed was assigned to their preferred course, rather than to another course.

It is also uncontested that the language that forms the basis for the "good faith consideration" provision of the CBA, Article 11.6, was initially proposed by the Employer.

---

[55] In the face of these disagreements about what did or did not transpire, it must be noted that the Union had two witnesses testify concerning bargaining history, and that these witnesses corroborated each other's testimony. In contrast the Employer only had a single witness testify concerning bargaining history.

Under the principle of *contra proferentem*, if language supplied by one party is reasonably susceptible to two interpretations, the one that is less favorable to the party that supplied the language is preferred.  How Arbitration Works, at 9.3.B.ii (citing cases). "The rule promotes careful drafting of language and accurate disclosure of what the language is intended to mean by penalizing the proponent who is 'at fault' for negligently drafting the text. *Id.*  This rule is normally applied when the intention of the parties cannot be ascertained by use of the primary principles of contract interpretation. *Id.*

In the present case Employer's bargaining team included, among others, Michael Bertoncini, a principal at the labor and employment law firm Jackson Lewis, and one of the representatives who communicated with Union President Maida Rosenstein concerning contract proposals.[56]  E-13.  Had the Employer intended its proposal only to apply good faith consideration to the continued assignment to particular courses, if and only if the Employer chose, at its complete discretion to reappoint an adjunct with seniority, it certainly could have drafted a proposal that clearly provided for this outcome.  Not only did it not do so, it affirmatively communicated to the Union that the proposal provided job security.  Its failure to draft language clearly setting forth its claimed view of what this language means, notwithstanding the skill of its negotiators, creates an additional basis for interpreting the language at issue in accordance with its more logical reading.  *See*, How Arbitration Works, at 9.3.A.xvi.

Finally, as detailed above, in Statement of Facts, L.2, the history of the proposals exchanged by the parties shows that language granting absolute discretion to the Employer, proposed repeatedly by the Employer, was eventually modified late in the negotiations.  Caveats

---

[56] https://www.jacksonlewis.com/people/michael-r-bertoncini

were finally added to the Management Rights Article, nine months into negotiations, after management had presented 12 proposals with no such caveats. Shortly before final agreement was reached, language previously contained in the Employer's proposals for Article 11, that "[n]o appointment or assignment shall create any right, interest or expectancy in any further appointment or assignment beyond its specific term . . .," was modified by adding the phrase: "[e]xcept as otherwise specifically provided in this Agreement . . ." Language stating that "[n]othing in this Article [Appointments and Assignments] shall be construed as limiting the rights set forth in [the Management Rights] Article" also did not survive into the final CBA. Then, on February 12, 2017, shortly before the language of the CBA was finalized, management agreed to move the following language from the Appointments and Assignments Article, with some modifications, into Management Rights: "Decisions regarding who is taught, what is taught, how it is taught and who does the teaching involve administrative and academic judgment and shall be made at the sole discretion of the Provost or his/her designee." By moving this language to Management Rights, the caveat contained in that Article, "[e]xcept as otherwise provided in this Agreement," became applicable. These changes, mutually agreed to by the parties, were necessary to ensure that language concerning management discretion would not undo the Employer's negotiated commitment to good faith consideration to the reappointment of Unit Members with seniority, as specifically provided for and defined in Article 11.5 and 11.6. Taken together these key modifications provide additional evidence that, as the parties moved towards final agreement, the Employer agreed to limit its discretion in important ways.

> "Arbitrators strive where possible to give *ambiguous* language a construction that is reasonable and equitable to both parties rather than one that would give one party an unfair and unreasonable advantage. The arbitrator, it has been said, should 'look at the language in the light of experience and choose that course which does the least violence to the judgment of a reasonable man.'"

How Arbitration Works, at Ch. 9.3.B.v. (citing Clifton Paper Bd. Co., 11 L.A. 1019, 1020 (Stein 1949).

Here, the plain language of the Agreement, reviewed both granularly and in the context of the CBA as a whole, as well as the record evidence concerning bargaining history, compel a finding that the Employer committed itself to give good faith consideration for reappointment to unit members with seniority.

## II. THE EMPLOYER DID NOT HAVE A GOOD FAITH REASON FOR NOT REAPPOINTING PROFESSOR FLEISCHER

### A. The Applicable Standard of Proof

Under Article 11.6 the Employer could only deny Professor Fleischer an appointment based on the circumstances enumerated therein. It has asserted that its non-reappointment of Dr. Fleischer was premised on two of these enumerated circumstances. The first, which is not in dispute, is that the creation of new full-time faculty positions reduced the need to appoint adjuncts to teach sections of FYW. *See*, J-1 at Article 11.6.c.

However, notwithstanding the creation of these new positions, the Employer continues to appoint adjuncts to teach in FYW. In fact, Dr. Fleischer, who was the most senior instructor in FYW, was the only FYW instructor entitled to "good faith consideration" for reappointment who was not reappointed. The Employer asserts that it based its decision to not reappoint Dr. Fleischer, rather than any of the less senior adjuncts, because of her unsatisfactory performance, another one of the circumstances allowing for the denial of appointment under Article 11.6. J-1

at 11.6.f.1.  Under Article 11.6 "[t]he standard of review for a grievance or arbitration alleging a violation of Article 11, Section 6, ¶¶ (e)-(f) shall be whether the College established by clear and convincing evidence that one of the conditions set forth in those sections has been met."  This language does not require it to be established that the Employer had a "good faith belief" that the cited basis for non-reappointment existed.  It explicitly requires that "one of the conditions set forth in those sections has been met."

Having justified its non-reappointment of Dr. Fleischer, who was entitled to good faith consideration for reappointment, on her alleged "unsatisfactory performance," the Employer has the burden of showing, by clear and convincing evidence, that her performance was in fact unsatisfactory.  This standard of proof is not a function of the generally applicable arbitral law, which normally establishes the quantum of proof required in a given case, and which side bears the burden of proof.  Rather, it has been mutually agreed to by the parties as a matter of contract.

The "clear and convincing evidence" standard has been defined in different ways by different arbitrators. One defined it as meaning that the "[t]ruth of the asserted facts is highly probable."  Progress Energy Florida, Inc., 2010 Lab. Arb. LEXIS 20 at *128 (Jennings, 2010) (citing How Arbitration Works).  Another stated that "[t]he evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established."  In the Matter of City A and Union, 2017 AAA LEXIS 39 (Renovitch, 2017).[57]  Yet another arbitrator stated that this standard is "not a moral certainty but it is beyond mere probability.  It is the proof needed to form a firm belief."  Zircoa, Inc., 136 BNA LA 105, 116 (Szuter, 2016).  While these definitions differ to some degree, they

---

[57] Pursuant to AAA rules this case has been published without the parties being identified.

have in common the fact that they require a degree of certainty well beyond a mere preponderance of the evidence.

**B. The Employer Has Failed To Establish Clear and Convincing Evidence that Professor Fleischer's Performance Was Unsatisfactory.**

However "clear and convincing evidence" is defined,  it is a burden that the Employer cannot meet in the present case.  Whatever "good faith consideration" means under Article 11.6, it does not mean the right to deny an appointment to a faculty member with 17 years of distinguished service, eight months after a single oral counseling, without any further review of her work, on the basis of her scores on two questions contained in her student evaluations, despite subsequent improvement in those scores.

The relevant facts are detailed in great detail above and will not all be repeated here. Professor Fleischer has always been a dedicated and hardworking member of Barnard's faculty, dedicated to its mission.  The Employer has recognized this fact in countless ways; e.g., by reappointing her 34 consecutive times, by choosing her to represent the College as part of an outside program review, by choosing her to teach in the "Revisiting the Classics" series, etc.  Dr. Fleischer's knowledge of her field has never been questioned.  She has never been accused of misconduct.  Many of her students, while commenting on her rigorous style and high expectations, have credited her with facilitating major improvements in their writing ability.

In September of 2016, her supervisor called her to a meeting where she expressed concerns based exclusively, or almost exclusively, on the response to two questions on her SET. At the meeting her supervisor made two specific suggestions about how Dr. Fleischer could improve the classroom experience for her students.  Professor Fleischer listened respectfully, discussed the issues raised "with equanimity and open-mindedness," and agreed to implement

the suggested changes, which she then did.  Her scores on those two questions, and others, improved markedly that academic year.

Between the date of that meeting and the date on which Dr. Fleischer was notified of her non-reappointment, her supervisor did not speak with her again about any perceived problems in connection with her teaching.  There was no further counseling, and no disciplinary action of any kind.  Her supervisor did not observe her teaching, despite an open invitation to do so.  She did not review any of the work produced by Dr. Fleischer's students, or Dr. Fleischer's written feedback on this work.  While Dr. Schor-Haim claims that she did not do so because of Dr. Fleischer's alleged failure to properly comply with her previous request for a work sample, the evidence shows that Dr. Schor-Haim never communicated any dissatisfaction with the sample that had been produced, but to the contrary, indicated to Dr. Fleischer that it was "great." Further, when Dr. Fleischer subsequently offered to share additional student essays with her supervisor, Dr. Schor-Haim said that she appreciated the offer, but that it was not necessary "at this point."  Apparently, in Dr. Schor-Haim's view, it never became necessary.

There is abundant evidence in the record that SET do not measure teaching effectiveness, and that SET scores reflect various biases.  The evidence shows that faculty members who give lower grades, or whom students expect to give lower grades, receive lower SET scores.  This effect is particularly likely on questions related to grades in students' minds, like questions addressing "clarity of grading standards" and "instructor's feedback on your work."  Further, as a result of stereotypes that involve expectations, held by both men and women, that women will be more lenient, and gentler and more forgiving in their feedback, when female professors fail to meet these expectations, they receive lower SET scores than men exhibiting similar behaviors. This is particularly true with regard to questions involving grades and feedback.

104

Because of the consensus among experts, including both expert witnesses in this case, that SET do not measure teaching effectiveness, there is near unanimity concerning the fact that institutions of higher learning should not rely exclusively (or even primarily) on SET for making high-stakes personnel decisions. Yet that is exactly what was done here. Instead, in courses such as FYW, where there are no objective exams, the best way to gauge teaching effectiveness is through portfolio reviews, which show how students' work changes from the beginning to the end of a course. Classroom observations can also be helpful. As shown above, these evaluative tools were never used.

In apparent recognition of the inadequacy of SET as an evaluative tool for making personnel decisions, Dr. Schor-Haim now claims that she based her decision not only on Dr. Fleischer's SET, but also on student complaints and, to a greater degree, on Dr. Fleischer's alleged unwillingness to change. However, in the first place, the evidence shows that her belated claims that Dr. Fleischer was defensive and unwilling to change have no basis in fact. Further, to the extent that one to two students per semester complained to Dr. Schor-Haim about Dr. Fleischer's teaching, she never brought these complaints to Dr. Fleischer's attention, or else raised them only in the most perfunctory manner. In addition, Dr. Schor-Haim testified that she directed the students to raise any issues directly with Dr. Fleischer, and to return to her if they were not resolved, and none returned to her. Finally, having never raised the issue prior to the arbitration hearing, Dr. Schor-Haim now also claims that Dr. Fleischer was insensitive to the needs of academically challenged students. Again, the evidence simply does not support this claim. Further, such concerns were never raised with Dr. Fleischer, meaning even if they were valid, despite the lack of evidence to support such a conclusion, she was never given the opportunity to address them.

105

It is beyond dispute that Dr. Fleischer had high expectations for her students, and was among the hardest graders in FYW. This made some students unhappy, though others, while commenting on the hard work required of them, acknowledged the positive results that flowed from Dr. Fleischer's teaching style. If Dr. Schor-Haim was concerned about whether Dr. Fleischer's teaching was satisfactory, she could have, and should have, reviewed the work being produced by her students. If she was concerned about how she treated academically challenged students she could have observed her interactions with such students in the classroom. If, for whatever reason, there were additional changes Dr. Schor-Haim wanted Dr. Fleischer to make in connection with her course, she could have communicated them to Dr. Fleischer. If she had, there is every reason to believe that Dr. Fleischer would have made a good faith effort to implement such changes, as she did with the previous changes suggested by Dr. Schor-Haim. Dr. Schor-Haim did none of these things.

In light of these facts, the Employer cannot meet its burden of proof of showing, by clear and convincing evidence, that Professor Fleischer's performance was unsatisfactory, and that this justified her non-reappointment.

## C. The Role of Anti-Union Animus in the Decision Not To Reappoint Professor Fleischer

A determination as to whether or not the Employer's decision not to reappoint Dr. Fleischer was motivated, in whole or in part, by anti-union animus, is not determinative in this case.[58] Even absent a specific finding of such animus, the Employer has failed to meet its burden

---

[58] In its grievance the Union alleged that Article 4 of the CBA, in addition to other Articles, was violated by the College. J-2. The Union subsequently stipulated that it was not pursuing the claim of age discrimination in the current action, because Dr. Fleischer was pursuing that claim through another forum, but that it was continuing to assert its claim for discrimination based on union activity. The Employer claims that the Union's remaining claim under Article 4 should be

of establishing, by clear and convincing evidence, that it gave Dr. Fleischer good faith consideration for reappointment, or that her performance was unsatisfactory within the meaning of Article 11.6.  Nonetheless, facts establishing clear evidence of anti-union animus have been detailed above.

In the first place, the evidence shows, notwithstanding her claims to the contrary, that Dr. Schor-Haim harbored (and harbors) significant animus towards the Union.  For example, during the drive she endorsed statements accusing the Union and its organizers, which included Professor Fleischer, of "misinformation and outright lies," and of "harassing and intimidating faculty members."  Another statement that she endorsed called the Union drive "distressing and deeply demoralizing."  In addition, the evidence shows that Dr. Fleischer not only initiated the Union drive, but was its most active inside representative.  Further, whether or not Dr. Schor-Haim knew it initially, by the time she made the decision not to reappoint Dr. Fleischer, she was aware of these facts.  *See*, Statement of Facts, Sections H and I.

Absent another explanation for the action taken against Professor Fleischer by Dr. Schor-Haim, the perfunctory manner in which she was treated after 17 years of service, the failure to give Dr. Fleischer any opportunity to address any concerns Dr. Schor-Haim may have had before

---

dismissed because Dr. Fleischer never filed an internal complaint through the College's non-Union grievance procedure. Tr. 1:34:15-37:3.  While the Union does not dispute the fact that Dr. Fleischer did not file a separate internal complaint alleging discrimination based on union activity, it does not concede that this is determinative to the Article 4 claim in this case.  Rather, to the extent that discrimination based on union activity is not addressed by any non-CBA Employer policy, it is the Union's position that filing an internal complaint over such allegations is not a prerequisite to asserting a claim through the CBA's grievance and arbitration procedure.  However, the gravamen of the Union's claim is that Professor Fleischer was denied good faith consideration for reappointment.  A specific finding that Article 4 was violated is unnecessary in order to reach that issue.  Evidence concerning the Employer's bad faith is, however, relevant.  Indeed, the Arbitrator ruled, over the Employer's objections, that evidence concerning the Employer's animus was admissible in this case. Tr. 2:11:12-12:17.

non-reappointing her, and the clearly established misrepresentations made about Dr. Fleischer by Dr. Schor-Haim in her testimony (e.g., the claim that she was uncooperative and unwilling to change, the claim that she found the work sample produced by Dr. Fleischer to be completely unacceptable), an inference that Dr. Schor-Haim was motivated, at least in part, by anti-union animus, is reasonable, even if not necessary. Dr. Schor-Haim's demonstrated anti-union animus provides a fact-based explanation for her conduct in connection with this matter.[59]

### III. THE EMPLOYER VIOLATED PROFESSOR FLEISCHER'S ACADEMIC FREEDOM

The evidence summarized above also shows that the Employer violated Article 9 (Academic Freedom) of the CBA. This violation lends further support to the claim that Professor Fleischer was denied the good faith consideration for reappointment that she was entitled to under Article 11.

Article 9.1 of the CBA states that:

> Subject to legal restrictions and the terms of this Agreement, Unit Members enjoy the academic freedom to express themselves without unreasonable restriction and to be judged as a teacher on the basis of legitimate intellectual and professional criteria.

---

[59] In considering whether or not the Employer's actions here were motivated, in whole or part, by anti-union animus, the Arbitrator should not rely on the fact that the National Labor Relations Board ("NLRB") dismissed the charges filed against the Employer by the Union and by Dr. Fleischer. Arbitrators have consistently found that NLRB determinations do not have collateral estoppel effect because the parties are not the same (the parties were the NLRB and the Employer, notwithstanding the fact that the charging parties caused the NLRB to initiate an investigation), the bases of the action are different (the National Labor Relations Act versus the CBA), and because the failure by the NLRB to issue a complaint is not an adjudication. *See*, Geauga Co., 92 L.A. 54, 58 (Fullmer, 1988); Anderson-Tully Co., 88 L.A. 7 (Hart, 1986); Contract Carpets, 68 L.A. 1022 (Finston, 1977).

Article 9.3 states that:

> Subject to College policies and the terms of this Agreement, Unit Members shall have the same rights as all other College faculty to establish standards of behavior in the classroom and determine appropriate methods of evaluation, assign grades, select course material where appropriate, and plan off-campus activities or other course enhancements.

The evidence in this case shows that Dr. Fleischer's performance was not judged "on the basis of legitimate intellectual and professional criteria" in violation of Article 9.1. The evidence also shows that she was denied her right, pursuant to Article 9.3, to establish appropriate methods of evaluation and to assign grades. Dr. Fleischer sets high standards in evaluating her students. The evidence shows that the setting of rigorous standards usually leads to lower SET scores, particularly for female professors. To the extent that Dr. Fleischer's lower SET scores resulted from her rigorous standards, and these scores were relied on as the primary justification for not reappointing her, notwithstanding the fact that the evidence shows that SET scores are not correlated with teaching effectiveness, Dr. Fleischer was unfairly penalized for exercising her rights under Article 9.

## **CONCLUSION**

For all of the foregoing reasons, the Union contends that the Employer should be found to have violated the CBA when it did not offer Georgette Fleischer an appointment for the 2017 Academic Year, that the Employer should be ordered to offer a three-year appointment to Dr.

Fleischer beginning in the Fall 2019 semester, per Article 11.5.e.1 of the CBA, and that she otherwise be made whole.

Dated:  May 23, 2019

Respectfully submitted,

Carl J. Levine
Levy Ratner PC
80 Eighth Avenue, 8th Floor
New York, New York 10011
(212) 627-8100
(212) 627-8182 Fax

# EXHIBIT H



PROVOST AND DEAN OF THE FACULTY

3009 BROADWAY
NEW YORK, NY 10027
P:212.854.2708
barnard.edu/provost
provost@barnard.edu

August 28, 2017

<u>Via Email</u>
Maida Rosenstein
President, Local 2110 UAW
maidarosenstein@2110uaw.org

**Re: Step 2 Grievance Response, Georgette Fleischer**

Dear Ms. Rosenstein:

On June 5, 2017, BCF-UAW Local 2110 (the "Union") filed a grievance on its behalf and on behalf of Adjunct Lecturer Georgette Fleischer concerning the College's decision not to appoint Georgette Fleischer to teach in the Fall 2017 semester.  The Union alleged violations of Article 4 (Non-Discrimination) and Article 11 (Appointments and Assignments) of the collective bargaining agreement between the parties (the "CBA"), and later amended the grievance on July 15 adding an allegation that the College had violated Section 9 (Academic Freedom) of the CBA.

On August 3, 2017 the Union requested via email that the grievance be heard at Step 2.  Typically the grievance procedure begins at Step 1, as outlined in Article 22, Section 4 (Grievance and Arbitration Procedure) of the CBA.  The College agreed to the Union's request to hold grievance deadlines in abeyance while the parties continued to meet in good faith to address CBA implementation issues.  The Union then requested that the parties skip the first two steps of the grievance process and move this matter directly to arbitration; however, the College rejected that proposal as there is value in the timely transmission of information through the established grievance process.  Instead the College granted the Union's request to expedite the process by beginning at Step 2 instead of Step 1.  A Step 2 meeting was held on Monday August 14, 2017 at 3pm.  In attendance on behalf of the Union were: June Benjamin, Michael Cinquina, Sonam Singh, and Georgette Fleischer.  In attendance on behalf of the College were Wendy Schor-Haim (Program Director, First Year Writing), Andrea Stagg (Deputy General Counsel), Jomysha Stephen (Chief of Staff to the President and General Counsel), and myself, Linda Bell (Provost and Dean of the Faculty).

I'll address each alleged violation in turn below.

**Article 4, Nondiscrimination**

Article 4, Section 1 provides as follows:  "Neither the Union nor the College shall discriminate on the basis of race, color, religion, creed, national or ethnic origin, age, disability, alienage or citizenship status, gender

(including gender identity or expression), marital partnership status, union activity . . . ." At the hearing, the Union did not offer any evidence of discrimination based on union activity or any other basis covered by Article 4, other than to note that Dr. Fleischer was an active member of the Union's bargaining committee.

The Union's bargaining committee included 5 members who had taught at Barnard College: Georgette Fleischer, Sonam Singh, Siobhan Burke, Todd Rouhe, and Nuria Quella. Nuria Quella left the bargaining team when she accepted an academic position at another institution. Dr. Singh, Mr. Rouhe, and Ms. Burke, like Dr. Fleischer, were all very active members of the Union and the bargaining committee and all testified in front of the National Labor Relations Board during the 2015 Representation case. Dr. Singh, Mr. Rouhe, and Ms. Burke all received appointments to teach at the College for the 2017-2018 academic year. At the grievance hearing the Union failed to show evidence supporting their allegation that Dr. Fleischer's active participation in the Union and/or the bargaining committee played any role in the decision not to appoint Dr. Fleischer to teach in the Fall 2017 semester.

In the grievance meeting Dr. Schor-Haim explained that she did not appoint Dr. Fleischer because her teaching effectiveness was not sufficient to meet the pedagogical needs of a foundational first year writing course. The program was revitalized and renamed after the academic curriculum review, which took place from 2013 to 2015. What was First Year English was renamed First Year Writing and given a clearer purpose: to better prepare students for all disciplines by teaching academic writing and critical inquiry skills using cutting-edge writing pedagogy. The renamed program focuses less on literature (a prior focus) and more on writing technique. Dr. Schor-Haim said that Dr. Fleischer failed to set clear expectations for her students, and she provided unhelpful feedback on written work. Dr. Schor-Haim discussed that she could not overlook these longstanding problems because clear expectations and useful feedback are critical for students to improve writing technique, which is the revised program's goal.

When Dr. Schor-Haim became the First Year Writing program director in 2015, she reviewed data from student evaluations over several years and identified areas of concern. In particular, Dr. Schor-Haim identified a long-term pattern of student complaints about Dr. Fleischer's lack of clarity in expectations and failure to provide useful feedback on written work. During the grievance meeting Dr. Schor-Haim explained that the long-term pattern of these complaints and their consistency over many semesters over many years were of particular concern.

At the hearing, Dr. Schor-Haim explained that she held an in-person meeting with Dr. Fleischer during the Fall 2016 semester in which she presented Dr. Fleischer with her concerns, which were supported by student feedback over many years, and discussed specific strategies for improvement in these areas. Dr. Fleischer's first response indicated her belief that students gave her negative feedback because her course was more rigorous than other courses in the program and she gave lower grades. Dr. Schor-Haim reviewed the grades given in the program and saw that Dr. Fleischer did not appear to be an outlier; her grading was not significantly different than others teaching the same course in the program. Dr. Schor-Haim made clear that in her view, communicating clear expectations, providing useful feedback on written work, and maintaining academic rigor are not mutually exclusive.

Dr. Fleischer agreed to attempt the strategies presented by Dr. Schor-Haim, but Dr. Fleischer stated that she did not believe that implementing these changes would make a difference. Dr. Schor-Haim explained at the grievance meeting that in conversations and emails with Dr. Fleischer it became clear that Dr. Fleischer had a particular viewpoint about why there appeared to be weaknesses in her teaching effectiveness. Dr. Fleischer

2

attributed the negative feedback from her students to a 15-year old review on a non-Barnard website that hosts anonymous faculty reviews. Dr. Fleischer described the Columbia student who wrote the review as "mentally unstable," and Dr. Fleischer shared her belief that this single student's comments from 15 years ago had poisoned all student feedback in future years. Dr. Fleischer did not provide any evidence that this was the case nor did she explain why a comment on an online faculty review website for a different course at another institution would affect internal student evaluations at Barnard College. Dr. Schor-Haim further explained that despite this meeting in the Fall 2016 semester and previous and follow-up email communications on this topic with Dr. Fleischer, she found no improvement by Dr. Fleischer in the areas of clarity of expectations and feedback on written work in Dr. Fleischer's courses during the 2016-2017 academic year and student evaluations for these sections continued to highlight the same weaknesses.

In implementing the goals of the academic curriculum review completed at the College in 2015 and the resulting newly shaped First Year Writing program, Dr. Schor-Haim considered the changed needs of the program and the skills instructors would need to teach writing successfully at Barnard when she was making appointment decisions. First Year Writing is a foundational course where students learn to write at a college level. Writing several drafts of each assignment is a core part of the course. In order to learn to write better the students must clearly understand the expectations set for them and they must receive feedback which helps them improve the quality of their written work. Dr. Schor-Haim explained that she could not overlook Dr. Fleischer's long-term pattern of failures in these areas that are so critical to effectively teaching First Year Writing.

I do not find any evidence to support the Union's contention that Article 4 of the CBA, Nondiscrimination was violated. Dr. Schor-Haim made an academic staffing decision within her discretion as a program director of First Year Writing without regard to union activity or any other basis covered by the Nondiscrimination article.

**Article 9, Academic Freedom and Responsibility**

Article 9, Section 1 provides in part that "...Unit Members enjoy the academic freedom to express themselves without unreasonable restriction and to be judged as a teacher on the basis of legitimate intellectual and professional criteria." The Union presented no evidence of a violation of Article 9 by the College. At the hearing, the Union did not directly address this section, but made comments about using professional standards to assess instructors, which is similar to the language of Article 9.

At the grievance meeting the Union expressed its concerns about the use of student evaluations and indicated that chairs and program directors must at a minimum include in their assessment of a Unit Member's teaching effectiveness that which may be observed directly in the classroom.

Dr. Schor-Haim addressed the Union's stated concerns about the use of student feedback and presented credible information about how she used student evaluations to identify long-term patterns of problematic behavior which she would then address with the faculty member. Dr. Schor-Haim also described observing instructors in the program for the purpose of assessing their teaching. Dr. Schor-Haim explained that the issues of concern regarding Dr. Fleischer's teaching effectiveness, specifically Dr. Fleischer's lack of clarity in expectations and failure to provide useful feedback on written work, were not observable in the classroom, which is why Dr. Schor-Haim did not observe her classes but instead reviewed students' written work (even though Dr. Fleischer failed to provide a random sample as requested) and student evaluations.

I do not find that the Union provided any evidence to support a finding that Article 9, Academic Freedom and Responsibility was violated. Article 9 requires that Unit Members "be judged as a teacher on the basis of legitimate intellectual and professional criteria." That language provides chairs and program directors with latitude in which to use their pedagogical expertise to judge teaching effectiveness. Nothing in the CBA requires a chair or program director to judge a teacher predominantly on the basis of the work observable in the classroom. In fact, the CBA does not even require the use of classroom observations. It merely allows the College to conduct classroom observations upon notice to the Unit Member. Dr. Schor-Haim's explanation that she reviewed several years of student evaluations, which showed a long term pattern of teaching weaknesses, communicated with Dr. Fleischer through conversations and correspondence regarding her concerns, presented to Dr. Fleischer strategies to improve her teaching effectiveness, and that Dr. Fleischer's weaknesses were in areas that became even more important to effective teaching with the change in the program (based on the results of the academic curriculum review) from First Year English to First Year Writing, clearly establish that Dr. Schor-Haim used legitimate intellectual and professional criteria to judge Dr. Fleischer. Nothing about this criteria was in any way inconsistent with Dr. Fleischer's rights under Article 9 to "express [herself] without unreasonable restriction and to be judged as a teacher on the basis of legitimate intellectual and professional criteria."

**Article 11, Appointments and Assignments**

Among other things, Article 11 of the CBA sets forth the College's options when determining teaching appointments for Unit Members. Based on Dr. Fleischer's longevity at the College, she was eligible to receive either a) a multiyear appointment or b) an offer of separation pay and no further assignments. Article 11, Section 1 provides that "all appointments and/or assignments of Unit Members shall only be made by the Provost or their designee." Here, Dr. Schor-Haim, acting as my designee and in her role as Director of First-Year Writing, decided not to appoint Dr. Fleischer to teach in the Fall 2017 semester and instead offered her separation pay in accordance with the terms of Article 11, Section 5.

The Union did not present any evidence to support the allegation that Article 11 was violated. During the hearing, the Union referred to good faith consideration but did not provide any factual information for alleging a violation of the College's obligation to provide good faith consideration. Good faith consideration as described in Article 11, Section 6 relates to the course assignment for a Unit Member who has been appointed to teach. It is therefore not applicable in this situation because Dr. Fleischer received no appointment to teach in the Fall 2017 semester. Accordingly, the issue of whether the College properly applied good faith consideration in deciding not to appoint Dr. Fleischer to teach in the Fall 2017 semester is not subject to grievance or arbitration in this matter.

As a result of the academic curriculum review, the First Year Experience Implementation Committee recommended that First Year Writing hire five full-time Lecturers to enhance program continuity and pedagogical stability. Dr. Schor-Haim was approved to hire three of these five full-time lecturers in time for the start of the academic year 2017-18. As a result, fewer courses were available for adjunct instructors to teach. For the remaining openings, Dr. Schor-Haim followed Article 11 of the CBA and either offered appointments (multiyear where applicable) or no appointment (and separation pay if applicable).

I do not find any evidence to support a finding that Article 11, Appointments and Assignments was violated. Dr. Schor-Haim did not offer Dr. Fleischer an appointment, nor was she obligated to. Dr. Schor-Haim instead offered Dr. Fleischer the separation pay dictated by the terms of Article 11, Section 5(e)(2).

4

**Conclusion**

Article 7 of the CBA, Management Rights, provides "[d]ecisions regarding who is taught, what is taught, how it is taught, and *who does the teaching* involve academic judgment and shall be made at the sole discretion of the College." (emphasis added). The College defers to the decisions made by departmental Chairs and Directors in academic decisions on who to appoint to teach in any given academic term.

The Union has presented no evidence of a violation of Article 4 of the CBA, while Dr. Schor-Haim provided credible information about the legitimate bases for her academic staffing decision.

The Union has presented no evidence of a violation of Article 9 of the CBA, whereas Dr. Schor-Haim described her legitimate and professional methods of evaluating Dr. Fleischer's teaching effectiveness, her inability to overlook weaknesses in proficiencies that were core to the First Year Writing program, and Dr. Fleischer's failure to improve.

The Union has presented no evidence of a violation of Article 11 of the CBA. Dr. Schor-Haim offered teaching assignments in accordance with the CBA, including offering separation pay of two years to Dr. Fleischer in accordance with the terms of the CBA. Dr. Schor-Haim had fewer sections available for adjunct instructors than ever before because she hired three full-time Lecturers into the program, and she used professional criteria to assess how she would assign the remaining sections. She did not hire any new adjunct instructors into the program for 2017-18, but rather selected the most effective teachers to teach this foundational first-year course that is often the first impression of Barnard for our new students.

All of the evidence presented demonstrates that Dr. Schor-Haim provided legitimate academic bases within her right as program director for making this academic staffing decision in her program. The Union cannot substitute their judgment for the academic decision-making of a chair or program director. Thus, the grievance is denied.

Sincerely,

Linda A. Bell
Provost and Dean of the Faculty

Copy to: Georgette Fleischer, Sonam Singh, Wendy Schor-Haim, Jomysha Stephen, Andrea Stagg

5